**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

TOM SHALOM, *et al.*,

                     Plaintiffs,

       v.

BASHAR MASRI,
PALESTINE REAL ESTATE INVESTMENT
COMPANY,
PALESTINE DEVELOPMENT &
INVESTMENT COMPANY,
PALESTINE INDUSTRIAL ESTATE
DEVELOPMENT COMPANY, AND
MASSAR INTERNATIONAL, LTD.,

                     Defendants.

Case No.   25 Civ. 23837 (DPG)

**DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**
**AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ......................................................................................... 1

FACTUAL ALLEGATIONS ............................................................................................ 4

I.  The Defendants .................................................................................................... 4

    A.  Bashar Masri Is a Palestinian Residing in Palestine ............................... 4

    B.  The Corporate Defendants Are Foreign Entities with No Allegations of U.S. Presence ......................................................................................... 5

II.  The Allegations .................................................................................................... 6

    A.  Economic Development in Gaza Was Internationally Supported and Transparent ............................................................................................. 6

    B.  The GIE Was a Civilian Industrial Project Created in 1997 Under Palestinian Authority Approvals and International Supervision ........................... 7

    C.  No Allegations Assert that Any Defendant Intended for Commercial Properties to Be Used by Hamas in the October 7 Attacks ................................. 8

    D.  Hamas's Alleged Tunnel Network Long Predated and Existed Independently of Any Project ................................................................. 10

III.  The Plaintiffs...................................................................................................... 11

ARGUMENT.................................................................................................................... 12

I.  THE COURT LACKS PERSONAL JURISDICTION OVER EACH DEFENDANT BECAUSE DEFENDANTS HAVE NO MINIMUM CONTACTS OR CLAIM-SPECIFIC NEXUS WITH THE UNITED STATES ....................................................... 12

    A.  Plaintiffs Fail to Allege Any Nexus Between the Claims and U.S. Contacts....... 14

    B.  Plaintiffs Fail to Allege that Each Defendant Purposefully Availed Themselves of the United States.................................................................. 17

    C.  Exercising Personal Jurisdiction over Foreign Defendants Would Violate Traditional Notions of Fair Play and Substantial Justice..................................... 20

    D.  Personal Jurisdiction Is Lacking Under Both the Minimum-Contacts Test and a "Flexible" Inquiry.................................................................. 21

II.  PLAINTIFFS FAIL TO PLEAD A JASTA AIDING AND ABETTING CLAIM BECAUSE "DEFENDANTS MUST HAVE KNOWN" IS NOT SUBSTANTIAL ASSISTANCE OR GENERAL AWARENESS........................................................... 24

    A.  As Required Under *Twitter*, Plaintiffs Fail to Allege "Conscious, Voluntary, and Culpable Participation" in Hamas's October 7 Attacks or Any Other Subsequent Attacks Sufficient to Amount to Knowing and Substantial Assistance........................................................................... 25

i

B.      Plaintiffs Fail to Plead Facts Satisfying the *Halberstam* Factors or Showing that Each Defendant Was Culpably Associated with Hamas's October 7 Attacks ........................................................................................ 31

         1.      No Allegations that Defendants Encouraged or Knew About the October 7 Attacks ............................................................................ 32

         2.      No Allegations Other than Routine, Lawful Activity .............................. 32

         3.      No Allegations that Defendants Were Present at the Time of the Attacks ..................................................................................... 32

         4.      No Allegations of Any Relationship With Hamas ................................... 33

         5.      No Allegations of a Culpable State of Mind ........................................... 33

         6.      No Allegations of a Period of Knowing Assistance ................................ 35

C.      Plaintiffs' Conclusory Allegations of General Awareness Are Insufficient to Withstand a Motion to Dismiss .......................................................... 35

III.    PLAINTIFFS FAIL TO PLEAD A CLAIM UNDER JASTA FOR CONSPIRACY LIABILITY BECAUSE CONCLUSORY ALLEGATIONS OF AN "AGREEMENT" TO AID HAMAS DO NOT SATISFY CONSPIRACY STANDARDS ........................ 36

    A.      Plaintiffs Fail to Allege an Agreement Between Defendants and Hamas ............ 37

    B.      Plaintiffs Fail to Allege an Agreement to Engage in an Unlawful Act ................ 38

    C.      Plaintiffs Allege No Overt Act in Furtherance of Any Conspiracy ...................... 39

    D.      Plaintiffs Fail to Allege Any Injury Caused by an Overt Act in Furtherance of a Conspiracy ........................................................................... 39

IV.    PLAINTIFFS FAIL TO STATE A DIRECT ATA CLAIM BECAUSE DEFENDANTS DID NOT COMMIT AN ACT OF "INTERNATIONAL TERRORISM," DID NOT PROXIMATELY CAUSE PLAINTIFFS' INJURIES, AND DID NOT ACT WITH THE REQUISITE SCIENTER ........................................................................ 40

    A.      Plaintiffs Do Not Plausibly Allege that Defendants Committed an Act of "International Terrorism" ....................................................................... 40

    B.      Plaintiffs Fail to Plead Proximate Causation ....................................................... 44

    C.      Plaintiffs Do Not Plausibly Allege the Requisite Scienter ................................... 46

V.     THE COMPLAINT SHOULD BE DISMISSED FOR INFLAMMATORY ALLEGATIONS THAT VIOLATE RULE 8's "SHORT AND PLAIN STATEMENT" REQUIREMENT AND IMPROPERLY LUMP ALL DEFENDANTS TOGETHER.... 47

VI.    MANY INDIVIDUAL PLAINTIFFS FAIL TO STATE A CLAIM FOR LACK OF STATUTORY STANDING ........................................................................ 49

VII.   DISMISSAL PURSUANT TO RULE 12(b)(5) FOR IMPROPER SERVICE IS WARRANTED ........................................................................................ 50

    A.      Proper Service Must Comply with the Protections of Rule 4 .............................. 51

ii

B.      Palestine Is Not a Signatory to the Hague Service Convention and
Plaintiffs Should Not Circumvent Palestinian Courts ......................................... 52

C.      Plaintiffs' Proposed Service Methods Fail to Satisfy Due Process Under
Rule 4(f)(2) and Rule 4(f)(3) ................................................................................. 54

1.      Plaintiffs' Proposed Methods of Service Fail to Provide Adequate
Notice .......................................................................................................... 55

2.      Plaintiffs' Proposed Methods of Service Are Not Consistent with
Palestinian Law ........................................................................................... 57

CONCLUSION ................................................................................................................................ 58

**TABLE OF AUTHORITIES**

Page(s)

Cases

*AGS Int'l Servs. S.A. v. Newmont USA Ltd.*,
346 F. Supp. 2d 64 (D.D.C. 2004) ........................................................................................18

*Albra v. Advan, Inc.*,
490 F.3d 826 (11th Cir. 2007) .............................................................................................57

*Asahi Metal Indus. Co., Ltd. v. Super. Ct.*,
480 U.S. 102 (1987).............................................................................................................20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................................................................................................... *passim*

*Ashley v. Deutsche Bank Aktiengesellschaft*,
144 F.4th 420 (2d Cir. 2025) ..............................................................................................31

*Associated Transp. Line, Inc. v. Productos Fitosanitarios Proficol El Carmen, S.A.*,
197 F.3d 1070 (11th Cir. 1999) ..........................................................................................19

*Averbach v. Cairo Amman Bank*,
No. 1:19-cv-00004-GHW, 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020)..............................50

*Averbach v. Cairo Amman Bank*,
No. 19-cv-0004-GHW-KHP, 2022 WL 2530797 (S.D.N.Y. Apr. 11, 2022).........................43

*Barcroft v. Gibbs*,
195 F. Supp. 3d 132 (D.D.C. 2016) .....................................................................................17

*Bartlett v. Société Générale de Banque Au Liban SAL*,
No. 19-CV-00007 (CBA) (VMS), 2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) ................41

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................3, 26, 29, 42

*Bernhardt v. Islamic Republic of Iran*,
47 F.4th 856 (D.C. Cir. 2022)........................................................................................27, 37

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal., San Francisco Cnty.*,
582 U.S. 255 (2017).............................................................................................................12

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)................................................................................................20, 22, 23

*Cabrera v. Black & Veatch Special Project Corp.*,
No. CV 19-3833 (LLA), 2024 WL 1435146 (D.D.C. Mar. 28, 2024) ....................................18

*Conley v. Gibson*,
355 U.S. 41 (1957)................................................................................................................47

*Daimler AG v. Bauman*,
571 U.S. 117 (2014)..............................................................................................................12

*In re Diisocyanates Antitrust Litig.*,
No. 18-1001, 2026 WL 522845 (W.D. Pa. Feb. 25, 2026)................................................14, 23

*Discon Inc. v. NYNEX Corp.*,
No. 90–CV–546A, 1992 WL 193683 (W.D.N.Y. June 23, 1992)...........................................47

*Flancbaum v. Tyson Grp., Inc.*,
No. 21-cv-81270-MIDDLEBROOKS, 2021 WL 9563812 (S.D. Fla. Dec. 9, 2021)..............18

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
592 U.S. 351 (2021)..................................................................................................14, 15, 16

*Freeman v. HSBC Holdings PLC*,
413 F. Supp. 3d 67 (E.D.N.Y. 2019) ..................................................................................41, 45

*Freeman v. HSBC Holdings PLC*,
465 F. Supp. 3d 220 (E.D.N.Y. 2020) ....................................................................................35

*Freeman v. HSBC Holdings PLC*,
57 F.4th 66 (2d Cir. 2023) ......................................................................................................38

*Fuld v. Palestine Liberation Organization*
606 U.S. 1, 16 (2025)..................................................................................14, 21, 22, 23

*Guillaume v. United States*,
No. 24-13584, 2025 WL 2610053 (11th Cir. Sep. 10, 2025) ...........................................48, 49

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983)........................................................................................ *passim*

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408 (1984)................................................................................................................14

*Herederos de Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*,
535 F. Supp. 3d 1299 (S.D. Fla. 2021) ..............................................................................16, 23

*Hernandez v. Patricio*,
No. 5:23-cv-23, 2023 WL 8553663 (S.D. Ga. Dec. 11, 2023) ...............................................55

v

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010)..................................................................................................46, 47

*Honickman v. BLOM Bank SAL*,
6 F.4th 487 (2d Cir. 2021) ...............................................................................32, 33, 36

*Infanti v. Scharpf*,
No. 06 CV 6552(ILG), 2008 WL 2397607 (E.D.N.Y. June 10, 2008) ...................................47

*Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*,
326 U.S. 310 (1945)..................................................................................................13, 20

*Keeton v. Hustler Mag., Inc.*,
465 U.S. 770 (1984)..................................................................................................15

*Keren Kayemeth LeIsrael – Jewish Nat'l Fund v. Educ. for a Just Peace in the Middle E.*,
66 F.4th 1007 (D.C. Cir. 2023)...................................................................................30, 44

*King v. Habib Bank Ltd.*,
No. 20 Civ. 4322 (LGS), 2022 WL 4537849 (S.D.N.Y. Sept. 28, 2022)...............................41

*Lelchook v. Islamic Republic of Iran*,
No. 16-cv-7078 (ILG), 2020 WL 12656283 (E.D.N.Y. Nov. 23, 2020)................................50

*Linde v. Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018)..........................................................................................25, 31

*Louis Vuitton Malletier, S.A. v. Mosseri*,
736 F.3d 1339 (11th Cir. 2013) ....................................................................................14

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
339 U.S. 306 (1950)..................................................................................................56

*Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*,
526 U.S. 344 (1999)..................................................................................................51

*Newman v. Associated Press*,
758 F. Supp. 3d 1357 (S.D. Fla. 2024) ........................................................................ *passim*

*Newman v. BAM Trading Servs., Inc.*,
24-cv-134-ECM-CWB, slip. op. (M.D. Ala. Mar. 11, 2026) .................................................49

*Ofisi v. BNP Paribas, S.A.*,
77 F.4th 667 (D.C. Cir. 2023)........................................................................................44

*Oldfield v. Pueblo De Bahia Lora, S.A.*,
558 F.3d 1210 (11th Cir. 2009) ...................................................................................... *passim*

*Omni Cap. Int'l v. Rudolf Wolff & Co.*,
 484 U.S. 97 (1987)..................................................................................................................55

*Oueiss v. Saud*,
 No. 1:20-cv-25022-KMM, 2022 WL 1311114 (S.D. Fla. Mar. 29, 2022)..............................19

*Prewitt Enters. v. Org. of Petroleum Exporting Countries*,
 353 F.3d 916 (11th Cir. 2003) .........................................................................................55, 58

*Raanan v. Binance Holdings Ltd.*,
 No. 24-cv-697 (JGK), 2025 WL 605594 (S.D.N.Y. Feb. 25, 2025) ...........................41, 45, 50

*Rosenberg v. Lashkar-e-Taiba*,
 No. 10 CV 5381 (DLI)(CLP), 2016 WL 11756917 (E.D.N.Y. July 5, 2016) .........................50

*Rush v. Savchuk*,
 444 U.S. 320 (1980)..................................................................................................................19

*Schrier v. Qatar Islamic Bank*,
 632 F. Supp. 3d 1335 (S.D. Fla. 2022) ..............................................................................13, 14

*Sea Lift, Inc. v. Refinadora Cosarricense de Petroleo, S.A.*,
 792 F.2d 989 (11th Cir. 1986) ..................................................................................................18

*Shalom v. Masri*,
 No. 25-cv-1024 (D.D.C. Apr. 7, 2025), Dkt. No. 1 .................................................................23

*Siam Kraft Paper Co. v. Parsons & Whittemore, Inc.*,
 400 F. Supp. 810 (D.D.C. 1975)...............................................................................................18

*Siegel v. HSBC N. Am. Holdings, Inc.*,
 933 F.3d 217 (2d Cir. 2019)......................................................................................................32

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
 605 U.S. 280 (2025)..................................................................................................................27

*Strauss v. Crédit Lyonnais, S.A.*,
 175 F. Supp. 3d 3 (E.D.N.Y. 2016) ..........................................................................................15

*Swierkiewicz v. Sorema N.A.*,
 534 U.S. 506 (2002)..................................................................................................................47

*Troell v. Binance Holdings Ltd.*,
 No. 24-CV-7136 (JAV), 2026 WL 636849 (S.D.N.Y. Mar. 6, 2026).........................28, 29, 39

*Twitter, Inc. v. Taamneh*,
 598 U.S. 471 (2023).................................................................................................... *passim*

*Vibe Micro, Inc. v. Shabanets*,
    878 F.3d 1291 (11th Cir. 2018) ........................................................................49

*Vyas v. Holman Auto. Grp., Inc.*,
    No. 24-cv-62086-WPD, 2025 U.S. Dist. LEXIS 26228 (S.D. Fla. Feb. 13, 2025)................48

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
    792 F.3d 1313 (11th Cir. 2015) ........................................................................48

*Weinstock v. Abu Marzook*,
    No. 17-23202-Civ-Scola, 2019 WL 1470245 (S.D. Fla. Apr. 3, 2019)............................13, 50

*Weiss v. Nat'l Westminster Bank, PLC*,
    993 F.3d 144 (2d Cir. 2021).............................................................................42

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980).....................................................................................20

*Zapata v. HSBC Holdings PLC*,
    414 F. Supp. 3d 342 (E.D.N.Y. 2019) ..............................................................30, 42

*Zobay v. MTN Group Ltd.*
    695 F. Supp. 3d 301, 355 (E.D.N.Y. 2023) .......................................................38, 40

## Constitution

United States Constitution
    Fifth Amendment........................................................................................14, 21, 23
    Fourteenth Amendment ................................................................................14, 21, 23

## Statutes and Codes

United States Code
    Title 18, Section 2331 .........................................................................................40
    Title 18, Section 2333 ............................................................................... *passim*
    Title 18, Section 2334 ...................................................................................12, 22
    Title 18, Section 2339A ......................................................................................46
    Title 18, Section 2339B ..................................................................................46, 47

D.C. Code
    Section 13-422 ................................................................................................23

Florida Statute
    Section 48.193.................................................................................................23

Palestinian Civil and Commercial Procedure Law No. (2) of 2001 .............................................57

Rules and Regulations

Federal Rules of Civil Procedure
  Rule 4 .......................................................................................................... *passim*
  Rule 8 .......................................................................................................... *passim*
  Rule 12 ........................................................................................................ *passim*

Other Authorities

Convention for the Protection of Cultural Property in the Event of Armed Conflict, May
  14, 1954, 249 U.N.T.S. 240 ..................................................................................53

Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or
  Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163................................52

Hague Convention, Status Table of Contracting Parties,
  https://www.hcch.net/en/instruments/conventions/status-table/?cid=17 (last visited
  May 6, 2026)..........................................................................................................52

Hague Convention, Status Table of Extensions,
  https://www.hcch.net/en/instruments/conventions/status-
  table/extensions/?cid=17&mid=427 (last visited May 6, 2026)............................................53

Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip, Isr.-P.L.O.,
  Sept. 28, 1995, 36 I.L.M. 551 ...............................................................................53, 54

*Preparation of Letters Rogatory*, Travel.State.Gov, U.S. Dep't of State,
  https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-
  judicial-asst/obtaining-evidence/Preparation-Letters-Rogatory.html (last visited May
  6, 2026) ...............................................................................................................51

*USAID Launches Project for Palestinian Legal System*, UNITED NATIONS: THE QUESTION
  OF PALESTINE (Feb. 12, 2004), https://www.un.org/unispal/document/auto-insert-
  208533/ (last visited May 6, 2026) .........................................................................54

Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331 ........................54

Pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(5), 12(b)(6), and 8(a), Defendants Bashar Masri ("Mr. Masri"), Palestine Real Estate Investment Company ("PRICO"), Palestine Development & Investment Company ("PADICO"), Palestine Industrial Estate Development Company ("PIEDCO"), and Massar International, LTD. ("Massar," together with PRICO, PADICO, and PIEDCO, the "Corporate Defendants"), respectfully submit the following memorandum of law in support of their motion to dismiss the Complaint.

## PRELIMINARY STATEMENT

The October 7, 2023 attacks on Israel were barbaric acts of terrorism, and Defendants unequivocally condemn Hamas's violence and the suffering it inflicted upon innocent civilians. Responsible parties who engaged in those attacks should be held accountable. But Plaintiffs wrongfully seek to impose unprecedented civil terrorism liability on an individual, Bashar Masri— whom Plaintiffs themselves describe as an internationally recognized humanitarian and businessman living in the West Bank—and four foreign companies, including two publicly traded companies, with no ties to the United States, under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), and, as amended, the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d)(2). These claims fail as a matter of law under the governing standard articulated in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), which requires plausible allegations that Defendants consciously, voluntarily, and culpably participated in the specific terrorist attack at issue—something the Complaint does not and cannot allege.

Once its legal deficiencies are exposed, the Complaint reduces to a theory that participation in Gaza's economy amounts to participation in terrorism. For more than 25 years, Mr. Masri and the Corporate Defendants invested in projects to promote modernization, growth, and broader stability in a troubled region, which have been lauded and supported by Israel, the United States,

1

the European Union, and major reputable international institutions. Mr. Masri has devoted a lifetime to improving living conditions in Palestine and fostering economic opportunity for a people in dire need. Yet, the Complaint seeks to negate that longstanding record of lawful commercial activity and international cooperation and instead impose terrorism liability for the independent criminal acts of Hamas and other operatives. It improperly seeks to transform ordinary business activity in Gaza into "knowing and substantial assistance" to terrorism.

In the more than 1,400 paragraphs of the Complaint, Plaintiffs do not allege that Defendants participated in the planning of the October 7 attacks, directed Hamas's operations, or exercised control over Hamas. The Complaint fails at every required element. It does not allege any non-conclusory facts that Defendants in any way intended for the attacks to occur. Nor does it allege how any Defendant consciously and culpably participated in their execution. Distilled to their essence, Plaintiffs' allegations amount to speculation that Mr. Masri and the Corporate Defendants—without identifying who did what, when, or how—engaged in international terrorism merely by participating in economic development projects in the region. Specifically, Plaintiffs point to the development and management of two hotels by the sea and an industrial complex near the Israel border, and then assert without factual support that these lawful projects concealed tunnels or generated solar energy that Hamas later siphoned for use in connection with the attacks. The Complaint offers conjecture in place of well-pleaded facts; for example, Section VIII of the Complaint, titled "Hamas Planned, Authorized and Committed the October 7 Attack With Defendants' Assistance," does not identify a single act by any Defendant or even *mention* any Defendant—an omission that is fatal under any plausible pleading standard. That is precisely the type of expansive and attenuated liability theory the Supreme Court rejected in *Twitter*.

*Twitter* clarified that aiding and abetting liability under JASTA demands more than

2

generalized allegations of association or parallel conduct.  Courts must determine: did Defendants consciously, voluntarily, and culpably participate in the particular act of international terrorism?  *Id.* at 504.  Here, the answer is unequivocally no.  The Complaint does not plausibly allege that any Defendant knowingly and substantially assisted Hamas in the October 7 attacks.  Instead, Plaintiffs seek to convert ordinary commerce in a conflict zone into acts of terrorism and attempt to do so by making a series of conclusory allegations that do not meet the well-established standards of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007).

Nor do Plaintiffs plead conspiracy liability.  The Complaint is devoid of any plausible allegations of an *agreement* between each Defendant and Hamas; it alleges no facts whatsoever of *who* agreed to *what, when, where,* and *for what purpose*—and only engages in speculation.  Without a well-pleaded meeting of the minds to commit an act of international terrorism, JASTA conspiracy liability cannot stand.

Equally defective are Plaintiffs' allegations of primary liability under the ATA; primary liability requires that each Defendant engaged in an act that is violent or dangerous to human life to meet the definition of "international terrorism."  Instead, Plaintiffs describe routine business activity such as "constructing new buildings," "development of [a] hotel," and "install[ing] solar panels."  ECF No. 1 ("Compl") ¶¶ 322, 353, 388.  Plaintiffs distort legitimate commercial activity as "tunnel infrastructure" or part of a "deception campaign" and allege no facts to even suggest that any Defendant built, financed, or maintained any hotel or industrial zone to assist Hamas in its campaign of terror.  Routine commercial activity is not international terrorism as a matter of law.  Further, even if Plaintiffs had plausibly alleged acts of international terrorism (and they have not), the Complaint cannot allege that such conduct proximately caused the injury to Plaintiffs; nothing in the Complaint plausibly connects each Defendant's commercial activities to the events

3

of October 7, 2023, nor the specific acts by the individuals who caused injury to Plaintiffs after that date.

Because the Complaint fails to establish personal jurisdiction, fails to plead the elements of primary or secondary liability under the ATA and JASTA, fails to allege proximate causation, rests on conclusory and collective assertions rather than well-pleaded facts, and violates the rules of service and the requirements of a short and plain statement of the claim, dismissal with prejudice is required.

## FACTUAL ALLEGATIONS

### I.    The Defendants

#### A.    Bashar Masri Is a Palestinian Residing in Palestine

Defendant Bashar Masri is a Palestinian entrepreneur who has spent decades engaged in commercial real estate, as well as financial, industrial, technological, and consulting ventures aimed at promoting economic development in Palestine.  Compl. ¶¶ 6-7, 9, 14, 61.

The Complaint attempts to connect Mr. Masri to the United States through attenuated conduct that occurred decades before the events of October 7, and which lack relevance to the allegations in this case.  For example, Plaintiffs allege that Mr. Masri resided in the United States from the mid-1990s through early 2000s, decades before October 7, 2023, *id*. ¶¶ 61; previously owned a residence in Falls Church, Virginia, which was sold "[i]n the late 2010s," *id*. ¶ 62; and was associated with the Rawabi Foundation, which listed a Virginia address ten years ago in 2016, *id*. ¶ 67.  Plaintiffs also assert that Mr. Masri made occasional political contributions "[s]ince 1988" and one in 2022 (*id*. ¶ 64); supported educational initiatives at Harvard University, including funding scholarships for Palestinian students and serving on its Dean's Council from 2014 until 2025 (*id*. ¶¶ 13, 65-66); and served on the advisory council of the U.S. International Development Finance Corporation ("DFC") between 2020 and 2023 (*id*. ¶ 13)—generalized assertions unrelated

4

to any acts alleged in the Complaint.

**B.     The Corporate Defendants Are Foreign Entities with No Allegations of U.S. Presence**

Plaintiffs likewise seek to hale four foreign entities—the Corporate Defendants—into this Court by lumping them together along with an individual and ignoring that each entity is a distinct foreign corporation with no allegations of operations, property, or employees in the United States.

PADICO is a publicly traded company incorporated in the Republic of Liberia with its principal place of business in Rawabi, Palestine.  Compl. ¶ 42; *see* ECF No. 46 (Rule 7.1 Statement).  The Complaint does not allege that PADICO maintains any offices, property, or business operations in the United States.

PRICO is a publicly traded company incorporated in Palestine with its principal place of business in Palestine.  Compl. ¶ 43.  As with PADICO, nothing in the Complaint alleges that PRICO has any presence, operations, or contacts in the United States.

PIEDCO is a holding company that develops properties in Gaza.  *Id.* ¶ 9.  Plaintiffs do not allege where it is incorporated and simply assert in a conclusory fashion that PIEDCO "manages the GIE on behalf of PRICO, PADICO, and Masri."  *Id.* ¶ 46.  Notably, Plaintiffs reference PIEDCO individually only eleven times in the Complaint, primarily to describe corporate affiliations, without alleging any independent conduct, U.S. presence, or role in the events underlying their claims.  *See id.* ¶¶ 9, 31, 44-46, 72, 252-53, 329, 402.

Finally, Massar is a holding company incorporated in Cyprus with its principal place of business in Rawabi, Palestine.  *Id.* ¶¶ 47-48.  Plaintiffs allege only that Mr. Masri used Massar to "secure funding" from unidentified sources in the United States to support projects in Gaza, *id.* ¶ 10; *see also id.* ¶ 36, but provide no factual details—no amount, date, transaction, or recipient.  Beyond those conclusory allegations, the Complaint offers nothing about Massar's alleged

involvement and expressly acknowledges its role as a foreign holding company. *See id.* ¶¶ 10, 31, 36, 47-50, 71, 77, 303-04, 430. As with the other Corporate Defendants, the Complaint fails to assert that Massar has any presence, operations, or contacts in the United States.

## II.     The Allegations

Plaintiffs focus on three properties in Gaza—the Gaza Industrial Estate ("GIE"), the Blue Beach Hotel and the Ayan Hotel (f/k/a Al Mashtal Hotel) (together, the "Hotels")—and characterize them as "crucial elements in Hamas's attack plan." *Id.* ¶ 5; *see also id.* ¶ 34. The Complaint, however, lacks any factual allegations that any Defendant conceived, constructed, or maintained the GIE, which was in existence years before Hamas even assumed control of Gaza in 2007, *see id.* ¶¶ 126-28, 252, or the Hotels, which were in existence years before the October 7 attacks, *see id*. ¶¶ 348, 392, with the intent to aid Hamas operatives in the October 7 attacks or otherwise to divert solar energy with a desired outcome to aid in the attacks.

### A.     Economic Development in Gaza Was Internationally Supported and Transparent

Well-known international organizations have been active in Gaza's reconstruction and development for decades. Plaintiffs themselves allege that projects in Gaza received funding and oversight from entities such as USAID, DFC, the World Bank's International Finance Corporation ("IFC"), and the United Nations Development Program ("UNDP"). *Id.* ¶¶ 10, 14-15, 17, 34, 37, 251-52, 268, 285-90. For example, the IFC financed a solar panel project and approved a sub-contractor, and the UNDP and European Union funded water and infrastructure rehabilitation. *Id*. ¶¶ 19, 37, 267, 285-90. Plaintiffs also concede that these efforts were publicly disclosed, lauded by donor institutions, used as the host site for some of the world's leading brands, and coordinated through international aid programs—which is incompatible with Plaintiffs' theory of covert terrorist facilitation. *Id*. ¶¶ 18, 256-58, 267, 270, 285-90. The challenged projects—hotels,

6

industrial parks, and energy infrastructure—were civilian in nature, aimed at private enterprise, tourism, and power generation.  *Id.* ¶¶ 18-20, 256-58.  None of these commercial initiatives had any operational nexus to the United States.

> **B.      The GIE Was a Civilian Industrial Project Created in 1997 Under Palestinian Authority Approvals and International Supervision**

Plaintiffs attempt to recast the GIE as a joint venture between Hamas and all five Defendants collectively, but the GIE has existed for nearly thirty years.  *Id.* ¶ 252.  In 1996, PIEDCO signed a 49-year concession agreement with the Palestinian Authority for 480,000 square meters of industrial park land.  *Id.* ¶ 253-55.  By 1997, USAID, the World Bank, the European Investment Bank, and the European Union had provided financing for development.  *Id.* ¶¶ 17, 252; *see also id.* ¶¶ 256-57.  The GIE opened in 1998, nearly a decade before Hamas became the *de facto* government in Gaza in 2007 and decades before the attacks at issue.  *Id.* ¶¶ 3, 257.  Currently, the GIE is a civilian industrial park situated near the Israeli border that has hosted commercial tenants, such as the Coca-Cola Company, and other pharmaceutical, cosmetic, manufacturing, and food companies.  *Id.* ¶¶ 16, 18-19, 254.

As explained in the Complaint, power for Gaza was primarily supplied by Israel, which provided roughly 120 megawatts of electricity—almost half of Gaza's total—along with fuel for a diesel plant generating another 65–75 megawatts.  *Id.* ¶ 328 n.24.  By comparison, the GIE's solar-energy project, implemented in 2021 with IFC support, operated for only two months, briefly generating only 7.3 megawatts before being damaged during Israeli airstrikes in May 2021.  *Id.* ¶¶ 289 n.21, 299-301, 328, 402, 406.  The project was not rebuilt until late 2022.  *Id.* ¶ 406.  By 2023, it accounted for merely "7.3 megawatts or about 18% of the solar energy generated in the Gaza Strip prior to October 7" compared to the roughly 195 megawatts supplied through Israel's grid and diesel-fueled plant.  *Id.* ¶ 328, n.24.  No allegations support the inference that any Defendant

7

consciously, voluntarily, and culpably engaged in this small, intermittently operational solar project with the intent to aid Hamas's terrorist attacks (when Israel already supplied power to the region).

As to the GIE, Plaintiffs allege, in conclusory fashion, that "Masri and the companies he controls worked with Hamas to construct and conceal an elaborate subterranean attack tunnel network which Hamas used to burrow under the border into Israel." *Id.* ¶ 18. But this allegation is contradicted later on in the Complaint, as Plaintiffs also claim that "Hamas revised its strategy, shifting from a tunnel-based invasion plan to one involving an above-ground assault calling for the breach of the border fence." *Id.* ¶ 230; *see also id.* ¶ 463 (describing 119 breaches in border fence during attack). Put another way, what Plaintiffs allege as "crucial" in Hamas' attack plans is also alleged to not be part of the attack plan.

### C.  No Allegations Assert that Any Defendant Intended for Commercial Properties to Be Used by Hamas in the October 7 Attacks

Plaintiffs similarly fault each Defendant for their commercial development and operation of two coastal hotels, namely the Blue Beach Hotel and the Al Mashtal Hotel (rebranded in 2023 as the Ayan Hotel), that provided ordinary hospitality services. *See, e.g.*, Compl. ¶¶ 356, 387. According to Plaintiffs, the Hotels' mere provision of lodging to guests allegedly affiliated with Hamas—the *de facto* Government—renders the owners complicit in terrorism. *See, e.g., id.* ¶ 387. Notably, the Complaint's own allegations regarding the Al Mashtal Hotel describe Hamas use that occurred years—and in some instances a decade—before the October 7 attacks. *See, e.g., id.* ¶ 349 n.29 (referencing alleged Hamas use in 2011); ¶ 350 (2011); ¶ 352 (2013); ¶¶ 22, 372 (2014). The operation of the Hotels through 2023 without any allegation of changed conduct reflects routine commercial activity, not a progression toward support for an imminent terrorist attack.

Plaintiffs also claim that the Hotels were vital to rocket launches and other military

8

activity—yet no allegation supports the inference that any Defendant intended to use the Hotels to assist Hamas in terrorist activities (particularly where they also allege that the Hotels were located near Hamas training grounds that could have served the same purported functions). *Id.* ¶¶ 5, 23-25, 386. Similarly, Plaintiffs allege, in conclusory fashion, that the GIE was critical to Hamas's operations, but nowhere assert that any Defendant intended to use the GIE to assist Hamas in its terrorist attacks.

While Plaintiffs allege that hundreds of miles of tunnels existed throughout Gaza, *id.* ¶ 160, they allege no facts that any Defendant consciously, voluntarily, and culpably built, controlled, or renovated any tunnel with the intent to assist in the October 7 attacks or to otherwise injure any Plaintiff. Plaintiffs speculate that Hamas instead used the Hotels and "the tunnel network connected to them both as a base of operations and a defensive position from which to later ambush IDF troops." *Id.* ¶ 25. Plaintiffs further allege that "rocket launching sites" were "positioned *near*" the Hotels. *Id.* ¶ 23. But even accepting those allegations as true, the Complaint offers no factual support of any Defendant's role in those activities, nor of any Defendant's intent to render these commercial properties as "crucial elements in Hamas's attack plan," "a base of operations," or otherwise for use in connection with the October 7 attacks. *Id.* ¶¶ 5, 25, 398.

Plaintiffs also improperly speculate that "Hamas's tunnel infrastructure beneath the [Blue Beach Hotel] was *likely* excavated after the hotel was initially constructed—sometime after 2017," *id.* ¶ 392 (emphasis added), and that tunnels extended "on the grounds of the hotel itself (and even directly into individual hotel rooms)," *id.* ¶ 394. They further hypothesize that Hamas's excavation would have involved daily arrivals of operatives, deliveries of concrete and machinery, and removal of debris, but plead no facts showing that any Defendant observed, approved, or participated in any such activity or when such activity occurred. *Id.* ¶ 392. Plaintiffs' allegations

9

rest entirely on conjecture, rather than on any concrete facts indicating communication, agreement, or involvement.

> **D.      Hamas's Alleged Tunnel Network Long Predated and Existed Independently of Any Project**

Setting aside Plaintiffs' legally deficient "lumping" of one individual and four foreign companies into a single unit, the core of Plaintiffs' theory is conclusory: because tunnels existed in Gaza, each Defendant likely knew about them and assisted in their construction for the purpose of supporting terrorism.  For example, Plaintiffs allege that given "the extensive nature of the tunnel system burrowed below" the Blue Beach Hotel and "because the construction of these tunnels poses the potential risk of destabilizing large structures situated above them," "Defendants *plainly knew of and assisted* in the construction of the Qassam Brigades' [defined in the Complaint as "Hamas's terror apparatus"] tunnel complex beneath the hotel" and that the "Qassam Brigades *necessarily coordinated their work with Defendants.*"  *Id.* ¶¶ 394-95 (emphasis added); *see also id.* ¶ 24.[1]  These allegations assume knowledge and participation solely from proximity to tunnels that are ubiquitous in Gaza anyway.  Moreover, even if such knowledge and participation could somehow be credited, these allegations are unsupported by any facts showing when, how, or by whom each Defendant supposedly "coordinated" with Hamas for the express purpose of assisting Hamas in connection with October 7, as opposed to the myriad purposes for which Gaza tunnels are used. The words "necessarily" and "likely" in Plaintiffs' own pleading, *see id.* ¶¶ 392, 395, are telling concessions: they acknowledge that no direct factual predicate for coordination exists and

---

[1]  *See also id.* ¶ 353 ("Defendants undertook the initial development of the hotel in coordination with Hamas, and it is *likely* that even the initial construction project helped to conceal Hamas's excavation and construction of a network of attack tunnels immediately below the hotel and accessible from the hotel's lower levels.") (emphasis added).

instead invite the Court to draw an improper inference from structural proximity alone.[2]

Plaintiffs also allege that the Israel Defense Forces ("IDF") discovered a Hamas tunnel under the GIE in 2018. *Id.* ¶¶ 274. Yet the Complaint offers no nonconclusory facts showing that Defendants had any involvement in constructing, controlling, or even knowing about it. Plaintiffs attempt to bridge that gap by pointing to nearby public protests, claiming Hamas "staged" demonstrations in front of the GIE in 2018 and again two weeks before October 7. *Id.* ¶ 333; *see also id.* ¶ 278. Proximity to public demonstrations along Gaza's border—an area where protests are common—does not plausibly establish the existence of operational tunnels known to or supported by any Defendant for the purpose of assisting Hamas in the attacks of October 7.

## III.    The Plaintiffs

Over one hundred Plaintiffs seek to hold all five Defendants liable for the injuries caused by Hamas operatives and other terrorists simply because Defendants allegedly collectively engaged in the commercial development of the Hotels and the GIE in the region. No allegations satisfy the proximate cause requirements, and Plaintiffs gloss over the admissions that avowed terrorists caused their injuries, with many of those injuries, sustained in the weeks and months after the conflict began, committed by "Hamas and other terrorist groups." *See, e.g.*, *id.* ¶¶ 513, 1091-110 (alleging Shoshana Bracha Shafer suffered bullet wounds on November 30, 2023, following an attack in Israel, and that she and eleven relatives seek recovery for those injuries); *id.* ¶¶ 1069-77 (alleging that Aaron Bours was shot on November 14, 2023, while on active duty); *id.*

---

[2] As Plaintiffs acknowledge, Gaza's underground tunnel network dates back to at least the late 1970s and was long used for smuggling goods and materials. *Id.* ¶¶ 171-72. Indeed, Plaintiffs cite reports that describe a "tunnel economy" that, by 2009, had become a billion dollar a year trade network serving as Gaza's principal import route. *Id.* ¶ 152-53. While Plaintiffs now characterize these same tunnels today as "command and control tunnels" or "attack tunnels" (*id.* ¶¶ 164-65), their own sources confirm the tunnels pre-dated both the GIE and the Hotels by decades.

¶¶ 1136-40 (alleging that Amichay Klughaupt was injured on December 8, 2023, while serving in an IDF tank unit); *id.* ¶¶ 1111-21 (alleging that Elitzur Moses suffered a tendon tear on December 2, 2023, while on active duty after a rocket-propelled grenade ("RPG") was fired at him); *id.* ¶¶ 1186-90 (alleging that Nadav Benjamin Shindman was injured by shrapnel on March 31, 2024, while in an armored IDF vehicle); *id.* ¶¶ 1156-73 (alleging that Maoz Morell was killed in February 2024 while on active duty, and that seven relatives and his estate now sue for liability); *id.* ¶¶ 1056-68 (alleging that Moshe Yedidyah Leiter was killed November 2023 while on active duty, and that nine relatives now sue for liability).  While Plaintiffs deserve compensation for their injuries, they wrongfully seek it from Defendants.  For the reasons explained below, Plaintiffs' Complaint requires dismissal with prejudice.

## ARGUMENT

**I.  THE COURT LACKS PERSONAL JURISDICTION OVER EACH DEFENDANT BECAUSE DEFENDANTS HAVE NO MINIMUM CONTACTS OR CLAIM-SPECIFIC NEXUS WITH THE UNITED STATES**

The Court lacks personal jurisdiction over each of the Defendants, who lack minimum contacts with the United States.  There are two types of personal jurisdiction: general and specific. *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 262 (2017). Defendants are subject to a court's general jurisdiction "when their affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (internal quotation marks and citations omitted). Plaintiffs do not allege that any Defendant is "at home" in Florida or the United States; Plaintiffs only assert that Defendants are subject to specific jurisdiction in the United States under Federal Rule of Civil Procedure 4(k)(2).  Compl. ¶ 29.[3]  Plaintiffs, however, fail to allege that each

_____

[3] The Complaint also alleges that this Court may exercise personal jurisdiction pursuant to 18

Defendant has the requisite contacts with the United States for the exercise of personal jurisdiction under any possible applicable standard.  *See* Fed. R. Civ. P. 4(k)(2).

Plaintiffs' specific jurisdiction theory reduces to this: that years-old generalized interactions with U.S.-based institutions concerning development projects in Gaza create nationwide minimum contacts for claims arising from Hamas's October 7, 2023 attacks in Gaza and other attacks by terrorists subsequent to that date.  Those years-old interactions, which are framed as applying to all Defendants collectively, do not meet the threshold for minimum contacts, and Plaintiffs' injuries do not "arise out of or relate to" these interactions.  Accordingly, the claims must be dismissed under Federal Rule of Civil Procedure 12(b)(2).

"Rule 4(k)(2) operates as a national long-arm statute which permits a court to aggregate a foreign defendant's nationwide contacts for jurisdictional purposes[.]"  *Schrier v. Qatar Islamic Bank*, 632 F. Supp. 3d 1335, 1355 (S.D. Fla. 2022) (alteration in original) (quoting *Weinstock v. Abu Marzook*, No. 17-23202-Civ-Scola, 2019 WL 1470245, at *2 (S.D. Fla. Apr. 3, 2019)).  Under Rule 4(k)(2), jurisdiction is proper only if "(1) the claim at issue arises under federal law, and (2) exercising jurisdiction is consistent with the Constitution and laws of the United States."  *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1218 (11th Cir. 2009).

Although Plaintiffs' claims arise under federal law, exercising jurisdiction over Defendants would not be consistent with due process or the laws of the United States because Defendants lack minimum contacts with the United States.  *See Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945).  Under Rule 4(k)(2), "[t]he exercise of personal jurisdiction comports with due process if the non-resident defendant has

---

U.S.C. § 2334(a), which requires proper service in the United States.  Compl. ¶ 29.  However, Plaintiffs have not served any Defendant in the United States, rendering this provision inapplicable.

13

established 'certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Oldfield*, 558 F.3d at 1220 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).  To determine if a defendant has established minimum contacts, courts consider: "(1) whether the plaintiff's claims arise out of or relate to at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant purposefully availed himself of the privilege of conducting activities with the forum state, thus invoking the benefit of the forum state's law; and (3) whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice." *Schrier*, 632 F. Supp. 3d at 1358 (quoting *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013)).  Here, Plaintiffs fail to allege facts to satisfy these well-established standards for personal jurisdiction, whether under the Due Process Clause of the Fourteenth Amendment or the Fifth Amendment.[4]

### A.        Plaintiffs Fail to Allege Any Nexus Between the Claims and U.S. Contacts

Plaintiffs fail to allege that their claims "arise out of or relate to" any contacts with the United States.  *Schrier*, 632 F. Supp. 3d at 1358 (quoting *Louis Vuitton Malletier*, 736 F.3d at 1355).  Though "some relationships will support jurisdiction without a causal showing . . . the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021).  Specific jurisdiction requires a "strong 'relationship among the defendant, the forum, and the litigation.'"

---

[4]  In *Fuld v. Palestine Liberation Organization*, the Supreme Court held that the Due Process Clause of the Fifth Amendment permits a more "flexible jurisdictional inquiry" than the Fourteenth Amendment.  606 U.S. 1, 16 (2025).  In cases lacking a clear conferral of personal jurisdiction from Congress, the minimum contacts test still applies.  *In re Diisocyanates Antitrust Litig.*, No. 18-1001, 2026 WL 522845, at *6 (W.D. Pa. Feb. 25, 2026) (holding that absent congressional grant of jurisdiction, jurisdiction under Rule 4(k)(2) still requires demonstration of minimum contacts with the United States after *Fuld*).  *See infra* § I(D).

*Id.* at 365 (citation omitted). Nothing in the Complaint demonstrates that the alleged U.S. contacts create the necessary "strong relationship" to Plaintiffs' claims.

Here, the supposed U.S. contacts consist of decades-old funding for generalized development projects in Gaza. For instance, Plaintiffs allege that PIEDCO or PRICO received USAID funding in or around 1997, Compl. ¶ 252—nearly thirty years removed from the events at issue. Funding received almost three decades ago for a generalized economic development project has no plausible nexus to the claims asserted here. Whatever flexibility *Ford* permits, it does not eliminate the requirement that the forum-related conduct bear a meaningful temporal and substantive connection to the alleged injury, which is completely lacking here. *See, e.g.*, *Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 20 (E.D.N.Y. 2016) (explaining nexus between conduct supporting jurisdiction and claims would be "too attenuated" if the defendant bank "executed the New York Transfers at a time far removed from the attacks that caused Plaintiffs' injuries"). Here, the contacts between any Defendant and the United States are "random, isolated, or fortuitous" and thus cannot support personal jurisdiction as to each Defendant. *Ford*, 592 U.S. at 359 (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 (1984)).

Plaintiffs further cite IFC and MIGA funding between 2018 and 2022, Compl. ¶¶ 17, 285, 289, 303-04, but that funding does not bear the required relationship to the October 7 attacks. Plaintiffs fail to allege that either the solar project or green-energy initiative was directed from the United States or that any operational conduct occurred here. Instead, Plaintiffs offer conclusory and implausible assertions that "Defendants," collectively, siphoned electricity from a 7.3-megawatt solar project, during its brief period of operation, to power "attack tunnels" in Gaza. That alleged conduct occurred abroad. The alleged U.S. contacts concern financing for foreign projects, not the operational conduct that allegedly facilitated the attacks. That is not the "strong

15

relationship among the defendant, the forum, and the litigation" required by *Ford*. *Ford*, 592 U.S. at 365 (internal quotation marks and citation omitted).

In addition to their allegations regarding the Corporate Defendants, Plaintiffs assert scattershot claims concerning Mr. Masri's supposed connections to the United States, including that he has U.S. citizenship, lived in the U.S. twenty-five years ago, "maintain[s] extensive consulting relationships with U.S.-based institutions," served on the advisory board of the DFC from 2020-2023 and sat on the Dean's Council at Harvard University's Kennedy School of Government, and engages in philanthropic and political activities in Virginia, Massachusetts, and Maryland. *See* Compl. ¶¶ 13-15, 30, 34, 60-68. Plaintiffs further allege that he leveraged these relationships and his U.S. citizenship to help the Corporate Defendants obtain financing, and that his consulting company's decades-old contracts with USAID somehow provided "legitimacy and diplomatic cover for Hamas operations." *Id.* ¶¶ 34, 36.

These allegations fall well short of establishing the required nexus. They are not only dated—some more than three decades old—but also wholly untethered to the alleged conduct. Plaintiffs plead no facts indicating that any alleged U.S.-based relationship directed, controlled, or meaningfully contributed to the operational conduct underlying the October 7 attacks. Even if these allegations were plausible (they are not), they are temporally and causally remote from the October 7 attacks and therefore far "too attenuated" to support the exercise of personal jurisdiction. *See Herederos de Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, 535 F. Supp. 3d 1299, 1306 (S.D. Fla. 2021), *aff'd*, 43 F.4th 1303 (11th Cir. 2022) (Rule 4(k)(2) jurisdiction cannot be based on "ambiguous allegations that do not demonstrate specific conduct" in the U.S.). As explained above, the financing itself—which concerns nothing more than solar-panel projects at the GIE—does not have a sufficient nexus to the claims, and these additional allegations regarding

16

Mr. Masri's historic U.S. affiliations are vague and even further removed. And it is irrelevant that Mr. Masri possesses U.S. citizenship when he has resided in Palestine for decades. *See, e.g.*, *Barcroft v. Gibbs*, 195 F. Supp. 3d 132, 135 (D.D.C. 2016) (rejecting argument that U.S. citizenship was sufficient to confer general jurisdiction in Washington, D.C. where parties were domiciled in Texas). Plaintiffs' Complaint must be dismissed as to Mr. Masri, and all Corporate Defendants, for lack of personal jurisdiction because Plaintiffs only plead collective "activities" in the United States that lack any meaningful connection to the claims asserted. That is insufficient.

### B. Plaintiffs Fail to Allege that Each Defendant Purposefully Availed Themselves of the United States

Plaintiffs do not allege that Defendants deliberately engaged in conduct directed at the United States sufficient to support the exercise of personal jurisdiction. Due process requires more than the existence of historical relationships with U.S.-based entities; it requires that each defendant purposefully avail themselves of the privilege of conducting activities within the United States. *Oldfield*, 558 F.3d at 1220-21. The Complaint alleges no such facts.

Plaintiffs' jurisdictional theory rests on the notion that Defendants generally obtained financing and insurance from U.S.-based entities years before the attacks. These conclusory allegations—which improperly lump all Defendants together, Compl. ¶¶ 30-37—boil down to three points: (i) PADICO, through its subsidiary, PIEDCO, began developing the GIE in 1997 using funding from USAID, the World Bank, the European Investment Bank, and the European Union (*id.* ¶ 252); (ii) Defendants sought and obtained IFC funding for the PRICO solar project in 2018 (*id.* ¶¶ 285, 289); and (iii) PRICO obtained additional IFC funding and $6 million in MIGA insurance for that green-energy initiative in or around 2022 (*id.* ¶¶ 17, 303-04). Significantly, each of these allegations concerns financing for projects located *entirely in Palestine*, with no operational conduct occurring in the United States.

17

Obtaining project financing or insurance from international lenders for non-U.S. projects does not constitute purposeful availment of the United States.  The IFC and MIGA finance projects around the world; their involvement does not transform economic development in Palestine into U.S.-directed conduct.  The exercise of personal jurisdiction over entities based solely on the fact that they receive IFC funding does not "comport with due process" because those entities "can not [sic] reasonably foresee being haled into this jurisdiction's courts as a result of such activity." *AGS Int'l Servs. S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d 64, 82 (D.D.C. 2004), *abrogated on other grounds as recognized in Cherdak v. Am. Arb. Ass'n Inc.*, 443 F. Supp. 3d 134 (D.D.C. 2020).  "To conclude otherwise would inundate the courts in [the U.S.] with the filing of countless lawsuits that concern events about which the [U.S.] has no interest."  *Id.*[5] (citations omitted).

Further, a contract alone is insufficient to establish purposeful availment over a defendant.  *See Flancbaum v. Tyson Grp., Inc.*, No. 21-cv-81270-MIDDLEBROOKS, 2021 WL 9563812, at *3 (S.D. Fla. Dec. 9, 2021) (citing *Sea Lift, Inc. v. Refinadora Cosarricense de Petroleo, S.A.*, 792 F.2d 989, 993 (11th Cir. 1986)).  That is "because a contract 'is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.'"  *Id.* (quoting *Sea Lift*, 792 F.2d at 993).  Here, the financing was "but an intermediate step" towards the real object of the transaction—the economic

---

[5]  Before refiling in this District, Plaintiffs initially filed this action in the District of Columbia. There, a court addressing materially similar allegations reached the same conclusion with respect to IFC funding.  Although the Report and Recommendation in *Cabrera v. Black & Veatch Special Projects Corps.* was not adopted and was vacated on other grounds, it is instructive.  *See* No. 19-cv-3833-EGS-ZMF, 2021 WL 3508091, at *13 (D.D.C. July 30, 2021), *report and recommendation vacated sub nom. Cabrera v. Black & Veatch Special Project Corp.*, No. CV 19-3833 (LLA), 2024 WL 1435146 (D.D.C. Mar. 28, 2024).  The court there explained that "[e]ntry into a forum for the sole purpose of 'securing a loan or an insurance guaranty' does not constitute purposeful availment of the forum, especially where the funding is for non-forum projects."  *Id.* (quoting *Siam Kraft Paper Co. v. Parsons & Whittemore, Inc.*, 400 F. Supp. 810, 812 (D.D.C. 1975)).

development projects in Palestine.  Plaintiffs do not allege that any Defendant conducted any part of those projects in the United States, directed activities here, or carried out any of the alleged conduct on U.S. soil.  Instead, they allege only that the financing institutions maintain a U.S. presence.  Such minimal allegations of purposeful availment are legally deficient and cannot support the exercise of jurisdiction in any state.

Plaintiffs' reliance on scattered allegations about Mr. Masri's U.S. citizenship, philanthropy, and past affiliations, such as his former advisory role with the DFC, past service on university boards, and residence in the United States decades ago, does not change this analysis. *See* Compl. ¶¶ 30, 34, 64.  Such generalized and historical affiliations do not constitute deliberate, defendant-specific engagement with the United States for purposes of personal jurisdiction.  Contacts unrelated to the case "must be pervasive" to support jurisdiction under Rule 4(k)(2), and Plaintiffs' allegations do not come close to satisfying that standard.  *See Associated Transp. Line, Inc. v. Productos Fitosanitarios Proficol El Carmen, S.A.*, 197 F.3d 1070, 1075 (11th Cir. 1999).

Finally, Plaintiffs' jurisdictional allegations are also deficient because they fail to include specific allegations as to each Defendant.  A plaintiff cannot rely on collective or aggregated allegations about multiple defendants to establish personal jurisdiction over an individual one. *See Rush v. Savchuk*, 444 U.S. 320, 331-32 (1980).  Yet here, Plaintiffs plead only in undifferentiated terms against "Defendants" as a group without identifying which Defendant purportedly engaged in which conduct. *See, e.g.*, Compl. ¶¶ 30, 251.  That is not permitted as "[t]he Court must assess its personal jurisdiction over each defendant separately." *Oueiss v. Saud*, No. 1:20-cv-25022-KMM, 2022 WL 1311114, at *9 (S.D. Fla. Mar. 29, 2022)).[6]  Accordingly, the Complaint must

---

[6] Plaintiffs' group pleading is improper not only with respect to their jurisdictional allegations but also with respect to their merits allegations. *See infra* § V.

be dismissed for lack of personal jurisdiction as to each Defendant.

> **C.      Exercising Personal Jurisdiction over Foreign Defendants Would Violate Traditional Notions of Fair Play and Substantial Justice**

Finally, even if Plaintiffs could establish constitutionally sufficient contacts and relatedness—which they cannot—the exercise of jurisdiction over these foreign defendants would not comport with "traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316.  "A 'primary concern' of the 'fairness' test is the burden placed on the defendant, and, in cases involving international defendants, courts should consider '[t]he unique burdens placed upon one who must defend oneself in a foreign legal system.'"  *Oldfield*, 558 F.3d at 1221 (alteration in original) (first quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980); and then quoting *Asahi Metal Indus. Co., Ltd. v. Super. Ct.*, 480 U.S. 102, 114 (1987)).  Those burdens are substantial here.

Each Defendant is foreign.  None of the Defendants is alleged to be incorporated in or reside within the United States.  None is alleged to maintain offices, employees, or business operations in the United States.  The projects at issue are all located abroad.  The alleged concealment of tunnel construction and attacks all occurred abroad.  And the relevant witnesses, documents, and physical evidence are located abroad.  Requiring these foreign Defendants to litigate complex terrorism claims in a U.S. court would impose significant burdens on them, including the inability to compel foreign witnesses, the need to marshal and translate materials located abroad, and the extraordinary practical and security challenges inherent in obtaining evidence and testimony from individuals located in Gaza.

Moreover, there was no reasonable basis for Defendants to anticipate being subjected to U.S. jurisdiction on these claims. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) ("By requiring that individuals have fair warning that a particular activity may subject them to the

jurisdiction of a foreign sovereign, the Due Process Clause gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.") (internal quotation marks and citations omitted).  Their alleged U.S. contacts concern development financing for foreign projects years before the attacks.  Nothing about securing project funding from international institutions with a U.S. presence would lead a foreign developer to believe it could be haled into U.S. court to answer for the independent acts of a third-party terrorist organization and other terrorists.

For the foregoing reasons, exercising personal jurisdiction over any Defendant would offend traditional notions of fair play and substantial justice.

### D.    Personal Jurisdiction Is Lacking Under Both the Minimum-Contacts Test and a "Flexible" Inquiry

The Supreme Court in *Fuld* most recently addressed personal jurisdiction in the context of the Fifth Amendment, recognizing that "the Fifth Amendment might entail a similar inquiry into the reasonableness of the assertion of jurisdiction" as the Fourteenth Amendment, while allowing for "a more flexible jurisdictional inquiry."  606 U.S. at 16, 23 (internal quotation marks and citation omitted).  Even under a "flexible" inquiry, however, Plaintiffs cannot and have not asserted that personal jurisdiction over foreign defendants with no presence in the United States would be reasonable based on collective group contacts from years ago that bear no meaningful relationship to the October 7 attacks.

In *Fuld*, the Supreme Court considered the constitutionality of the Promoting Security and Justice for Victims of Terrorism Act (the "PSJVTA"), which authorized courts to exercise personal jurisdiction over the Palestinian Authority and the Palestine Liberation Organization (the "PLO")

under Rule 4(k)(1).[7]  The PSJVTA allows courts to assert personal jurisdiction over the Palestinian

Authority and the PLO only if one of two jurisdictional predicates is satisfied: (i) the defendant

made payment to individuals who committed acts of terrorism that injured U.S. nationals or (ii)

the defendant conducts activities or maintains offices in the United States.  *See* 18 U.S.C. §

2334(e).  No comparable congressional directive exists here.  And none of the facts in *Fuld* is

present in this case.

First, the PLO and Palestinian Authority are "*sui generis* foreign entities, both of which

exercise governmental functions in a geopolitically sensitive region and have decades of

'meaningful contacts, ties, [and] relations' with the United States." *Fuld*, 606 U.S. at 22 (alteration

in original) (quoting *Burger King Corp.*, 471 U.S. at 472).  Defendants here exercise no

governmental functions and do not have the extensive ties with the United States that the PLO and

Palestinian Authority have.

Second, because the PLO and the Palestinian Authority were expressly identified in the

statute, the PLO and Palestinian Authority "were put on clear notice—far more than most

defendants in the mine-run of litigation—that continuing to engage in certain specified conduct

would open them up to potential federal court jurisdiction." *Id.* at 25.  No such notice exists here.

Third, *Fuld* is limited to a narrowly tailored statutory grant of jurisdiction in the PSJVTA,

and in doing so, the Supreme Court was careful not to endorse broader jurisdiction theories,

emphasizing that it was "wary to reach further and bless more attenuated assertions of

jurisdiction." *Id.* at 18.

Notably, the Eleventh Circuit held before *Fuld* that, for purposes of personal jurisdiction

---

[7]  Rule 4(k)(1) provides that "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant . . . when authorized by a federal statute."  Fed. R. Civ. P. 4(k)(1)(C).

under Rule 4(k)(2), "the Fifth Amendment's personal-jurisdiction analysis should track the Fourteenth's." *Herederos*, 43 F.4th at 1308. As a result, the Eleventh Circuit's inquiry under Rule 4(k)(2), which asks whether "the non-resident defendant has established certain minimum contacts with the forum," is the applicable analysis for assessing personal jurisdiction. *See Oldfield*, 558 F.3d at 1220 (internal quotation marks and citation omitted); *see also In re Diisocyanates*, 2026 WL 522845, at *6 (holding, after *Fuld*, that absent congressional grant of jurisdiction, jurisdiction under Rule 4(k)(2) still requires demonstration of minimum contacts with the United States).

Whether analyzed under minimum contacts or under a more flexible inquiry, Plaintiffs' allegations are still insufficient. As set forth above, Plaintiffs fail to satisfy the minimum contacts analysis under either the Fourteenth Amendment or the Fifth Amendment. Defendants lack decades of "'meaningful contacts, ties, [and] relations' with the United States" and there is no justification to hale any Defendant into this Court based on years-old touch points with no nexus to the claims alleged. *Fuld*, 606 U.S. at 22 (alteration in original) (quoting *Burger King Corp.*, 471 U.S. at 472). Nor do Plaintiffs allege a constitutionally sufficient nexus between the limited contacts they identify and the claims asserted here.[8]

---

[8] The Complaint also does not allege that this Court may exercise personal jurisdiction pursuant to Florida's long-arm statute, unsurprisingly, because none of the Defendants is alleged to have any contacts with Florida. Notably, when Plaintiffs initially filed this lawsuit in the District Court for the District of Columbia, they asserted that Defendants were subject to personal jurisdiction there pursuant to D.C. Code § 13-422. Complaint ¶ 29, *Shalom v. Masri*, No. 25-cv-1024 (D.D.C. Apr. 7, 2025), Dkt. No. 1. However, after withdrawing that Complaint, they refiled in this District without invoking Florida's long arm statute, which provides that a defendant may be subject to specific jurisdiction in Florida based on "[o]perating, conducting, engaging in, or carrying on a business or business venture in [Florida]"; "having an office or agency in [Florida]"; or "[c]ommitting a tortious act within [Florida]." Fla. Stat. § 48.193(1)(a)(1)-(2). Plaintiffs do not allege that any Defendant engaged in any conduct in Florida and thus, the Court cannot exercise specific jurisdiction under Florida's long-arm statute.

II.     **PLAINTIFFS FAIL TO PLEAD A JASTA AIDING AND ABETTING CLAIM BECAUSE "DEFENDANTS MUST HAVE KNOWN" IS NOT SUBSTANTIAL ASSISTANCE OR GENERAL AWARENESS**

Even if the Court could properly exercise jurisdiction over any Defendant, Plaintiffs still fail to state a claim because their allegations do not satisfy the statutory elements for secondary liability under JASTA (or primary liability under the ATA, as discussed below, *infra* Section IV). Plaintiffs seek to convert ordinary commerce in a conflict zone into acts of terrorism.  JASTA requires much more.  As the Supreme Court held in *Twitter*, an aiding-and-abetting claim under JASTA requires a finding that the "defendants consciously, voluntarily, and culpably participate[d] in or support[ed]" the October 7 attacks.  598 U.S. at 505.  The Complaint does not come close to making such a showing, nor could it.

The ATA, as amended by JASTA, "attaches a civil cause of action for U.S. nationals 'injured . . . by reason of an act of international terrorism.'"  *Newman v. Associated Press*, 758 F. Supp. 3d 1357, 1367 (S.D. Fla. 2024) (alteration in original) (quoting 18 U.S.C. § 2333(a)).  To state a claim for aiding-and-abetting liability under JASTA, the Complaint's first cause of action, Plaintiffs must allege "three elements: (1) 'the party whom the defendant aids must perform a wrongful act that causes an injury;' (2) 'the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance;' and (3) 'the defendant must knowingly and substantially assist the principal violation.'"  *Id*. (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)).  Absent plausible factual support for each element, dismissal is required.

Here, Plaintiffs fail to allege these elements.  The Complaint contains no facts showing that Defendants aided Hamas, were generally aware of the illegal activity, or knowingly and

24

substantially assisted in the commission of the alleged terrorist act.[9]  Instead, the Complaint rests on the untenable premise that engaging in routine economic development in Gaza constitutes aiding and abetting Hamas in its acts of international terrorism on October 7, 2023.

> **A.    As Required Under *Twitter*, Plaintiffs Fail to Allege "Conscious, Voluntary, and Culpable Participation" in Hamas's October 7 Attacks or Any Other Subsequent Attacks Sufficient to Amount to Knowing and Substantial Assistance**

The knowing and substantial assistance prong requires Plaintiffs to allege that Defendants knowingly and substantially assisted Hamas in committing the attacks at issue.  Since JASTA's enactment in 2016, courts have analyzed substantial assistance claims using the six *Halberstam* factors: "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance."  *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (citing *Halberstam*, 705 F.2d at 483-84).  Applying those factors as a "framework" in *Twitter*, the Supreme Court clarified the inquiry as asking: "[d]id defendants consciously, voluntarily, and culpably participate in or support the relevant wrongdoing?"  598 U.S. at 497, 505.  *Twitter* rejected enterprise-wide liability and made clear that, absent "a showing of pervasive and systemic aid" sufficient to "hold a defendant liable for all the torts of an enterprise," JASTA requires knowing and substantial assistance to a *particular act of international terrorism*—not merely association with, or generalized support for, a terrorist organization.  *Id*. at 506.

Here, the Complaint fails to meet this standard.  Plaintiffs do not allege that any Defendant

---

[9]  While Plaintiffs allege that Hamas caused injury to Plaintiffs, they also allege that "other terrorist[s]" caused injury to Plaintiffs.  Compl. ¶¶ 165, 200, 513, 522, 1408.  Thus, some injuries may not even be attributable to a foreign terrorist organization ("FTO") or to anyone Defendants are accused of aiding.  Regardless, Plaintiffs have not pled any facts to support a claim that any Defendant aided Hamas or "other terrorists" in the attacks of October 7.

knowingly and substantially assisted the planning, preparation, or execution of the October 7 attacks. Nor do Plaintiffs allege that Defendants had advance notice of the attacks, were aware of their planning, or knowingly provided assistance in anticipation of violence. Instead, Plaintiffs point to Defendants' development of two hotels and an industrial estate in Gaza and attempt to recast those lawful commercial activities as substantial assistance to terrorism.

Although the Complaint is sprawling, it is devoid of allegations implicating any Defendant in Hamas's conduct.[10] Distilled to their essence, Plaintiffs' allegations concern speculation that Defendants (collectively) constructed and maintained the tunnel infrastructure under the Hotels and the GIE which the Complaint alleges run throughout Gaza.[11] Even accepting those allegations for purposes of this motion, Plaintiffs identify no act by any Defendant that allegedly facilitated the planning, preparation, or execution of the October 7 attacks. At most, the Complaint alleges ordinary real estate development and general contracting work routinely performed by large corporations such as PADICO and its subsidiaries. That is not "direct, active, and substantial" assistance in terrorist activities. *Twitter*, 598 U.S. at 502. At most, Plaintiffs allege "passive" economic conduct. *Id.* at 491.

Beyond that, the Complaint relies on conclusory phrases—repeatedly asserting "Defendants knew," "worked directly," or acted "with the full knowledge and support" of Hamas's activities—that do not meet pleading standards under *Iqbal* and *Twombly*. *See, e.g.*, Compl. ¶¶ 17, 276, 292, 372. Repetition of conclusory allegations does not make them any less conclusory. To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "Threadbare recitals of

---

[10] As further discussed below, the Complaint fails to comply with Rule 8 of the Federal Rules of Civil Procedure. *See infra* § V.

[11] The Complaint describes "hundreds of miles of tunnels." Compl. ¶ 178.

the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  A claim cannot survive a motion to dismiss "if based on inferences unsupported by facts or legal conclusions disguised as factual allegations." *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 866 (D.C. Cir. 2022) (affirming grant of motion to dismiss) (internal quotation marks and citation omitted).

The *facts* in the Complaint, as they pertain to Defendants, simply do not satisfy JASTA's statutory requirements.  The Supreme Court's recent decision in *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280 (2025), clarified the limits of aiding and abetting claims. There, the Court held that allegations "of 'indifference,' rather than assistance" are insufficient, and that "omissions" or "inactions" are "rarely the stuff of aiding-and-abetting liability."  *Id*. at 297. *Smith & Wesson* reaffirmed that viable aiding and abetting claims must "pinpoint" a "specific criminal transaction[] that the defendants (allegedly) assisted."  *Id*. at 294.  Plaintiffs point to no such transaction here.  That Hamas is the *de facto* government in Gaza does not render participation in the Gazan economy as knowing participation in or furtherance of a terrorist act.  For this reason, Plaintiffs' allegations that Mr. Masri attended a signing ceremony in May 2022 with a Hamas official do not pass muster. *See* Compl. ¶¶ 312-15.  To hold otherwise would extend liability to the thousands of "owners and operators of property situated over" the hundreds of miles of tunnels which Hamas allegedly decided to use in the October 7 attacks. *See id.* ¶ 204.   Such overbroad claims liability cannot survive *Twitter* and *Smith & Wesson*.

At best, the Complaint alleges lawful, non-violent conduct, most notably the development of two hotels and an industrial park, or passive acquiescence to the laws of the *de facto* government in Gaza.  And that governance makes sense: as Plaintiffs allege, "Hamas . . . has ruled Gaza as a hybrid totalitarian government and terrorist/criminal enterprise." *Id.* ¶ 149.  Merely residing in

Gaza or engaging in lawful business operations under the *de facto* Government's rule does not make Defendants complicit in Hamas's crimes. Extending aiding and abetting liability to such activity would effectively convert ordinary commerce into strict liability for international terrorism, and would make the millions of people living in Gaza liable to claims under JASTA— which is inconsistent with core principles of "our legal system." *See Twitter*, 598 U.S. at 489. Congress enacted JASTA to reach those who knowingly and intentionally assist terrorism, not those engaged in lawful commerce in areas under terrorist control.

Plaintiffs' characterization of what they allege to be "attack tunnels" near Defendants' development sites are not only conclusory, but also a retroactive self-serving characterization to fit their narrative. *See, e.g.*, Compl. ¶ 9. The Complaint itself acknowledges that there is nothing unusual about tunnels in Gaza; they are ubiquitous. *Id.* ¶¶ 161, 171-77. Indeed, Hamas's tunnel networks are described as "vast" and "constitut[ing] an unprecedented form of urban planning." *Id.* ¶ 178. These tunnels are, and have long been, used for many purposes by many actors. *See id.* ¶¶ 178-98. While Plaintiffs allege that the Hotels were the source of rocket fire, *id.* ¶ 360, Plaintiffs neither allege when this rocket fire took place nor that Defendants knew anything about the rocket fire. *See Troell v. Binance Holdings Ltd.*, No. 24-CV-7136 (JAV), 2026 WL 636849, at *19 (S.D.N.Y. Mar. 6, 2026) ("[E]ven crediting the allegation that Nobitex is controlled by the [Islamic Revolutionary Guard Corps ("IRGC")], processing transactions for wallets hosted on Nobitex does not suggest that Defendants intended to assist IRGC in committing terrorist attacks.") (internal citation omitted).

The Complaint's own allegations about Gaza's long-standing "tunnel economy" further undercut any inference of knowing and substantial assistance. Plaintiffs allege that Gaza's "tunnel economy" has existed for decades and was a major commercial infrastructure long before the

October 7 attacks.  *See* Compl. ¶¶ 152-52, 171-77.  By Plaintiffs' own account, as of 2009, "80 per cent [sic] of Gaza's imports … c[a]me through the tunnels," which had become a billion-dollar-per-year trade in everyday goods, facilitated by Hamas-imposed fees, routine ordering systems, and ordinary commercial practices.  *Id.* ¶ 152-53 (discussing a "published report" that "described the tunnel economy in 2009").  In other words, even if Defendants were aware of tunnels in Gaza, they would have understood them to serve routine economic functions such as the importation of goods, not tunnels to attack Plaintiffs on October 7.  *See Twitter*, 598 U.S. at 489 (explaining that "if aiding-and-abetting liability were taken too far, then ordinary merchants could become liable for any misuse of their goods and services").  Under *Iqbal* and *Twombly*, where lawful explanations are at least as plausible as unlawful ones, the latter must be rejected.  *Iqbal*, 556 U.S. at 678-80; *Twombly*, 550 U.S. at 556-57; *see also Troell*, 2026 WL 636849, at *23 (dismissing JASTA and ATA claims against Binance for October 7 attacks and finding alternative explanation for Binance's conduct could "more plausibly be inferred").  Plaintiffs themselves plead that the IDF discovered a Hamas tunnel under the GIE in 2018 yet do not allege that the GIE was shut down or that any Defendant was held accountable.  *See* Compl. ¶¶ 274.  That omission further underscores that the mere existence of tunnels does not plausibly imply participation in Hamas's terrorist conduct.

To plead substantial assistance, Plaintiffs would need to allege facts showing that each Defendant knew in advance of the October 7 attacks, shared Hamas's objectives, or took action in coordinating the attacks.  The Complaint does none of this.  "[I]t is not enough, as plaintiffs contend, that a defendant have given substantial assistance to a transcendent 'enterprise,'" like Hamas, "separate from and floating above all the actionable wrongs that constitute it."  *Twitter*, 598 U.S. at 495.  "Rather, a defendant must have aided and abetted . . . another person *in the*

29

*commission of the actionable wrong . . . .*"  *Id.*  (emphasis added).  Not a single allegation asserts that any Defendant assisted Hamas in committing the October 7 attacks.

It is also not enough that conduct occurs within Gaza for JASTA or the ATA to be triggered: courts "cannot reasonably infer that Hamas controls every act . . . merely because it administers the Gaza Strip." *See Keren Kayemeth LeIsrael – Jewish Nat'l Fund v. Educ. for a Just Peace in the Middle E.*, 66 F.4th 1007, 1015 (D.C. Cir. 2023) ("*JNF*").  Nor have Plaintiffs alleged "a sufficiently direct relationship between the conduct in question and the injuries for which recovery is sought." *Zapata v. HSBC Holdings PLC*, 414 F. Supp. 3d 342, 356 (E.D.N.Y. 2019) (footnote and citations omitted).  Plaintiffs' theory conflates physical proximity with nexus, but JASTA requires far more—a direct link between the defendant's acts and the terrorist injury.

Notably, under *Twitter*, "the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort." *Twitter*, 598 U.S. at 506.  Here, Plaintiffs have not alleged any nexus.  Nor have Plaintiffs alleged any culpable participation in post-October 7 attacks—attacks that the Complaint itself attributes to "other terrorist groups."  *See* Compl. ¶ 513 ("For a period of 14 months, the IDF engaged in violent confrontations with Hamas *and other terrorist groups* seeking to inflict casualties on Israeli forces in the Gaza Strip.") (emphasis added).[12]

In short, Plaintiffs ask this Court to transform ordinary economic activity in Gaza into actionable terrorism without any allegations of nexus or knowing and substantial assistance in the

---

[12]  The lack of causation as to the October 7 attacks, in addition to the Complaint's numerous deficiencies, applies with equal force to Plaintiffs' direct liability ATA claims, discussed below. Plaintiffs are unable to allege that each of those attacks were "planned, committed, and authorized" by Hamas, as required under 18 U.S.C. § 2333, and as to each attack committed by an unnamed "other terrorist."  While the Complaint describes "other terrorist groups" as "agents" of Hamas in a conclusory fashion, Compl. ¶ 1408, without any facts as to a principal-agent relationship between Hamas and some unnamed terrorists, such conclusory allegations cannot be credited.

October 7 attacks and the attacks by "other terrorist[s]" in the weeks and months afterwards. That is precisely the attenuated liability theory that the Supreme Court rejected in *Twitter*.

> **B.** **Plaintiffs Fail to Plead Facts Satisfying the *Halberstam* Factors or Showing that Each Defendant Was Culpably Associated with Hamas's October 7 Attacks**

An analysis of the *Halberstam* factors further underscores the legal deficiencies in Plaintiffs' allegations as none supports a finding that Defendants "culpably associated themselves with [Hamas's] actions." *Twitter*, 598 U.S. at 504. The *Halberstam* factors provide a framework for assessing whether a defendant's conduct amounts to knowing and substantial assistance. *See Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 437 (2d Cir. 2025) ("[I]t is best to revisit JASTA's sweep under the *Halberstam* framework with the benefit of *Twitter*.");[13] *see also Linde*, 882 F.3d at 329-30. Courts evaluate all six factors collectively, asking whether, taken together, they demonstrate that the defendant knowingly and culpably associated itself with the principal's wrongful act. No factor supports such an inference here. Tellingly, Section VIII of the Complaint, which is titled "Hamas Planned, Authorized and Committed the October 7 Attack With Defendants' Assistance," spans 87 paragraphs describing Hamas's planning of the attacks *but does not mention the Defendants even once*. Compl. ¶¶ 431-517. That omission underscores the Complaint's fundamental flaw: Plaintiffs cannot plausibly allege that Defendants meaningfully assisted Hamas in the October 7 attacks or in any terrorist act.

---

[13] *Ashley* was the first federal appellate decision to evaluate a JASTA aiding and abetting claim following *Twitter*. There, the Second Circuit held that the plaintiffs' money laundering claims did "not meet th[e] high bar" established in *Twitter*, because "[e]ven assuming the Banks' aid was pervasive and systemic, the complaint does not support the inference that the Banks' money laundering operations were designed or performed with the intent to aid the Syndicate." *Ashley*, 144 F.4th at 445. Here, too, Plaintiffs fail to allege that Defendants' infrastructure and development work was undertaken with the intent to aid Hamas or any terrorist activity.

31

### 1. No Allegations that Defendants Encouraged or Knew About the October 7 Attacks

Plaintiffs do not allege that Defendants knew about the October 7 attacks or any subsequent hostilities, let alone that they encouraged Hamas. *See Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 225 (2d Cir. 2019) ("The plaintiffs here have not plausibly alleged that HSBC encouraged the heinous November 9 Attacks or provided any funds to [the FTO]."). Critically, "the alleged aid"—the tunnel infrastructure—was not "important to the nature of the injury-causing act." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 500 (2d Cir. 2021). As noted above, tunnels are ubiquitous throughout Gaza and have been used for many purposes by many actors. Moreover, Hamas purportedly decided not to use the tunnels to invade Israel in the first place but instead breached the border fence. Compl. ¶ 230.

### 2. No Allegations Other than Routine, Lawful Activity

The Complaint alleges nothing beyond Defendants' engagement in routine commercial activity typical for any corporation in the real estate industry. *See Twitter*, 598 U.S. at 491 ("passive actors . . . carrying out routine transactions" are not liable for aiding-and-abetting liability). Plaintiffs attempt to hold Defendants liable for the terrorist attacks by Hamas and other terrorists solely because Hamas allegedly used tunnels under the GIE and the Hotels. Plaintiffs infer that as property owners, all Defendants must have necessarily assisted in maintaining tunnels, but by Plaintiffs' logic, every property owner in Gaza is equally liable for acts of terrorism: exactly what *Twitter* cautioned against.

### 3. No Allegations that Defendants Were Present at the Time of the Attacks

Plaintiffs do not allege that Defendants, or any of their representatives, were present at the location of any of the alleged attacks, either on or after October 7, 2023. This absence underscores both physical and temporal distance between Defendants' lawful business activity and the terrorist

acts—precisely the sort of attenuation *Halberstam* recognized as incompatible with aiding and abetting liability.

### 4.     No Allegations of Any Relationship With Hamas

Plaintiffs allege no supervisory authority, operational control, revenue-sharing arrangement, or coordinated relationship between Defendants and Hamas to aid in the attacks. Instead, Plaintiffs allege that "Hamas and the companies it controls monopolized lucrative sectors of the Gaza economy," including "significant real estate and commercial developments."  Compl. ¶ 158.  From that premise, they infer that Defendants' projects "could not have been commenced or completed without" Hamas's approval or coordination.  *Id.* ¶ 159.  Such speculation is conclusory and too "attenuated" to allege substantial assistance.  *See Honickman*, 6 F.4th at 501. Plaintiffs' inference amounts to guilt by geography, not evidence of any cooperative or conspiratorial relationship with Hamas.  Further, interactions with the *de facto* government are not tantamount to substantially assisting international terrorism.

### 5.     No Allegations of a Culpable State of Mind

Plaintiffs must allege that Defendants acted "consciously and culpably" "with respect to their actions and the tortious conduct (even if not always the particular terrorist act)."  *Twitter*, 598 U.S. at 503-04.  Yet the Complaint contains no well-pleaded facts suggesting that any Defendant acted with the requisite knowledge or intent.  Plaintiffs offer no plausible allegation that Defendants believed their conduct was unlawful or that they intended to further terrorism.

Instead, Plaintiffs rely on a handful of disconnected assertions, such as public statements by PADICO or its board members, remarks or conduct attributed to employees involved in Gaza operations, supposed meetings with individuals later involved in tunnel construction, claims that Hamas members or affiliates stayed at the Hotels, and even misleading anecdotes about Mr. Masri's childhood (notably, at a time when Hamas did not even exist), to imply awareness or

33

sympathy for Hamas.  *See, e.g.*, Compl. ¶¶ 53-54, 73-74, 303, 311-12, 329-31, 364-65.  Plaintiffs suggest that these scattered references somehow demonstrate intent to assist or alignment with Hamas's objectives.  They do not.

The cited statements and events, even taken as true, reflect nothing more than routine commercial or public conduct divorced from any support for terrorism.  PADICO's press releases about reconstruction projects and photographs of Mr. Masri at public signing ceremonies describe economic development initiatives carried out openly with international participation, not clandestine efforts to aid Hamas in the October 7 attacks.  The appointment of a local executive such as Farid Al-Qeeq, whose prior academic work at the Islamic University of Gaza is alleged to show Hamas ties, does not establish that Defendants shared Hamas's aims or that they knowingly advanced its terrorism.  Likewise, allegations that Hamas members or affiliates stayed at the Hotels merely show that Defendants operated public accommodations in Gaza, not that they intended to harbor or assist terrorists.  Finally, Mr. Masri's decades-old comments about his youth—made in interviews reflecting on events from the 1970s (well over a decade prior to Hamas's formation)— cannot reasonably be read as evidence of any present intent to support Hamas or its 2023 attacks.  None of these allegations, individually or collectively, comes close to establishing the "knowing and substantial assistance" JASTA demands.

Plaintiffs also highlight several post–October 7 statements by Mr. Masri and PADICO board members to imply sympathy with Hamas or indifference to the attacks.  *See* Compl. ¶¶ 406-22.  These include PADICO's financial statement referencing "aggression on the Gaza Strip," Mr. Masri's personal Facebook posts criticizing Israel's military response, and commentary by two PADICO directors invoking "resistance" or expressing political views about the conflict.  *See, e.g.*, *id.* ¶¶ 406, 410, 412, 414, 423.  Even if accurately described, such after-the-fact rhetoric cannot

plausibly establish that Defendants knowingly assisted or intended to further the October 7 attacks. The statements were made *after* the alleged acts of terrorism, often by individuals speaking in their personal capacity, and reflect political commentary about the ensuing war and humanitarian crisis, not admissions of culpable participation in the attacks themselves.  JASTA does not punish physical proximity, hindsight association, or commercial interaction within conflict zones; it imposes liability only for purposeful, culpable participation in terrorism itself.  Plaintiffs plead none.

### 6.      No Allegations of a Period of Knowing Assistance

Finally, the Complaint identifies no period during which Defendants knowingly assisted Hamas in any terrorist activities.  The alleged conduct—developing the hotels and the GIE—consisted of discrete, lawful commercial projects completed years before the October 7 attacks. Nothing in the Complaint suggests an ongoing relationship, continuing assistance, or any temporal overlap with the attacks.  This absence of contemporaneous support forecloses liability under *Halberstam* and *Twitter*, both of which require sustained, knowing participation in the tort itself. Further, even if there were allegations of a "lengthy" period of assistance, which there are not in this Complaint, "there are no allegations that Defendants provided any services to" Hamas directly. *Freeman v. HSBC Holdings PLC*, 465 F. Supp. 3d 220, 234 (E.D.N.Y. 2020).

In short, every *Halberstam* factor weighs decisively against liability and warrants dismissal of Plaintiffs' claims.

### C.      Plaintiffs' Conclusory Allegations of General Awareness Are Insufficient to Withstand a Motion to Dismiss

Even if Plaintiffs could satisfy the substantial assistance requirement—and they cannot—their JASTA claim would still fail because they have not plausibly alleged general awareness. These are separate and independent requirements; failure to plead either is fatal to the claim.  *See*

*Twitter*, 598 U.S. at 486, 504.  To satisfy the general awareness requirement, the Complaint "must plausibly allege" that Defendants were "generally aware of [their] role in unlawful activities from which the attacks were foreseeable while it was providing" its services.  *Honickman*, 6 F.4th at 501.  General awareness requires more than showing that Defendants' activities occurred in a region governed by Hamas; Plaintiffs must plausibly allege that Defendants knew, or at least could reasonably foresee, that their conduct would assist Hamas in committing the October 7 attacks. *See id.*; *see also Twitter*, 598 U.S. at 497-505 (holding mere association with wrongdoers or awareness of wrongdoing is insufficient to establish aiding and abetting liability).

As an initial matter, the attack took the world by surprise.  Plaintiffs acknowledge that Hamas "foster[ed] a belief by Israeli intelligence" that it "was deterred from attacking Israel and was instead prioritizing economic development."  Compl. ¶ 235.  Plaintiffs claim that Defendants were somehow "integral" to the deception campaign, *id.* ¶ 5, yet plead no facts indicating any Defendant's  participation in any deceptive scheme other than their engagement in lawful, public economic development.  Participation in legitimate, transparent development cannot, without more, establish awareness of a covert terror plan.

Without well-pleaded facts showing that each Defendant knew, or was at least aware, that its own conduct played a role in advancing Hamas's violent aims of October 7, the general awareness element fails as a matter of law.  JASTA requires intentional, culpable participation in a terrorist scheme, not mere presence or lawful engagement in a region governed by a terrorist organization.  Plaintiffs' conclusory theory collapses under its own logic and fails to satisfy JASTA's exacting standard.

### III.   PLAINTIFFS FAIL TO PLEAD A CLAIM UNDER JASTA FOR CONSPIRACY LIABILITY BECAUSE CONCLUSORY ALLEGATIONS OF AN "AGREEMENT" TO AID HAMAS DO NOT SATISFY CONSPIRACY STANDARDS

Plaintiffs' second cause of action, conspiracy liability under JASTA, fares no better.  To

plead a JASTA conspiracy, Plaintiffs must allege "(1) an agreement between two or more persons; (2) to participate in an unlawful act; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Newman*, 758 F. Supp. 3d at 1373-74 (quoting *Halberstam*, 705 F.2d at 477). Plaintiffs do not come close to satisfying any of these elements.

### A. Plaintiffs Fail to Allege an Agreement Between Defendants and Hamas

"An 'agreement' in the context of an ATA conspiracy requires that the defendant 'conspire with the person who committed' the terrorist act." *Bernhardt*, 47 F.4th at 873 (quoting 18 U.S.C. § 2333(d)(2)). "For there to be an agreement, Plaintiffs here must allege that the [Defendants were] 'pursuing the same object' as Hamas." *Newman*, 758 F. Supp. 3d at 1374 (quoting *Bernhardt*, 47 F.4th at 873). They do not. The Complaint asserts only the bare conclusion that "Defendants joined [Hamas's] conspiracy" to launch the October 7 attacks "by knowingly agreeing to provide Hamas with civilian cover for its attack tunnels under the GIE and the Blue Beach and Al Mashtal hotels." Compl. ¶ 1400. Aside from the conclusory nature of the allegation, Plaintiffs fail to allege *when* such an agreement was reached, *who* reached it, or *what* its terms were. The Complaint alleges no meeting, negotiation, or communication reflecting assent to an unlawful objective. Nor does the Complaint allege any coordination among the Defendants themselves or any meeting of the minds with Hamas.

Alleging that Defendants operated projects in Gaza at the same time Hamas operated there does not plausibly establish a meeting of the minds. Conspiracy cannot be inferred from parallel conduct, geographic proximity, or participation in the same economic environment. Plaintiffs' theory amounts to guilt by geography, not a plausible allegation of agreement.[14]

---

[14] To the extent that Plaintiffs attempt to rely on the "signing ceremony" attended by Mr. Masri

### B.      Plaintiffs Fail to Allege an Agreement to Engage in an Unlawful Act

Even if Plaintiffs had plausibly alleged an agreement—and they have not—the supposed agreement concerned lawful commercial projects, not an unlawful act.  *Newman* is instructive. There, Plaintiffs claimed that the Associated Press ("AP") conspired with Hamas to commit the October 7 attacks based on allegations that the AP had a "tacit understanding . . . to publish activities and further Hamas's propaganda designed to win support for their ongoing murderous cause."  *Newman*, 758 F. Supp. 3d at 1374 (internal quotation marks and citation omitted). However, the court rejected that theory, finding that "the only factual support" for such allegations was the AP's publication of photographs and alleged payments for them—lawful journalistic activity that did not plausibly suggest an agreement to commit terrorism.  *Id.*  The court concluded that "the conclusory allegation of an agreement at some unidentified point in time is not plausible to infer that the terrorist attacks that injured Plaintiffs"—the same attacks at issue here—"were in furtherance of a conspiracy to which the AP allegedly agreed."  *Id*. at 1374-75.

The same reasoning applies here.  Plaintiffs' allegations that Defendants engaged in economic development in Gaza reflect lawful, transparent commercial activity, not an agreement to commit terrorism, and certainly not an agreement to participate in the October 7 attacks.  As *Zobay v. MTN Group Ltd.*, explains, "conclusory allegations that Defendants each shared a common specific intent" are inadequate; the alleged agreement must be "a common scheme to commit an act of international terrorism."  695 F. Supp. 3d 301, 355 (E.D.N.Y. 2023) (internal quotation marks citations omitted).  In *Newman*, the plaintiffs alleged a concrete agreement: the

---

and an alleged Hamas official, Compl. ¶¶ 312-14, that is insufficient.  The content of the alleged agreement was "to rebuild parts of the GIE."  *Id*. ¶ 312.  An alleged agreement to build an industrial park is not an agreement to accomplish "an unlawful objective."  *See Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 79 (2d Cir. 2023) (affirming dismissal of JASTA conspiracy claim for failure to allege "an agreement between two or more persons . . . to participate in an unlawful act") (alteration in original) (quoting *Halberstam*, 705 F.2d at 477).

AP obtained photographs in exchange for compensation. 758 F. Supp. 3d at 1374-75. But even that agreement did not constitute a "common scheme" to commit terrorism. *Id.*

The same is true here. Corporations routinely enter into agreements to develop projects such as the GIE or Hotels. Those lawful business arrangements are no more conspiratorial than the AP's purchase of photographs in *Newman*. Plaintiffs cannot transform ordinary commercial arrangements into an undefined, unexplained conspiracy to commit terrorism simply because such agreements necessarily existed in the course of economic development. *See Troell*, 2026 WL 636849, at *23 ("[T]hat Binance transacted broadly with Nobitex, and that the Axis Terrorists, among many others, used Nobitex to process transactions does not plausibly support an inference that Binance entered into a conspiracy with the Axis Terrorists to achieve the same unlawful objective.") (citation omitted).

### C. Plaintiffs Allege No Overt Act in Furtherance of Any Conspiracy

The Complaint also fails to identify any unlawful overt act performed "pursuant to and in furtherance of the common scheme." *See Halberstam*, 705 F.2d at 477. The only acts alleged—developing the GIE and operating two hotels—were lawful commercial projects conducted with the knowledge and support of international institutions and even Israel. Plaintiffs' theory that these projects somehow provided civilian cover for Hamas's activities is entirely speculative. As *Newman* makes clear, "conclusory allegation[s] of an agreement at some unidentified point in time" are insufficient to infer that the acts at issue "were in furtherance of a conspiracy to which [Defendants] allegedly agreed." 758 F. Supp. 3d at 1374-75.

### D. Plaintiffs Fail to Allege Any Injury Caused by an Overt Act in Furtherance of a Conspiracy

Finally, even if Plaintiffs could identify an agreement—which they cannot—they plead no facts showing that any alleged overt act furthered the October 7 attacks or proximately caused

39

Plaintiffs' injuries.  Indeed, the Complaint does not identify a single overt act by Defendants that proximately caused the October 7 attacks or any other terrorist activity.  Instead, as in *Newman* and *Zobay*, the allegations here rest on impermissible speculation and hindsight—asserting that because Hamas carried out an attack, anyone doing business in Gaza must have "agreed" to aid it. But JASTA does not impose liability based on geography or association.  Without factual allegations linking each Defendant's  supposed agreement or conduct to Plaintiffs' injuries, their conspiracy claim collapses.  In sum, Plaintiffs' conspiracy claim fails for the same reason as their aiding and abetting claim: it rests on speculation, not facts.  JASTA requires a concrete unlawful agreement, an overt act in furtherance of that agreement, and an injury caused by that act.  None of these elements is plausibly alleged.

IV.  **PLAINTIFFS FAIL TO STATE A DIRECT ATA CLAIM BECAUSE DEFENDANTS DID NOT COMMIT AN ACT OF "INTERNATIONAL TERRORISM," DID NOT PROXIMATELY CAUSE PLAINTIFFS' INJURIES, AND DID NOT ACT WITH THE REQUISITE SCIENTER**

Plaintiffs' direct liability claim "has three elements: (1) unlawful action, i.e. an 'act of international terrorism;' (2) the requisite mental state, and (3) causation."  *Newman*, 758 F. Supp. 3d at 1375 (citation omitted).  Plaintiffs satisfy none.

A.  **Plaintiffs Do Not Plausibly Allege that Defendants Committed an Act of "International Terrorism"**

An act of "international terrorism" must "(A) involve violent acts or acts dangerous to human life . . . ;  (B)  appear  to  be  intended . . . to  intimidate  or  coerce  a  civilian population . . . or . . . to influence the policy of a government by intimidation or coercion[,] or . . . mass destruction; and (C) occur primarily outside the [United States'] territorial jurisdiction [or transcend national boundaries]."  *Id*. at 1375-76 (quoting 18 U.S.C. § 2331(1)).  Plaintiffs' allegations fail prongs (A) and (B).

*First*, nowhere in the more than 200-page Complaint do Plaintiffs identify any act by

40

Defendants that is violent or dangerous or otherwise meets the definition of "international terrorism." *See Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 82 (E.D.N.Y. 2019) ( "Plaintiffs must plausibly allege that Defendants' actions were, themselves, acts of international terrorism in order to give rise to primary liability under § 2333(a)"); *Newman*, 758 F. Supp. 3d at 1376 ("Accordingly, to successfully assert a claim for primary liability, the Court agrees with the AP that Plaintiffs must separately allege that the AP committed an act of international terrorism."). The conduct attributed to Defendants consists entirely of routine commercial activity such as "constructing new buildings," "development of [a] hotel," and "install[ing] solar panels." Compl. ¶¶ 322, 353, 388. Such activities are lawful, nonviolent, and apolitical. That Hamas committed acts of violence does not render Defendants' alleged conduct acts of violence. *See Bartlett v. Société Générale de Banque Au Liban SAL*, No. 19-CV-00007 (CBA) (VMS), 2020 WL 7089448, at \*7-8 (E.D.N.Y. Nov. 25, 2020) (dismissing ATA claim because providing "financial services" to customers, including those "affiliated with a foreign terrorist organization . . . is not an act which is 'violent or dangerous to human life' as contemplated by the ATA"); *Raanan v. Binance Holdings Ltd.*, No. 24-cv-697 (JGK), 2025 WL 605594, at \*16 (S.D.N.Y. Feb. 25, 2025).[15] Plaintiffs' ATA primary liability claim should be dismissed on that basis alone.

Plaintiffs' attempt to recast that legitimate commercial work as "tunnel infrastructure" or part of a "deception campaign" does not cure the deficiency. Even taking those labels at face

---

[15] Often, plaintiffs bringing these claims do not contend that the challenged conduct was violent but rather that it was "dangerous to human life." *See, e.g.*, *id.* at \*16 ("The plaintiffs do not contend that the defendants' conduct was violent; rather, the plaintiffs claim that the defendants committed 'acts dangerous to human life.'") (citation omitted); *King v. Habib Bank Ltd.*, No. 20 Civ. 4322 (LGS), 2022 WL 4537849, at \*4 (S.D.N.Y. Sept. 28, 2022) ("Plaintiffs do not argue that providing material support in the form of money or banking services is itself a 'violent act,' but rather that financially supporting a terrorist organization is nonetheless an 'act dangerous to human life.'"). Here, Plaintiffs allege neither.

value, the Complaint alleges no facts suggesting that Defendants built, financed, or maintained any structure for violent use, knew of violent plans, or intended such use.  Construction and alleged maintenance of infrastructure (*e.g.*, the Hotels and GIE) that others may later misuse does not convert lawful development into an act of violence.  Likewise, any alleged "deception" or public-relations activity is nonviolent, expressive conduct that is not "dangerous to human life."

*Second*, Plaintiffs do not plausibly allege that Defendants acted with the apparent intent to intimidate or coerce civilians or to influence a government.  This inquiry is objective: the question is how Defendants' conduct would appear to a reasonable observer, not their subjective motives.  *Weiss v. Nat'l Westminster Bank, PLC*, 993 F.3d 144, 161 (2d Cir. 2021).  Nothing in the Complaint supports the conclusion that Defendants' conduct appeared intended to intimidate or coerce anyone.  The rehabilitation of hotels, development of an industrial park, and installation of solar panels are inherently economic acts aimed at promoting investment and stability.  Indeed, the Complaint itself cites the IFC's stated goal of demonstrating "the commercial viability of renewable energy investment in Gaza" and boosting "investor confidence and comfort."  Compl. ¶ 288.  Those aims are plainly economic and developmental, not coercive or violent.  Even the Israeli government is alleged to have "recognize[d] in Gaza a process for economic stabilization." *Id.* ¶ 237.  Participation in that process cannot plausibly appear as terrorism.[16]  *See Zapata*, 414 F.

---

[16] Plaintiffs boldly assert that the Defendants collectively deceived an entire nation and that Israeli intelligence was lulled into complacency. *Id.* ¶¶ 3, 5, 231, 235.  Allegations of this kind, untethered to any factual basis, do not warrant credit under *Twombly* and *Iqbal*.  Plaintiffs' theory appears to be that Defendants "deceived" Israel into believing Hamas was focused on economic development because Defendants themselves engaged in economic development.  But that claim is directly contradicted by Plaintiffs' own allegations: elsewhere, the Complaint cites public statements by Hamas leaders, such as an August 25, 2023 interview on Hezbollah's Al-Mayadeen network in which Hamas's deputy Salah al-Arouri openly described preparations for an "all-out war" with Israel and declared that such a war was unavoidable and was imminent.  *Id.* ¶¶ 439.  These allegations of explicit threats of conflict are irreconcilable with Plaintiffs' suggestion that Israel was lulled into a false sense of security by Defendants' alleged "deception" campaign.

Supp. 3d at 358-59 (dismissing direct liability claims where "to an objective observer," defendant's "conduct appeared to be motivated by economics, not by a desire to intimidate or coerce") (citations omitted).

Ultimately, Plaintiffs' allegations "falls short on specific acts in which" any Defendant "engaged that could fall within the definition of an act of international terrorism." *Averbach v. Cairo Amman Bank*, No. 19-cv-0004-GHW-KHP, 2022 WL 2530797, at *17-19 (S.D.N.Y. Apr. 11, 2022) (dismissing ATA direct liability claim because, even assuming defendant was aware of its clients' ties to terrorism, conducting normal business is neither violent nor endangering human life). Plaintiffs anticipate this deficiency by asserting, in conclusory fashion, that "Defendants did more than just passively allow their properties and money to be appropriated by terrorists." Compl. ¶ 244. But even accepting those allegations as true, the alleged "develop[ment of] *new* projects," Compl. ¶ 245, does not constitute an act of terrorism.[17]

Plaintiffs' theory of liability—under which engaging in ordinary economic development or inaction could be deemed terrorism—would expand the ATA beyond recognition and chill virtually all economic activity throughout the developing world, as companies like the Corporate Defendants could be found liable in a U.S. court for simply engaging in the economic development in poor, faraway countries, regardless of their lack of knowledge or intent. Allegations of passive inactivity or incidental use of Defendants' property by others fall far short of terrorist conduct. For that reason, Plaintiffs' ATA direct liability claim fails as a matter of law.

---

[17] None of the projects at issue was new. As the Complaint acknowledges, the GIE opened nearly thirty years ago. Compl. ¶ 257. The Blue Beach Hotel and the Ayan Hotel were renovated, not built, because both properties' existence predated Defendants' involvement. *Id.* ¶ 23. Plaintiffs frame these long-existing developments as new projects to create the illusion of active culpability where the allegations, at most, describe passive conduct or routine commercial conduct.

### B.    Plaintiffs Fail to Plead Proximate Causation

Even if Plaintiffs' allegations of economic development could somehow constitute allegations of "acts of international terrorism," their claim would still fail because they cannot show that Defendants' conduct was the proximate cause of their injuries.  Proximate cause under the ATA requires a showing that Defendants "substantially contributed to Plaintiffs' injuries." *Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667, 678 (D.C. Cir. 2023).  Plaintiffs cannot do so here. Whether Plaintiffs were injured on October 7, 2023, or in the following weeks or months, nothing in the Complaint plausibly connects Defendants' conduct to those events.  Plaintiffs' own allegations establish that Defendants had no involvement in, or knowledge of, the horrific events of October 7.

The foundation of Plaintiffs' theory of liability is that Defendants' Gaza real estate holdings "were crucial elements in Hamas's attack plan on October 7."  Compl. ¶ 5.  Yet not one factual allegation supports that assertion.  Plaintiffs do not allege that any Defendant knew of Hamas's plans, participated in the construction or use of tunnels for violent purposes, or acted with any intent to facilitate the attacks.  The Complaint concedes that Hamas's tunnel network was built long before the October 7 attacks.  *See id.* ¶¶ 160-77.  Indeed, as Plaintiffs acknowledge, Gaza's "tunnel economy" was a billion-dollar commercial system that had, for years, served as a primary channel for imports and everyday goods.  *Id.* ¶¶ 152-53.  By Plaintiffs' own telling, the tunnels were a pervasive feature of Gaza's economic life, not specialized terrorist infrastructure known to Defendants.  That context makes it implausible that Defendants could have foreseen Hamas's later use of tunnels for violence or that their lawful development projects were "a substantial factor in, and had the reasonably foreseeable effect of, causing" Plaintiffs' injuries.  *JNF*, 66 F.4th at 1015. The same economic reality underscores that the properties at issue—the Hotels and the GIE—were developed for legitimate, commercial properties: the Hotels are located far from the attack sites,

44

and the GIE is an industrial park with tenants such as Coca-Cola.  Nothing about those enterprises plausibly suggests they were designed or used to further terrorism.

Setting aside the tunnel allegations—and Plaintiffs' self-serving characterization of them as "attack tunnels"—the Complaint still fails to connect Defendants to any of the attacks or injuries described.  Plaintiffs allege in conclusory terms that Hamas used tunnels located beneath or near Defendants' properties during the October 7 attacks.  *See, e.g.*, Compl. ¶¶ 377-78.  But the Complaint pleads no facts showing that Defendants built, financed, controlled, or knowingly facilitated the use of those tunnels, or that they had any knowledge of Hamas's plans to use the tunnels for violence.  Instead, the injuries depicted in the Complaint stem from random acts of violence by unidentified individuals or from injuries sustained by Israeli soldiers engaged in active military duty after the war began—events wholly unconnected to any Defendant.  For example, Plaintiff Shafer was injured by two gunmen on November 30, 2023, while waiting at a bus stop, *id.* ¶¶ 1091-92; Plaintiff Bours was called up to his IDF reserve unit following October 7 and wounded in combat weeks later, *id.* ¶¶ 1069-77; Plaintiff Shalom was killed after "other terrorists fired a [RPG]" at him, *id.* ¶ 522; and another Plaintiff alleges physical and mental anguish following encounters with RPGs, gunfire and grenades in January 2024 in Gaza and from deployment in Lebanon, *id.* ¶ 1049-51.

These allegations bear no proximate causal connection to Defendants' commercial activities in Gaza.  "Given the lack of any connection between Hamas's actions [after] the October 7 Attack and [Defendants'] alleged conduct . . . Plaintiffs fail to plead proximate cause." *Newman*, 758 F. Supp. 3d at 1381.  The ATA does not permit recovery where the link between a defendant's conduct and a plaintiff's injury is "remote, purely contingent, or overly indirect." *Freeman*, 413 F. Supp. 3d at 84; *see also Raanan*, 2025 WL 605594, at *17 ("As alleged, the causal link between

45

Binance's provision of financial services and the plaintiffs' injuries is too attenuated to support a plausible finding of proximate cause."). Nor can Plaintiffs satisfy the statute's foreseeability requirement. Nothing in the Complaint suggests that Defendants could have anticipated Hamas's attack plans or that their lawful development projects made such violence more likely. The properties at issue were longstanding, openly operated commercial sites financed and monitored by international institutions and, at times, supported by Israeli authorities. These facts sever any conceivable chain of proximate causation. Because proximate cause under the ATA requires more than remote or incidental association, this claim must also be dismissed.

### C. Plaintiffs Do Not Plausibly Allege the Requisite Scienter

Primary ATA liability also requires scienter. "[U]nder § 2339B, Plaintiffs must establish that [Defendants] 'knowingly provided material support or resources to a foreign terrorist organization.'" *Newman*, 758 F. Supp. 3d at 1379 (quoting 18 U.S.C. § 2339B).[18] However, Section 2339B "does not penalize mere association," but "rather prohibits the act of giving material support." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 39 (2010) (citation omitted). Here, none of the facts Plaintiffs plead—whether alleged public statements, business meetings, hotel guests, or post-October 7 commentary—supports an inference that Defendants acted with knowledge that their conduct would further Hamas's terrorist activities, or those of unidentified "other terrorists." *See supra* § II.B.5; § IV.A. The pleaded facts instead describe ordinary commercial projects undertaken openly and, at times, in coordination with international institutions and Israeli authorities. Such conduct cannot plausibly be characterized as the knowing provision of material support required by § 2339B.

---

[18] Plaintiffs do not bring a claim under 18 U.S.C. § 2339A, requiring a showing of intent to materially support specific terrorist acts, likely recognizing the claim's futility.

46

Nor does the allegation that Hamas later benefited from Gaza's infrastructure establish scienter.  The Supreme Court has made clear that guilt by association is insufficient; liability attaches only when a defendant acts with knowledge or intent that its conduct will further terrorist activity.  *Holder*, 561 U.S. at 12.  The Complaint alleges no such knowledge or intent.  Because the alleged conduct reflects legitimate economic activity rather than purposeful support for terrorism, Plaintiffs fail to plead the requisite scienter under § 2339B.

## V.   THE COMPLAINT SHOULD BE DISMISSED FOR INFLAMMATORY ALLEGATIONS THAT VIOLATE RULE 8's "SHORT AND PLAIN STATEMENT" REQUIREMENT AND IMPROPERLY LUMP ALL DEFENDANTS TOGETHER

Plaintiffs' sprawling complaint violates Rule 8 of the Federal Rules of Civil Procedure and warrants dismissal on this ground alone.  Rule 8(a)(2) requires "a *short* and *plain* statement of the claim showing that the pleader is entitled to relief," and Rule 8(d)(1) mandates that "[e]ach allegation must be simple, concise, and direct."  Fed. R. Civ. P. 8(a)(2), (d)(1) (emphasis added).  As the Supreme Court explained, a complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  "It is not the duty of . . . [D]efendants or this Court to sift through the Complaint and guess which factual allegations support which claims.  Rule 8(a) places the burden squarely upon the plaintiff to clearly and succinctly state its claims."  *Infanti v. Scharpf*, No. 06 CV 6552(ILG), 2008 WL 2397607, at *2 (E.D.N.Y. June 10, 2008) (alterations in original) (quoting *Discon Inc. v. NYNEX Corp.*, No. 90–CV–546A, 1992 WL 193683, at *16 (W.D.N.Y. June 23, 1992)).

Instead of setting forth a short and plain statement of facts relevant to the asserted claims, Plaintiffs present a sprawling, non-linear narrative spanning decades and featuring scores of unrelated individuals, entities, and events.  The Complaint provides an extensive, albeit one-sided,

history of the Israel–Palestine Conflict beginning in 1979, approximately 44 years before the relevant events of October 7, 2023, including every major Israeli operation in Gaza since December 2008—and even including allegations about Mr. Masri's *childhood*. Compl. ¶¶ 84–430. It also makes improper and irrelevant allegations against non-parties ranging from international organizations to private individuals, including the United Nations, Harvard University, the long-deceased Yasser Arafat, the Qatari Government, Qatari nationals, George Soros, the European Union, the World Bank, Ricardo Texieira, and USAID, to name a few. *See, e.g.*, *id.* ¶¶ 10, 13, 76-83, 91, 251-52, 308-09. Such inflammatory and extraneous material obscures any cognizable claim and fails to give Defendants fair notice of the allegations against them.[19]

The Complaint also impermissibly lumps all Defendants together as a single undifferentiated group, leaving it impossible to discern who allegedly did what. *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015) (identifying the types of impermissible "shotgun pleadings," including those that "assert[] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against") (footnote omitted); *see also Guillaume v. United States*, No. 24-13584, 2025 WL 2610053, at *4 (11th Cir. Sep. 10, 2025) (affirming dismissal of multiple causes of action because pleading "failed to specify which defendants were liable for the alleged wrongdoing, which in turn fails to give the defendants adequate notice of the claims against them"). This type of group pleading violates Rule 8 and warrants dismissal. *See Vyas v. Holman Auto. Grp., Inc.,* No. 24-cv-62086-WPD, 2025 U.S. Dist. LEXIS 26228, at *5-6

---

[19] As noted above, the Complaint also accuses Defendants in headings yet fails to even mention any Defendant in any paragraph. *See* Section VIII of the Complaint (titled "Hamas Planned, Authorized and Committed the October 7 Attack With Defendants' Assistance," *but does not mention the Defendants even once* in the 87 paragraphs that follow). Compl. ¶¶ 431-517.

(S.D. Fla. Feb. 13, 2025). As the *Guillame* court observed: "[s]hotgun pleadings 'waste scarce judicial resources, inexorably broaden the scope of discovery, wreak havoc on appellate court dockets and undermine the public's respect for the courts.'" 2025 WL 2610053, at *3 (quoting *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018)). Thus, dismissal is proper under Rule 8 alone. *See Newman v. BAM Trading Servs., Inc.*, 24-cv-134-ECM-CWB, slip. op. at 4 (M.D. Ala. Mar. 11, 2026), ECF No. 127 (dismissing JASTA claims under Rule 8 and finding that plaintiffs sought "to recover under each claim against the defendants <u>collectively</u>" and made "no effort to distinguish factual grounds that would permit liability to be imposed against any of them <u>separately</u>").

## VI. MANY INDIVIDUAL PLAINTIFFS FAIL TO STATE A CLAIM FOR LACK OF STATUTORY STANDING

While the Complaint should be dismissed altogether for the legal deficiencies discussed above, many of the plaintiffs (*e.g.*, the Waldman plaintiffs) independently lack standing because they are not U.S. nationals. *See, e.g.*, Compl. ¶¶ 651-56 (Eyal, Ella, Guy, and Sharon Waldman are citizens of the State of Israel and not of the United States and assert claims in their individual capacities because of their personal injuries).[20] The ATA provides a private right of action only to "[a]ny national of the United States injured in *his or her* person, property, or business by reason of an act of international terrorism, or *his or her* estate, survivors, or heirs." 18 U.S.C. § 2333(a) (emphasis added). While a foreign national may bring a claim on behalf of a U.S. national, only

---

[20] Other non-U.S. nationals bringing personal injury claims include: Plaintiff Aviram Abraham Bejerano, Compl. ¶¶ 631, 634; Plaintiffs Inbal Chen, David Zafrani, and Osnat Tal Zafrani, *id.* ¶¶ 676-77, 679, 682; Plaintiff Izhar Shay, *id.* ¶¶ 719, 725; Plaintiff Yaniv Rousso, *id.* ¶¶ 776, 780; Plaintiffs Yael Levy Oppenheimer, I.O., Y.L., J.L., Tzuria Levy, Zohar Levy, A.L., Judith Levy, Shlomo Levy, Eliyahu Levy, Nir Yehezkel Levy, *id.* ¶¶ 804-11, 813, 815; Plaintiffs Eitan Mor and Leron Mor, *id.* ¶¶ 848, 851, 855; Plaintiffs Oren Glisko, Liat Glisko, Ori Glisko, and Y.G., *id.* ¶¶ 1035-38, 1040; and Plaintiffs L.A., H.A., T.A., and Y.A., *id.* ¶¶ 1299-1302, 1304. The citizenship of A.Z. (minor child of Itay Zafrani and Inbal Chen) is not alleged. *Id.* ¶¶ 676, 682.

personal injuries suffered by U.S. nationals are actionable. *Raanan*, 2025 WL 605594, at *14 ("[A] foreign national plaintiff cannot sue under the ATA based on that plaintiff's *own* personal injuries."); *Averbach v. Cairo Amman Bank*, No. 1:19-cv-00004-GHW, 2020 WL 1130733, at *2 (S.D.N.Y. Mar. 9, 2020) ("[A]ny United States national, or his estate, survivors, or heirs, may sue for any injuries that the national receives to his person, property, or business by reason of an act of international terrorism.  Nowhere in the statute does Congress provide remedies for non-nationals claiming damages for personal injuries."); *Rosenberg v. Lashkar-e-Taiba*, No. 10 CV 5381 (DLI)(CLP), 2016 WL 11756917, at *19 (E.D.N.Y. July 5, 2016), *report and recommendation adopted as modified*, 2017 WL 11647006 (E.D.N.Y. Mar. 31, 2017) (The ATA "is clear that only claims brought on behalf of individuals who are United States nationals may proceed.").[21]  Accordingly, the non-U.S. national claims (including, for example, the Waldman plaintiffs' claims) must be dismissed.[22]

## VII.  DISMISSAL PURSUANT TO RULE 12(b)(5) FOR IMPROPER SERVICE IS WARRANTED

Plaintiffs' proposed methods of service—express mail via FedEx for the Corporate Defendants and publication in an *Israeli* newspaper with direct messages to purported email addresses and social media accounts for Mr. Masri—violate Rule 4 of the Federal Rules of Civil

---

[21]  There is a split of authority on this question.  The only case in this District to have determined whether foreign nationals could bring a claim under the ATA held that the ATA "contains no requirement that the survivors or heirs of a United States national killed by an act of international terrorism must themselves be citizens of the United States." *Weinstock*, 2019 WL 1470245, at *4 (citations omitted).  However, no Court of Appeals has decided the issue, and the weight of authority is consistent with Defendants' position. *See Lelchook v. Islamic Republic of Iran*, No. 16-cv-7078 (ILG), 2020 WL 12656283, at *4 (E.D.N.Y. Nov. 23, 2020) ("Notwithstanding a split of authority within this District, this Court concludes that the *Averbach* court's construction is the most natural reading of the ATA" because "[t]he ATA does not include language authorizing foreign nationals to bring ATA claims in a U.S. court for their own injuries.") (footnote omitted).

[22]  Defendants do not challenge standing to bring a claim on behalf of U.S. citizens' estates, but only claims asserted in individual capacities by non-U.S. nationals.

Procedure, usurp the judicial authority of Palestinian courts, and otherwise ignore Palestinian law. *See* ECF Nos. 22, 25, 28.  Instead of proceeding in a manner that respects Palestinian courts, such as via letters rogatory,[23] Plaintiffs crafted the most convenient service options *for them*.  In authorizing service in the manner proposed by Plaintiffs, the Court did not have the benefit of considering the issues raised herein, which render Plaintiffs' methods of service improper. Accordingly, dismissal for improper service of process is another independent basis for dismissal of this action.  *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999) (holding that "a court ordinarily may not exercise power over a party the complaint names as defendant" without "service of process").[24]

### A.      Proper Service Must Comply with the Protections of Rule 4

Federal Rule of Civil Procedure 4(f) sets out the methods for serving a person in a foreign country, and Rule 4(h)(2) extends those methods to foreign corporations and associations.  *See* Fed. R. Civ. P. 4(f), 4(h)(2).  In short, Rule 4(f) authorizes three broad categories of service abroad:

- **Rule 4(f)(1)—Service by International Agreement:** Where an international treaty or

---

[23] Letters rogatory "are the customary means of obtaining judicial assistance from overseas in the absence of a treaty or other agreement.  Letters rogatory are requests from courts in one country to the courts of another country requesting the performance of an act which, if done without the sanction of the foreign court, could constitute a violation of that country's sovereignty. Letters rogatory may be used to effect service of process or to obtain evidence if permitted by the laws of the foreign country." *See Preparation of Letters Rogatory*, Travel.State.Gov, U.S. Dep't of State, https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/obtaining-evidence/Preparation-Letters-Rogatory.html (last visited May 6, 2026); *see also* Fed. R. Civ. P. 4(f)(2)(B).  In this instance, letters rogatory would have provided the appropriate formal mechanism to request that the competent Palestinian judicial authority effect service in accordance with Palestinian law, thereby minimizing offense to Palestinian law and respecting principles of international comity and territorial sovereignty.

[24] Defendants further question Plaintiffs self-serving allegations that "Plaintiffs have exercised all reasonable diligence and best efforts in attempting to serve Masri in the United States but have been unable to do so."  ECF No. 22 (Mot. for Alt. Serv. as to Masri) at 1.  Basic due diligence would have revealed that Plaintiffs kept attempting service at a D.C. residence where Mr. Masri never resided.

convention applies (such as the Hague Service Convention ("Hague Convention"),[25] to which Israel is a signatory but not Palestine), service should typically be made according to that treaty's procedures.

- **Rule 4(f)(2)—Service in the Absence of a Treaty or If Treaty Allows:** If no treaty applies or if the treaty permits it, Rule 4(f)(2) allows: (A) service by a method prescribed by the law of the foreign country for serving its own court documents; (B) service as the foreign authority directs in response to a letter rogatory or letter of request; or (C) service by certain means (like personal delivery or mail requiring a signed receipt) unless prohibited by the foreign country's law.

- **Rule 4(f)(3)—Service by Court-Ordered Alternative Means:** A plaintiff may also request a court order to use "other means not prohibited by international agreement."

As explained herein, proper methods of service should be consistent with international law and the laws of Palestine, which Plaintiffs both ignore and violate.

> ### B.      Palestine Is Not a Signatory to the Hague Service Convention and Plaintiffs Should Not Circumvent Palestinian Courts

Plaintiffs concede that the Hague Convention does not apply to Palestine, which has not ratified or acceded to it, and is thus not bound by it.  *See* Hague Convention, Status Table of Contracting Parties,  https://www.hcch.net/en/instruments/conventions/status-table/?cid=17  (last visited May 6, 2026); *see* ECF No. 22 (Mot. for Alt. Serv. as to Masri) at 10.  Plaintiffs thus submit that Israel serves as the conduit for judicial assistance in Palestine as Israel is a signatory to the Hague Convention.  ECF No. 22 (Mot. for Alt. Serv. as to Masri) at 10.  That request usurps the rights of Palestinian courts and is not consistent with Article 29 of the Hague Convention.

---

[25]  *See* Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163 ("Hague Convention").

Article 29 of the Hague Convention would allow Israel to "declare that the present Convention shall extend to all the territories for the international relations of which it is responsible." *See* Hague Convention at Art. 29.  Israel, however, has never invoked Article 29 with respect to Palestine.  *See* Hague Convention, Status Table of Extensions, https://www.hcch.net/en/instruments/conventions/status-table/extensions/?cid=17&mid=427 (last visited May 6, 2026) ("In case a particular territorial unit is not mentioned in this table of extensions, it means that the application of the Convention has not (yet) been extended to that territorial unit"). [26]  Accordingly, there is no legal basis to submit that Israeli courts can act for Palestinian courts in connection with service of a foreign action, a conclusion reinforced by the Israeli–Palestinian Interim Agreement on the West Bank and the Gaza Strip ("Oslo Accords"), which established separation of judicial authority between Israel and the Palestinian Territories. *See* Israeli–Palestinian Interim Agreement on the West Bank and the Gaza Strip, Isr.–P.L.O., Ch. 1(Art. IX)(6), Sept. 28, 1995, 36 I.L.M. 551 ("[T]he [Palestinian] Council shall, within its jurisdiction, have an independent judicial system composed of independent Palestinian courts and tribunals."); *id.* at Annex IV(Art. III)(1) ("The Palestinian courts and judicial authorities have jurisdiction in all civil matters, subject to this Agreement.").  In other words, contrary to Plaintiffs' position, permitting Israel to effect service of process within Palestine because Israel is a signatory to the Hague Convention would amount to an extension of Israeli judicial authority into a jurisdiction governed by a totally separate legal and judicial system—an outcome incompatible with both the Hague Convention's territorial structure, public international law, local (Palestinian)

---

[26]  Palestine's participation in international agreements in its own right further confirms that its courts are not subject to Israel's treaty obligations absent an express extension under Article 29 of the Hague Convention. *See, e.g.*, Convention for the Protection of Cultural Property in the Event of Armed Conflict art. 18, May 14, 1954, 249 U.N.T.S. 240.

law, and the Oslo Accords' express allocation of civil judicial authority—not to mention established practice since the establishment of the Palestinian Authority in 1994.

These international law principles make clear that civil judicial authority is vested exclusively in Palestinian institutions. *Id.* Palestinian courts operate under the authority of the Palestinian Authority and apply Palestinian—not Israeli—law. *Id.* Israeli courts do not exercise civil judicial sovereignty over Palestinian persons or entities located in the area. *Id.* In other words, given the complexities of the region, there is no reason to circumvent Palestinian courts in connection with service requirements.[27]

### C. Plaintiffs' Proposed Service Methods Fail to Satisfy Due Process Under Rule 4(f)(2) and Rule 4(f)(3)

With the possibility of service under Rule 4(f)(1) eliminated, the remaining provisions of Rule 4(f) do not permit litigants to select the method of service unilaterally. Rather, Plaintiffs must ensure that service under Rule 4(f)(2) or Rule 4(f)(3) is carried out in a manner that does not offend the laws of Palestine. *See* Rule 4(f)(2) (envisioning service accomplished "as prescribed by the foreign country's law . . . ; as the foreign authority directs . . . ; or [accomplished by other

---

[27] Plaintiffs also argue that because the United States does not recognize Palestine as a sovereign state, service through Israel is permissible. ECF No. 22 (Mot. for Alt. Serv. as to Masri) at 13. But recognition of state sovereignty is a political question; treaty applicability is a legal question governed by the treaty's text and the identity of its contracting parties under international law. *See* Vienna Convention on the Law of Treaties art. 34, May 23, 1969, 1155 U.N.T.S. 331 ("A treaty does not create either obligations or rights for a third State without its consent."). The United States' position on Palestinian statehood does not convert Palestine into a part of Israel for purposes of service of process, nor does it expand Israel's treaty obligations beyond the geographic scope of its own sovereignty. Furthermore, the United States recognizes and interacts with the Palestinian Authority and its judiciary. In fact, the United States has been one of the principal supporters of the Palestinian Judicial Authority and has provided tens of millions of dollars in technical assistance, capacity building, and training for the Palestinian judiciary since 1994. Also, the very fact that the Israeli-Palestinian Interim Agreement on the West Bank and Gaza Strip was signed in Washington, D.C. is a testament to the weight that the United States gives to that treaty. *See generally USAID Launches Project for Palestinian Legal System*, UNITED NATIONS: THE QUESTION OF PALESTINE (Feb. 12, 2004), https://www.un.org/unispal/document/auto-insert-208533/ (last visited May 6, 2026).

prescribed means] unless prohibited by the foreign country's law"); *Prewitt Enters. v. Org. of Petroleum Exporting Countries*, 353 F.3d 916, 927 (11th Cir. 2003) (affirming dismissal where plaintiff failed to effect service in compliance with Rule 4(f)(3) and applicable foreign law, noting that "[i]nasmuch as our Constitution requires that reasonable notice be given, *an earnest effort* should be made to devise a method of communication that is *consistent with due process* and *minimizes offense to foreign law*") (quoting Fed. R. Civ. P. 4(f)(3) advisory committee's notes to 1993 amendments). This is critical to ensuring due process. "Due process under the United States Constitution requires that 'before a court may exercise personal jurisdiction over a defendant, there must be *more than* notice to the defendant . . . [t]here also must be a *basis* for the defendant's amenability to service of summons. Absent consent, this means there must be *authorization* for service of summons on the defendant.'" *Id.* at 924-25 (alterations in original) (citing *Omni Cap. Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987)). Here, Plaintiffs' proposed methods of service neither provide adequate notice nor comply with Palestinian law.

> 1. **Plaintiffs' Proposed Methods of Service Fail to Provide Adequate Notice**

Plaintiffs sought authorization to serve Mr. Masri—who resides in Palestine—by email, social media, and publication *in an Israeli newspaper*. *See* ECF No. 22 (Mot. for Alt. Serv. as to Masri) at 7, 15-16 (requesting publication in *Yediot Ahronot*). In support of those requests, Plaintiffs asserted that they do not know Mr. Masri's current location and do not have a known foreign address for him—only that he once, more than half a year ago, gave an interview to that newspaper. *Id.* at 3, 15. That assertion—that Plaintiffs do not know where Mr. Masri is—is central to Plaintiffs' motion, and it fatally undermines their chosen methods of service. *Cf. Hernandez v. Patricio*, No. 5:23-cv-23, 2023 WL 8553663, at *2 (S.D. Ga. Dec. 11, 2023) (denying Plaintiffs'

Motion to Execute Alternative Service for not having "exercised the requisite level of diligence in pursuing all available means of ascertaining Defendant['s] . . . whereabouts").

Notice by publication is constitutionally permissible only where it is "reasonably calculated, under all the circumstances," to apprise the defendant of the action. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314-15 (1950) ("It is not an accident that the greater number of cases reaching this Court on the question of adequacy of notice have been concerned with actions founded on process constructively served through local newspapers.  Chance alone brings to the attention of even a local resident an advertisement in small type inserted in the back pages of a newspaper, and if he makes his home outside the area of the newspaper's normal circulation the odds that the information will never reach him are large indeed.").  Tellingly, Plaintiffs did not opt to request service in a Palestinian newspaper.[28]  Where a plaintiff claims ignorance of a defendant's whereabouts, selecting a particular newspaper—especially a foreign newspaper—without any showing that the defendant is likely to see it cannot satisfy due process. *See generally* ECF No. 22 (Mot. for Alt. Serv. as to Masri) (omitting any consideration as to publication in Palestinian newspapers).

The same due-process defect applies to Plaintiffs' request to serve Mr. Masri by social-media messaging or email.  Plaintiffs did not identify any physical location for Mr. Masri, did not establish that he regularly accesses the identified email addresses or social media accounts (only when someone using the account last posted on them), and did not show that emails or messages sent through social media platforms would actually be received, opened, or viewed by him. *See id.*

---

[28]  The stated basis for the publication selected by Plaintiffs is that because Mr. Masri provided a statement to the publication, he is likely to read it.  *See* ECF No. 22 (Mot. for Alt. Serv. as to Masri) at 15.  There is no basis for that inference.  Simply because Mr. Masri answered a newspaper's question does not mean he would subscribe to Israeli publications or otherwise read or write Hebrew.

at 5-6, 8-9. Absent such a showing, email and social-media service is no more reasonably calculated to provide notice than newspaper publication.

###### 2. Plaintiffs' Proposed Methods of Service Are Not Consistent with Palestinian Law

Service of process in the Palestinian Territories is governed by the Civil and Commercial Procedure Law No. (2) of 2001 and its amendments. Once a matter is filed and recognized by the courts in Palestine, the courts in Palestine follow the aforementioned law within Palestine. Indeed, Plaintiffs themselves quote the provision and state:

> Article 3 of the 2024 Code, amending Article 7 of the 2001 Code, provides that "notification may be made by sending a text message on a cell phone, by e-mail, or by using one of the *approved electronic means in accordance with the provisions of the system for electronic notification*." Article 13(4)(A) establishes that electronic notification "shall be deemed to have legal effects from the day following the date of receipt." The 2024 Code authorizes publication "*in two local daily newspapers*, as determined by the Supreme Judicial Council for this purpose, and on their websites or on any approved website affiliated with the Supreme Judicial Council" if electronic notification is impossible. Art. 14(1).

*See* ECF No. 22 (Mot. for Alt. Serv. as to Masri) at 14 (emphases added).

Notably, service by email is linked to the *approved system* of electronic notification. And service by publication requires publication in *two daily local* newspapers—*i.e.*, newspapers in Palestine. Plaintiffs—by their own admission—ignored these requirements and sought this Court's endorsement of methods that are inconsistent with Palestinian law. In sum, Plaintiffs ignored the Palestinian judicial system and usurped their involvement by crafting methods of service that are convenient for Plaintiffs but inconsistent with international and local norms.

Finally, though Plaintiffs assert that their chosen methods of service will ensure "actual notice" of the lawsuit, *id.* at 16, the Eleventh Circuit recognizes that "[a] defendant's actual notice is not sufficient to cure defectively executed service." *Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007) (affirming dismissal where service not properly effectuated). Here, defects in

service abound where service of process was inconsistent with Palestinian law. *See Prewitt*, 353 F.3d at 926 (affirming dismissal where plaintiffs bypassed foreign law governing service). Accordingly, dismissal of this action for improper service pursuant to Rule 12(b)(5) is also warranted.

## CONCLUSION

For the foregoing reasons, Defendants request dismissal of all claims for lack of personal jurisdiction, improper service, failure to state a claim, and failure to assert a short and plain statement pursuant to Rules 12(b)(2), 12(b)(5), 12(b)(6), and 8(a) of the Federal Rules of Civil Procedure.

## REQUEST FOR A HEARING

Pursuant to Local Rule 7.1(b), Defendants respectfully request oral argument on their Motion. The Motion raises multiple significant and complicated legal issues, including several that implicate recent Supreme Court precedent, and Defendants respectfully submit that oral argument may be helpful to the Court.  Defendants suggest 30 to 45 minutes per side in the event the Court has questions.

Dated: May 8, 2026

Respectfully submitted,

By: _/s/ Markenzy Lapointe_____

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

Markenzy Lapointe
Florida Bar No. 172601
600 Brickell Avenue, Suite 3100
Miami, Florida 33131
Phone: (786) 913-4900
Fax: (786) 913-4901
markenzy.lapointe@pillsburylaw.com

Carolina A. Fornos*
Christopher C. Caffarone*

58

31 West 52nd Street
New York, NY 10039
Phone: (212) 858-1000
Fax: (212) 858-1500
carolina.fornos@pillsburylaw.com
christopher.caffarone@pillsburylaw.com

Melissa Lesmes*
Waleed Nassar*
1200 17th Street NW
Washington, D.C.  20036
melissa.lesmes@pillsburylaw.com
waleed.nassar@pillsburylaw.com

*pro hac vice pending

*Attorneys for Defendants Bashar Masri, Palestine Real Estate Investment Company, Palestine Development & Investment Company, Palestine Industrial Estate Development Company, and Massar International, LTD.*

59