**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:25-cv-23837-DPG**

TOM SHALOM, ESTER SASI, *individually and on behalf of the estate of* AVRAHAM SASI, MORAN SASI, DANIELLE SASI, R.P., *a minor*, NATALIE SASI, LEE MELTZ SASI, SAMANTHA MELTZ, ELI SASI, DANIEL LAWRENCE SASI, ELIN LEVY SASI, TAL MELTZ SASI, SHULAMITH ZANI, RONIT RAHOUM, ESTER HALIF, YOSEF SASI, VITO SASY, IZHAK SASI, BEKHOR SASSI, MEIR SASY, YAAQOV SASI, MICHAL HALEV, RACHEL GOLDBERG and JON POLIN, *individually and on behalf of the estate of* HERSH GOLDBERG-POLIN, LEEBIE GOLDBERG-POLIN, ORLY GOLDBERG-POLIN, GURAM BENIASHVILI, SHAY SHABTAY BEN-SENIOR, *individually and on behalf of the estate of* DANIELL BEN-SENIOR, *the estate of* JACOB BEN-SENIOR, *the estate of* PERRY BEN-SENIOR, AVIRAM ABRAHAM BEJERANO, OMRI ELMALEM, EYAL WALDMAN and ELLA WALDMAN, *individually and on behalf of the estate of* DANIELLE WALDMAN, GUY WALDMAN, SHARON WALDMAN, MITCHEL NEWMAN, NOACH NEWMAN, GAVRIEL NEWMAN, DVIR TUVIA NEWMAN, BATYA LEAH SPREI, ARIEL VARDI, MICHAL ZIPPORAH ZAFRANI, *individually and on behalf of the estate of* ITAY ZAFRANI, INBAL CHEN, A.Z., *a minor*, DAVID ZAFRANI, ORI ZAFRANI, OSNAT TAL ZAFRANI, RONI ZAFRANI, MARK ZIERING and DEBORAH ZIERING, *individually and on behalf of the estate of* ARYEH ZIERING, ELIANA ZIERING, YONATAN ZIERING, TAL ZIERING, HILLA SHAY and IZHAR SHAY, *individually and on behalf of the estate of* YARON OREE SHAY, SHIR SHAY, LIOR

SHAY, OPHIR SHAY, IRIS WEINSTEIN HAGGAI, *individually and on behalf of the estates of* JUDY WEINSTEIN HAGGAI AND GAD HAGGAI, AHL HAGGAI, RAHM HAGGAI, ZOHAR HAGGAI, RONEN NEUTRA and ORNA ESTHER NEUTRA, *individually and on behalf of the estates of* OMER MAXIM NEUTRA, DANIEL YUM NEUTRA, OR JOSEPH RAHBEK, KEREN RAHBEK, LEAH RAHBEK, YANIV ROUSSO and FANNY ROUSSO, *individually and on behalf of the estate of* OFEK ROUSSO, INBAR ROUSSO, HANNAH WACHOLDER KATSMAN, *individually and on behalf of the estate of* HAYIM KATSMAN, YAEL LEVY OPPENHEIMER, *individually and on behalf of the estate of* ROY JOSEPH LEVY, I.O., *a minor*, Y.L., *a minor*, J.L., *a minor*, TZURIA LEVY, ZOHAR LEVY, NAOMI KAHANA *on behalf of* A.L., *a minor,* JUDITH LEVY, SHLOMO LEVY, ELIYAHU LEVY, IDDO MOSHE LEVY, NIR YEHEZKEL LEVY, MAYA TREGER ROSENFELD, AVRAHAM ROTHNER, EITAN MOR and SHLOMIT MIRIAM MOR, *individually and on behalf of the estate of* SMADAR MOR EDAN, LERON MOR and ZOLTAN IVAN GYONGYOSI *on behalf of*, A.E., *a minor*, M.E., *a minor*, Am.E., *a minor*, LERON MOR, SARAH BOMFLEK, DONALD GOODMAN, NOA MORGAN CHERNEY, GIL BOAZ DANIELS, RIVKA DAVIDOVICH, A.D., *a minor*, Mi.D., *a minor,* H.M.D., *a minor*, M.D., *a minor*, S.E.D., *a minor*, Y.D., *a minor*, A.E.D., *a minor*, CHANA SARAH BEN ZAKEN, S.L.*, a minor,* A.L.*, a minor,* Ay.BZ.*, a minor,* Av.BZ.*, a minor,* HADAS PNINA SAFFER BEN HAMO, N.B.H.*, a minor,* R.B.H.*, a minor,* M.B.H.*, a minor,* NAAMA SAFFER AMAR, A.A., *a minor*, G.A., *a minor*, O.A., *a minor*, A.M.A., *a minor*, A.E.A., *a minor*, YEHOSHUA GOODMAN, SHIRA GOODMAN, A.G., *a minor*, B.G., *a minor*, Y.G., *a minor*, B.G., *a minor*, M.G. *a minor*,

N.G., *a minor*, LEOR ZER-CHEN, YAAKOV ZER-CHEN, YAEL ZER-CHEN, AVRAHAM GUTSTEIN, MIRIAM GUTSTEIN, Z.C.G., *a minor*, YITSHAK YISACHAR GUTSTEIN, TAMAR GUTSTEIN, S.G., *a minor*, ODEYA CHEN NATAN, A/K/A ODEYA CHEN TEICHER, NAOMI TEICHER, MICHAEL JAY TEICHER, SHLOMI REVIVO, NAOMI FEIFER-WEISER and YISRAEL WEISER, *individually and on behalf of the estate of* ROEY WEISER, SHANI WEISER, NADAV WEISER, RUBY CHEN and HAGIT CHEN, *individually and on behalf of the estate of* ITAY CHEN, ROY CHEN, A.C., *a minor*, OREN GLISKO and LIAT GLISKO, *individually and on behalf of the estate of* ITAI GLISKO, ORI GLISKO, Y.G., *a minor*, ETHAN LIBIN, SHLOMO WERDE, REUT ENGLE, JAY MICHAEL (YECHIEL) LEITER, CHANA LEITER, NERIYA DOV LEITER, SARA BRACHA ATTIAS, DAVID ELIMELECH LEITER, SOPHIA REDLER, SAMUEL YAIR LEITER, NOAM ELISHA LEITER, AMIKAM TZION LEITER, AARON BOURS, ROBERT AIRLEY and JENNIFER AIRLEY, *individually and on behalf of the estate of* BENYAMIN AIRLEY, A.A., *a minor*, C.A., *a minor*, Y.A., *a minor,* SARAH AIRLEY, YEHUDA AIRLEY, SHOSHANA BRACHA SHAFER, MICHAEL MARTIN SHAFER, RIVKA YEHUDIS SHAFER, A.S., *a minor*, E.L.S., *a minor*, E.P.S., *a minor*, YEHUDA SHAFER, YISROEL MEIR SHAFER, YITZCHOK SHAFER, NECHAMA SORAH GOVE, CHANA SHIRA ABRAHAM, CHAIM SHAFER, ELITZUR MOSES, DAFNA MOSES, Y.M.*, a minor,* Ei.M.*, a minor,* Ey.M.*, a minor,* T.M.*, a minor,* C.M.*, a minor,* TOVA SCHENKOLEWSKI, AMICHAY KLUGHAUPT, ARYEH THALER, JEFFREY THALER, KAREN THALER, ZEV THALER, ELIYAHU THALER, YOSEF THALER, PESHA THALER, A.T. *a minor*, L.T., *a minor*, R.T., *a minor*, H.T., *a minor*, VARDA MORELL and EITAN MORELL,

*individually and on behalf of the estate of* MAOZ MORELL, E.E.M., *a minor*, C.M, *a minor*, SHACHAR YEHUDA MORELL, MORDECHAI ELIEZER MENACHEM MORELL, DOV YERACHMIEL MORELL, AARON MOSHE SPITZ, LEAH SPITZ, GAVRIEL BINYAMIN SPITZ, AVITAL MIRIAM SPITZ, A.H.S.*, a minor,* A.S.S.*, a minor,* I.J.S.*, a minor,* NADAV BENJAMIN SHINDMAN, SIMEON ZIMBALIST and SARA ZIMBALIST, *individually and on behalf of the estate of* ELIYAHU MOSHE ZIMBALIST, S.Z. *a minor,* B.Z., *a minor*, A.Z. *a minor*, NECHAMA ZIMBALIST, AVIVA ZIMBALIST, SHIRA ZIMBALIST, NATHAN SUSSKIND, SHELOMO TAWIL, ELIEZER BENZAKEIN, DAVID APELBAUM, NECHAMA APELBAUM, MICHAL BERGER BING, ELIOR BITON, E.S.N., *a minor,* R.N., *a minor,* SHIRA GOODMAN, SHACHAR HANNA KASSEL, M.S.K., *a minor,* Sh.K., *a minor,* S.K., *a minor,* D.C.K., *a minor,* Av.K., *a minor,* Y.Y.K., *a minor,* Ah.K., *a minor,* E.K.*, a minor,* B-S.K.*, a minor,* Ye.K.*, a minor,* BARAK KOSKAS, NAOMI RUSSEK, R.R.*, a minor,* S.R.*, a minor,* T.R.*, a minor,* A.R.*, a minor,* Ef.R.*, a minor,* C.P.R.*, a minor,* M.H.R.*, a minor,* Ep.R.*, a minor,* Av.R.*, a minor,* ELI KNOLLER, *individually and on behalf of the* ESTATE OF NADAV KNOLLER, ROSEANNE GREENWALD KNOLLER, HADAR KNOLLER, Y.K., *a minor,* YUVAL KNOLLER, ORTAL KNOLLER, ITAI KNOLLER, GILIT KNOLLER STZRIGLER, DAVID MESSNER, AHARON HOLTZMAN, SHILO SAPIR, TAYYIR AZULAI, L.A., *a minor*, H.A., *a minor*, T.A., *a minor*, Y.A., *a minor*, LEAH FAYAZI, EBRAHIM FAYAZI, AVIGAIL AHARONOV, MALKA MICHAEL, SHLOMO FAYAZI, L.F., *a minor*, Yi.F., *a minor*, NAOMI ARONOF, HADASSA MIZRACHI, ELISHEVA HAZIZA, DAVID FAYAZI, AYALA PERETZ, YOCHEVED FAYAZI, Yo.F., *a*

*minor*, CHAYA MUSHKA HORDINER, DAVID TAWIL, NAOMI RACHEL KASSIN, LISA BERGER, DEVORAH RACHEL SAFFER, HAIM KATZIN, ISRAEL KATZIN, YONATAN FRANK, NATALI ROTCHES, JONATHAN KARTEN, EZRA KASSIN, E.K., *a minor,* SAMUEL BLISKO, JOSHUA FRIEDMAN, LAUREN FRIEDMAN, R.Y.F., *a minor*, R.E.F., *a minor*, E.T.H.F., *a minor*, SELA KEDEM, SHIRA NAVON and HAIM REFAEL NAVON, *individually and on behalf of the* ESTATE OF ELKANA NAVON, H.N., *a minor*, E.N., *a minor*, AYALAH NAVON, ARYE NAVON, BINYAMIN OVADIA, LIAD SIMCHONY, HILLY SIMCHONY, ZVI SIMCHONY, and EDEN SIMCHONY,

     Plaintiffs,

   v.

BASHAR MASRI, PALESTINE REAL ESTATE INVESTMENT COMPANY, PALESTINE DEVELOPMENT & INVESTMENT COMPANY, PALESTINIAN INDUSTRIAL ESTATE DEVELOPMENT COMPANY, and MASSAR INTERNATIONAL, LTD.,

   Defendants.

_____/

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

## INTRODUCTION

1. In the years leading up to the terrorist attacks of October 7, 2023 ("October 7 Attack"), the Islamic Resistance Movement ("Hamas") planned and trained for a ground invasion of Israel while engaging in strategic deception designed to persuade Israel that it was not an immediate threat.

2. Despite numerous public statements promising a decisive campaign to destroy

Israel, Hamas was not, the deception went, planning to act upon its threats—but was, instead, focused on directing its energies toward the economic development of the Gaza Strip, which it had controlled since 2007.

3.      When Hamas launched its large-scale invasion on October 7, 2023, murdering more than 1,200 people and taking 251 others hostage, mostly civilians, Israel's security and intelligence services were caught completely off guard, having been lulled into a false sense of security. Plaintiffs—American victims of the October 7 Attack and its aftermath, and their family members and their estates—suffered unimaginable harm.

4.      Defendants were an integral part of that grand deception—as well as the October 7 Attack itself. Defendants owned and operated flagship properties in Gaza that they knowingly and deliberately integrated into Hamas's terrorist infrastructure, including by hosting a Hamas weapons training site and facilitating the construction, rebuilding, and maintenance of attack tunnels, missile launch sites, and other terrorist infrastructure for Hamas's use. Attack tunnels were crucial elements in Hamas's strike plan for October 7, and Defendants' properties themselves were foreseeably used by Hamas on October 7 itself. Defendants' conduct also foreseeably contributed to further terrorist and civilian deaths in the months that followed.

5.      Defendant Bashar Masri ("Masri") is a U.S. citizen and purported billionaire. After engaging in violence against Israel for years, Masri decided to remake himself and burnish a reputation as a legitimate businessperson and visionary entrepreneur, committed to developing the Palestinian economy and ostensibly finding ways to work with Israel.

6.      Masri came to own and operate a number of properties and large-scale development projects in the Palestinian Territories, including in the Gaza Strip. He repeatedly accessed the U.S. Government, as well as other Government-related and aid institutions in Washington, D.C., for

resources to finance the development and improvement of these properties as well as his other ventures. He even accessed a senior U.S. official in connection with efforts to evade this lawsuit.

7.     Yet, all the while Masri was attracting praise and securing capital from governmental and multilateral institutions in the U.S. to invest in his properties, he and the companies he controls were actively aiding and abetting and conspiring with Hamas to build and maintain terror infrastructure used before and during the October 7 Attack and to provide cover for Hamas's true violent aims.

8.     Masri and the closely-associated and interrelated companies he controls—including Defendants Palestine Development & Investment Company ("PADICO"), Palestine Real Estate Investment Company ("PRICO"), and Palestinian Industrial Estate Development Company ("PIEDCO")—developed and operated prime properties in Gaza for outwardly legitimate purposes.

9.     But in reality, Masri and his companies used these properties—developed with funding from *the U.S. Government and aid organizations in Washington, D.C.*—to construct and conceal Hamas's terrorist infrastructure, including attack tunnels used to store and launch rockets at Israel, host Hamas leadership and operatives, and even to produce electricity for Hamas's attack tunnel infrastructure.

10.     Masri and his companies also permitted their properties to be used for Hamas weapons training, a forward observation post (replete with the Hamas flag) to surveil the Israeli border, and a tunnel excavation workshop used to expand and reinforce Hamas attack tunnels.

11.     Just prior to the October 7 Attack, Masri even installed an individual closely tied to Hamas as Chairman of PIEDCO, the entity that managed Masri's flagship property—a property that Hamas used to prepare for and execute the October 7 Attack, and that was honeycombed with

Hamas terrorist infrastructure built or restored in the years leading up to that attack.

12.     The properties Defendants developed with Hamas were part of the infrastructure Hamas used to train for and execute the October 7 Attack itself.

13.     Masri used Defendant Massar International Ltd ("Massar")—a holding company which indirectly owns a significant stake in PADICO, among other things—to secure funding from the United States and various governmental and international organizations. This funding flowed into Gaza, and Masri used it, in part, to provide logistical and infrastructural support to Hamas through helping to construct, maintain, and conceal terrorist infrastructure and by contributing solar-generated electricity to Hamas's attack tunnel network.

14.     But Defendants' collaboration with Hamas went even deeper: the development of these properties deliberately advanced Hamas's false narrative that it was interested primarily in the economic development of Gaza and a grudging coexistence with Israel.

15.     At a time when the outside world was understandably skeptical about financing the development of an enclave controlled by a violent, U.S.-designated Foreign Terrorist Organization ("FTO"), Masri traded on his carefully cultivated image as a peace-building businessman and used his connections, both inside the Palestinian Territories and in Washington, D.C., and across the West, to convince U.S.-related institutions like the World Bank and other governmental and multinational entities to invest in his Gaza projects.

16.     Masri cloaked himself in legitimacy in service of this grand deception. His marital residence in the Kalorama section of Washington, D.C., was up the street from the residence of a former U.S. president and assorted political leaders and diplomats. He donated to multiple political campaigns and sat on the Dean's Council at Harvard University's Kennedy School of Government until he resigned after his role in the October 7 Attack described herein was publicized.

17.     He continues to serve alongside dignitaries and business elites on the board of the Middle East Investment Initiative, and even served on the advisory council of the U.S. Development Finance Corporation ("DFC") from 2020-2023, a U.S. government agency from which he secured tens of millions of dollars for one of his investment funds.

18.     For years, Masri leveraged his meticulously cultivated image in Washington to gain consulting contracts and secure financing for his development projects in Gaza and elsewhere from U.S. Government entities, such as the taxpayer-funded U.S. Agency for International Development ("USAID"), the Overseas Private Investment Corporation ("OPIC," the DFC's predecessor agency), the World Bank's International Finance Corporation ("IFC"), and Multilateral Investment Guarantee Agency ("MIGA").[1]

19.     As set forth below, Masri, through companies he fully controls, gained multiple contracts to advise the above-mentioned agencies in Washington, D.C., while simultaneously soliciting them successfully for millions of dollars in investments and loans for other companies he owns and controls.

20.     He also used the agencies to provide his companies with the appearance of legitimacy and diplomatic cover, which itself aided his further fundraising efforts and deterred Israel from striking Defendants' properties.

21.     The crown jewel of Masri's developments in Gaza was the Hamas-infested Gaza Industrial Estate ("GIE" or "Estate"), which Masri personally visited and oversaw. Through companies he controls, including PADICO, PRICO, and PIEDCO, Masri owned and operated this

---

[1]     According to the IFC: "The U.S. is IFC's largest shareholder and actively supports private sector development globally through a combination of co-investment, advisory and blended finance. The U.S. government has provided important contributions to IFC Private Sector Advisory Services with a historic focus on investment climate reform, private sector development, and solar energy." The United States is also the largest shareholder in the World Bank.

480,000 square meter industrial park, which sat only a few hundred yards from the border fence between Gaza and Kibbutz Nahal Oz, an Israeli community that Hamas overran during the October 7 Attack.

22.     To develop the GIE, Masri and the companies he controls relied heavily on foreign aid—especially from the United States. They obtained financing from the UN, the European Union, and more recently (in 2022), the IFC in Washington, D.C. (along with insurance from MIGA).

23.     Prior to the October 7 Attack, Hamas conducted firearms training on the grounds of the GIE.  A dedicated Hamas training base sat next to the GIE and was physically connected to it through the tunnel system.  The GIE also supported another Hamas command center in a mosque immediately outside the GIE's western gate that contained weapons, instructions on the use of various explosive devices and a detailed map (shown below) of one of the Israeli communities targeted by Hamas on October 7.

24.     Hamas operatives in uniform openly roamed the grounds of the GIE and used it to conduct surveillance of Israel.  Hamas used the GIE on October 7 to launch its attack on Israel and Hamas fighters were killed on its grounds that day.

25.     In developing the GIE, Masri, PIEDCO, and the other Defendants worked directly, openly, and knowingly with senior Hamas leaders, including, in the months before the October 7 Attack, a Hamas official in charge of the development of Hamas's terrorist-industrial base in Gaza.

26.     Above ground, the GIE was a showcase for legitimate businesses like Coca-Cola and a variety of light manufacturing companies.

27.     But beneath the surface, Masri and the companies he controls worked with Hamas—even hiring a construction company controlled by Hamas's terror apparatus,  the so-

called Izz al-Din al-Qassam Brigades ("Qassam Brigades"). This company was paid to construct and conceal an elaborate subterranean attack tunnel network which Hamas used to attack nearby Israeli communities, and to ambush Israeli military personnel.

28.     Ongoing construction on the attack tunnels below the GIE took place in the lead-up to the October 7 Attack, and the tunnel network was still being expanded and developed at the time of the attacks – as evidenced by excavation workshops on and near the premises that contained engineering supplies for the tunnels.

29.     Hamas also used the GIE to probe the border fence and test Israel's response times and countermeasures in the lead up to the October 7 Attack. (Hamas even installed an anti-tank battery in one of the GIE's water towers facing the border). Hamas also used buildings within the GIE to store weapons and to hold meetings, including in newly constructed buildings.

30.     The photograph below depicts a Hamas observation post facing the Israeli border situated next to a GIE building regularly used by Hamas operatives for meetings. Hamas's (green) flag was openly displayed next to the observation post.  This observation post was connected to the Hamas tunnel network that ran under, through and around the GIE.



*Hamas Observation Post at the GIE - December 4, 2022*

31.     In one of the opening acts of the October 7 Attack, Hamas breached the border fence north of the GIE.

32.     Additionally, thanks to the financing that Defendants obtained from the IFC in the United States, the GIE also featured advanced solar technology, officially intended, in part, to provide electrical power to the GIE's commercial tenants. But at a time when ordinary Gazans were often without power, Defendants knowingly siphoned off electricity from their World Bank-funded solar project to power Hamas's attack tunnel network below the GIE and other areas of central Gaza.

33.     Bashar Masri's other prestige projects in Gaza, which Defendants owned, operated, and which Masri personally visited and oversaw, included two luxury seaside hotels, the Blue Beach Hotel and the Al Mashtal Hotel (rebranded in 2023 as the Ayan Hotel).

34.     Hamas operatives and leaders—including the architect of the October 7 Attack, Yahya Sinwar—regularly used the hotels to host public and private Hamas events. Hamas officials also used the hotel for private functions, relaxing in the luxury accommodations and facilities that few Gazans could afford.

35.     But the hotels' involvement in Hamas's plans went deeper than just hosting Hamas terrorists. As far back as 2014, Al Mashtal Hotel, adorned with large UN and EU signage on its roof to deter Israeli counterstrikes, hosted a significant network of Hamas attack tunnels. These tunnels were used to launch rockets into Israel and served as a command center for Hamas's leaders during the 2014 conflict between Israel and Hamas. Israel eventually struck a launch site on the grounds and damaged the hotel.

36.     In the years after the hotel was damaged, Masri, PADICO, and PRICO worked closely with Hamas and (with respect to at least the Al Mashtal Hotel) a Qassam Brigades-affiliated construction company to renovate and refurbish the hotels, including electrical upgrades used to power Hamas's tunnel network beneath them, and to restore and enhance the rocket launching sites positioned near the hotels.

37.     Hamas worked on its terrorist tunnel network, which ran under and into Masri's hotels during the renovation of the Al Mashtal Hotel with Defendants' knowledge and active assistance, and the tunnels were accessible directly from guest rooms and other facilities inside the hotels.

38.     On October 7, 2023, Hamas fired rockets from the rocket launching sites structurally connected to the Al Mashtal Hotel.

39.     The restored Blue Beach Hotel included a labyrinth of tunnels with multiple shafts accessible inside and on the grounds of the hotel. The Blue Beach tunnel complex linked the hotel

- 13 -

to the adjacent Badr Base, a Hamas training facility a few hundred meters southwest of the hotel, where the Qassam Brigades trained its equivalent of the Navy SEALs and could reach the Mediterranean without deploying above-ground.

40. Hamas later established a command post inside the Blue Beach Hotel itself and multiple rooms contained weapons and equipment used by Hamas during the October 7 Attack and its aftermath.

41. During and after the October 7 Attack, Hamas used Defendants' hotels and the tunnel network connected to them both as a base of operations and a defensive position from which to later ambush Israeli troops. The hotels were severely damaged in November 2023 after a pitched battle between Israeli forces and Hamas terrorists positioned inside and under the hotels.

42. By actively working with Hamas while simultaneously advancing Hamas's campaign of deception, Defendants aided and abetted and conspired with Hamas and its Qassam Brigades.

43. The October 7 Attack and the deaths and injuries sustained by plaintiffs thereafter were a foreseeable consequence of Defendants' collaboration with Hamas and its Qassam Brigades.

44. Plaintiffs—American victims of the October 7 Attack and its aftermath, and their family members and their estates—therefore bring this action under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d)(2).

## JURISDICTION AND VENUE

45. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2333(a) and (d), and 18 U.S.C. § 2338 as a civil action brought by citizens of the United States who have been injured by reason of acts of international terrorism committed by Hamas.

46.     Venue is proper in this District pursuant to 18 U.S.C. § 2334(a) (the first named Plaintiff resides in this district) and 28 U.S.C. § 1391(b) and (d).

47.     Defendants are each subject to personal jurisdiction pursuant to Federal Rule of Civil Procedure 4(k)(2) because (1) Plaintiffs' claims arise under federal law; (2) Defendants are not subject to personal jurisdiction in any other State; and (3) it is reasonable to exercise jurisdiction over Masri, PADICO, PRICO, PIEDCO, and Massar under flexible Fifth Amendment due process principles.

48.     Masri and the corporations he controlled obtained funding in the United States, in part paid for by U.S. taxpayers, not just to develop their Gaza properties, but specifically with the knowledge and intention to enhance Hamas's terror infrastructure (particularly tunnel infrastructure) and provide electricity to that Hamas terror infrastructure. American citizens therefore footed much of the bill for Defendants' contribution to Hamas's murderous capabilities that injured or killed hundreds of Americans including Plaintiffs.

49.     Defendants have substantial ties with the United States as a whole because, among other things, they have *repeatedly* sought and received funds in and from the United States—much of it in connection with their properties, particularly the GIE:

a. Some of this funding it benefitted from came *directly* from the U.S. Government. For example, the GIE was built in part with funds provided by USAID, an arm of the United States federal government. Several Defendants, including Massar, receive funding from the DFC (or its predecessor, OPIC), a U.S. Government agency; in one instance, OPIC provided $30 million to Massar. In fact, Masri sat on the *advisory council* of the DFC.

b. Significant funding came from the U.S.-based World Bank—of which the U.S. is the largest shareholder—and its affiliates, including the IFC and MIGA. The U.S.-based IFC provided funding to develop solar energy technology at the GIE. After Israel was forced to strike the GIE in 2021 due to the existence of Hamas tunnels and infrastructure there, Masri, via PRICO, obtained *additional funding* from the IFC in 2022 for solar energy at the GIE. These solar panels ultimately helped to power Hamas's attack tunnels. For the same project, Masri

obtained a $6 million insurance policy from U.S.-based MIGA.

50.     Masri also had a number of contracts with the U.S. Government, including with *the very entities that he repeatedly turned to for financing*. For example, Massar, through a consulting subsidiary, had contracts with USAID and the World Bank.

51.     But the assistance that Masri and his companies sought in the United States went beyond financial support. Masri repeatedly corresponded with U.S. officials regarding his projects. Indeed, as described below, Masri sought assistance from a U.S. Government official to facilitate dismissal of *this very action*.

52.     The United States always has a strong interest in providing a forum for its citizens injured in terrorist attacks. But the United States' interest here is even deeper because of the fact that Masri repeatedly sought and received funding in the United States to develop his projects which he knew benefitted the Hamas terror infrastructure used during the October 7 Attack.

53.     Each Defendant is subject to personal jurisdiction here.

54.     **Masri:** Defendant Masri has substantial aggregate contacts with the United States as a whole to satisfy the Fifth Amendment's Due Process Clause. Masri is a naturalized U.S. citizen who has owned real property in and around Washington, D.C. (and where his wife, at least, lives on a full-time basis), and who has systematically conducted business throughout the United States for decades, including, as noted, securing tens of millions of dollars in financing from U.S.-based institutions for entities he controls, serving on a U.S. government advisory council, and engaging in substantial political and philanthropic activities across multiple states including Virginia, Massachusetts, and Maryland.

55.     **Corporate Defendants:** Likewise, PADICO, PRICO, PIEDCO, and Massar (collectively, the "Corporate Defendants"), each have substantial aggregate ties with the United

States as a whole to satisfy the Fifth Amendment's Due Process Clause. These entities, acting under Masri's direction and control, have conducted substantial capital raising and other business activities within the United States. These activities include obtaining financing and insurance from institutions located in the U.S. totaling tens of millions of dollars, processing this financing through New York and Washington, D.C. financial institutions, maintaining consulting contracts with U.S. government agencies, and operating through U.S. and other corporate structures that list U.S. addresses.

    a. **PADICO:** As described in more detail below, PADICO has substantial connections with the United States.

    b. **PRICO:** As described in more detail below, PRICO has substantial connections with the United States.

    c. **PIEDCO:** As described in more detail below, PIEDCO has substantial connections with the United States.

    d. **Massar:** As described in more detail below, Massar has substantial connections with the United States.

56. The companies that comprise the Corporate Defendants—PADICO, PRICO, PIEDCO, and Massar—are closely associated, act for each other's benefit, have interlocking ownership structures, and share directors and employees.

57. Defendants' extensive contacts with the United States are directly related to the underlying claims in this case.

58. Defendants exploited their extensive U.S. contacts and Masri's carefully cultivated American identity to deceive U.S.-based institutions and secure funding that directly enabled Hamas's terrorist infrastructure used in the October 7 Attack.

59.     That included, among other things, funds received in connection with the PRICO Gaza Solar project at the GIE.

60.     Masri leveraged his U.S. citizenship, Washington D.C. residence, and carefully cultivated relationships with U.S. government agencies – including serving on the advisory board of the DFC from 2020-2023 – to obtain tens of millions of dollars in financing from U.S. taxpayer-funded institutions, including DFC-predecessor OPIC, and the World Bank's IFC and MIGA, which he then used in substantial part to develop the very properties in Gaza that formed core infrastructure for Hamas's October 7 Attack.

61.     The Corporate Defendants processed this U.S.-sourced financing through financial institutions in the United States, while Masri's investment fund purposefully sought out and attracted investment from prominent U.S. investors, demonstrating how Defendants exploited their privileged access to U.S. institutions to secure financing for projects supporting Hamas's terrorist activities.

62.     Masri's consulting company, operating through Massar, also maintained contracts with USAID, using this relationship to provide legitimacy and diplomatic cover for Hamas operations.

63.     Defendants' U.S.-based activities were not merely incidental to their collaboration with Hamas; they were integral to enabling the terrorist attacks that injured Plaintiffs – from the IFC-funded and MIGA-insured solar energy projects at the GIE that enabled the expansion of Hamas infrastructure there and directly powered the Hamas attack tunnels used in the October 7 Attack, to the protective diplomatic cover that deterred Israeli strikes on Hamas infrastructure at Masri's properties until after the massacres had already occurred.

**DEFENDANTS**

64.     **Masri:** Defendant Bashar Masri is a natural person who holds U.S. citizenship and

- 18 -

was previously domiciled in and around Washington, D.C. where he owned several properties, and where his wife lives on a full-time basis.

65.     Masri is the chairman of Defendant PADICO, a holding company that invests in numerous purportedly legitimate businesses in a variety of sectors throughout the Palestinian Territories, and its subsidiary, Defendant PRICO.

66.     Masri controls PADICO and directs its operations.

67.     **PADICO:** PADICO, through its subsidiaries, owns and controls the GIE, the Blue Beach Resort, and the Al Mashtal Hotel. As set forth in detail below, these properties formed an essential part of Hamas's terrorist infrastructure.

68.     PADICO is incorporated in the Republic of Liberia and has its principal place of business in Rawabi, a planned community near Ramallah in the Palestinian Territories that Masri developed with financing from Qatar.

69.     **PRICO:** PRICO is a subsidiary of PADICO, which owns over 80% of its shares.

a.  PRICO was incorporated in 1994 and was listed on the Palestinian Stock Exchange in 1997. Its principal place of business is Al Masyoun Ramallah, PADICO House Building, Ramallah, Palestinian Territories. Like PADICO, PRICO is controlled by Masri.

b.  PRICO is engaged in real estate investment and development in the Palestinian Territories. It has been described as "the investment arm and subsidiary of PADICO [] in the real estate sector."

70.     **PIEDCO:** Defendant PIEDCO is a subsidiary of PRICO, which owns over 80% of its shares.

a.  Masri controls PIEDCO.

b.  PIEDCO manages the GIE on behalf of PRICO, PADICO, and Masri.

71.     **Massar:** Masri is also the founder and chairman of Defendant Massar International Ltd ("Massar"), which indirectly owns a controlling stake in PADICO.

a. Masri incorporated Massar in Cyprus and lists his address in the corporate filings as Falls Church, VA, and his citizenship as "United States."

b. Massar is the holding company through which Masri indirectly owns approximately 16% of PADICO's shares and controls PADICO. It is incorporated in Cyprus with its principal place of business at Q Center Rawabi, Palestinian Territories.

c. Massar also controls Massar Consulting and Technical Services, which boasts clients that include the European Union, European Commission, the World Bank, USAID,[2] UN Development Program ("UNDP"), and PADICO.[3]

d. Massar partnered with the Qatar Diar Real Estate Investment Co. to develop the planned city of Rawabi, near Ramallah. Qatar provides significant funding to Masri's business operations (in addition to having widely known links to Hamas).[4]

72.     As set forth in detail below, acting through the Corporate Defendants, Masri has conspired with and knowingly provided substantial assistance to Hamas and its Qassam Brigades and aided and abetted the acts of international terrorism that injured Plaintiffs.

## FACTUAL ALLEGATIONS

## I.     BASHAR MASRI AND THE CORPORATE ENTERPRISES HE CONTROLS

### A.     Masri's Ties to the United States

73.     Defendant Bashar Masri was born in 1961 in Nablus, a city in what is now the Palestinian Territories but was then controlled by Jordan.

74.     After graduating from high school in Egypt, in 1978, Masri came to the United States. He attended college at Richard Bland College in Petersburg, Virginia, and Virginia Tech. He graduated in 1983.

75.     Masri began his professional career with a Saudi Arabian company before joining

---

[2]     As discussed below, Massar Consulting and Technical Services was retained as a primary subcontractor to Chemonics International on a USAID initiative aimed at strengthening micro-finance institutions in the Palestinian Territories and by DPK Consulting for a USAID project creating two dispute resolution centers in Gaza and Ramallah.

[3]     Massar Consulting and Technical Services also received funding from USAID in 2001-2004 for "strategic planning, implementation, management and promotion" of the GIE.

[4]     Qatar has hosted Hamas's Political Bureau since 2012 and allowed Hamas's most senior officials to reside in Doha both before and after the October 7 Attack. It has also bankrolled Hamas for more than a decade.

LMRC, a management consulting and lobbying firm in Washington, D.C., in 1986.

76.    Masri returned to the Palestinian Territories after the start of the First Intifada in 1987. The First Intifada was an organized series of demonstrations and acts of terrorism organized by various Palestinian factions, including Hamas, against Israel, lasting until the Oslo Accords were signed in 1993. Palestinian rioters targeted Israelis with rocks, Molotov cocktails, rifles, grenades, and explosives.

77.    Masri's return to the Palestinian Territories during the First Intifada did not happen by coincidence—he was there to help lead it. As he told *Time Magazine* in 2015, "At that stage, I wasn't going out in demonstrations. I was more on the planning side."[5]

78.    Masri's support for violent activities led to Israel barring his entry into Israel in 1991, when the Israeli Minister of the Interior determined Masri was a security risk to the country. He was allowed to return in 1994 after the signing of the Oslo Accords between Israel and the Palestine Liberation Organization.

79.    Masri married Pennsylvania native Jane Masri in 1989, which enabled him to gain United States citizenship. Masri and Jane have two children who are United States citizens and who were largely raised in the United States, in the suburbs of Washington, D.C. At least one of Masri's children still lives in the United States.

80.    As best as can be determined, Masri is still married to Jane Masri.[6]

81.    As noted above, in the mid-1990s, Masri set his sights on business ventures in the Palestinian Territories, and the family moved there, where they resided until the early 2000s.

---

[5]    Inna Lazareva, *Meet the Palestinian Who Went From Throwing Stones at Israelis to Building a Town With Them*, TIME MAGAZINE, Sept. 1, 2015, *available at* https://time.com/4018306/rawabi-bashar-masri/.

[6]    Jane filed a petition for divorce in the Fairfax County Circuit Court in February 2014. However, Jane later nonsuited the action, causing the court to terminate the divorce action without issuing a decree of divorce.

82.     At that point, the family moved back to Virginia. Masri traveled back and forth between the United States and Ramallah.

83.     For many years, Masri's home base was a house in Falls Church, Virginia, which he owned. In the late 2010s, he and Jane sold this home and moved to a house in northwest Washington, D.C.

84.     Masri has consistently maintained close ties to the United States through his family and businesses. As he stated to the *Forward* in 2011, "I'm Palestinian, I'm American. I'm proud of being both, but I've gained so much experience in the United States that my smaller nation, the nation in the making, needs."

85.     For decades, Masri has been actively engaged in American politics. Since 1988, he and Jane have donated over $100,000 to various political causes. As recently as February 2022, Masri contributed to the campaign for a Maryland congressperson, listing the residence in Washington, D.C., as his residence on the donation form. In total, he has donated to U.S. politicians seventeen different times, including four times from 2018 to 2022.

86.     From 2014 until 2025, when, as noted above, the allegations described herein were publicized and he was asked to resign, Masri was a member of the Harvard University Kennedy School's Dean's Council. He has also served on Harvard's Committee on University Resources.

87.     In 2018 he established and currently funds the graduate Rawabi Fellowship for Leaders from Palestine at the Harvard University Kennedy School. This fellowship program provides tuition, health insurance, and stipends for Palestinian graduate students at Harvard.

88.     The Rawabi Foundation is a registered nonprofit with a listed address of Falls Church, VA until at least 2016. The Rawabi Foundation has a partnership with the Harvard Kennedy School of Government.

89.     Masri served as a member of the advisory council of the U.S. International Development Finance Corporation from 2020 to 2023. In this capacity, he advised on U.S.-led investment strategies aimed at fostering economic development in the Palestinian Territories.

90.     As discussed below in more detail with respect to the Corporate Defendants, Masri repeatedly relied on the U.S. Government (including Government agencies like USAID) and U.S. Government-related entities, like the World Bank, to finance the development and improvement of his properties—including for the specific benefit of Hamas and the commission of the October 7 Attack. Masri used these entities to build out Hamas infrastructure and funneled U.S.-sourced dollars (including U.S. taxpayer dollars from the World Bank) to build a solar energy platform that Defendants siphoned to Hamas's tunnel infrastructure. He did so over the course of several years, including as recently as the year before the October 7 Attack.

91.     Masri has communicated regularly with the United States Government concerning his affairs.

92.     In fact, following the filing of the Complaint in this case, Masri again called on his sympathetic U.S. Government contacts for assistance, this time enlisting the help of a U.S. government official to contact certain Plaintiffs in this proceeding. The senior U.S. official did so. He urged those Plaintiffs to drop this lawsuit because of Masri's purported relative moderation and cooperation with the United States.

**B.      Masri's Business Enterprises and Their Ties to the United States**

93.     Masri controls a variety of corporations and shell companies, including the Corporate Defendants herein. Because many of Masri's corporate holdings are held in offshore structures in, *e.g.*, Cyprus and the Cayman Islands,[7] a complete mapping of his business entities

---

[7]      Masri also controls multiple companies registered in Panama and the British Virgin Islands.

and investors is difficult.

94.     Among the entities relevant in this case are the Corporate Defendants: PADICO, PRICO, PIEDCO, and Massar. But Masri owns many other entities beyond these.

95.     Many of these companies own stakes in each other, thereby creating interlocking ownership structures.[8] For example, Masri's Rawan International Investment Company owns nearly 20% of Defendant PADICO and 2% of Defendant PRICO but is itself 100% owned by PADICO, and Masri's Siraj Palestine Fund I owns 6.5% of PADICO but is controlled by Defendant Massar – which also separately owns almost 16% of PADICO indirectly.

96.     PADICO owns more than 80% of PRICO, and PRICO owns more than 80% of PIEDCO. PRICO also owns a small share of PADICO.

97.     Masri unilaterally controls and runs these businesses personally, both directly and using a team of trusted long-time employees who sit on overlapping boards and management teams and implement his policies.  All material decisions flow from Masri himself.

| Individual | Corporation/Entity | Role |
|---|---|---|
| Bashar Masri | PADICO | Chairman |
| | Massar International Ltd. | Founder, Chairman |
| | PRICO | *Former* Member of Board of Directors |
| Wadie Muhammad Shabban Al-Masri | Blue Beach Hotel | General Manager |
| | Al Mashtal Hotel | General Manager |
| | GIE | Former Director; Board Member |
| | Al Mashtal Hotel Tourism Investment Company | Chairman of the Board of Directors |

---

[8]     Masri has also employed many of the same personnel at his primary Gaza investment locations. For example, Wadie Muhammad Shabban Al-Masri worked as general manager of both the Blue Beach Hotel and Al Mashtal Hotel and formerly served as director of the GIE. Similarly, Mohammad Najjar—Chairman of the Al Mashtal Hotel board of directors—is also director of the Infrastructure and Energy sector at PADICO Holding, where he oversees PADICO's investments portfolio in Gaza.

| Mohammad Najjar | PADICO | Director of Infrastructure and Energy |
| | PRICO | Board of Directors |
| Abdallah Sabat | PADICO | Chief Executive Officer |
| | Massar International Ltd. | Senior Partner; Trustee of Masri's children's shares |
| | Siraj Palestine Fund I | General Manager |
| Khaled Anabtawi | PADICO | Board of Directors |
| | PIEDCO | Chief (2021) |
| Nimer S. Abdul Wahed | PADICO | Chief Financial Officer |
| | PRICO | Chairman of the Board of Directors |
| Ziad Y. Tafesh | PADICO | Deputy Admin and HR Manager |
| | PRICO | Board of Directors |

98.     The entities that Masri uses, including the Corporate Defendants, lack well-defined boundaries. Masri designed this set of corporations as corporate buffers for the unified purpose of running his business empire. Masri constructed them to have interlocking ownership structures and lack customary formalities. Masri uses them as parts of a single corporate organism, and as such they customarily act for each other's benefit and have control over each other's affairs. Tellingly, three of the entities (PADICO, PRICO, and PIEDCO) share the same logo.

99.     A prime example of this core reality is illustrated by a May 2022 signing ceremony between PRICO and Hamas to refurbish parts of the GIE, following prior Israeli strikes on Hamas infrastructure in the GIE (detailed below). Although a representative of PRICO nominally signed the agreement with Hamas, the signage at the ceremony read "PADICO"; and PADICO posted the details of the event on its website with a picture of Masri overseeing the ceremony, even though Masri has no formal role on PRICO's board of directors.

100.     Each of the Corporate Defendants—to the limited extent they can really be said to be separate entities—has, and together they collectively have, substantial ties with the United States. These ties primarily emanate from the funding that Masri and the Corporate Defendants repeatedly solicited—and received—from U.S. Government agencies and international institutions located in and funded by the United States.

101.     **PADICO**: PADICO, of which Masri is the chairman, owns and controls Masri's properties, including the GIE and his hotel ventures. PADICO has substantial connections with the United States as a whole and benefits from Masri's connections with the United States.

    a.  Masri directly employed PADICO in running the GIE, which received funding from USAID and the World Bank. That included funding in connection with the solar energy installation at the GIE.

    b.  PADICO conducts its financial reporting in U.S. dollars.

    c.  In keeping with Masri's longstanding connections to Harvard University, Masri has used PADICO to sponsor visits by Harvard students to the Palestinian Territories, in part to familiarize them with PADICO's role in developing business there.

    d.  PADICO owns a majority stake in PRICO, which, as described below, received money from the IFC and World Bank in connection with the PRICO Solar Gaza project, which was used to provide electricity for Hamas's attack tunnels, among other things. The U.S. is the largest shareholder in the World Bank. Masri directed PADICO to help PRICO obtain at least some, if not all, of the IFC funding for the PRICO Solar Gaza project as well as insurance from MIGA.

102.     **PRICO**: PRICO is the investment and real estate arm of PADICO. PRICO has substantial connections with the United States as a whole, as evidenced by Masri using PRICO to funnel benefits from his connections within the United States.

    a.  IFC, the private sector arm of the World Bank, committed over $3.5 million to PRICO's operations.

    b.  In 2017, the World Bank and the IFC expanded their support through investing in the PRICO Solar Gaza project, with a total estimated cost of up to US $12 million. As described below, electricity from that solar plant was directly used to aid Hamas's terroristic activities.

    c.  The World Bank's insurance provider, MIGA, maintained insurance of over $6.93 million on the PRICO Solar Gaza Project. That insurance coverage has previously been used to facilitate reconstruction of the solar project. In securing

MIGA insurance, PRICO was required to submit documentation to MIGA at its U.S. headquarters.

    d.  PRICO is also closely associated with Masri's ownership and management of the Blue Beach hotel.

103.    **PIEDCO:** PIEDCO is a subsidiary of PADICO. Masri used PIEDCO heavily in developing, operating, and managing the GIE. PIEDCO has substantial connections with the United States as a whole, as evidenced by Masri using PIEDCO to funnel benefits from his connections within the United States.

    a.  The GIE, PIEDCO's core asset, was financed by U.S. entities, including USAID.

    b.  Masri directed PIEDCO to manage and oversee the installation of the U.S.-funded PRICO Solar Gaza project once PRICO had secured the funding for the solar project, reporting to the World Bank that damage occurred to the project in 2017.

104.    **Massar**: Massar has substantial connections with the United States as a whole, as evidenced by Masri using Massar to funnel benefits from his connections within the United States.

    a.  As with PADICO and Masri, Massar used PRICO to obtain at least some, if not all, of the IFC funding for the PRICO Solar Gaza project as well as insurance from MIGA.

    b.  Massar lists multiple U.S. entities as partners, including the DFC and Chemonics, a U.S.-based development firm that was awarded over $44 million by USAID to "expand[] markets for Palestinian products, build[] resilience, and mitigat[e] shocks to the Palestinian economy."

    c.  Massar's indirect subsidiary, Siraj Palestine Fund I, received a $30 million loan from OPIC, DFC's predecessor and the U.S. Government's former development finance institute. OPIC provided funding to Siraj Palestine Fund I through 2019. Siraj Palestine Fund I also received funds through other U.S. entities, including the Soros Economic Development Fund, which invested almost $10 million. Other U.S. investors include the United Church of Christ's Pension Boards,[9] and Crescent Investments LLC.

    d.  Through Massar's consulting subsidiary, Masri has provided consulting services for various U.S.-based institutions, including USAID, OPIC, the American Development Foundation, and others.

    e.  Massar conducts its business in U.S. dollars.

105.    Masri personally decided and directed that all of the Corporate Defendants would

---

[9]    The United Church of Christ's Pension Boards describe their investment in Siraj as "Investing in Peace."

work closely with Hamas and its Qassam Brigades in Gaza.

106.    At the same time that he received substantial funding from the U.S., Masri also received money from entities connected to Qatar, particularly in connection with developing Rawabi, a new planned city near Ramallah. That included entities and individuals tied to Hamas, which has long been supported by Qatar.

107.    Rawabi was primarily financed by Qatar Diar Real Estate Investment Co., whose CEO is Ghanim Bin Saad Saad Al Saad, a wealthy Qatari investor (acting on behalf of the Qatari regime).  Ghanim Bin Saad Saad Al Saad is the former chairman of the Qatar Charity, a long-time member of a coalition of organizations operating under the umbrella of the Union of Good, a global Hamas-fundraising network designated as a Specially Designated Global Terrorist ("SDGT") by the U.S. Department of the Treasury in 2008.[10] Ghanim Bin Saad Saad Al Saad and Masri are close business partners and personal friends.

108.    Masri also has maintained close relations with Muhammad al-Emadi, the head of Qatar's Gaza Reconstruction Committee overseeing the regime's financial aid to Gaza, and has facilitated the distribution of Qatari cash to Hamas. Al-Emadi maintained an office at Masri's Al Mashtal Hotel in the years prior to the October 7 Attack and visited and hosted Hamas's senior leader, Yahya Sinwar, on multiple occasions. Al-Emadi served as Qatar's point person for funneling massive quantities of cash into Gaza, including for the benefit of Hamas's Qassam Brigades.

---

[10]    In March 2008, Qatar Charity was listed as a Priority III terrorism support entity ("TSE") by the Interagency Intelligence Committee on Terrorism ("IICT"), after having demonstrated intent and willingness to provide financial support to terrorist organizations willing to attack U.S. persons or interests or provide witting operational support to Priority I-II terrorist groups.



*Bashar Masri seated with Qatari Representative Muhammad al-Emadi in March 2021*

## II. HAMAS – A DESIGNATED FOREIGN TERRORIST ORGANIZATION

### A. Background and Takeover of Gaza

109. Several terrorist organizations operate in Palestinian-controlled territory, most notably Hamas, a radical terrorist organization committed to the destruction of the State of Israel.

110. Shortly after its founding in 1987, Hamas committed itself to violent terrorist attacks against Israel, and over the next five years it began to actively compete in the Palestinian political arena to establish its bona fides by escalating the pace and ambition of its acts of terrorism. Hamas launched terrorist attacks on Israeli targets, including civilian centers, military installations, vehicles, and civilians. These initial attacks were mostly comprised of shootings, stabbings, and the abduction and murder of Israeli soldiers.

111. On June 18, 1989, Israel designated Hamas a terrorist organization.

112. On January 23, 1995, President Clinton issued Executive Order No. 12947. President Clinton found that "grave acts of violence committed by foreign terrorists that threaten to disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

113.    Executive Order No. 12947 designated Hamas a Specially Designated Terrorist ("SDT") and blocked all property and interests in property of the terrorist organizations and persons designated in the Order, including Hamas.

114.    In 1996 and 1997 Hamas launched a wave of suicide bombings, targeting primary commuter buses, shopping centers and cafes in Tel Aviv and Jerusalem.

115.    On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated Hamas a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act and the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The U.S. government has renewed Hamas's designation as an FTO every two years since Hamas was originally designated.

116.    On October 31, 2001, pursuant to Executive Order 13224, Hamas was designated a Specially Designated Global Terrorist ("SDGT"). Executive Order 13224 blocked all property and interests in property of the terrorist organizations and persons designated in the Order, including Hamas. Hamas has retained this designation since then.

117.    In the Second Intifada (also known as the al-Aqsa Intifada), which broke out in late September 2000 and unofficially ended near the end of 2004, Hamas and other Palestinian terrorist organizations perpetrated hundreds of terrorist attacks against Israel and its civilians, regularly using suicide bombings that killed hundreds and injured thousands, including U.S. citizens.

118.    Israel tried to counter the violence from Hamas and other terrorist organizations by, among other things, engaging in military operations in the Palestinian Territories and building a security fence.

119.    Eventually, in 2005, Israel also withdrew its soldiers from the Gaza Strip and dismantled Israeli enclaves there, leaving Gaza under the complete control of the Palestinian

Authority ("PA").

120.    Not long afterward, legislative elections were held in January 2006 in the Palestinian Territories, including the Gaza Strip, and Hamas succeeded in winning control of the Palestinian Legislative Counsil. For the first time since its formation, Hamas joined the Palestinian government.

121.    In 2007, Hamas expelled the PA and seized control of the Gaza Strip, killing hundreds of Palestinians in the process. Since then, Hamas has been the de facto ruler in Gaza, assuming control of its borders, creating its own police force, and taking control of all governmental functions.

**B.      Integration of Terror Apparatus, Governance, and Economic Control**

122.    Hamas's organizational structure in Gaza integrated a form of civilian governance together with its terror apparatus, the Qassam Brigades.

123.    Before the October 7 Attack, the Qassam Brigades numbered more than 30,000 terrorists. They were responsible for perpetrating terror attacks for Hamas and murdered and injured more than 1,000 Israeli civilians and numerous U.S. citizens even before the October 7 Attack.

124.    Following the model of Hezbollah in Lebanon, Hamas had succeeded in subverting and ultimately taking over governmental functions. It grew from a lethal terrorist organization to a de facto governing authority with a near monopoly on force and concrete control of territory (while remaining a lethal terrorist organization).

125.    Emulating Hezbollah, Hamas began positioning terrorist infrastructure in dense population centers and in (and under) schools and hospitals; using civilians as human shields for terrorist operatives (both to deter Israeli reprisals and to use the suffering of its own civilians to place diplomatic pressure on Israel); directing rocket and mortar fire against Israeli population

centers; and conducting public training exercises both to improve the terrorist organization's operational readiness and as a propaganda tool to legitimize its rule.

126. Like Hezbollah, Hamas then began a transition from a purely terrorist organization – whose operational capabilities were the product of relatively small Qassam Brigades terror cells operating covertly (under the overall command of the organization's political leadership) – to a more ambitious and complex organization that controls territory and oversees and develops forces capable of launching significant rocket attacks on Israel, and one ultimately able to perpetrate the October 7 Attack.

127. That transition included the development of the Nukhba ("elite," in Arabic) Forces, the special forces unit of the Qassam Brigades. It was founded by Yahya Sinwar in 2013. That unit was developed to conduct specialized missions including infiltration operations, raids, and hostage-taking.

128. The Nukhba Forces, which originally numbered 5,000 operatives, heavily utilized Hamas's network of tunnels. Its recruits received specialized training such as paragliding, sabotage, and intelligence courses in Lebanon, Iran, and elsewhere.

129. The Nukhba Forces played a leading role in the surprise attack on Israel on October 7, 2023. It led the coordinated assault across the Gaza-Israel barrier, infiltrating Israeli communities and military bases.

130. Hamas has also gained control of other terrorist organizations in Gaza. Hamas asserted that it created the Joint Operations Room in 2018, which functioned as the central command for all armed forces in the Gaza Strip and brought together 12 different Palestinian terrorist organizations in the Gaza Strip (all the so-called "resistance factions" in Gaza) under Sinwar's full control, operating under the leadership of Mohammed Deif, the Chief Commander

of the Qassam Brigades.[11]

131.    From 2007 – 2023, Hamas, through force, controlled Gaza's economy, including through its control of the tunnel system within Gaza, some of which (mostly those along Gaza's southern border) were used for trade and smuggling. Over time, Hamas began to formalize its control over the smuggling tunnels, even establishing a Tunnel Affairs Commission that, together with the Qassam Brigades, controlled and monitored those involved in the tunnel smuggling trade, and controlled and (most importantly) taxed what came in and out of the tunnels.

132.    In addition, because Hamas exercised control above ground as well as below ground, everything from sales taxes to court fees to building permits fell under the terrorist organization's control.[12]

133.    Hamas and the companies it controlled monopolized lucrative sectors of the Gaza economy by either imposing prohibitive taxes on competitors or directly involving themselves in major economic projects. For example, Hamas participated in significant real estate and commercial developments, and businesses that aligned with or were controlled by Hamas received preferential treatment.

134.    Given the size and prominence of Bashar Masri's and the Corporate Defendants' massive investments in Gaza *after* Hamas seized control of the Gaza Strip in 2007, those projects could not have been commenced or completed without Hamas's (1) approval, (2) receipt of payments (in the form of taxes and kickbacks), and (3) coordination in the construction of the

---

[11]    From at least July 2018 onward, all terrorist organizations in the Gaza Strip acted under the direction and authorization of Hamas, including Palestinian Islamic Jihad ("PIJ"), Popular Front for the Liberation of Palestine ("PFLP"), Al Aqsa Martyrs Brigade ("AAMB") and the Popular Resistance Committees ("PRC").

[12]    For example, prior to October 7, Hamas enforced a range of restrictive measures, including substantial taxes and fees on imports and locally produced goods, including a reported 300% tax on cigarettes and other imported goods.

Qassam Brigades' attack tunnel and other terrorist infrastructure.[13] Indeed, as discussed below, there is substantial evidence that tunnel and other terrorist infrastructure construction on Masri's properties was coordinated between Hamas's Qassam Brigades on the one hand and Masri and the Corporate Defendants on the other.

### C.      Hamas's Massive Tunnel Enterprise

#### 1.      Overview of Hamas's Underground Tunnel System

135.    Hamas built hundreds of miles of tunnels under the Gaza Strip in the years after it seized power in 2007, with construction efforts accelerating after 2014. Like a subway system or "Metro," the Hamas tunnel network connected like a subterranean spider's web – linking Hamas's Qassam Brigades units that allowed operatives to cross the Egyptian border in the south and walk (and in many places drive) all the way to the Erez Crossing on Gaza's northern border with Israel.

136.    Individual sections of the tunnel had different uses. For example, although many of the early tunnels in Gaza were used for smuggling, many tunnels were later used for (1) command and control, with subterranean Hamas headquarters and command rooms; (2) attack tunnels, which could cross the border to Israel or serve as internal supply lines in Gaza; and (3) storing weapons and rockets.

137.    As discussed below, one "command and control" center was located in a mosque adjacent (and indirectly connected by tunnels) to the GIE.

138.    Attack tunnels, like many of those existing under Defendants' properties, served several purposes. Historically, many were initially built as cross-border attack tunnels to facilitate Hamas invasion of Israel and terrorist attacks within Israel. Attack tunnels constructed inside the Gaza Strip, on the other hand, were primarily designed to allow Hamas operatives (and those of

---

[13]      None of the development projects at issue were situated along the Egyptian border, and none of the tunnels discussed herein were built for smuggling purposes.

other terrorist organizations under Hamas's control) to move freely and covertly underground and to exit through openings (shafts) that were prepared in advance. The attack tunnels allowed Hamas terrorists to ambush Israeli forces during a ground assault and then retreat quickly.

139.   With Defendants' knowledge and assistance, Hamas's Qassam Brigades built multiple attack tunnels underneath and within Defendants' properties and, as discussed below, the Qassam Brigades were deployed by Hamas using the tunnels prior to, during, and following the October 7 Attack.

140.   Tunnels were also key for Hamas's rocket-based warfare. During Operation Cast Lead in 2009, Hamas realized that when its operatives emerge from their hiding areas to launch rockets into Israeli territory, Israel's detection systems often identified the launch sites very quickly and destroyed them. Therefore, Hamas's tactics evolved, and it built tunnel infrastructure whose purpose was to enable the transportation and placement of rockets according to defined firing plans in each area. By concealing the launch sites underground, Hamas was able to dramatically increase the short-term survivability of its operatives and rocket launchers, improve its firing capabilities, and preserve more rockets for future operations.

141.   As discussed below, this system was deployed at Masri's Al Mashtal Hotel during the October 7 Attack.

142.   As further detailed below, Hamas's tunnel system was repeatedly rebuilt and expanded after prior Israeli attacks and Defendants played an important role in refurbishing and expanding the parts of the tunnel network constructed under their properties.

### 2.   Logistics and Tunnel Construction and Collaboration with Property Owners

143.   Hamas's vast tunnel networks throughout the Gaza Strip constitute an unprecedented form of urban planning, connecting hundreds of miles of tunnels like a spider's

web.

144.    Whenever possible, Hamas constructed its tunnels under streets, along pre-existing sewage lines and under vacant public lands. Construction in these circumstances posed fewer engineering and security challenges, but excavations under dense urban infrastructure were more challenging.

145.    Hamas appointed a respected engineer, Dr. Muhamad Ziyara, to advise and oversee the effort. Dr. Ziyara holds a Ph.D. in engineering (and a master's degree from Georgia Tech) and was appointed as an engineering professor at the Islamic University of Gaza (one of Hamas's flagship institutions).

146.    Dr. Ziyara served in two prominent capacities. He was the Palestinian Minister of Public Works and Housing on behalf of the PA (2019-2024) and, at the direction of Sinwar, taught special courses to Qassam Brigades operatives on tunnel engineering. He also took part in the design and construction of the most important tunnels constructed by Hamas. In this capacity, he served as the unofficial "Dean" of Hamas's tunnel program.

147.    Defendant Bashar Masri, whose properties included significant Hamas attack tunnel infrastructure, knows Dr. Ziyara personally and has met with him on multiple occasions.



*Bashar Masri (left); Muhamad Ziyara, the unofficial "Dean" of Hamas's Tunnel Program*

*(right)*

148.    While Dr. Ziyara provided training and guidance to the overall Hamas tunnel enterprise, at the operational level, Hamas's brigade commanders, battalion commanders, and company commanders in each area were responsible for determining and defining the locations of the tunnels in their sector, their routes, shaft exits, and operational purposes.

149.    Hamas assigned an excavation officer responsible for the excavation activity and the coordination required to carry it out in accordance with the operational plan developed by Hamas's engineers.

150.    Building clandestine tunnels (often under dense urban areas) is a dangerous undertaking, risking, *e.g.*, cave-ins, ventilation issues, flooding, and the stability of the land and structures above it.

151.    It is also complex, usually involving a network of tunnels that are interconnected with communication and electrical systems, feature various types of doors (according to the tunnels' purposes and functions), and require a water supply as well as sewage drainage, ventilation, and other systems.

152.    Hamas assigned a specific engineer to oversee each tunnel project and to address the cross-section of soil layers and the geotechnical effects resulting from the excavation process and to adapt the required route to the type of soil encountered during the dig. The engineers were responsible for defining the depth of the tunnels and the slope of the excavation, locating failure points, devising necessary engineering solutions, and measuring the tunnel route using dedicated equipment.

153.    Depending on the complexity of the project and the size of the above-ground

infrastructure under which the tunnel was built, either the engineer or a senior Hamas brigade or battalion commander would work with the owner or tenant of the property to ensure the structural integrity of the building above ground and the safety of the tunnel below it.

154.    Most tunnel routes that were not under streets or public lands passed under land parcels that were owned and/or occupied by residents of the Gaza Strip who were known to and affiliated with Hamas and trusted by the Qassam Brigades command structure not to divulge the existence of the tunnel running under—and frequently into—their properties. As discussed below, that includes the tunnels running under the properties owned and managed by Defendants.

155.    During excavation, Hamas required the land and property owners to take care of all of the needs of the excavators from the moment they arrived at the excavation site until they completed the job, including full access to the above-ground site.

156.    Indeed, it would be essentially impossible to construct tunnels under a property without the owner being, at a minimum, aware of and more likely facilitating that construction in various ways.

157.    The excavators themselves were in almost all cases Hamas operatives who were assigned to physically carry out the excavation. For example, the Qassam Brigades-affiliated construction company Al Bayan, which (as will be seen) Masri hired to work on the properties owned and managed by the Corporate Defendants, was often involved in the excavation there.

158.    Whenever feasible, Hamas engineers concealed their excavation work and the debris resulting from removing sand, dirt, and rock from the work area, such as by coordinating their tunnel projects with seemingly legitimate construction projects undertaken above-ground. The sight of heavy construction equipment, building supplies, and piles of dirt and debris are far less conspicuous at an active construction site.

159. This was the case with Masri's three projects, as described below.

160. Hamas often also had its workers construct extensive pergolas that provided shade and (more importantly) concealment from aerial surveillance for all of the displaced dirt and debris until it could be discreetly disposed of.

161. In order to make the tunnels Hamas constructed in Gaza effective and allow for rapid movement of men and equipment, it was not sufficient to ensure that the tunnels were structurally sound; they also required adequate lighting and ventilation to provide fresh air, remove harmful gases, and moderate temperature (particularly given the routinely high surface temperatures in Gaza), both of which required a reliable source of electricity. In many cases, that power supply was provided by the property owners whose structures concealed the tunnels. For the most part, Hamas appears to have reimbursed its collaborators for their costs, including electricity.

## III. HAMAS ATTACKS PROMPTING MAJOR ISRAELI RESPONSES (2008 - 2021), DAMAGING DEFENDANTS' PROPERTY AND THE MISSILE LAUNCHING SITES AND OTHER TERRORIST INFRASTRUCTURE THEY HOSTED

162. During more than 15 years of Hamas rule in Gaza from 2007 to 2023, Hamas continually attacked Israel from its base in the Gaza Strip.

163. Rocket fire on Israeli civilian population centers was the primary method used by Hamas (and to a lesser degree by Palestinian Islamic Jihad and other terrorist organizations operating in Gaza under Hamas's control).

164. In addition, as discussed above, Hamas also invested considerable resources into digging tunnels under the border with Israel to attack the Israeli border communities and Israeli military patrols.

165. Periodically, Hamas provoked a more extensive response to its violent tactics, precipitating an Israeli military campaign. These consisted primarily of airstrikes, but on several

occasions also involved Israeli ground forces. Inducing Israel into a military response was a routine Hamas strategy to maintain support within Palestinian society, while isolating Israel internationally and attempting to demoralize Israel.

166. Israel's responses to Hamas's terrorist attacks (including rocket attacks) included (1) Operation Cast Lead, which took place from December 2008 to January 2009 and involved Israeli targeting of tunnels and rocket-launching sites with airstrikes and raids; (2) Operation Pillar of Defense, which took place in November 2012 and involved Israeli airstrikes and tank fire in response to rocket and missile launches from Hamas; (3) Operation Protective Edge, which took place from July to August 2014 and involved Israel targeting Hamas infrastructure, including tunnels and rocket launch sites, in response to Hamas rocket fire; and (4) Operation Guardian of the Walls, which took place in May 2021 and involved Israel responding with airstrikes to thousands of rockets being launched from Gaza into Israel.

167. As described above, Defendants' property was damaged during these actions, including during Operation Guardian of the Walls in 2021, because of the existence of Hamas missile launching sites, and other infrastructure and tunnels at and under the properties.

168. None of these operations lasted more than a few weeks. But because Defendants' properties in Gaza were knowingly and deliberately used as Hamas rocket launching sites, command centers or attack tunnel locations, they were periodically damaged by Israeli airstrikes. This led to a cyclical process by which Defendants invested, and foreign donors donated, funds to rebuild damaged above-ground infrastructure while Hamas simultaneously did the same underground, leading to successive rounds of airstrikes, refurbishment and renewed Hamas tunnel activity.

169. For example, even after the GIE was damaged during Operation Guardian of the

Walls in 2021 because of its use by Hamas, Masri, PADICO, and Massar helped PIEDCO obtain funding from the World Bank's IFC and insurance from MIGA to expand the solar energy facilities at the GIE.

170. Given this cyclical process, owners and operators of properties situated above Hamas attack tunnels within Gaza, including Defendants, understood that the tunnels were used to attack Israel, as they often drew airstrikes intended to suppress the rocket fire.

## IV. DEFENDANTS KNOWINGLY PROVIDED SUBSTANTIAL ASSISTANCE TO HAMAS THROUGH INFRASTRUCTURE DEVELOPMENT AND CONCEALING THE CONSTRUCTION OF ATTACK TUNNELS AND OTHER TERRORIST INFRASTRUCTURE

171. As the owners and operators of prominent business enterprises in Gaza, Masri and the Corporate Defendants worked closely with Hamas, which exercised near-total control over the Gazan economy. But Defendants did more than just passively allow their properties and money to be appropriated by terrorists.

172. Instead, they actively conspired with Hamas to develop *new* projects that were central to maintaining and, indeed, expanding, Hamas's terrorist infrastructure. Despite knowing of Hamas's near-total control of Gaza and its economy since 2007, Masri and the Corporate Defendants affirmatively chose to work with Hamas. Defendants knowingly provided Hamas with some of the infrastructure it would use on October 7, 2023, to carry out the most devastating terrorist attack in Israel's history.

173. To develop these projects, Defendants knowingly and directly collaborated with Hamas's terror apparatus—the Qassam Brigades.

174. Three of Defendants' properties were particularly central to their collaboration with Hamas: the GIE, the Blue Beach Hotel, and the Al Mashtal Hotel.

175. Defendants worked closely with Hamas to facilitate its use of their properties for

terrorist activities over the course of many years and coordinated directly with Hamas leadership to construct terror infrastructure.

### A. Defendants Partnered with Hamas to Redevelop the GIE and Construct Terror Infrastructure

176. The financing that Defendants solicited and obtained from institutions in the United States was critical to their assistance to Hamas.

177. This U.S. dollar-denominated financing, much of it indirectly funded by U.S. taxpayers, was facilitated from and through financial institutions in the United States.

178. Defendants went to great lengths to appeal to, among others, U.S.-based donor institutions like IFC, and MIGA, applying for funding (and insurance) from them in the U.S., and receiving the funds necessary to develop both the GIE and, later, the Hamas infrastructure within (and below) it.

### 1. USAID Helps Defendants Launch the GIE

179. PADICO began developing the GIE in 1997 through its subsidiary, PIEDCO, with financing provided by USAID.  Under Bashar Masri's leadership, it also obtained funding from the World Bank,[14] the European Investment Bank, and the European Union.

180. The year before, PIEDCO had signed a concession agreement with the PA for a 49-year period with eligibility for an extension of another 49 years.

181. The GIE is situated four kilometers from the center of Gaza City, adjacent to the Karni crossing into Israel and only a few hundred meters from Kibbutz Nahal Oz and Kibbutz Kfar Aza, which were both brutally attacked on October 7. The central portion of the GIE is located  at approximate coordinates 31°28'39.9" N 34°28'20.9" E.

---

[14] The total project cost was originally estimated at US$84.5 million. The World Bank-supported components (US$10 million) represented about 12% of total project costs which, it claims, "focused on off-site infrastructure, capacity building, and project management."

182. The GIE is an industrial park consisting of approximately 480,000 square meters.

183. For more than 25 years, USAID and other international donors hoped the GIE would serve as a model for private commercial development in Gaza and the normalization and streamlining of trade between Gaza and Israel through the Karni crossing, a few hundred meters from the site.

184. According to the Clinton-Gore Administration History Project:

> The Gaza Industrial Estate opened in 1998 as a facility designed to support the expansion of industrial production and jobs in the Gaza Strip. In addition to providing funds for the construction of key installations at the estate, [USAID] supported development of a legal framework and institutional environment conducive to promoting investment at all industrial estates planned for the West Bank and Gaza.

185. The GIE industrial park purported to host pharmaceutical, cosmetics, woodworks, plastic manufacturing, food and beverages, furniture, textiles and clothing, printing, and packaging industries.



*Aerial view of the Gaza Industrial Estate in 2023*

186. However, Hamas attacked Israeli border officials on multiple occasions during the

Second Intifada, leading to temporary shutdowns of the Karni crossing, which was vital to the success of the GIE.

187.    In May 2007, Hamas initiated mortar and small arms attacks on the PA's Presidential Guard training camp (located near the GIE).

### 2.    Defendants' Redevelopment of the GIE

188.    In the 15 years preceding the October 7 Attack, it became increasingly clear that the GIE was not only situated in close proximity to various Hamas targets for terrorism; it was also a staging ground for these violent operations.

189.    As a result, Israel repeatedly struck the GIE. Defendants repeatedly reconstructed and redeveloped the GIE using resources obtained in the United States—and they did so in a way that furthered Hamas's terrorist goals.

190.    During Operation Cast Lead, in December 2008, Israel struck multiple targets inside the GIE because parts of the facility were being used as a terrorist asset by the Qassam Brigades.

191.    By 2011, Israel effectively shut down the Karni crossing because of Hamas's ongoing terrorist activities in the Gaza Strip and the danger the crossing and the transfer of goods posed to Israeli security.

192.    During Operation Protective Edge in 2014, Israel once again targeted parts of the GIE facility being used by the Qassam Brigades, in part because of the Hamas tunnel system built below it.[15]

---

[15]    A *Wall Street Journal* article published on October 25, 2023, provides a 2014 map of the then extant tunnel system in Gaza known to Israeli intelligence at the time. The map shows a tunnel network running under the GIE and connected to a larger grid in east-central Gaza. *See*, https://www.wsj.com/livecoverage/israel-hamas-war-palestinians-news/card/the-gaza-tunnel-system-that-israel-is-targeting-AiyZLseMU8GJGPDuQkoE (last accessed June 19, 2026).

193.    According to the UN,[16] the GIE "was severely destroyed during the 2014 hostilities. The desalination plant was damaged and was out of order, 16 out of 24 transformer rooms were demolished, one water well was targeted, the sewage treatment plant was also destroyed in addition to most of the lighting poles and cables." The UN estimated the damage at $5 million.

194.    Beginning in September 2016 and continuing through 2019, with financial support from the UN Development Program and the European Commission—and in coordination with Hamas—Defendants rebuilt much of the GIE's water and energy infrastructure. The Coca-Cola Company and the Palestinian National Beverage Company ("NBC") jointly opened a $20 million bottling plant on the premises.

195.    The successful pursuit of grants from both the UN Development Program and later U.S.-based entities like the IFC (and MIGA) served multiple purposes beyond the obvious benefits of obtaining financing. Masri, and by extension the Corporate Defendants, burnished their image through these projects and provided the GIE with a guise under which it coordinated with Hamas on its subterranean construction activities under the protective umbrella of prestigious international organizations. This cemented their appearance as vehicles for economic growth, "green" investments and "good governance"—enticing international donors and deterring Israeli countermeasures against Hamas at the site.

196.    The 2022 funding from the UN Development Program and other international agencies helped "reconstruct" the GIE.

197.    But reconstruction was not the only goal. The work at the GIE simultaneously concealed the excavation and expansion of extensive Qassam Brigades attack tunnels built under it. This construction was carried out by contractors controlled by Hamas.

---

[16]    UN statistics and assessments set forth herein are not offered as empirical facts.

198.     According to the UN:

> Four complete tendering packages were produced and reviewed by UNDP senior engineers and rechecked on the ground. The packages were announced for local contractors through [the] UNDP site and the Contractors' Union. Four contractors were identified to carry out the transformer[] rooms, external lighting, sewage and well rehabilitation and the desalination plant upgrading projects. The fifth package, which targeted the construction and drilling of a new water well, was signed later in September in 2018 following the approval of budget reallocation by the EU. The five contractors started the implementation process under UNDP's direct supervision and quality assurance. All activities are implemented in close coordination with PIEFZA and PEIDCO in order to facilitate the movement of labours [sic] and engineers within the GIE premises, using well-planned security measures.

199.     The UN did not disclose that Hamas controlled the "local contractors" and the "Contractor's Union"; nor did it describe the extensive Hamas attack tunnel built under the GIE in 2017-2018.

200.     What is known is that much of the funding overseen by the UNDP was paid for by the European Union and that the project—dubbed "Project Evaluation of the Rehabilitation and Consolidation of the Gaza Industrial Estate Project"—was overseen by the unofficial "Dean" of Hamas's tunnel project, the aforementioned Professor Muhamad Ziyara, who was named "Team Leader."[17]

201.     Hamas tunnel construction of this kind required the active cooperation and collaboration of the owners and operators of the above-ground infrastructure—including Defendants. As detailed above, excavation "hosts" were required to take care of all of the needs of the Hamas excavators working on the tunnels from the moment they arrived at the excavation site until they completed the job, including full access to the above-ground site. Defendants provided

---

[17]     The UNDP described Dr. Ziyara as "a contributor to advances in structural engineering, rehabilitation of structures, construction materials, planning and management of construction and infrastructure projects," and as someone "with practical experience [that] covers vast range of subjects … includ[ing] reinforced concrete, steel and stone structures, planning and design of infrastructure …."

these services and many others because the GIE served as an important forward observation post for the Qassam Brigades and a key hub for the launching of the October 7 Attack.

202. In 2018, Israel discovered the massive Hamas attack tunnel depicted below that ran from within and underneath the GIE, across the border into Israel, near Kibbutz Nahal Oz.

203. The portion traversing Israeli territory was destroyed, but at least some of the tunnel infrastructure under the GIE remained.



204. That is, Defendants knew of and assisted Hamas's construction of an attack tunnel into Israel. The GIE *itself* was part of Hamas's attack infrastructure.

205. In December 2019, Dr. Ziyara, Hamas's unofficial "Dean" of tunnel engineering, visited the GIE. He returned in July 2022.

206. Regardless of the *stated* purposes of Dr. Ziyara's visits (including on behalf of the UN), it is clear that Hamas regarded the GIE as an important terrorist asset due to (1) its proximity to the border and the kibbutz and nearby military base at Nahal Oz, (2) the road infrastructure leading from Israel into Gaza which resulted from the area's proximity to the Karni border crossing (where goods and workers once crossed daily), and (3) the added protection of operating in an area where a UN agency maintained warehouses and U.S. and international donors had invested

significant capital. (Hamas's command center was located in a mosque next to a building bearing United Nations signage.)

207.    In May 2021, during Operation Guardian of the Walls (discussed above), Israeli forces launched airstrikes at Qassam Brigades targets inside the GIE.

208.    A PADICO press release issued on May 18, 2021, titled "Israeli aggression targets Gaza Industrial City and destroys a number of factories," reported that airstrikes damaged 10 factories in the GIE, adding: "What justification does the Israeli occupation fabricate for its aggression here?"

209.    Masri, PADICO, and the other Corporate Defendants knew about the massive Hamas attack tunnels constructed *with their assistance* under the GIE and that the "aggression" was not "fabricated" but resulted from their own complicity in working with the Qassam Brigades, hosting an observation post and meeting points and helping to construct and hide tunnels under the GIE that were intended as a launch point for attacks on Israel.[18]

210.    According to the World Bank, the GIE "suffered significant damage as a result of being directly hit on multiple occasions, resulting in an estimated US\$ 20 – 25 million in damage to facility structures, equipment, inventory, solar rooftop panels and operating equipment."

211.    But rather than desist from working with and shielding Hamas, Masri and the Corporate Defendants doubled down on investing in the GIE and providing cover for Hamas's use of the GIE to prepare for the October 7 Attack under the guise of repairing the damage done to the GIE.

---

[18]    As noted above, a 2014 Israeli military map of the then extant tunnel system in Gaza known to Israeli intelligence published by *The Wall Street Journal* on October 25, 2023, demonstrates that the Hamas tunnel system under and through the GIE already existed nine years before the October 7 Attack. Defendants knowingly assisted Hamas in *augmenting* its tunnel system in the years immediately preceding the attack, including by providing the tunnel network with enhanced electricity.

212. Once again, Masri, PADICO, and Massar returned to the well of funding in the U.S., seeking—and receiving—funds (nominally for PRICO) to construct additional solar energy facilities at the GIE that would provide electricity to Hamas.

213. Ultimately, given the GIE's proximity to the Israeli border, the former Karni crossing and Kibbutz Nahal Oz and the nearby Israeli military base (which were overrun on October 7), Hamas's Qassam Brigades refurbished and expanded at least three major attack tunnel branches after May 2022, described below, used to plan, assemble and ultimately launch the October 7 Attack and attempt to ambush Israeli tanks and infantry traversing the access roads surrounding the GIE following the attack.

### 3. Hamas Uses the GIE to Test Israeli Defenses and Prepare for the October 7 Attack

214. In March 2018, Hamas launched the "Great March of Return," a series of violent demonstrations along the Gaza-Israel border. The purpose was to test Israel's response to mass assaults on the Gaza border fence.

215. On April 20, 2018, Hamas organized a violent protest in front of the GIE along the border. (Hamas's attack tunnel ran underground beneath the area where the border confrontation took place.)



*April 20, 2018, border confrontation in front of the GIE*

216.    On April 27, 2018, a large crowd estimated at between several hundred and several thousand people rushed toward the Karni border crossing, after a speech delivered by Hamas leader Ismail Radwan (reported by *The New York Times*) to rouse the crowd by exclaiming: "When we are brave, we are getting closer toward martyrdom, martyrdom, martyrdom," and "We say to Nikki Haley, to Netanyahu, to the criminal Lieberman [referring, respectively, to then-United States ambassador to the United Nations, the Israeli prime minister, and Israel's then-defense minister, Avigdor Lieberman] we are afraid neither of death nor of martyrdom."

217.    The encampment from which this and other violent demonstrations were launched at the crossing was located directly in front of the GIE.

218.    The border area in front of the GIE and the GIE itself were, in fact, a key staging area Hamas used for the demonstrations it organized to probe the border fence and test Israel's reaction to potential breaches in advance of the October 7 Attack.

219.    For example, on March 30, 2019, on the first anniversary of the "Great March of Return," Hamas organized an estimated 40,000 protesters along the Gaza border, including in front of the GIE, replete with ambulances.

220.    As described above, by December 2022, the Qassam Brigades had openly established an observation post at the northeastern end of the GIE to allow it continuous surveillance of Israeli defenses.

221.    On September 22, 2023—two weeks before the October 7 Attack—Hamas organized yet another protest at the same location not far from its observation post inside the GIE.

222.    Like its predecessors, this confrontation was largely a media-driven event designed to attract international attention. But it also served an important tactical purpose—testing Israel's security measures and response times in a key sector where a main thrust of the October 7 assault

would take place—and further lulling Israeli intelligence into complacency by convincing Israel that Hamas was content with symbolic (if often violent) demonstrations along the border.

### 4. The World Bank's IFC in the U.S. Helped Finance the GIE Solar Project Used to Power Hamas Attack Tunnels

223. In 2017, Defendants began their initial plans to obtain funding from the IFC in Washington, D.C., for a 7-megawatt peak rooftop photovoltaic solar energy project at the GIE, which would officially be run by PRICO (although the due diligence was directed to PADICO employees). The IFC is largely funded through capital provided by U.S. taxpayers.[19]

224. The project was expected to service the electricity needs of the GIE and connect to Hamas's Gaza Electricity Distribution Company ("GEDCO") electrical grid.[20]

225. Led by Masri—and his long-cultivated image as a "visionary investor," American/Palestinian moderate, and "green energy" enthusiast—Defendants convinced the IFC in Washington that the project would "enhance capacity building of local institutions to lay the foundation for private sector participation and long-term growth," support economic growth and job creation, and improve the environment by providing "clean and cost competitive electricity" and reducing greenhouse gas emissions in the process.

---

[19] The United States is the largest shareholder in the IFC, which means U.S. taxpayers indirectly contribute to the IFC through the U.S. government's capital contributions. Unlike direct foreign aid programs, taxpayer money is not directly transferred to the IFC for its day-to-day operations.

[20] Electricity, like money, is fungible, and the resources Defendants provided to Hamas necessarily freed up other resources that allowed Hamas to engage in additional terrorist activities.



*Bashar Masri (far left) at ceremony promoting World Bank/ IFC Investment in the GIE Solar Project*

226.    The IFC was eager to fund the project "to demonstrate the commercial viability of renewable energy investment in Gaza" and to "boost investor confidence and comfort" through the IFC's "presence and participation in the renewable energy program."

227.    In 2018, the IFC in Washington, D.C., voted to approve what it described as a "structured [] innovative debt financing package for the PRICO Solar project to promote the installation of solar panels on the rooftops of several buildings belonging to the Gaza Industrial Estate, Gaza's largest business park."[21] PRICO, which had applied for the funding in Washington, sub-contracted the installation to PWSJV, a Nablus-based firm approved by the IFC.

228.    Seventy-five percent of the costs of the project were covered in one form or another by the IFC.

---

[21]    The project was intended to run for five years. It was launched in 2017 but implemented in March 2021 and extended until January 31, 2022.



*Masri at the GIE posing with solar panels that powered Hamas attack tunnels*

229.   That same firm also installed solar panels on the roof of the Blue Beach Hotel (discussed below).

230.   The solar panel installation project at the GIE successfully generated reliable electricity for the light manufacturing companies with operations at the GIE.

231.   But, with the full knowledge and support of Defendants, the PWSJV installation on the site also provided reliable electricity to the extensive Hamas attack tunnels underneath the GIE and throughout the center of the Gaza Strip, powering the equipment (including for construction machines, pumps, communications, etc.), lighting, and ventilation needed to deploy Hamas terrorists below ground.

232.   For example, the tunnels required significant ventilation systems to clear noxious gases, given that the tunnel networks often concealed numerous operatives (filling the air with carbon dioxide), along with their equipment. The tunnels also required some form of sewage

system, and connectivity to power generators. In addition, during active operations, at least some tunnel entrances were sealed most of the time for tactical reasons, preventing any natural airflow. The "spider web" of interconnected tunnels sharing air therefore required energy-hungry ventilation systems, making GIE's sharing of solar power vital to the tunnels' long-term operations.

233.    In fact, the solar power panels installed by Defendants (and others) proved to be the most important and reliable energy source used by Hamas to power its tunnel system – so much so that Israel eventually identified the presence of solar panels as a leading marker to locate tunnel shafts throughout Gaza.

234.    According to PADICO's press statements, "with a budget exceeding $1 million, PADICO built new structures" at the GIE following the airstrikes on the GIE in 2021 as part of Operation Guardian of the Walls. And at Masri's direction and with the help of Massar and PADICO, PRICO obtained yet additional funding from the IFC in Washington, D.C., for a "green energy" initiative to fund a massive *new* solar panel project at the GIE (which would then knowingly be used to assist Hamas).

235.    At Masri's direction and with the help of Massar and PADICO, PRICO also obtained more than $6 million in insurance from MIGA in Washington, D.C., to cover any damage to the project.

236.    Like the IFC, MIGA is a part of the World Bank Group and is headquartered in Washington, D.C. In securing insurance from MIGA, PRICO was required to submit a "Preliminary Application" to MIGA at its Washington, D.C., headquarters.

237.    Once "investment and financing plans" were established, PRICO was then required to submit to MIGA in Washington, D.C., a "Definitive Application along with any relevant project

documentation and a processing fee."

238.    According to MIGA: "The investor [PRICO] has applied for a guarantee under MIGA's West Bank and Gaza Investment Guarantee Trust Fund and under MIGA's Conflict-Affected and Fragile Economies Facility for up to $6.93 million for the equity investment in assets for a period of up to 15 years against the risks of transfer and convertibility restrictions, expropriation and war and civil disturbance, including temporary loss of income...."

239.    In October 2021, the GIE solar project received the United Nations Global Climate Action Award entitled "Self-Reliance" for its "environmentally friendly project."

240.    Further adding to the protective shield concealing Hamas activities at the GIE, the United Nations Office for Project Services ("UNOPS"), a United Nations agency purportedly dedicated to implementing humanitarian and development projects, maintained warehouses at the GIE prior to October 7.

### 5.    Defendants Work with Hamas to Redevelop the GIE In Advance of October 7

241.    Hamas's direct involvement in the GIE, including specifically in solar energy projects partially funded by the IFC and insured by MIGA, is confirmed in several ways.

242.    For example, Mofeed al-Hassayna (Hamas's "Minister of Public Works and Housing in Gaza") and Masri appeared together at events promoting the project.

243.    On May 25, 2022, Masri personally presided over the signing of a joint venture agreement with Hamas to rebuild parts of the GIE. Masri represented PADICO and PRICO, and Hamas's Deputy Minister of Economy, Abdel Fattah Zrai' (a/k/a Abed Al-Zeriei), attended the signing in person and represented Hamas.



*Masri standing with Hamas leader Abdel Fattah Zrai' at the signing ceremony*

244.    PADICO's website quotes Hamas's Zrai' as saying at the ceremony: "We appreciate the role of PADICO by its continuous investment and activation of the economic movement through huge projects under the challenges and impediments that limit the capital appetite to invest in Gaza Strip."

245.    He added that the presence of PADICO chairman Bashar Masri at the ceremony affirmed the willingness of some investors to take risks to support their country.



246. Abdel Fattah Zrai' was responsible within Hamas for both overseeing infrastructure projects and the manufacturing division for Hamas's Qassam Brigades.

247. Zrai' was killed by Israel in 2024.

248. According to the Israeli military's statement:

> Abed Al-Zeriei—a Hamas terrorist who stopped humanitarian aid from reaching Gazan civilians. Al-Zeriei was involved in the Manufacturing Department of Hamas' Military Wing and Hamas' Minister of Economy in Gaza. He had a significant role in directing Hamas' efforts to seize control of humanitarian aid entering Gaza and in managing Hamas-controlled markets. Additionally, he was responsible for the distribution of fuel, gas, and funds for terrorist purposes.

249. On August 4, 2024, Hamas and its Qassam Brigades released an official statement mourning the loss of Zrai', whom they honored as "the leader, the Jihad fighter (mujahid), and engineer."

250. Hamas and (nominally) PRICO—with Masri's public approval—jointly approved

the construction project which they awarded to the Qassam Brigades-affiliated Al Bayan Trading, Industry and Contracting Company.

251. Under cover of the Al Bayan construction project and the IFC-funded and MIGA-insured solar energy project, Hamas's Qassam Brigades refurbished and expanded attack tunnel branches under the GIE after May 2022. That included a stretch of tunnel running west-to-east along the southern part of the GIE, linking that tunnel system to a new building complex on the southern axis road.

252. In both locations, once the new phase of the solar project was approved in 2022, Al Bayan began constructing new buildings at the sites where Hamas attack tunnels were later identified.

253. These construction sites helped to conceal Hamas's attack tunnel excavations and in the case of the southwestern tunnel system, the new construction was accompanied by the presence of multiple pergolas, used to shield tunnel excavations from aerial reconnaissance.

254. Ultimately, Israeli forces discovered multiple tunnel excavation sites within the GIE. One was located above a spur off an existing attack tunnel.

255. In total, at least three major interconnected tunnel routes were dug beneath and around the GIE, acting as an integrated network for (1) linking the GIE and the border spurs of the tunnel system to Hamas's larger tunnel network running northeast of the GIE through the Shejaiya section of Gaza, (2) funneling Qassam Brigades fighters into the border area to conduct simultaneous attacks on Israeli communities and forces near the Gaza border, and (3) protecting and waging a battle of attrition against Israeli forces that would cross the border after Hamas's initial strike.

256. These tunnels were used by Hamas's Qassam Brigades before, during and after

October 7.

257.     The main arteries of the tunnel system in 2023 are depicted below.



*Mapped Portions of Hamas's GIE Tunnel System in 2023*

258.     Tunnel Number 1, the southernmost tunnel, ran roughly from east to west and extended toward the border with Israel just south of the GIE. It was connected by a north-to-south spur to a tunnel excavation workshop located on the grounds of the GIE. The tunnel workshop was located at 31° 28' 34.13" N by 34° 28' 08.88" E.  The north-south spur of this tunnel was expanded in 2022–2023.

259.     Tunnel Number 2, the middle tunnel, also ran east to west, directly under the center of the GIE, including under buildings newly constructed (by the Qassam Brigades construction

firm, Al Bayan) that Israeli forces later determined to be high-priority targets after October 7.

260.   Tunnel Number 2 connected to a Hamas training camp adjacent to the GIE (location: 31°28'46.15" N 34°28'10.97" E). This training camp was equipped with a mockup of a tank to facilitate Hamas training and prepare Hamas terrorists for urban combat with Israeli forces.



261.   Tunnel Number 2 was also connected to another excavation workshop.  It also intersected with Tunnel Number 1 right near the security fence separating Israel from Gaza.

262.   Tunnel Number 3 (the northernmost tunnel system later mapped by Israel) also ran under the GIE in part, although part of it also extended to the north of the GIE. This tunnel extended to the Hamas observation post discussed below.  Crucially, it also extended above and along a main access road that would ultimately be used as a Hamas attack route by its Shejaiya Battalion on October 7, 2023. A portion of Tunnel 3 extended across the border approaching Nahal Oz, but was detected and destroyed by Israel in 2018.

263.   In addition, an anti-tank battery was installed in a GIE water tower situated near the entrance of the complex, facing Israel, as depicted below:



264.    The buildings that were constructed at the GIE by Al Bayan on Defendants' properties situated above these attack tunnels were destroyed in Israeli counterstrikes after the October 7 Attack.

265.    Weapons, maps, excavation tools, and other Qassam Brigades paraphernalia were found at and under the GIE after October 7, further signifying that these facilities were being actively used by Hamas in connection with the October 7 Attack.

266.    During the months preceding October 7, Hamas operatives repeatedly and in some cases openly met on the GIE grounds, particularly gathering in GIE structures closest to the border.

267.    At least 10 months before the October 7 Attack, Hamas had established a permanent observation post (flying the Hamas flag) on the grounds of the GIE.  This observation post was connected to Tunnel 3.



*Hamas Observation Post on the Grounds of the GIE (December 4, 2022)*

268.    Hamas operatives evidently used the GIE for planning sessions as well as border surveillance. The below image depicts Hamas operatives surveying the Israeli border by the water tower near the eastern edge of the GIE on December 18, 2022.



*Hamas Operatives on the Grounds of the GIE*



*Hamas Operatives at the GIE Water Tower Facing the Israeli Border*

### 6.      Other Hamas Activity at the GIE Linked to Defendants

269.    As noted, the GIE's location—a stone's throw from the security fence demarcating the border with Israel and a mile-and-a-quarter away from Kibbutz Nahal Oz (location: 31° 28' 35.18" N by 34° 28' 27.31" E)—made it a valuable staging area for the cross-border attacks on October 7, 2023. But the GIE's location was important in other ways as well.

270.    One building within the GIE (near its northeastern edge) was used as a Hamas meeting place. Known Hamas operatives, as well as other unknown individuals, arrived at that building and would have meetings, including on the rooftop, which overlooked the security fence and Israel beyond.

271.    Time-elapsed photography shows improvements to the Hamas rooftop meeting-place over time, with structures made of alloy and/or wood. Those were added to the rooftop *after* Defendants hired the Qassam Brigades' Al Bayan construction company to work on the redevelopment project in May 2022, so these improvements were added not long before the October 7 Attack.

272.    Additionally, from 2022 onwards, Hamas openly conducted weapons training within the boundaries of the GIE (namely, at its eastern edge).

### 7.      Hamas Activity Near and Related to the GIE Linked to Defendants

273.    Hamas training camps were located on either side of the GIE and were connected to it by the tunnel system. The one on the western side of the GIE (the camp with the mockup tank) was located only 50 meters from the GIE's western fence. As discussed above, this Hamas training camp was connected to the GIE by what this complaint refers to as Tunnel Number 2.

274.    A mosque at the western gate of the GIE frequented by workers at the GIE (location: 31° 28' 39.64" N by 34° 28' 06.10" E) also served as a Hamas command center.



275.    An underground portion of the mosque contained both a briefing room and command room for Hamas which was indirectly connected to the GIE via the tunnel network.

276.    It was filled with explosive devices, rocket-propelled grenades ("RPGs"), small arms ammunition, and other tools of terrorism.



277.    For example, the command center contained shaped charges, which are deployed against armed vehicles.  These devices, when triggered (usually by a passive infrared device), launch metal fragments into armored vehicles.



278.   The command center also stored platter charges, which are used against vehicles and/or infantry.



279.   The Hamas command center in the mosque also contained signs and instructions teaching terrorists how to kill their targets, as well as other Hamas propaganda.



280.    Another sign affixed to the wall of the underground portion of the mosque lists different types of explosives to be deployed against various targets.  The sign bears the insignia of the Shejaiya Battalion, a unit within Hamas's Qassam Brigades, and is flanked by a Hamas flag.



281.    This command center was used as part of the planning for the October 7 Attack and on the day itself. It contained a model of Kibbutz Sa'ad, which was attacked on October 7, 2023, by Hamas's Nukhba Forces and was the site of heavy fighting.



282.    Additionally, across the street from the mosque was a tunnel excavation workshop (location: 31° 28' 41.72" N by 34° 28' 06.71" E). This area had copious tunnel construction infrastructure for use throughout the region, including concrete arches to stabilize tunnels, tunnel lining, and piles of sand excavated from the tunnel network under and around the GIE.

283.    Trucks carrying the excavation materials from the tunnel excavation site near the mosque would leave the dirt road behind the mosque and turn onto the road with the GIE on it. Hundreds of trucks were required to move all of the earth necessary to excavate the tunnels.

### 8.    Masri's Visits to the GIE and Collaboration with Hamas

284.    Masri regularly visited his prized property, the GIE site—replete with Hamas attack tunnels and Hamas anti-tank weaponry—including in January 2023 and on September 19, 2023, just two weeks before October 7.

285.    He proclaimed that the visits represented "important opportunities that align with our vision at PADICO to stimulate the local economy in the Gaza Strip by intensifying investment efforts. Such visits bring attention to various economic sectors and how to address the challenges they face."

286.    In addition to assisting Hamas to build and conceal its attack tunnels and related

terrorist infrastructure at the GIE, Masri and the Corporate Defendants knowingly assisted Hamas by providing it and its terror infrastructure with electricity.

287.   The GIE's solar energy infrastructure, partially financed by the IFC in Washington, D.C., consisted of more than 21,000 solar cells and initially generated 7.3 megawatts or about 18% of the solar energy generated in the Gaza Strip prior to October 7. It also powered the Qassam Brigades' attack tunnels that ran along two sides of the complex (and under it) and provided Hamas additional electricity for its other needs.[22]

288.   Days before the October 7 Attack, PIEDCO installed a new Hamas-affiliated chairman named Farid Sobeh Al-Qeeq, who served on the faculty of Hamas's Islamic University of Gaza ("IUG") for more than 15 years, including as Dean of the Engineering Department (2015-2017) and President of the university in 2020. He had professional ties to Dr. Ziyara, the aforementioned fellow engineering professor at IUG who taught special courses to Qassam Brigades operatives on tunnel engineering.

289.   Al-Qeeq's prior employer, the IUG, has been one of Hamas's flagship institutions for decades,[23] and its senior staff all belong to Hamas.  He had long publicly advocated for armed

---

[22]   Prior to October 7, Israel supplied approximately half of Gaza's power (120 megawatts), much of it effectively provided free of charge. Gaza also had a single diesel power plant that generated an additional 65–75 MW, with fuel purchased from Israel and financed by Qatar.

[23]   Examples of international media identifying IUG as a Hamas institution date back three decades. For example, a May 3, 1994, article in the *Los Angeles Times* referred to the Islamic University of Gaza as "a Hamas stronghold." The *Miami Herald* reported on November 27, 1994, on its front page: "Outside the white-walled Islamic University of Gaza, a center of Hamas support …." A June 5, 2000, article in the *Jerusalem Report* (written by *The New York Times* correspondent Isabel Kershner) described "the Islamic University of Gaza (IUG), one of Hamas's leading institutions, with prominent members of Hamas's local political leadership, such as Dr. Mahmud Zahar and Dr. Abd al-Aziz Rantisi, on its staff." An October 9, 2001, article by Lee Hockstader of *The Washington Post* observed that "Islamic University, with about 14,000 students, is a stronghold of Hamas, the Islamic Resistance Movement, a radical group that has carried out a string of suicide bombings against Israelis." In 2007, the Arabic newspaper *al-Mustaqbal* described the IUG as "the main stronghold of Hamas in Gaza." On May 29, 2007, the United States Department of Justice identified the Islamic University of Gaza as one of the entities that were part of the Hamas social infrastructure in the list of unindicted co-conspirators in the criminal case of the *United States v. Holy Land Foundation*, No. 3:04-cr-000240-L (N.D. Tex.). On February 28, 2010, the *Boston Globe* published an article titled "Hamas U." reporting that: "the university is something else again: the brain trust and engine room of Hamas, the

struggle (*i.e.*, terrorism) that should be pursued "along parallel lines to achieve our people's right to freedom and independence" and had professional ties to Dr. Ziyara, the aforementioned fellow engineering professor at IUG who taught special courses to Qassam Brigades operatives on tunnel engineering.

290.    During his visits, Masri regularly visited with Na'im Bashir Muhammad Siksik, one of the major tenants of the GIE.  Siksik regularly associated with Hamas leadership, including Dr. Ziyara, Hamas's unofficial "Dean" of tunnel engineering.

291.    Siksik also publicly hosted Hamas's Deputy Minister of Economy, Zrai' at his factory in the GIE.

**B.    Defendants Partnered with Hamas to Build and Refurbish the Al Mashtal Hotel, Including the Tunnel Beneath the Complex Used by the Qassam Brigades to Fire Rockets at Israel**

292.    Bashar Masri owns the Al Mashtal Hotel (now called the Ayan Hotel) through PADICO, which nominally holds the property through its subsidiary Al Mashtal Tourism Investment Company. PADICO oversees the Al Mashtal Hotel though its subsidiary and agent, PRICO.

293.    The overlapping and interlocking nature of the Corporate Defendants is on display with respect to the Al Mashtal Hotel. The Chairman of the Board of Directors of Al Mashtal Tourism Investment Company is Muhammad Fawzi Najjar who also serves as the Director of PRICO. Wadie Muhammad Shaaban al-Masri served as the general manager of the Al Mashtal and Blue Beach Hotels, as well as a board member of the GIE.

---

Islamist movement that governs Gaza and has been a standard-bearer in the renaissance of radical Islamist militant politics across the Middle East." On August 2, 2014, *The Independent* (UK) reported that the Israel Defense Forces bombed the Islamic University of Gaza, claiming to strike a "weapons development centre." The article notes that the IUG was "previously hit in the 2008 Gaza War, when the Israeli military again claimed that science facilities were being used by Hamas to develop and store weapons."

294.     Through intermediaries, PADICO purchased a controlling stake in the hotel prior to 2011 with Hamas's approval.

295.     PADICO described the hotel venture as "in line with [its] commitment to … promote the national economy in the Gaza Strip" and told its investors of "progress in several projects including Al Mashtal Hotel…." It explained that PADICO's operating expenses "soared by 54.23% settling at $86.94 million in 2011 compared to $56.37 million in 2010 due to completing the Gaza Strip Hotel—Al Mashtal—during 2011…."

296.     At the time the hotel opened, it was publicly known that it was built just 500 meters north of a major Hamas "military" base belonging to the Qassam Brigades' Shati Brigade.[24]

297.     Already at that time (in 2011), Hamas used the hotel on a regular basis for events and other activities, including hosting many of the terrorists released in the 2011 exchange for Gilad Shalit, an Israeli soldier who was taken hostage in 2006.



---

[24]     For example, an Israeli news broadcast regarding the opening of the hotel in 2011 casually noted its immediate proximity to the Qassam Brigades' base. On August 8, 2011, the *Guardian* similarly noted that the "al-Mashtal doesn't have tourists and sits next to a military training camp…."

*Terrorists released for hostage Gilad Shalit posing for pictures poolside at the Al Mashtal Hotel*

*in 2011*

298. These included:

(1) Yusuf Musa Mahmud al-Khales (sentenced to life in prison for the murder of an Israeli police officer);
(2) Hamuda Said Abd al-Rahim Salah (sentenced to 22 years in prison for conspiracy to murder, planting a bomb, and shooting people);
(3) Muhammad Musa Hussein Muhammad Taqatqa (sentenced to life in prison for murder); and
(4) Ayad Dhiab Ahmed Abu Khizran (sentenced to life in prison for murder).

299. In 2013, Wadie Al-Masri (general manager) hosted Hamas's "Minister for Tourism and Antiquities" at the hotel and publicly thanked him for meeting the hotel's needs.

300. Defendants undertook the initial development of the hotel in coordination with Hamas, and it is likely that even the initial construction project helped to conceal Hamas's excavation and construction of a network of attack tunnels immediately below the hotel and accessible from the hotel's lower levels.

301. As noted above, nearly all Hamas tunnel projects were selected, in part, on the basis that the above-ground hosts were reliable allies of Hamas, in order to ensure the hosts provided logistical assistance to the Hamas engineering and excavation team throughout the tunneling process.

302. During Hamas's July-August 2014 terror campaign, the Al Mashtal Hotel (and the tunnel network below it) was used to launch rockets at Israel. The hotel itself was used as a Hamas command center because the presence of foreign aid workers and international journalists initially shielded the hotel from being targeted by Israeli forces.

303. The hotel provided extremely useful cover for the Qassam Brigades both because it was a prominent hotel that hosted foreign "dignitaries" and because the letters "UN" and "EU"

were painted on the hotel's roof, as indicated below.



304. The use of UN and EU signage on the roof was intended to be visible to Israeli aircraft and satellites, to deter Israel from attacking facilities that purportedly housed UN and EU offices and personnel.

305. Indeed, during the conflict, Hamas operated openly within the hotel, utilizing it as a base due to the presence of international media and the UN and EU insignia, which effectively shielded it from Israeli airstrikes.

306. The media were denied access to certain restricted areas, particularly the basement level of the hotel.

307. Nevertheless, once it became clear that Hamas was using the hotel to launch rockets at civilian population centers in Israel, the Israeli military's legal department and Office of the Chief of Staff approved strikes on the rocket launching sites across the street to suppress the rocket fire. These launch sites were fed by the tunnel system under and accessible from the hotel itself.

308. The Israeli forces' effort to suppress the rocket fire also caused significant

secondary damage to the hotel.

309.    At some point after the damage caused by the 2014 conflict, Masri and the Corporate Defendants obtained permission from Hamas to commence another renovation that once again included refurbishing Hamas's tunnel network under the hotel.

310.    Under Masri's guidance, the renovated hotel thereafter once again served as a premier venue for international aid organizations, foreign corporations, and diplomats,[25] as well as for Hamas-sponsored events.

311.    These included social events like the hosting of weddings for senior Hamas officials as well as "official" ceremonies like the 2021 hosting of the head of Egyptian Intelligence, an event hosted at the hotel by Yahya Sinwar, Hamas's leader in Gaza, and his deputy, Khalil al-Hayya.

312.    Rawhi Mushtaha, a member of Hamas's Political Bureau and a Specially Designated Global Terrorist, visited the hotel on multiple occasions.

313.    More importantly, once again, the hotel provided extremely useful cover for the Qassam Brigades, as a favorite site for the World Bank, USAID, and the European Union and as Gaza's most prominent hotel for foreign VIPs, journalists and NGOs, making it all but off-limits to Israeli strikes (under conditions prevailing before October 7, 2023).

314.    The tunnel running under and into the hotel allowed Hamas to store rockets and move Qassam Brigades operatives from the relative safety of the hotel's underground passages to the prepositioned launch areas in the parking area west of the hotel's main entrance and across the street some 100 – 150 meters north.

315.    As discussed below, Hamas launched rockets at Israel on October 7 from this site

---

[25]    For example, Mohammed al-Emadi, the Qatari envoy to the Gaza Strip responsible for facilitating the transport of Qatari money to Hamas in Gaza, maintained an office in the hotel.

as part of its diversionary tactics to conceal its ground invasion and confuse Israel and delay its response.

316. With Masri's full knowledge and approval, the Corporate Defendants contracted with the Qassam Brigades-affiliated construction company Al Bayan Contracting to help redevelop and refurbish the Al Mashtal Hotel—a project completed only three months before the October 7 Attack.

317. Moreover, as discussed above, because the construction of these tunnels poses the potential risk of destabilizing large structures situated above them, the Qassam Brigades had to coordinate their work with Defendants to better ensure the continued structural integrity of the hotel during and after construction and reconstruction of the tunnel network.

318. The above-ground renovations also provided concealment for the Qassam Brigades' tunnel excavations, as the presence of heavy construction equipment and of large quantities of debris attracts less notice when there is a credible reason for their appearance on site.

319. In addition, given the logistics of not only excavating tunnel passages and removing debris during the project but also the need for Hamas operatives to familiarize themselves with the interior of the hotel and train for the deployment of the rocket teams that would use the tunnel complex whenever Hamas decided to attack Israel, none of these terrorist activities could go unnoticed by hotel management.

320. Considering the events of July and August 2014 when the hotel was used as a Hamas command center and the hotel's Hamas tunnel infrastructure was used to launch rockets at Israel and the consequent damage to the hotel that resulted, it is clear that in continuing to invest in the maintenance and renovation of the hotel in the lead up to October 7, Masri and the Corporate Defendants made a conscious decision to work with Hamas to build out their attack tunnel system

and provide (1) their facilities to Hamas, (2) logistical support (including electricity and hotel access) to Hamas's attack tunnels, and (3) important cover for Hamas's terrorist activities—including its regular rocket fire on Israeli civilians.

321. Despite all the foregoing, the Al Mashtal Hotel was renovated and rebranded in 2023, and Masri visited the hotel on multiple occasions, including January and September 2023, just prior to Hamas's invasion of southern Israel.

322. Masri exercised "hands-on" control of the hotel, using it (along with the GIE) as a centerpiece of his public profile as a leading entrepreneur and investor in Gaza and as a venue to showcase his role as a business leader and innovator committed to working and investing in Gaza (with Hamas).

323. For example, in September 2023, a few weeks before October 7, Masri announced his "Energy of Hope" program at a conference held at the hotel stating:

> I announced today the "Taqa Amal" project in the Gaza Strip at a cost of $60 million to generate clean additional electricity that alleviates the suffering of our people.... We continue in PADICO with development and investment in our beloved homeland….

324. As it did in 2014, prior to the October 7 Attack, the hotel maintained the giant insignia on its roof, including "UN."

**C.** **Defendants Partnered with Hamas to Build and Refurbish the Blue Beach Hotel and its Attack Tunnel Complex**

325. PADICO, through PRICO, effectively owns the 160-room Blue Beach Hotel and controls its operations.[26] The Blue Beach Hotel is located in the western part of Gaza City, on Al-Rashid Street in the Al-Rimal Neighborhood.

---

[26]     In fact, PADICO's 2022 audited financial statement lists among its intangible assets, "the right to benefit from the coast land – Blue Beach – Gaza."

326. The Blue Beach Hotel complex sits directly on the Gaza shoreline across the street from the Al Mashtal Hotel (now called the Ayan Hotel) and diagonally across from the Qassam Brigades' "Badr Base," a Hamas training facility where the Qassam Brigades trained their version of Navy SEALs.[27]

327. The Blue Beach Hotel was part of the Qassam Brigades' sector-based combat system in that region of the Gaza Strip. At the time of the October 7 Attack it was situated at a strategically key point, providing control over the coastal route that serves as a main artery through which logistic supplies could be transported to the Qassam Brigades and reserves could be shifted within the combat area. This area also constituted a tactical "bottleneck" for Israeli forces, as was seen in the aftermath of the October 7 Attack.

328. Like the Al Mashtal Hotel discussed above, Masri and PADICO oversaw the Blue Beach Hotel's renovations (through PRICO) and promoted it as a luxury hotel for use by local VIPs (*i.e.*, senior Hamas officials) and international visitors.

329. After the October 7 Attack, because of its strategic location, the Qassam Brigades, with Defendants' assistance, repurposed the hotel's civilian infrastructure into combat infrastructure, such as fortified command posts and assembly rooms.

330. Hotel rooms were repurposed as fortified rooms and a command post, from which Hamas conducted command-and-control efforts. Underneath these rooms, the existing underground infrastructure was used to facilitate the Qassam Brigades' covert movement.

331. Some hotel rooms contained many types of weapons such as projectile-based weaponry, missiles, explosive charges, and diving suits for aquatic assaults.

332. Notably, the Blue Beach Hotel complex also featured an underground network of

---

[27] A Hamas "SEAL Team" landed on Zikim Beach in Israel on October 7.

tunnels with at least seven separate shafts accessible on the premises, including one that provided direct access to the beach and sea (for the benefit of the Qassam Brigades' "Navy SEALs"), one that exited the tunnel system next to a large mosque just north of the hotel complex, one that connected to the Al Mashtal Hotel tunnel complex's rocket-launching site, and one that provided access to at least one guest room inside the hotel itself. The tunnel system's external exit facilitated covert movement from the hotel to the edge of the Shati refugee camp nearby and to Badr Base— the training site for Qassam Brigades' equivalent of Navy SEALs.



*Illustration of Hamas attack tunnel footprint linking Defendants' resorts*

333.    Hamas's tunnel infrastructure beneath the hotel was almost certainly excavated after the hotel was initially constructed—sometime after 2017—especially given the fact that some tunnels extended *into* hotel guest rooms. The process would have involved Hamas operatives arriving daily to drop off and pick up the excavators, and to examine the progress of tunnel

excavation. Hamas's on-site engineer would have been regularly present together with deliveries of concrete, heavy machinery, and the removal of excess dirt and debris.

334.    Tunnel construction involves displacement of significant amounts of earth and rock which must be removed (shielded from Israeli surveillance, if possible). A common Hamas procedure was to erect temporary covered areas like shaded pergolas to help disguise excavations related to tunnel excavation and expansion.

335.    Indeed, multiple tunnel excavation workshops with entry shafts into the tunnel system were found directly adjacent to the Blue Beach Hotel and the central tunnel route. Some were concealed with sheds; others had concrete tunnel components, evincing active construction.

336.    Given the fact that the Blue Beach Hotel was perched on a bluff above the Gaza beachfront and the extensive nature of the tunnel system burrowed below it *and* the fact that it was excavated at least in part on the grounds of the hotel itself (and even directly into individual hotel rooms), Defendants plainly knew of and assisted in the construction of the Qassam Brigades' tunnel complex beneath the hotel.[28]

337.    Moreover, because the construction of these tunnels poses the potential risk of destabilizing large structures situated above them (particularly on sandy soil), the Qassam Brigades necessarily coordinated their work with Defendants to better ensure the continued structural integrity of the hotel complex—and the tunnels—during and after construction of the tunnel network.

338.    Much like the GIE, the tunnel system below the Blue Beach Hotel and Al Mashtal Hotel complexes was designed, at least in part, to create a "kill zone" for Israeli forces that would

---

[28]    *See, e.g.*, https://www.youtube.com/watch?v=56yGe2NNw6w. The depth of the tunnels beneath the Blue Beach Hotel had to be shallow due to the hotel's proximity to the seashore and water table. Therefore, the excavation of the tunnel was performed close to the surface of the hotel's lowest level.

inevitably target the Qassam Brigades' Badr Base nearby.[29]

339.    In keeping with Masri's public emphasis on "green energy," in 2016, PRICO installed solar panels comprehensively on the roof of the buildings constituting the Blue Beach Hotel complex which were used to power the hotel's operations and electrify the Hamas tunnel infrastructure beneath it.

340.    By agreement with Hamas, the Blue Beach Hotel provided excess electricity it generated to Gaza's main energy grid.

341.    Additionally, the Blue Beach Hotel's roofs were covered by solar panels installed by the same company that installed the IFC-financed solar power project at the GIE, and like the GIE, the electricity generated by the solar panels was knowingly provided to Hamas for its subterranean tunnels.

### D.    Defendants Have Blamed Israel for the Destruction of Their Properties

342.    Masri and the Corporate Defendants chose not only to invest in Gaza after it came under Hamas's control once they fully understood that all major business operations in the Strip would require the involvement of Hamas (both formally in the form of taxes, permits, and licenses and informally in kickbacks to Hamas officials). They also repeatedly invested more money and attracted foreign financial aid and investment for projects at sites that were repeatedly (1) used by Hamas for terrorist activities and (2) damaged by Israeli strikes as a result of Hamas's use of those same sites for terrorist purposes.

343.    Defendants were aware of Israel's repeated targeting of terrorist activities occurring on their properties but continued to invest in them, and by extension, the tunnel infrastructure

---

[29]    In addition to the children's play area located at the Ayan Hotel complex (discussed above) the area surrounding the Badr Base was dotted with schools used by Hamas to shield attack tunnels and store weapons as part of a larger tactical schematic to draw in Israeli forces and move Hamas terrorists below ground to create lethal fields of fire.

below them.

344. After Israel struck the GIE during Operation Guardian of the Walls in May 2021, PIEDCO's chief, Khaled Anabtawi, was quoted in a PADICO press release as claiming that "the Israeli occupation targeted on two consecutive days the [Gaza Industrial Estate], with several raids launched by the occupation's warplanes and artillery, which led to severe damage of more than 10 factories" and that "the Israeli raids on the Industrial city caused severe damage to the electric power generation from solar energy on the roofs of buildings project."

345. Ignoring the presence of Hamas attack tunnels that Defendants helped excavate and power, PADICO announced that "Anabtawi held the Israeli occupation authorities accountable for all the damage to the Gaza Industrial City" and wondered "what justification is the Israeli occupation using to fabricate its aggression here?"

346. In October 2021, after the GIE received a United Nations Global Climate Action Award, PADICO issued a press release quoting Masri as stating that:

> This award is to our steadfast people in Gaza Strip living under the siege with patience after the destruction to heal their wounds. This strategic project has been launched to alleviate their sufferings and to contribute to strengthening the economic structure there, despite the destruction of a large part of it during the last aggression on the Gaza Strip, which incurred Gaza Industrial Estate losses exceeding $12 million.

347. After October 7, in his capacity as chairman of the board of PADICO, Masri also released a statement acknowledging that the "scale of the damages and losses suffered by PADICO's investments in the Gaza Strip is significant, as reflected in the preliminary financial statements for the year 2023."

348. PADICO's Preliminary Financial Statement goes on to say:

> The aggression on the Gaza Strip resulted in the destruction of the Ayan Hotel (formerly Al-Mashtal), the biggest five-star hotel located on the northern coast of Gaza City, which had recently undergone a multi-million-dollar renovation and

rebranding and launched on 26 August 2023. Moreover, the entirety of the Blue Beach Resort facilities was also destroyed, in addition to the destruction of the Gaza Industrial Estate, including its entire solar energy project which was rebuilt in 2022 after one-third of it was destroyed in a previous aggression on the Gaza Strip in 2021; two months after production had begun.

349. The "previous aggression" referenced in this statement (*i.e.*, Operation Guardian of the Walls in May 2021), like previous Israeli strikes on properties owned by Masri and the Corporate Defendants, was due to their extensive use by the Qassam Brigades.

350. At the time these statements were made, Defendants were actively collaborating with the Qassam Brigades. The fact that these same properties were damaged over and over again after previous Hamas rocket barrages would have put even less complicit parties on notice that their properties in Gaza were being used by Hamas for terrorist purposes.

351. In sum, and in addition to the foregoing, Defendants' knowing assistance to Hamas was substantial in at least <u>five</u> critical ways:

1) It provided infusions of capital into the Gaza Strip separate from Hamas's other illicit revenue streams (smuggling, Iranian and Qatari funding, international NGOs).

2) It enhanced Hamas's legitimacy as the rulers of the Gaza Strip by normalizing and legitimizing commercial investments in a region controlled by a Foreign Terrorist Organization.

3) As discussed below, it contributed to Hamas's strategic deception by helping convince Israel that Hamas's primary focus (prior to October 7) was to stabilize the Gaza economy and to allow entry to laborers from Gaza into Israel—a deception whose success was necessary to Hamas's ability to carry out the October 7 Attack without advance detection.

4) It shielded and concealed Hamas's terrorist activities at (and under) Defendants' development of various sites by attracting both international development aid and cultivating their use by international NGOs and corporations while clandestinely facilitating terrorist activities.

5) It provided physical cover for the excavation and utilization of Hamas attack tunnels and provided material support to Hamas's Qassam

Brigades, including (solar based) electricity used to power its attack tunnels.

## V. WITH DEFENDANTS' ASSISTANCE, HAMAS DECEIVED ISRAEL INTO BELIEVING ITS GAZA LEADERSHIP WAS PRIORITIZING ECONOMIC DEVELOPMENT OVER ATTACKING ISRAEL

352.   In early 2012, after his release from an Israeli prison, Yahya Sinwar was elected to the Hamas Political Bureau in Gaza and appointed representative to the Qassam Brigades—the "War Minister" of Hamas. This appointment gave him a direct say in Hamas terrorist policies including developing military ties with Iran, Turkey, and other states, as well as directing Hamas's overall strategy. Sinwar later gained full control of the Qassam Brigades, and he was eventually appointed head of the Hamas Political Bureau in 2017.

353.   According to Hamas, it established the Joint Operations Room in 2018, which brought together 12 "military" divisions from different Palestinian terrorist organizations in the Gaza Strip (all the "resistance factions" in Gaza) under Sinwar's full control.

354.   The headquarters of the Joint Operations Room effectively took on the role of a general command for a regular terrorist "army" within the Gaza Strip, possessing the authority to make critical decisions regarding the initiation of terrorist confrontations with Israel, including the timing, location, and details of the attack, along with the forces that would participate from each terror faction.

355.   Despite their ideological commitment to destroy Israel, Sinwar and the Hamas leadership strategically reached out to Israel through intermediaries, signaling their purported willingness to pursue a state of security calm in return for the delivery of international aid to support the economic development of the Gaza Strip.

356.   On December 7, 2021, the Israeli Ministry of Defense finalized the construction of a ground barrier surrounding the Gaza Strip, effectively hindering the excavation of Hamas attack

tunnels into Israel of the kind discovered in 2018 running from Defendants' property toward Kibbutz Nahal Oz.

357.   Consequently, Hamas revised its strategy, shifting from a tunnel-based invasion plan to one involving an above-ground assault calling for the breach of the border fence.

358.   However, attack tunnels *within Gaza* remained an important part of the assault plan. They provided critical logistical support and fortified and clandestine supply lines that played a crucial role in the October 7 Attack and its aftermath.

359.   To prepare for the attack, Hamas lulled the State of Israel into the false conception that it had shifted from prioritizing terrorism to prioritizing governance and economic development, and only provoked Israel occasionally to maintain its domestic credibility.

360.   For example, in July 2020, Brigadier General Amit Sa'ar, then chief of the Israeli Military Intelligence ("AMAN") research division, considered the top expert on the Palestinian arena, stated that:

> Hamas has no interest in a confrontation with Israel. It is deterred. What worries it the most is the economic situation in the Gaza Strip. … The state component in Hamas' concept is getting stronger. … From the beginning, Hamas had two identities: a religious resistance organization and a national movement. From 2007 (Hamas' violent takeover of the Gaza Strip and the expulsion of the Palestinian Authority), it also has the identity of the sovereign in Gaza and is measured against it every day. The main shaper that determines the reality of Hamas is the economy.

361.   He went on to explain:

> As long as [it] feels there is progress—**projects, international money**— Hamas will bite [its] lips. And if [it] thinks there is no progress or that [it] is being played with, [it] will signal. … As long as [it] thinks there is a chance and conditions for a settlement, [it] is interested in keeping the peace.

> (Emphasis added.)

362.   In an October 9, 2020, interview with the Israeli newspaper, *Yedioth Ahronoth*, the

outgoing head of the Israeli security forces' Military Intelligence's research department, Brigadier General Dror Shalom, said "Gaza is … not an existential challenge … we have built very significant capabilities there," and "we brought Hamas to a low point."

363. Masri and the Corporate Defendants assisted Hamas with a key element of this deception—fostering a belief by Israeli intelligence, both before and especially after Israel's May 2021 "Guardian of the Walls" operations, that Hamas's Gaza leadership was deterred from attacking Israel and was instead prioritizing economic development over its long-standing goal of destroying Israel. They did so by, *inter alia*, emphasizing the rebuilding and expansion of purportedly commercial properties like the GIE and by returning to U.S.-based investors like the IFC for further developments at the properties, such as the additional solar panels at the GIE.

364. In early 2022, after fortifying its terrorist force and conducting training that included rehearsing an attack plan, Hamas entered a new stage of its strategic deception strategy against Israel. This stage was characterized by the dissemination of messages that convinced Israel that its tactics of coercion (threats to assassinate Hamas leaders) and rewards (economic concessions to the Gaza Strip) were effectively achieving their intended purpose of restraining Hamas and avoiding military confrontation.

365. This strategy paid dividends for Hamas, as many, including high-ranking Israeli officials within the Israeli security and intelligence services became convinced that peace was a possibility. For example:

   a. The head of AMAN at the time, Major General Aharon Haliva, forecast in September 2022 that "the peace with Hamas will be maintained for five years and [we will] recognize in Gaza a process for economic stabilization that has the potential for long years of peace."
   b. In December 2022, the Gazit Institute held a two-day conference titled "Intelligence, Strategy, and Technology." At the conference, Brigadier General Amit Sa'ar remarked that "[i]t is precisely in the Gaza Strip that we are in a stable situation and there are conditions to extend the interval of

stability." He explained one of the reasons for this stable situation: "Hamas understands that in the coming years it will want to invest in Judea and Samaria, and therefore it is better to quiet the focus on Gaza."

c. On January 13, 2023, in an interview broadcast on the Israeli TV Channel 12, former Chief of Staff Lieutenant General Aviv Kochavi stated that "a loss to [Hamas's] economy, to workers … could definitely be a deterrent."

366. Thus, the Israeli leadership was led to believe there was no immediate threat to Israel. This was thanks in part to initiatives such as Defendants' economic development activities.

367. But that was all a smokescreen: Hamas leadership was actively preparing for the invasion plan into Israeli territory starting in early 2022.

368. Based on a released recording by the spokesman for the Qassam Brigades, starting in early 2022, Hamas made the decision to accelerate preparations for the implementation of the invasion plan into Israeli territory and implement a strategic deception toward Israel that would allow it to improve its preparations for war while dissuading Israel from attacking the terrorist infrastructure in the Gaza Strip.

369. The misconception that Hamas's Gaza leadership was interested in economic development and maintaining the *status quo* continued through the eve of the October 7 Attack. As a result, Israel's military was undermanned, out of position, and poorly organized before the attacks happened. For example, Israel did not have a plan to respond to a large-scale Hamas attack on Israeli soil. The Israeli military units deployed in the immediate area were primarily patrol units tasked with monitoring the border and potentially responding to small-scale infiltrations by terrorists.

370. Through their acquisition of international—including U.S.—investment and signaling that the future of Gaza lay in economic development, Masri and the Corporate Defendants intentionally contributed to that misconception—all the while actively collaborating with Hamas during this period. This included a publicized late-September 2023 tour of the GIE by

Masri touting his commitment to his investment – all while providing Hamas with electricity and coordinating the refurbishment and enhancement of a murderous network of tunnels throughout the property.

## VI.   THE OCTOBER 7 ATTACK[30]

371.   As noted above, in July 2018, Hamas established a Joint Operations Room in Gaza to coordinate with 12 "resistance factions" active in Gaza, including PIJ, PFLP, AAMB and PRC. The Joint Operations Room united the disparate terrorist organizations operating in the Gaza Strip under one command and worked to coordinate their activities.

372.   Since at least 2021, Iran's Islamic Revolutionary Guard Corps – Qods Force ("IRGC-QF") created a "Joint Operations Room" in Lebanon as well, where senior Hezbollah, Hamas, PIJ, and Islamic Revolutionary Guard Corps ("IRGC") officials met and coordinated their efforts against Israel, often under the auspices of Muhammad Izadi, the IRGC-QF official who served as the head of the Palestinian Office of the IRGC-QF in Lebanon.

373.   As Hamas regrouped after its latest round of fighting with Israel in May 2021, the broad outlines of what it secretly terms its "Big Project" came into sharper focus, and Hamas's relationship with Iran took on even greater importance.

374.   According to *The New York Times*, at a meeting in May 2023, Hamas leaders said that they wanted to commit the October 7 Attack by the end of 2023 because Israel had announced that it was developing a new type of laser that could destroy Hamas rockets more effectively than its current air defense system (the Iron Dome and David Slingshot).

375.   On June 19, 2023, then-Hamas leader Ismail Haniyeh also met with a delegation of

---

[30]   A significant portion of the summary of the events of October 7 described in this Section is derived from the published 7 October Parliamentary Commission Report, chaired by Lord Andrew Roberts and compiled by the UK-Israel All Party Parliamentary Group. The Report is available at https://www.7octparliamentarycommission.co.uk/.

high-level Iranian security and military officials. Haniyeh, accompanied by his deputy Saleh al-Arouri and other Hamas figures, also met with the IRGC chief, Hossein Salami, and a number of his aides over a period of three days.

376.    Starting no later than August 2023, IRGC-QF commanders used the Joint Operations Room in Beirut to conduct biweekly planning meetings with Hamas, PIJ, Hezbollah, and other Iranian-backed terror groups. Iran's foreign minister Hossein Amir-Abdollahian attended at least two of these meetings.

377.    *The Wall Street Journal* has reported that meetings in the Joint Operations Room in Beirut culminated with an October 2 meeting in which Iran provided the green light for Hamas, PIJ, and the other Iran-backed groups to launch the pre-planned attack against Israel, using Iranian intelligence, training, and military supplies.

378.    In the days leading up to October 7, Yahya Sinwar was seen fleeing into Hamas's tunnels with his family. It is from there that Sinwar ordered the October 7 Attack to begin.

**A.      October 7, 2023**

379.    Saturday, October 7, 2023, was the Jewish holiday of Simchat Torah, often celebrated in Israel by families spending time together at home, including Israeli military personnel who often received a "weekend pass" to go home for the holiday weekend.

380.    It was also the 50th anniversary of the Yom Kippur War, the most devastating war in Israel's history—itself a surprise attack intentionally launched on a Jewish holiday.

381.    It was on this day that Hamas shattered the dawn with its brutal invasion of southern Israel, resulting in the single deadliest day for the Jewish people since the Holocaust. More than 1,200 men, women, and children were brutally murdered. Many victims were raped, and over 250 were taken hostage.

382.    The attack was so brutal in part because Israel was not fully prepared; it had been

lulled into a false sense of security that Hamas was no longer interested in all-out war with Israel. This false sense of security came from the intentional decision of Hamas and its allies, including Defendants, to portray Hamas as more interested in economic development than continued terrorism.

**B.   Geography of the Attack**

383.   The attack on Israel started with combined air, sea, and land incursions from the Gaza Strip into the Gaza border communities in Israel, collectively known as the "Gaza Envelope."

384.   This area includes "kibbutzim," collectivist communities such as Kfar ("village") Aza and Kibbutz Nahal Oz and Kibbutz Sa'ad, all located close to the GIE.

385.   These communities have experienced decades of security threats due to their proximity to Gaza, and yet many advocated for peace.

386.   One border community, Kibbutz Nir Oz, was home to several prominent peace activists. Nir Oz had the third highest number of civilian deaths of any community attacked on October 7, 2023, and the highest number of people kidnapped to Gaza—including 15 children and 21 people over 70. People from Nir Oz made up a third of the 251 hostages taken on October 7, 2023.

387.   Hamas targeted these specific towns and villages in the Gaza Envelope (listed from south to north): Holit, Sufa, Nir Yitzhak, Pri Gan, Talmei Yosef, Mivtachim, Yesha, Amioz, Magen, Nir Oz, Nirim, Ein Hashlosha, Kissufim, Re'im, Be'eri, Alumim, Nahal Oz, Kfar Aza, Mefalsim, Yachini, Nir Am, Sderot, Netiv Ha'asara, Karmia, Zikim Beach, and Ofakim, as well as public spaces and outdoor festivals, such as the Nova Music Festival near Kibbutz Re'im and the Psyduck music festival located between Nirim and Nir Oz. Ofakim was the easternmost town attacked on the ground that day.

**C.   Hamas's Rocket Barrage Overwhelms Israel's Defense Systems**

388.     The October 7 Attack began with a first phase of infiltration that Hamas called the "blinding plan" to ensure minimum resistance to infiltration. This phase involved a coordinated rocket bombardment of unprecedented size, aimed in the direction of civilian targets in the Gaza Envelope and elsewhere in Israel, including the cities of Ashkelon, Tel Aviv, and Jerusalem.

389.     Hamas terrorists began heading toward the border fence at roughly 6:15 a.m.

390.     At 6:29 a.m., rocket alerts sounded in over 30 Israeli communities as rockets were launched from Gaza toward Israel. Hamas forces also fired 120mm mortar rounds, many of which landed on and around Route 232 throughout the day.

391.     Nearly 4,000 rockets and mortars were fired on Saturday, followed by further barrages on October 8 and 9.

392.     As discussed herein, some of these rockets were fired from the launch site connected to the Al Mashtal Hotel owned by Defendants.

393.     The Iron Dome intercepted missiles, unintentionally masking the sound of snipers systematically eliminating cameras along the border fence. Simultaneously, 100 remotely operated drones targeted watchtowers equipped with machine guns and cameras that are connected to the border's thermal imaging sensors and to optical and radar detection systems. Hamas also dropped incendiary explosives from drones, fired RPGs, and used sniper fire to attack several Sentry Tech systems along the border.

**D.     Hamas Attacks by Ground, Air, and Sea**

394.     Thus began the first wave of the ground attack, during which approximately 30 breach points were assaulted simultaneously. Trained terrorists began blowing holes in the security fence using a wide range of explosives and munitions. Video footage from a fence infiltration near Kibbutz Be'eri captured terrorists fixing explosives and propping an anti-tank mine against the fence. Other methods to breach the fence include detonating a strip-and-frame charge explosive;

this was one of the many weapons Hamas specially created for the attack and was also designed to be affixed to home saferoom doors in Israeli border communities. Improvised Explosive Devices ("IEDs") were used to target and breach both wire fences and concrete walls. Tractors were deployed to dismantle sections of the barrier. Cutting charges and shaped explosives were used to sever metal beams and posts.

395.    With the surveillance systems around the border down, and Israel's defenses blinded, it took mere minutes for Hamas terrorists to cross into Israel. Specialized engineering teams were dedicated to breaking through barriers using tools like Bangalore Torpedo-type charges, linear shaped charges, and other explosives. Folding bridges were prepared to overcome obstacles, like concrete walls, enabling motorcycles and vehicles to cross.

396.    Most Hamas Nukhba commandos and regular Qassam Brigades troops crossed the border and drove to targeted communities in white Toyota pick-up trucks and on motorcycles. At Sderot and a few other places they also arrived in Israeli cars stolen or hijacked that morning. Advance teams of Hamas commandos arrived at some targets in powered two-man paragliders. At Zikim, north of the Gaza Strip, they came by sea in rigid inflatable boats. A small number of Hamas vehicles used in the October 7 Attack were "technicals" – pickup trucks mounted with heavier weapons.

397.    Some terrorists wore fatigues to resemble Israeli army uniforms or were dressed like Israeli police to confuse Israeli security forces and civilians. Some carried radios for communication and zip ties to restrain hostages. Some wore "Go-Pro" or other body cameras that allowed them to capture video footage of the horrific acts they committed that day.

398.    By the end of the day, the border had been breached in 119 locations – equivalent to nearly three breaches per mile. Breaches were as big as bulldozed holes in the fence and as small

as a gap between two concrete slabs.

399.     As discussed herein, one of the areas where such a breach occurred was at the border adjacent to the northern end of the GIE, which had been used as a key observation post and a source of intelligence gathering. Of course, as a result of Defendants' assistance and cooperation, the area was also equipped with multiple attack tunnels linked to a Hamas command center.

400.     The ground invasion was accompanied by airborne and naval breaches. Video footage of the early morning rocket attacks shows motorized paragliders crossing into Israel above the fence and below the rocket fire, including at key attack points such as the Nova Music Festival site. And four dinghies with 35 armed terrorists exited the Gaza fishing zone and entered Israeli coastal waters. Four fast boats of Hamas naval commandos approached, carrying 35 terrorists of the Naval Nukhba, prompting a battle with the Israeli Navy and a landing on Zikim Beach near Kibbutz Zikim. At the same time, Hamas terrorists fired anti-tank missiles at the navy's observation posts.

401.     As discussed below, the tunnels that Defendants helped to construct under the Blue Beach Hotel went to the sea. The Hamas naval commandos were trained using those tunnels.

**E.     Hamas Infiltrates Civilian Communities, Military Outposts, and Highways**

402.     Kibbutz Kfar Aza—located about three-and-a-quarter miles from the GIE—was the first civilian community Hamas infiltrated, with motorized paragliders entering the airspace of the community at 6:32 a.m.; the last of these communities Hamas infiltrated was Moshav Yated, which Hamas reached at approximately 9:15 a.m.

403.     In the communities where the attackers were able to breach the fences and overwhelm any organized internal defense, the terrorists went from house to house killing civilians who hid in the bomb shelters and "safe rooms."

404.     Over the course of the day, many residents fought to keep the door handles of their

safe rooms closed from terrorists, and many were killed after being shot through the door or after the terrorists threw grenades inside. Other residents were burnt alive or died from smoke inhalation when terrorists purposely set fire to the houses, knowing that civilians were hiding in their safe rooms.

405. Additionally, residents living in buildings without safe rooms (mostly older buildings) were forced to run to community shelters. In Ofakim, terrorists specifically targeted older neighborhoods, knowing that residents would be running from their homes to these shelters. Many were killed while attempting to reach or return from the shelter.

406. The Israeli villages that were under the control of the terrorists for several hours experienced high numbers of atrocities, such as torture, rape, and the mutilation of the dead. There was widescale damage from the attacks and purposeful destruction of property, including arson attacks.

407. The worst affected communities were Kibbutz Kfar Aza, Kibbutz Be'eri, and Kibbutz Nir Oz. At Be'eri over 100 civilians were killed, and 62 at Kfar Aza.

408. 231 of the 251 hostages were taken from these communities. Nir Oz suffered the most kidnappings with 75 hostages taken alive to Gaza and a further seven bodies kidnapped.

409. The attacks on the kibbutzim and other communities (some called "moshavim") were aided by the simultaneous attack on Israeli military outposts and bases in the area, which as part of their official functions act as a first line of defense in the area. This prevented Israeli forces from coming to the aid of the civilian communities.

410. Terrorists attacked the Re'im army base, which is the headquarters of the Israeli military's Gaza Division, taking control of the base before Israeli forces repelled them later in the day on October 7. They also attacked the army base at Nahal Oz—several hundred meters on the

eastern side of the border fence from the GIE—killing more than 60 Israeli soldiers and taking six as hostages.

411.    Hamas also attacked military posts at key crossing sites, including at the Erez checkpoint, in the north of Gaza, and the Kerem Shalom crossing, located near Israel's border with Egypt. They attempted to take over the base in Zikim, the site of the amphibious landing.

412.    Further adding to the chaos of the day was the deliberate sabotage of communication networks by the terrorists as part of the border breach and hits on observation outposts. It took hours for the Israeli response units to fully understand what was happening.

413.    Hamas also took strategic control of the main highway, Route 232. Route 232 is the main north-south highway in the Gaza Envelope, running parallel to the Gaza border and connecting over 20 rural communities. On October 7, 2023, Hamas strategically seized control of this critical artery, murdering nearly 300 people along a 33-mile stretch. The highway became a killing zone as Hamas set up ambushes at 37 separate locations along the road, targeted civilians at major intersections and junctions, attacked roadside rocket shelters filled with Nova festival escapees, and ambushed responding security forces and medical personnel.

414.    By 7:30 a.m., Shahar HaNegev junction (the intersection between Route 232 and Highway 34) was under full terrorist control. The main intersections along Route 232, including the Re'im intersection and Gamma Junction, were taken in the next 10 minutes. This created chokepoints which prevented the entry of security and emergency services who tried to respond to the attack, as well as preventing civilians from escaping. By doing so, the terrorists effectively created a confined killing zone, which enabled maximum bloodshed.

F.    **The Terrorists Committed Successive Waves of Attacks on Compromised Communities**

415.    The first wave of attacks was led by Hamas's elite Nukhba Forces, followed over

the next two to three hours by Hamas "regular" corps of terrorists, the Qassam Brigades, together with other Palestinian militias and terror groups under Hamas's control and command, including Al-Quds Brigades (Palestinian Islamic Jihad), the Abu Ali Mustafa Brigades (Popular Front for the Liberation of Palestine), the Jihad Jibril Brigades (Popular Front for the Liberation of Palestine-General Command), the National Resistance Brigades (Democratic Front for the Liberation of Palestine), the Nassar Salah Al-Din Battalions (Popular Resistance Committees), the Al-Aqsa Martyrs' Brigades, the Holy Warriors' Battalions (Mujahideen), and the Al-Ansar Brigades (Al-Ansar Movement).

416.    Then, in midmorning, there was a third invasion from Gaza by several thousand Gazan civilians instructed or encouraged by Hamas officials to engage in looting and kidnapping.

### G.    Attack on the Nova Music Festival

417.    In the early morning hours of October 7, 2023, between 3,000-4,000 young people were celebrating at the Nova Music Festival in Kibbutz Re'im in southern Israel (five miles southeast of the GIE). The event, scheduled to coincide with the end of the Sukkot holiday, was in full swing—DJs played electronic music on two stages as attendees danced under colorful tarpaulins or rested in tented camping areas.

418.    Starting at approximately 6:29 a.m. and thereafter, the sky filled with rockets launched from Gaza. The music initially drowned out the sound of incoming fire.

419.    Festival organizers quickly cut the music. A producer shouted "Tseva Adom" (Red Alert) through the speakers, ordering everyone to lie on the ground. Shortly afterward, police ordered a complete evacuation of the site. In the confusion, thousands rushed to their vehicles, creating traffic jams at the exits.

420.    What no one at the festival realized yet was that this was not just a rocket attack. Hamas fighters had breached the Gaza border and were systematically setting up ambush points

along Route 232, the main escape route from the festival. By 8:00 a.m., pickup trucks carrying Hamas Nukhba commandos arrived at the festival grounds from both the north and south. The small contingent of police officers, armed only with pistols, were quickly overwhelmed by terrorists with assault rifles, machine guns, and RPGs.

421.    With the site under their control, Hamas gunmen began methodically hunting for survivors, targeting those trying to flee. Some attendees abandoned cars and ran across open fields, where they were pursued by gunmen on motorcycles and in trucks. Others hid under festival stages, inside portable toilets and in trash containers. Many fled to nearby concrete rocket shelters along Route 232, which became death traps when terrorists threw grenades inside.

422.    About 20 people crowded into an ambulance for protection. Hamas terrorists discovered them, fired at the vehicle, and then launched a thermobaric RPG inside, killing 18 of the 20 people.

423.    Those who managed to escape the festival tried to take refuge in roadside concrete shelters along Route 232. At the Be'eri shelter, with its distinctive mural of a girl blowing bubbles, Hamas terrorists fired hundreds of rounds into the crowded space and tossed grenades inside.

424.    At the Re'im west shelter, Hersh Goldberg-Polin lost part of his arm to a grenade explosion and was later taken hostage, dragged by his hair into a pickup truck while bleeding heavily.

425.    Military and police reinforcements arrived only around noon, about four hours after the initial assault began. By then, the terrorists had killed 375 people, making it the deadliest concert attack in history.

426.    First responders discovered scenes of unimaginable brutality. Bodies were strewn across the festival grounds—in the bar, medical tent, camping area, dancing space, parking lots,

and portable toilets. Evidence indicated many victims had been subjected to rape and sexual violence before being killed, with women found tied to trees, stripped of clothing. Many bodies showed signs of deliberate mutilation or had been intentionally burned.

427.    The 375 victims represented a cross-section of Israeli society: young people from cities and kibbutzim, Arab Israelis, Bedouins, foreign nationals, security guards, and first responders.

### H.    Hostage-Taking into Gaza Using the Tunnel System

428.    Hamas abducted 251 hostages on October 7, 2023, into Gaza. Of these, 210 people were taken alive; 41 bodies were abducted after they had been killed. Their families were placed in a nightmarish state of limbo, not knowing the fates of their loved ones, what they were experiencing, or whether they would ever see them again. The hostages simply vanished.

429.    This was made possible in part by the system of Hamas attack tunnels that were powered in part by electricity that Defendants knowingly provided to Hamas.

430.    Evidence indicates that hostage-taking was a premeditated part of the attack plan, with Hamas having prepared a manual titled "How to take captives" that included instructions on separating hostage groups and methods of controlling them.

431.    Among the 210 living hostages, 176 held Israeli nationality (51 with dual citizenship from 14 different countries), while others were Thai, Philippine, Nepalese, and U.S. nationals. The vast majority (197) were civilians, while 13 were military personnel. Nearly half of those taken (102) were women and children, including 35 children under 18 years old. The youngest hostage was Kfir Bibas, only nine months old, and the oldest was 85-year-old Shlomo Mantzour.

432.    The hostages were taken from multiple locations, with the largest numbers coming from Kibbutz Nir Oz (75), the Nova Music Festival (34), Kibbutz Be'eri (27), and Kibbutz Kfar

Aza (20). The abductions often involved breaking into family homes across seven kibbutz communities, impacting 44 families. Many hostages were forced to witness their family members being murdered before they were taken.

433.    Documentation through videos, CCTV footage, and bodycams worn by terrorists revealed that many hostages suffered abuse during their abduction, including physical assault, verbal abuse, sexual assault, and degrading treatment. Footage showed hostages bound, partially undressed, beaten, and threatened. According to testimony from released hostages, this abuse continued during captivity and included sunlight deprivation, starvation, binding, beatings, sexual abuse, and other degrading and terrorizing treatment.

434.    Hamas used the Gaza tunnel system that it built beneath, into, and through various properties to transport and hide many of the hostages they captured during the October 7 Attack.

435.    Yocheved Lifshitz, an eighty-five-year-old hostage who was released after several weeks in captivity, described the vast network of tunnels as looking like a spider web.

436.    Aviva Siegel, a resident of Kfar Aza who was taken hostage in Gaza for 51 days, described being pushed down into a tunnel during the October 7 Attack. She described being locked in a tunnel with another hostage and left for days on end without food.

437.    Sapir Cohen, a young woman taken hostage in Gaza for 55 days, recalled being moved from homes above-ground to the tunnels, which were filled with mold, lice, and bed bugs.

438.    Qaid Farhan Alkadi, a Bedouin Arab Israeli, was rescued by Israeli forces from a tunnel under southern Gaza after 326 days in captivity.

439.    In July 2024, the bodies of five hostages—Ravid Katz, Oren Goldin, Maya Goren, Sgt. Kiril Brodski, and Staff Sgt. Tomer Yaakov Ahimas—were recovered from a tunnel located underneath an Israeli-designated humanitarian zone in the southern Gaza city of Khan Younis.

440.    In August 2024, the bodies of six hostages—Israeli-American Hersh Goldberg-Polin, Ori Danino, Eden Yerushalmi, Almog Sarusi, Alexander Lobanov, and Carmel Gat—were recovered by Israeli forces in a tunnel underneath the southern Gaza city of Rafah after having been executed at close range. The Israeli forces reported that the hostages had been held there for days prior to their murders.

### I.    Hamas's Use of Hostages as Bargaining Chips

441.    Hamas used the hostages to effect multiple goals. It placed them as human shields—for example, Israel located members of Hamas's leadership in Gaza but could not strike without risking injury to the hostages they kept with them as personal shields.

442.    Through the kidnappings, Hamas also attempted to influence Israeli and U.S. policy in other ways by presenting taped messages by hostages to the media to intimidate and demoralize the Israeli government and civilian population and to affect the conduct of both the Israeli and American governments in the way they approached the conflict.

443.    Most critically, Hamas used the hostages as bargaining chips.

444.    During the weeklong truce in late November 2023, 105 hostages were released (and four were released before that) in exchange for hundreds of Palestinian terrorists held in Israeli prisons.

445.    Hamas periodically released hostages, including during hostage-for-terrorists exchanges. The final living hostages were returned to Israel in October 2025, over two years after they had first been captured, as part of a ceasefire agreement. In total, 168 hostages were returned alive, the vast majority of which were released through negotiated exchanges and ceasefire agreements. The bodies of 87 hostages were also repatriated to Israel, with the last not being recovered until January 26, 2026.

### J.    Israel's Response to October 7 in Gaza

446. In response to the October 7 Attack, Israeli ground operations in the northern Gaza Strip began on October 27, 2023, with advances along three axes: a southward drive along the western coast toward al Shati camp, a southwestward drive into Beit Hanoun, and a westward drive from Juhor ad Dik to the western coast, thereby cutting the Gaza Strip in half and isolating the northern Strip from the southern Strip.

447. For a period of over 22 months (interrupted by temporary ceasefires in late 2023 and early 2025), Israeli forces engaged in violent confrontations with Hamas and other terrorist groups under their control seeking to inflict casualties on Israeli forces in the Gaza Strip.

448. To date, over 950 Israeli soldiers, including several dual U.S.-Israeli citizens, have been killed and many more injured (often severely). As described above, many of those held by Hamas and its co-conspirators, some of them U.S. citizens, have been murdered, or are believed to have been murdered, by their captors.

449. Hamas specifically prepared for Israeli incursions, and ambushing and killing as many Israeli soldiers as possible was part of the larger October 7 plan.

450. Hamas used its attack tunnels to evade capture and ambush Israeli forces.

451. During Israeli counterstrikes, Hamas leaders took refuge in their tunnels to hide from the attacks, regroup, and rearm.

452. As described herein, Hamas's Qassam Brigades fought Israeli troops on Defendants' properties, using the attack tunnels they constructed with Defendants' knowing assistance to confront Israeli forces.

## VII. HAMAS USED THE TERROR INFRASTRUCTURE IT DEVELOPED WITH DEFENDANTS' KNOWING ASSISTANCE DURING THE OCTOBER 7 ATTACK

453. Defendants facilitated Hamas's cross-border attacks on October 7 itself as well as the violence in the aftermath.

**A.      The GIE and the October 7 Attack**

454.      The GIE, including the tunnels below it, served as a planning and staging ground for the October 7 Attack, both for preparation purposes and on the day itself.

455.      As noted above, two weeks prior to the October 7 Attack, Hamas, with Defendants' assistance, staged yet another protest in front of the GIE to test Israel's response and further probe weaknesses in border security at the area around the Karni crossing.[31]

456.      Prior to the October 7 Attack, Hamas used the GIE itself (and the areas adjacent to it) to train its forces, reconnoiter the Israeli border and store weapons and tunnel equipment.

457.      Moreover, the adjacent Hamas training camp and command center under the nearby mosque (which was frequented by GIE workers) were physically connected to the GIE via underground tunnels. The stored weapons, instructional posters and detailed three-dimensional map of Kibbutz Sa'ad all confirm that the camp and command center were used to prepare for the October 7 Attack and it is highly probable that Hamas personnel transited through the underground tunnel beneath the GIE that day given that Kibbutz Sa'ad was in fact attacked.[32]  Fighting later occurred on the grounds of the GIE during the Israeli counterstrike into Gaza.

458.      Hamas fighters used the GIE grounds on October 7, 2023, and some were even killed there by Israeli forces. A Gaza-based photographer captured the scene of the death of one of Hamas's motorcycle teams at the GIE on October 7.

---

[31]      The Hamas underground tunnel "Metro" made it possible for the assault teams to assemble closer to the border without detection before moving above ground for the eventual ground assault. Defendants' provision of electricity to this tunnel system literally lit their way.

[32]      Kibbutz Sa'ad was one of the few border communities to largely withstand Hamas's assault on October 7.



*Hamas operatives killed by Israeli strike on October 7, 2023. The water towers of the GIE can be seen in the background.*

459.     Under ordinary circumstances, because the GIE received international funding, including from the IFC, MIGA, the UN, and the European Union and hosted warehouses leased by the UN, Israel's targeting protocols would have required extensive review and approval before approving airstrikes even in close proximity to this privileged facility.

460.     However, the scale of the atrocities of October 7 compelled Israel to launch a ground assault on Hamas in Gaza.

461.     The Qassam Brigades tunnel installations at the GIE were situated along important access roads in order to ambush Israeli tanks and troops entering Gaza.

462.     Accordingly, approvals were granted for targeted airstrikes on these installations in the days immediately following the massacre.

463.     Shortly thereafter, heavy bombs fell on the GIE, including on buildings built directly over the tunnels by the Masri-approved Al Bayan construction crews in the year preceding the October 7 Attack. In the aftermath, weapons were discovered.



*A grenade found on the grounds of the GIE in the aftermath of October 7*



*Machine gun magazines found on the grounds of the GIE in the aftermath of October 7*

### B.    Al Mashtal Hotel and the October 7 Attack

464.    On October 7 and thereafter, Hamas used the tunnel complex under and through the hotel to launch rocket attacks on Israel. Nearly 4,000 rockets and mortars were fired from Gaza on that day.

465.     That total included rockets fired directly from the launch site that was adjacent to and structurally connected to the Al Mashtal Hotel via the attack tunnels built, rebuilt, and maintained with Defendants' cooperation and assistance.



Hamas's attack tunnels ran under the Al Mashtal Hotel across the street to a rocket

launch site

466.     After October 7, when Israeli ground forces entered Gaza, the rocket launching sites across from the hotel that depended on the tunnel network under the hotel were destroyed, and Hamas gunmen fought a pitched battle against Israeli troops from inside the hotel, causing substantial damage to the hotel's interior and eventually the hotel's destruction.

467.     When the Israeli Nahal Brigade's 932nd Battalion reached the hotel complex, Hamas operatives opened fire from a children's play area on the premises (not far from the hotel's pool area).

468.     When they gained control of the play area, Israeli forces recovered a weapons cache

and discovered a tunnel shaft linked to the attack tunnels beneath the hotel complex.[33]

469. Subsequent searches of the hotel's rooms found a variety of weapons, including rifles, ammunition, and mortars.

470. In fact, both the Blue Beach Hotel and Al Mashtal Hotel were strategically situated at the edge of the Shati refugee camp[34] in close proximity to the home base of the Qassam Brigades' "Shati Brigade" – a main base of Hamas terror operations.[35] Hence, the tunnel and terror infrastructure developed in and under the hotels was of particular strategic importance to Hamas.

471. After Israel's post-October 7 operations destroyed the hotel, PADICO issued a statement asserting that, "[t]he Ayan Hotel was bombed and eventually completely destroyed in late 2023 during the aggression on the Gaza Strip."

472. The statement made no reference to the October 7 Attack, the tunnel network beneath the hotel, or Hamas's use of the premises as a staging area for attacks on Israel.

C. The Blue Beach Hotel and the October 7 Attack

473. The Defendants' Blue Beach Hotel also played an important part on October 7 and in its aftermath.

474. A Hamas strike team that set out in four speed boats for Zikim Beach on October 7 was trained at and deployed from Hamas's Badr Base, which is physically connected to the Blue Beach Hotel.[36]

475. That Hamas strike team used the hotel tunnel complex to access the sea as part of

---

[33] *See, e.g.*, https://www.youtube.com/watch?v=5nc3IKpgca0.
[34] In the Palestinian Territories prior to October 2023, a "refugee camp" did not signify a place with tents or other temporary housing but rather denoted a densely populated area more akin to an urban housing project in the U.S.

[35] Hamas's Shati Battalion was responsible for attacking Nahal Oz on October 7. Prior to the attack, the Shati Battalion was one of six Hamas battalions in the Gaza City Brigade. The Battalion's primary role was to defend against an Israeli attack from the sea and to prevent Israeli forces from advancing from the coast into the heart of Gaza City.

[36] Hamas murdered 18 people at Zikim Beach: 17 civilians and one military personnel.

its training.

476.    When Israeli forces did eventually reach the area in the aftermath of the October 7

Attack, Hamas used the Blue Beach Hotel complex as a base of operations for ambushing Israeli

troops, and Israeli troops had to storm the hotel to secure the area. During the fighting, dozens of

Hamas terrorists were entrenched in the hotel, waging war against Israeli forces with projectile-

based weaponry, missiles, and explosive charges.

477.    According to the Israeli military's social media account on X:

> IDF troops operated at a Hamas terrorist quarters under the Blue Beach
> Hotel by the beach in northern Gaza, using a range of methods and
> destroyed the infrastructure earlier this week. Hamas terrorists exploited the
> hotel, from where they planned and executed attacks both above and below
> ground. Many weapons were found under the hotel, including AK-47
> assault rifles, explosives and drones. During the course of combat, dozens
> of Hamas terrorists entrenched in the hotel fired anti-tank missiles at IDF
> forces, who returned fire. During the forces' operations in the hotel's area,
> the soldiers encountered and eliminated terrorists.



Hamas weapons found on the grounds of the Blue Beach hotel.

**D.    Defendants Consistently Ignore the Events of October 7 or Deny Atrocities
Occurred**

478.    In an article published in the Palestinian daily newspaper *Al-Quds* on September

24, 2023, PADICO board member Dr. Dalal Iriqat emphasized that PADICO functions as an

ideological vehicle for "resistance" against Israel:

> Since its founding in 1993, this [PADICO] company has been challenging the logic of borders and promoting sustainable economic development through investment in Palestine, specifically in the Gaza Strip…. These border areas are ripe for innovative entrepreneurship, adaptation, and *muqawamah* (resistance) if they are invested in and leverage their unstable geopolitical situation not only for survival or prosperity, but also in the hope of *muqawamah* (resisting) the reality of occupation through investment and innovation…. PADICO Holding has chosen to be a model for a *muqawamah* (resistance) economy, in a neoliberal global system focused on profit from investment.

479.    On October 7, 2023, while the Hamas-led mass murder and rape in southern Israel was unfolding, PADICO board member Dr. Iriqat posted on X that the attack was "just a normal human struggle":

 

**Dr. Dalal IRIQAT** ✔ د. دلال عريقات
@DalalIRIQAT

The world tolerated watching >35000 Palestinian youth seek refuge via territorial waters, putting their lives at risk, choosing to drawn in the Sea over their miserable lives in a big prison called #Gaza after 17 yrs Israeli siege. Today is just a normal human struggle 4 #Freedom

6:43 AM · Oct 7, 2023 · **887 Views**

480.    In an article she published in the Palestinian daily newspaper *Al Quds* on October 8, 2023 (while Hamas Nukhba operatives were still killing civilians across southern Israel, especially at Kibbutz Be'eri) Dr. Iriqat wrote:

> Resistance has exposed the occupying state. The resistance we are witnessing is simply a natural human struggle to achieve freedom and the most basic human rights. The Palestinian people, like all peoples, have the right to live with dignity, freedom, and independence, and they have the right to defend themselves, in accordance with Article 51 of the United Nations Charter.

481.    On October 9, 2023, Dr. Iriqat was interviewed on *Al Jazeera* and explained that

the October 7 Attack "is a Palestinian struggle for freedom. Diplomacy failed the Palestinian people for 75 years…."

482.    On October 9, 2023, Masri posted on Facebook: "Where are those who sing the praises of humanity? What we are witnessing in Gaza now is not war and revenge, but a criminal act." At that point—two days after the October 7 massacres—Israel had not even regained full control of its own territory, identified (let alone buried) most of those Hamas murdered on October 7, or begun its ground assault into Gaza.

483.    Dr. Iriqat declared on October 11, 2023, that "the right of *muqawama* [resistance] is legitimate."

484.    On October 30, 2023, Dr. Iriqat justified the October 7 Attack as the result of "75 years under Israeli military occupation." The "75 years" language parrots Hamas's position that all of Israel, from the UN partition plan forward, is "occupied" and implicitly rejects the existence of Israel in its entirety.

485.    Upon the release of an Israeli teenage hostage on November 28, 2023, who managed to keep her dog alive with her in captivity, Dr. Iriqat posted on Facebook: "Even animals are safe!!", suggesting that Hamas's abduction and torture of civilians was exaggerated.

486.    On November 30, 2023, Dr. Iriqat again posted on X:

> The industrial zone of #Gaza was targeted by Israeli missiles! A PADICO mega project in Gaza that hosted factories and different manufacturing outlets of food, juice, clothing, etc etc, the industrial zone stood as income generating private sector project for so many civilians and business people.

487.    The following day Dr. Iriqat posted an attack on CNN for reporting on the fact that Hamas and its cohorts raped and sexually mutilated many victims:



488.   On April 7, 2024, Masri posted a tribute on his Facebook account to a PFLP terrorist who died of cancer in an Israeli prison while serving a life sentence for the 1984 murder of an Israeli soldier.

489.   The day after the September 27, 2024, Israeli airstrike that killed Hezbollah's supreme leader, Hassan Nasrallah, PADICO board member Ruba Masrouji posted a picture on her Facebook page of flowers with a decorative plate with Nasrallah's image on it as a tribute to him.

490.   Ms. Masrouji's documented affinity for Hezbollah and other terrorists known for murdering Jews dates back more than a decade.

491.   In January 2009, Ms. Masrouji endorsed a petition advocating for the "Resistance," a term generally used in the region to refer to Hamas and the violent acts perpetrated by Hamas and other terrorist groups—and, indeed, Ms. Masrouji herself later clarified that the "Resistance" referred to Hamas.[37] The petition stated, "Our firm stand [is] with our people and the Resistance

---

[37]   In the Middle East, the term "Resistance" when used in reference to Israel is used to refer to violent opposition to Israel. As noted above, Hamas's full name is the Islamic Resistance Movement. Hezbollah's main fundraising arm is the Islamic Resistance Support Association; Iran calls its stable of terrorist proxies surrounding Israel the "Axis of Resistance." Indeed, later communications show that this is how Ms. Masrouji *herself* understood the term.

in the Gaza Strip, and our insistence [is] on supporting the steadfastness of our people in the face of the barbaric Israeli aggression."

492.    On December 22, 2015, Ms. Masrouji published an article in which she mourned the death of Samir Kuntar, a Lebanese terrorist convicted of several murders, including that of a four-year-old Israeli girl whose head he smashed against a rock. Upon his release from prison, he joined forces with Hezbollah to strategize attacks on Israel from Syria. Ms. Masrouji lauded Kuntar, saying, "Rest in peace, Arab Guevara. Your virtuous sacrifice will not be in vain," and continued, "We are both proud and honored to witness Hezbollah transform the power structure in our region."

493.    In another published article dated March 23, 2017, Ms. Masrouji asked rhetorically, "Why do I hold the view that Palestine will be liberated in the next few years?" Her answer was that "[t]he achievements and victories of the *muqawamah* [resistance movements] in Lebanon [*i.e.,* Hezbollah] and Gaza [*i.e.,* Hamas] have reinstated the younger generation's belief in the truth and the likelihood of success."

494.    On the one-year anniversary of the October 7 Attack (October 7, 2024), Ms. Masrouji posted on Facebook: "On this day last year, the spark of revolution against the systematic crimes of the occupation began. It is not only a day of history, but a slap in the face of the so-called humanity they claim. It is a crime that has not and will not pass, and its reckoning will inevitably come. A day made by the blood of free people, and what followed is a crime for which they will be held accountable. Palestine will win."

495.    That post was followed by another on November 27, 2024, thanking Hezbollah for its support: "To our brother Lebanon: Thank you for your sincere support for Palestine, and thank you for the blood of your martyrs that mingled with the blood of our martyrs in the battle for

dignity and freedom."

496.    In December 2023, Ms. Masrouji signed a document called the "National Liberation Initiative" that stated: "The struggle in all forms of political, popular and armed resistance is a right and a duty."

497.    Ms. Masrouji made her view known once again on January 15, 2025, when she posted on her Facebook page: "The resistance is dignity."

498.    In a January 2025 statement disclosing that Bashar Masri's Massar and Siraj companies had recently purchased 58 million shares of PADICO stock, PADICO reiterated that the "company has implemented several developmental projects in Gaza, such as the Gaza Industrial Estate, Ayan Hotel (Al-Mashtal), and the Blue Beach Resort. Recently, it announced strategic projects, including the 'Energy for Hope' solar energy project costing $60 million, just two weeks before the aggression began." The statement makes no reference to the October 7 Attack or to the destruction of these properties due to the Hamas attack tunnel infrastructure beneath them or Hamas's deployments inside the hotels.[38]

499.    In a May 2025 interview with *Yediot Ahronot*, an Israeli newspaper, Masri downplayed his assistance to Hamas, explaining that whenever he enters Gaza, he "pass[es] between Hamas operatives" and that "they're in charge of everything and what choice do you have? Whether to give Hamas more strength or to abandon our Gazan employees?"

500.    Masri essentially argued that he had no choice but to work with Hamas given the reality of Hamas's control of Gaza. Of course, even this sanitized version of his extensive collaboration with Hamas is not true: Masri, a U.S. citizen, could simply have decided not to do

---

[38]    One of the stated objectives of the 'Energy for Hope' solar energy project was to power street lights for the main road running north-to-south through the middle of the Gaza Strip – a project Hamas would only have approved in order to power the main artery of its tunnel system which ran directly under the same roadway.

business in an enclave controlled by an FTO, consistent with U.S. law.

501.    Regardless, it is clear that Masri did not simply capitulate to Hamas's demands—he was actively involved in helping them by facilitating the construction of attack tunnels, other terrorist infrastructure, and Hamas gathering places; allowing the GIE to be used as a staging area; funneling electricity to Hamas; and working with Hamas to lull Israel into believing that Hamas was more interested in economic development than terrorism.

## VIII.    THE PLAINTIFFS ARE ALL VICTIMS OF ACTS OF INTERNATIONAL TERRORISM

### A.    The Shalom Family

502.    Ram Shalom was a citizen of the State of Israel when he was murdered by Hamas on October 7, 2023. He was 24 years old.

503.    Ram was attending the Nova Music Festival near Kibbutz Re'im in Israel. He was there with ten friends when the festival was overrun by Hamas terrorists, who proceeded to massacre more than 350 civilians.

504.    At 6:30 a.m. on October 7, Ram and his friends fled the festival at the sight and sounds of rockets.

505.    By around 8:00 a.m. on October 7, Ram had escaped the Nova festival by car. An hour or two later, he and his friend left the car to hide and shelter by the side of the road. As shooting erupted around them, they remained quiet. In a surviving video from where Ram was sheltering among vehicles to the side of the road, automatic gunfire can be heard, followed by Ram observing: "these are not soldiers, they are terrorists."

506.    Shortly thereafter, the terrorists approached Ram's hiding spot. Ram was determined not to allow himself and those around him to be executed. He attacked one of the terrorists, but other terrorists fired an RPG at Ram's position, murdering Ram, and most of those

hiding with him.

507. For the next few hours, Ram's mother, Nurit, and his brother, Plaintiff Tom Shalom, made every call and inquiry they could to locate Ram. For hours and then days, they heard nothing.

508. On Monday, October 9, 2023, Tom flew to Israel. No news of Ram arrived for two more days.

509. On Thursday, October 12, 2023, two army officers knocked on Nurit Shalom's door. They informed Nurit and Tom that Ram had been murdered on October 7.

510. Thousands attended Ram's funeral and visited during the shiva period. Tom stayed in Israel for weeks trying to piece together Ram's final moments.

511. Plaintiff Tom Shalom is a citizen of the United States. He is the brother of Ram Shalom.

512. As a direct and foreseeable result of the October 7 Attack and the death of Ram Shalom, Plaintiff Tom Shalom has suffered severe mental anguish and extreme emotional distress, and economic loss.

## B. The Sasi Family

513. Avraham Sasi was a citizen of the United States and a resident of the State of California when he was murdered by Hamas at the Nova Music Festival on October 7, 2023. He was 64 years old.

514. Avraham was the fourth of 12 siblings in a close-knit family. He married Plaintiff Ester Sasi in 1982, and the couple raised three daughters – Plaintiffs Moran Sasi, Danielle Sasi, and Natalie Sasi – in Woodland Hills, California.

515. Plaintiff Ester Sasi is a citizen of the United States and a resident of the State of California. She is the wife of Avraham Sasi.

516.     Plaintiff Moran Sasi is a citizen of the United States and a resident of the State of California. She is the daughter of Avraham Sasi.

517.     Plaintiff Danielle Sasi is a citizen of the United States and a resident of the State of California. She is the daughter of Avraham Sasi.

518.     Plaintiff Natalie Sasi is a citizen of the United States and a resident of the State of California. She is the daughter of Avraham Sasi.

519.     In September 2023, Avraham and Ester traveled to Israel for the Jewish holidays with their daughter Danielle to visit Natalie, who was living in Israel at the time (after the October 7 Attack, Natalie moved back to California from Israel), along with various siblings, nieces, and nephews. During that trip, Avraham's niece, Plaintiff Lee Meltz Sasi, got engaged.

520.     During that trip, Avraham attended the Nova Music Festival with his daughter, Plaintiff Danielle Sasi, her husband, Maor, and Plaintiff Lee Meltz Sasi. Alex, a longtime family friend who traveled with them, also joined, along with Nitzan, another one of Avraham's nieces, and her boyfriend, Lidor.

521.     Danielle was dancing with her father at the festival when air raid sirens started, followed by incoming rockets and mortar fire. Avraham instructed everyone in the Sasi family group to run to their cars, and the group divided up into two and drove to two separate roadside shelters. Nitzan and Lidor took refuge inside the same shelter that U.S. citizen Hersh Goldberg-Polin hid in before Hamas shot his arm off and took him hostage into Gaza. Nitzan and Lidor were both murdered at the scene.

522.     Avraham, Danielle, Maor, Lee, and Alex arrived at a shelter at 7:06 a.m., which was already packed with young people fleeing from the Hamas terrorists attacking at the Nova Music Festival. Avraham, a former high-ranking service member in the Israeli armed forces during

the First Lebanon War, positioned himself at the shelter entrance, assembled men with him, and told them not to let any of the terrorists enter.

523.    Hamas gunmen approached the shelter, shot Alex, and then lobbed a grenade into the shelter, murdering Avraham. The terrorists then threw an explosive into the shelter and stepped inside, walking over the bodies of the people that they had just murdered. The Hamas gunmen, wielding AK-47 rifles, fired into the bodies huddled in the shelter. Danielle was shot in the leg and her elbow was fractured. A young woman in front of her was shot in her torso and screamed and cried. Danielle and her husband Maor tried to help the injured woman, but she died of her wounds.

524.    Lee was sheltered by the bodies of the people in front of her who had been killed. Black smoke filled the shelter and began to suffocate Lee. She put her jacket over her mouth but blacked out. When she opened her eyes to check on whether her uncle Avraham was okay, she saw that he was dead. All but 13 of those inside the shelter were killed in the initial attack, including Avraham and Alex. Five more would die over the course of the next few hours.

525.    After the initial assault, the terrorists remained positioned around the shelter, shooting at cars and passersby on the road. About every 15 to 20 minutes, they returned to shoot and throw stun grenades and hand grenades into the shelter. It seemed to Danielle and Lee that another survivor in the shelter died in each new assault. Danielle covered her face with blood from her leg wound to appear to the terrorists to have already been killed. Maor sheltered Danielle beneath the just-murdered bodies of fellow Nova Music Festival attendees. The body of a third person fell on Danielle's legs. She started counting the seconds between explosions to estimate whether the terrorists had retreated far enough for the survivors to try to escape.

526.    Lee spent time in between waves of attacks encouraging survivors to stay positive and stay alive, while she texted their location to others. She also called her mother, Plaintiff

Samantha Meltz, to say goodbye.

527.     Shrapnel had embedded itself all over Danielle's body and had entered her lungs. Lee felt the blast of each grenade and sensed a strange taste on her tongue. It was the taste of someone else's flesh that had been blown into her mouth.

528.     After a few hours of these attacks, Hamas terrorists fired a rocket propelled grenade at the back of the structure. The resulting explosion was so powerful that it lifted Lee off the ground.

529.     More than seven hours after the Sasi family arrived at the shelter, the father of a young woman in the shelter arrived with a car at about 2:30 p.m., escorted by soldiers. He sped the survivors away—there were only eight.

530.     Avraham's daughters Moran and Natalie, his wife Ester, and his niece Gital had heard from Lee that Avraham had been murdered earlier that day, but they refused to believe it. As she was being evacuated, Danielle called and confirmed that her father Avraham had been murdered in front of her at the roadside shelter near Be'eri and that his body was still there.

531.     Moran, her husband, and their three young children flew from California to Israel that day (most airlines canceled flights to and from Israel immediately following the October 7 Attack, and just two airlines were offering emergency flights).

532.     Danielle, Maor, and Lee went to Soroka Hospital where, at about 3:30 p.m. on October 7, they joined the throng of horrifically injured people emerging from the Hamas-perpetrated massacre. All around them, people were missing limbs, bloodied, and dead. The doctors advised Danielle to wash her bullet wound with soap and water, explaining that they would not be able to operate on her that day.

533.     Danielle was then taken to a hospital further north in Netanya. The doctors there

removed the bullet from her leg. She was hospitalized for two weeks.

534.    Avraham's body was not found for over a week. His funeral was held on October 15. Thousands of mourners attended.

535.    Plaintiff Danielle Sasi lived near her parents. She has struggled to return to life after witnessing the murder of her father and so many others. In addition to the pain and suffering from the bullet wound, Danielle has pain and ongoing medical needs resulting from the shrapnel embedded throughout her body, including in her lungs. She has undergone further surgery for her leg and suffers from tinnitus. She has seen specialists for damage sustained to her nervous system.

536.    Plaintiff Lee Meltz Sasi is a citizen of the United States and a resident of the State of California.

537.    She has not been the same since the October 7 Attack. She has had difficulty eating, working, and engaging in ordinary tasks. Formerly social, she now wants only to be alone.

538.    Lee's parents, Plaintiffs Samantha Meltz and Eli Sasi (who is Avraham's brother), and siblings, Plaintiffs Daniel Lawrence Sasi, Elin Levy Sasi, and Tal Meltz Sasi, are all citizens of the United States. They are suffering extreme emotional distress from Lee's trauma and worry deeply about her. Despite everything they have been doing to help her recover, she continues to struggle.

539.    Avraham's siblings have suffered extreme emotional distress in the aftermath of his murder. Plaintiffs Shulamith Zani, Ronit Rahoum (Nitzan's mother), Ester Halif, Yosef Sasi, Vito Sasy, and Izhak Sasi are citizens of the State of Israel; Plaintiffs Bekhor Sassi and Meir Sasy are citizens of the United States and residents of the State of Israel; and Plaintiffs Eli Sasi (Lee's father) and Yaaqov Sasi are citizens of the United States and residents of the State of California.

540.    As a direct and foreseeable result of the October 7 Attack, Plaintiffs Danielle Sasi

and Lee Meltz Sasi have suffered severe physical and mental anguish and extreme emotional distress, and economic loss.

541.    Danielle also brings this action on behalf of her minor son R.P.

542.    R.P. is a citizen of the United States and a resident of the State of California.

543.    As a direct and foreseeable result of the October 7 Attack and the injuries to his mother, Danielle Sasi, R.P. has suffered severe mental anguish and extreme emotional distress.

544.    As a direct and foreseeable result of the October 7 Attack and the death of their brother, Avraham Sasi, Plaintiffs Shulamith Zani, Ronit Rahoum, Ester Halif, Yosef Sasi, Vito Sasy, Izhak Sasi, Bekhor Sassi, Meir Sasy, Eli Sasi, and Yaaqov Sasi have suffered severe mental anguish and extreme emotional distress, and economic loss.

545.    As a direct and foreseeable result of the October 7 Attack and the injuries to his daughter, Lee Meltz Sasi, Plaintiff Eli Sasi has also suffered severe mental anguish and extreme emotional distress, and economic loss.

546.    As a direct and foreseeable result of the October 7 Attack and the injuries to her daughter, Lee Meltz Sasi, Plaintiff Samantha Meltz has suffered severe mental anguish and extreme emotional distress, and economic loss.

547.    As a direct and foreseeable result of the October 7 Attack and the injuries to their sister, Lee Meltz Sasi, Plaintiffs Daniel Lawrence Sasi, Elin Levy Sasi, and Tal Meltz Sasi have suffered severe mental anguish and extreme emotional distress, and economic loss.

548.    Plaintiff Ester Sasi brings this action individually and on behalf of the Estate of Avraham Sasi.

549.    As a direct and foreseeable result of the October 7 Attack, the Plaintiff Estate of Avraham Sasi experienced conscious pain and suffering and suffered economic loss.

550.    As a direct and foreseeable result of the October 7 Attack and the death of her husband, Avraham Sasi, and the injuries to her daughter, Danielle Sasi, Plaintiff Ester Sasi has suffered severe mental anguish and extreme emotional distress, and economic loss.

551.    As a direct and foreseeable result of the October 7 Attack and the death of their father, Avraham Sasi, Plaintiffs Moran Sasi, Danielle Sasi, and Natalie Sasi have suffered severe mental anguish and extreme emotional distress, and economic loss.

552.    Plaintiffs Moran Sasi and Natalie Sasi have also suffered economic loss and severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7 Attack and the injuries to their sister, Danielle Sasi.

C.    The Abramov Family

553.    Laor Abramov was murdered by Hamas on October 7, 2023.

554.    He had lived in New Jersey for some time before moving back to Israel where he was raised in the hopes of following the footsteps of his father, a famous Israeli disk jockey known as DJ Darwish. His first headlined event was scheduled for November 24, 2023. It was called "To The Light," an English translation of Laor's Hebrew name. Laor had plans to travel the world after that event before returning to study music editing.

555.    Prior to his death, Laor spoke daily to his mother, Plaintiff Michal Halev. They also traveled together, having toured London in June 2023. The two were close; Laor was Michal's only child.

556.    On October 6, Laor and his lifelong friend, Tamar, headed to southern Israel to attend the Nova Music Festival. Laor sent a message to his mother that he was out with friends and assured her that they would talk the next day.

557.    On the morning of October 7, at the sound and sight of rockets, Laor fled the Nova festival and called his family to say that he was okay and on his way home. But as he and Tamar

drove north, they hit a Hamas roadblock, came under fire, and sought shelter.

558.    By 7:48 a.m., Laor updated his family that he was in a roadside shelter— unharmed, doing well, but staying silent to avoid getting caught up in the fighting unfolding around them. His text read: "I am going into a missile shelter, a bomb shelter, and don't worry. I'm not going to be able to speak because it's very noisy."

559.    Pictures and videos from Laor's last known location—the roadside shelter near Re'im—show Laor's towering figure among those who took refuge within the structure, including Hersh Goldberg-Polin. Taller than almost everyone else inside, he reported to the others what he was seeing on the road.

560.    Hamas terrorists then approached the shelter and threw hand grenades inside (the first several of which were thrown back out by Hersh's friend Aner Shapira, as well as by Laor and Tamar). The terrorists then fired upon everyone in their line of sight and entered the shelter, instructing the survivors to march outside and board a pickup truck.

561.    Laor and Tamar never made it out of the shelter alive.

562.    After Laor's text to his family, they did not hear from him again. As the hours and days passed, they received mixed and confusing information: A photo showed Laor at the roadside shelter near Re'im, but Laor's phone tracked closer to a fortified shelter near Be'eri.

563.    Michal was in the United States at the time and managed to get onto the last seat of an October 8 flight to Israel.

564.    On Monday evening, October 9, a woman who survived from the roadside shelter near Re'im told Laor's parents that she saw someone who she thought was Laor taken as a hostage onto the back of a pickup truck. Michal hoped her son was still alive.

565.    On the evening of Wednesday, October 11, two soldiers and two social workers

knocked on the door of Laor's home in Israel. Before Laor's family heard even a word, they began to scream. The family was notified that Laor's body had been recovered.

566. Laor's body was later identified by Michal's brother, and for months after, Michal called him to confirm that he was sure he had correctly identified Laor's body.

567. She gathered as much information as she could about Laor's final moments but is still haunted by the lack of certainty.

568. Plaintiff Michal Halev is a dual citizen of the State of Israel and the United States.

569. As a direct and foreseeable result of the October 7 Attack and the death of Laor Abramov, Plaintiff Michal Halev has experienced severe mental anguish and extreme emotional distress, and economic loss.

**D. The Goldberg-Polin Family**

570. Hersh Goldberg-Polin was a dual citizen of the United States and the State of Israel when he was murdered by Hamas in August 2024. He was 23 years old.

571. Hersh was born in Berkeley, California, and then moved to Israel with his family when he was eight years old.

572. Hersh attended high school and completed his mandatory military service in April 2023. He planned to travel through Asia before attending college and was scheduled to begin his trip during the last week of December 2023.

573. Hersh had a deep passion for music, which is what brought him to the Nova festival on the Saturday morning of October 7, 2023. He had turned 23 on October 3 and wanted to celebrate his birthday there with his childhood friend, Aner Shapira.

574. The Goldberg-Polin family had been at the home of their friends for Shabbat dinner the night before the festival. At about 11:00 p.m., Hersh picked up the backpack he had brought with him to dinner and left to meet Aner and go to the festival. On his way out, Hersh kissed his

mother goodbye.

575.    The next morning, sirens blared across Jerusalem, where the Goldberg-Polins live, starting at about 8:00 a.m. Plaintiff Rachel Goldberg, Hersh's mother, woke up her two daughters and they went to the safe room in their apartment. She turned on her phone at about 8:20 a.m. to make sure Hersh was safe and saw two messages from him at 8:11 a.m. The first said "I love you," and the second said "I'm sorry."

576.    Rachel immediately knew something terrible was happening. She responded at 8:23 a.m., "Are you okay?" Receiving no response, Rachel sent another message at 8:29 a.m.: "Please let me know you are okay." At 8:36 a.m., Rachel wrote: "I'm leaving my phone on. Let us know you are okay."

577.    Hersh's parents later found out that he and his friend had tried to escape from the massacre that was taking place at the Nova festival by hiding with approximately 30 others in a roadside bomb shelter. Hamas terrorists threw grenades inside, and Hersh's friend managed to pick up seven and throw them back out. The eighth exploded in his hands, killing him. Two more detonated inside. The terrorists then fired an RPG into the shelter and sprayed the room with gunfire.

578.    The dust settled, and the Hamas terrorists entered the shelter. Most of the fleeing festivalgoers inside were dead, and some hid under bodies pretending to be dead. Those are the witnesses who described to Hersh's parents how the terrorists ordered Hersh and a few other young men to stand. They did so, and it was apparent that Hersh's left arm had been blown off below the elbow. He had managed to fashion a tourniquet for himself to stop the bleeding and was able to walk outside, where he and the other men were loaded onto a pickup truck.

579.    Hersh's last cellphone signal was at 10:25 a.m., from inside Gaza.

580.    On April 24, 2024, Hamas released a video of Hersh, the first proof that he survived his capture on October 7 despite being badly wounded. The video showed Hersh sitting in a chair, addressing the camera. Gesturing occasionally with his injured arm, he identifies himself and gives his date of birth and parents' names. He states that he had been "here for almost 200 days" (April 24, 2024, was the 201st day since his abduction).

581.    In the video, Hersh appeared significantly thinner than before his capture. He was missing most of his left arm, and it was apparent that he had not received proper medical treatment for the severe injuries he sustained during the initial attack.

582.    On August 31, 2024, Israeli forces recovered Hersh's body along with five other hostages from a tunnel beneath Rafah in southern Gaza. Medical examinations indicated they had been executed one by one shortly before Israeli forces reached them.

583.    The two hostages who had been loaded onto the pickup truck with Hersh have since been released. One of these two hostages, Or Levy, described how, on their 52nd day of captivity, Hersh told him: "He who has a 'why' can bear with any 'how.'" Levy tattooed the quote onto his arm after his release. Levy learned from Hersh's parents that the line is from Nietzsche and was cited in Viktor Frankl's "Man's Search for Meaning" to describe the mental strength required of him to survive the Holocaust.

584.    Hersh's funeral was held on September 2, 2024, and was attended by tens of thousands of mourners.

585.    Plaintiffs Rachel Goldberg and Jon Polin bring this action on behalf of the Estate of Hersh Goldberg-Polin. Hersh Goldberg-Polin was a dual citizen of the United States and the State of Israel.

586.    Plaintiffs Rachel Goldberg and Jon Polin also bring this action individually. They

are dual citizens of the United States and the State of Israel and the parents of Hersh Goldberg-Polin. They have become prominent advocates for hostage families, having traveled extensively to meet with political leaders worldwide, including former President Biden and the late Pope Francis.

587.   Plaintiff Leebie Goldberg-Polin is a dual citizen of the United States and the State of Israel. She is the younger sister of Hersh Goldberg-Polin.

588.   Plaintiff Orly Goldberg-Polin is a dual citizen of the United States and the State of Israel. She is the younger sister of Hersh Goldberg-Polin.

589.   As a direct and foreseeable result of the October 7 Attack and 330 days in captivity, the Plaintiff Estate of Hersh Goldberg-Polin experienced conscious pain and suffering and suffered economic loss.

590.   As a direct and foreseeable result of the October 7 Attack, and the abduction, captivity, and murder of Hersh Goldberg-Polin, Plaintiffs Rachel Goldberg, Jon Polin, Leebie Goldberg-Polin, and Orly Goldberg-Polin have suffered severe mental anguish and extreme emotional distress, and economic loss.

### E.   The Beniashvili / Ben Zvi Family

591.   Sagiv Baylin Ben Zvi was murdered by Hamas while fleeing the Nova Music Festival on October 7, 2023. He was 24 years old.

592.   Sagiv is the son of Plaintiff Guram Beniashvili, a citizen of the United States.

593.   At around 2:00 am on October 7, Sagiv returned home from work and then drove with a friend to attend the Nova Music Festival. The last thing he said to his mother was that she should not worry and that he would be back home in a few hours.

594.   At around 6:30 am, as alarms blared around the music festival, Sagiv had just left the festival, driving home in his friend's car. Between 6:55 and 7:00 a.m., Sagiv reached the road

into the town of Mefalsim in search of a place to shelter.

595.    As Sagiv drove to the entrance of Mefalsim, he encountered a contingent of Hamas-led terrorists ambushing cars and murdering civilians. One terrorist launched an RPG at Sagiv's car. Sagiv swerved, avoided the grenade, and took a hard right turn.

596.    The Mefalsim town gates were closed, as Mefalsim's residents were fighting off the attack.

597.    A group of terrorists executed an assault on Sagiv's car: a terrorist approached the car and shot Sagiv in the head and then murdered his friend, Roni Petrovski, who died next to Sagiv in the passenger seat.

598.    At 9:18 a.m. on October 7, Sagiv's mother filed a missing person report with the Israeli police.

599.    Sagiv's relatives in Israel began scouring hospitals, going room to room and then car to car, looking for him among the wounded victims and hoping that he had been brought in for medical treatment. They posted to Facebook, Instagram, and Twitter seeking any news of Sagiv.

600.    At 9:41 a.m., Sagiv's phone tracked to the Indonesian Hospital in Gaza.

601.    For three days after October 7, there was no news of Sagiv. His parents spent those days in agony, calling hospitals for any sign of Sagiv and not getting any sleep. Then, on October 11, 2023, security personnel from Mefalsim informed Sagiv's parents that the car he was driving had been found outside Mefalsim, bullet-ridden, blood-soaked, but with no sign of Sagiv. The seatbelts had been cut.

602.    On October 15, 2023, Israeli authorities informed Sagiv's parents that he had been kidnapped by Hamas and taken to Gaza.

603.    His family joined a group advocating for hostages; they printed posters. New York

newspapers covered Guram's search for his missing son.

604.    The *New York Daily News* quoted Guram Beniashvili: "I am trying everything, with everyone, to try to find my son…. I called everyone…. You sit down and wait and wait and wait and you don't know what you are waiting for."

605.    For 19 days, Sagiv's parents experienced extreme emotional agony, believing that their son was not only missing and injured, but also being held captive under the Hamas-controlled Indonesian Hospital in Gaza, where his phone was last located online.

606.    On October 25, 2023, Israeli authorities recovered Sagiv's body and informed his parents. The next day, Sagiv's funeral was held in Israel.

607.    As a direct and foreseeable result of the October 7 Attack and the death of Sagiv Baylin Ben Zvi, Plaintiff Guram Beniashvili has experienced severe mental anguish and extreme emotional distress, and economic loss.

**F.    The Ben-Senior Family**

608.    Daniell Ben-Senior was a citizen of the United States and a resident of the State of Israel when she was murdered by Hamas on October 7, 2023. She was 34 years old.

609.    Daniell was born in Los Angeles and raised in the U.S. and in Israel. She attended college at the Hebrew University and then worked as a nurse.

610.    Daniell attended the Nova Music Festival with her friends. Early in the morning of October 7, 2023, Hamas terrorists attacked the festival, and Daniell was reported as missing. Her father, Jacob Ben-Senior, was only informed of her death by authorities on October 10, 2023, when her body was eventually identified. Previously, he had tried to reach her by calling her repeatedly, but to no avail. The exact circumstances of her death are still not fully known by her family. They know that her phone had a bullet hole through it.

611.    Like the other victims of the attack on the Nova Music Festival, Daniell

experienced the terror of rockets fired from Gaza followed by the onslaught of terrorists shooting, raping, and torturing the fleeing festivalgoers. The final moments of her life were filled with terror and pain.

612.     Daniell had been a caretaker for her parents, both of whom had been rehabilitating from serious medical situations. Her murder proved too great a burden for her parents to bear. In the days following October 7, Daniell's mother, Perry Ben-Senior, fell into a deep depression, asking repeatedly where Daniell was. The Ben-Senior family moved her to a nursing home in an attempt to get her full-time care and replace the care that Daniell had provided, but Perry lost her will to live. On October 26, 2023, Perry Ben-Senior suffered a cardiac arrest and died. Perry was a citizen and resident of the State of Israel.

613.     Daniell's father, Jacob Ben-Senior, suffered a series of health setbacks after Daniell's murder. He too lost his motivation to fight for his life and passed away less than a year after Daniell's death. Jacob was a citizen of the United States and a resident of the State of Israel.

614.     Daniell's brother, Plaintiff Shay Shabtay Ben-Senior, brings this action individually and on behalf of the Estate of Daniell Ben-Senior, the Estate of Jacob Ben-Senior, and the Estate of Perry Ben-Senior. Shay is a citizen of the United States and is a resident of the State of Israel.

615.     Plaintiff Aviram Abraham Bejerano is a citizen and resident of the State of Israel. Aviram is Daniell's half-brother, the son of Perry Ben-Senior.

616.     Daniell's brothers, Plaintiffs Shay Shabtay Ben-Senior and Aviram Abraham Bejerano, are grief-stricken at the loss of their sister and the resulting loss of their parents.

617.     As a direct and foreseeable result of the October 7 Attack, the Plaintiff Estate of Daniell Ben-Senior experienced conscious pain and suffering and suffered economic loss.

618. As a direct and foreseeable result of the October 7 Attack and the death of Daniell Ben-Senior, Plaintiffs Perry Ben-Senior, Jacob Ben-Senior, Shay Shabtay Ben-Senior, and Aviram Abraham Bejerano have suffered severe mental anguish and extreme emotional distress, and economic loss.

### G. The Elmalem Family

619. Matan Elmalem, also known as "Kido," was a citizen and resident of the State of Israel when he was murdered by Hamas on October 7, 2023. He was 42 years old.

620. Matan was a renowned DJ who had traveled the world performing at top music festivals and events in Europe, India, South America, and Japan. He was at the height of his career and beloved in the international "trance" music scene, a subgenre of electronic dance music aiming to induce a euphoric, trance-like state in listeners.

621. On October 7, 2023, Matan was performing as a DJ at the Nova Music Festival when Hamas terrorists attacked the festival. He had just finished what would be his final set on the DJ stage when the massacre began.

622. During the attack, Matan demonstrated extraordinary heroism by leading festival attendees to safety, calming them down, and helping them leave the area. He then returned to help more people.

623. After the attack ended, Matan was initially listed as missing. His friends conducted an extensive search for him, crawling on the ground for miles at night searching for him. They found his bag, car, and personal equipment, but not his phone. The next day they returned and searched the entire area again and finally located his body.

624. It took five days from the October 7 Attack until Matan's family was officially notified that his body had been found. During those five agonizing days, the family endured tremendous uncertainty and anguish not knowing his fate.

625.    Matan's funeral was held on October 15, 2023, and drew hundreds of mourners who came to pay their respects to the beloved DJ and humanitarian.

626.    Plaintiff Omri Elmalem is a citizen of the United States and resident of the State of New York. He is the younger brother of Matan Elmalem.

627.    As a direct and foreseeable result of the October 7 Attack and the death of his brother Matan Elmalem, Plaintiff Omri Elmalem has suffered severe mental anguish and extreme emotional distress, and economic loss.

**H.      The Waldman Family**

628.    Danielle Waldman was a citizen of the United States and a resident of the State of Israel when she was murdered by Hamas on October 7, 2023. She was 24 years old.

629.    Danielle was attending the Nova Music Festival near Kibbutz Re'im in Israel. She was there with her boyfriend of six years, Noam Shay, when the festival was infiltrated by Hamas terrorists, who proceeded to massacre more than 350 civilians.

630.    The morning of the October 7 Attack, Danielle's brother Guy wrote in the family group chat to ask where everyone was. Danielle responded that everything was fine, and that the family should not worry. That was the last time Danielle's family heard from her.

631.    Upon learning of the October 7 Attack, and that Danielle was missing, Danielle's father, Eyal, rushed home from a trip outside of Israel. The morning of Monday, October 9, 2023, Eyal traveled south, to the site of the massacre, using the emergency tracking features on Danielle's phone to search for Danielle and Noam. Making his way in a Jeep through an ongoing combat zone, Eyal eventually came upon Danielle's car, riddled with bullet holes, and stained with blood. Eyal found shells from a Kalashnikov rifle near the car.

632.    It was evident that the car had been attacked by Hamas terrorists. But the family hoped that Danielle had not been in the car, or perhaps that she was only wounded and had escaped,

or even that she had been taken hostage and was still alive.

633. But on Wednesday, October 11, 2023, the family's worst fears were confirmed. They learned that Danielle's body had been found in the car and had been taken away from the scene by first responders. The family later received a video of some of Danielle's final moments, recorded in her car on the phone of someone who had been with her and Noam.

634. Danielle's parents, Eyal and Ella Waldman, bring this action on behalf of the Estate of Danielle Waldman.

635. Plaintiff Eyal Waldman also brings this action individually. He is a citizen of the State of Israel. He is the father of Danielle Waldman.

636. Plaintiff Ella Waldman also brings this action individually. She is a citizen of the State of Israel. She is the mother of Danielle Waldman.

637. Plaintiff Guy Waldman is a citizen of the State of Israel. He is the brother of Danielle Waldman.

638. Plaintiff Sharon Waldman is a citizen of the State of Israel. She is the sister of Danielle Waldman.

639. As a direct and foreseeable result of the October 7 Attack, the Plaintiff Estate of Danielle Waldman experienced conscious pain and suffering and suffered economic loss.

640. As a direct and foreseeable result of the October 7 Attack and the death of Danielle Waldman, Plaintiffs Eyal Waldman, Ella Waldman, Guy Waldman, and Sharon Waldman have suffered severe mental anguish and extreme emotional distress, and economic loss.

## I.    The Newman Family

641. David Newman was a citizen and resident of the State of Israel when he was murdered by Hamas. He was 21 years old.

642. On October 7, 2023, David was attending the Nova Music Festival in Kibbutz

Re'im when terrorists invaded Israel and began attacking the people at the festival.

643.    David was with his girlfriend at a party at the festival when they heard what they thought were fireworks, but what turned out to be missiles. David remained calm and started to leave the festival with his girlfriend. David and his girlfriend realized the terrorists were inside the festival, wearing Israeli military uniforms, so David told his girlfriend to lie down with her hands covering her head. They would remain like that until the shooting subsided before trying to flee. David and his girlfriend got to a large metal dumpster and climbed inside of it, with anywhere between ten to fifteen other people. They hid in the dumpster, underneath garbage bags, for approximately four hours. During their time hiding in the dumpster, David remained calm and tried to keep the others calm as well.

644.    David texted a friend who was a high-level official within the Israeli armed forces asking to be rescued. Unfortunately, his phone died before his location could be shared with the friend.

645.    At some point, the group heard people outside the dumpster speaking in Arabic.

646.    The terrorists came right up to the dumpster, and with David on top, began shooting. Only four of the people hiding in the dumpster came out alive. David was shot dead.

647.    Plaintiff Mitchel Newman is a citizen of the United States and is a resident of the State of Israel. He is the father of David Newman.

648.    Plaintiff Noach Newman is a citizen of the United States and is a resident of the State of Israel. He is the brother of David Newman.

649.    Plaintiff Gavriel Newman is a citizen of the United States and is a resident of the State of Israel. He is the brother of David Newman.

650.    Plaintiff Dvir Tuvia Newman is a citizen of the United States and is a resident of

the State of Israel. He is the brother of David Newman.

651. Plaintiff Batya Leah Sprei is a citizen of the United States and is a resident of the State of Israel. She is the sister of David Newman.

652. As a direct and foreseeable result of the October 7 Attack and the death of David Newman, Plaintiffs Mitchel Newman, Noach Newman, Gavriel Newman, Dvir Tuvia Newman, and Batya Leah Sprei have suffered severe mental anguish and extreme emotional distress, and economic loss.

## J.    The Vardi Family

653. Laurie Vardi was a citizen and resident of the State of Israel when she was murdered by Hamas. She was 24 years old.

654. Laurie Vardi was at the Nova Music Festival on October 7, 2023, when rockets began to fall in the vicinity of the festival. She and her boyfriend got into their car and attempted to leave but then took shelter in a concrete bomb shelter near Kibbutz Alumim. Hamas terrorists threw a grenade at the bomb shelter, and Laurie went outside for air because of the smoke and was shot and killed immediately outside the bomb shelter.

655. Plaintiff Ariel Vardi is a citizen of the United States and a resident of the State of Massachusetts. He is the brother of Laurie Vardi.

656. As a direct and foreseeable result of the October 7 Attack and the death of Laurie Vardi, Plaintiff Ariel Vardi has suffered severe mental anguish and extreme emotional distress, and economic loss.

## K.    The Zafrani Family

657. Itay Zafrani was a citizen of the United States and a resident of the State of Israel when he was murdered by Hamas. He was 35 years old.

658. Itay was attending the Nova Music Festival in Re'im, Israel, on October 7, 2023.

Itay left the festival immediately by car when the rockets started at approximately 6:35 a.m. and drove toward the Mefalsim junction where he first encountered Hamas terrorists. He tried to make a U-turn but was shot and killed there at 6:52 a.m. The terrorists then pulled Itay out of the car to see what they could steal from him, taking his iPhone and Apple Watch.

659.    Plaintiff Michal Zipporah Zafrani is a citizen of the United States and is a resident of the State of Israel. She is the mother of Itay Zafrani. She brings this action individually, and on behalf of the Estate of Itay Zafrani.

660.    Plaintiff Inbal Chen is a citizen and resident of the State of Israel. She brings this action individually, as the surviving spouse of Itay Zafrani, and as the legal guardian of A.Z., the surviving child of Itay Zafrani.

661.    Plaintiff David Zafrani is a citizen and resident of the State of Israel. He is the father of Itay Zafrani.

662.    Plaintiff Ori Zafrani is a citizen of the United States and a resident of the State of Israel. He is the brother of Itay Zafrani.

663.    Plaintiff Osnat Tal Zafrani is a citizen and resident of the State of Israel. She is the sister of Itay Zafrani.

664.    Plaintiff Roni Zafrani is a citizen of the United States and a resident of the State of Israel. She is the sister of Itay Zafrani.

665.    As a direct and foreseeable result of the October 7 Attack, the Plaintiff Estate of Itay Zafrani experienced conscious pain and suffering and suffered economic loss.

666.    As a direct and foreseeable result of the October 7 Attack and the murder of Itay Zafrani, Plaintiffs Inbal Chen, A.Z., David Zafrani, Michal Zipporah Zafrani, Ori Zafrani, Osnat Tal Zafrani, and Roni Zafrani have suffered severe mental anguish and extreme emotional distress,

and economic loss.

**L.      The Ziering Family**

667.    Aryeh Ziering was a citizen of the United States and a resident of the State of Israel when he was killed by Hamas on October 7, 2023. He was 27 years old.

668.    Aryeh was a member of the Israeli military's Oketz (canine) unit. He was at his parents' home for the Jewish holiday when he was called to duty in southern Israel to respond to the October 7 Attack.

669.    He went to his base to meet other members of his unit and get his combat gear and headed to defend an instillation near Zikim, which had been attacked by Hamas.

670.    Aryeh was killed sometime around midday on October 7 during a firefight with Hamas terrorists.

671.    Aryeh's parents, Mark and Deborah Ziering, bring this action on behalf of the Estate of Aryeh Ziering.

672.    Plaintiff Mark Ziering also brings this action individually. He is a citizen of the United States and is a resident of the State of Israel. He is the father of Aryeh Ziering.

673.    Plaintiff Deborah Ziering also brings this action individually. She is a citizen of the United States and is a resident of the State of Israel. She is the mother of Aryeh Ziering.

674.    After Aryeh left home that Saturday morning, Mark and Deborah did not hear from him and assumed he and his unit were engaging the terrorists. Because Aryeh was an experienced soldier and a strong, confident, and seemingly indestructible young man, even though they worried about him, his parents assumed he would be okay. Around 11:30 p.m. on Saturday night, after some confusion in the notification, Mark and Deborah received a knock on the door from Israeli military representatives notifying them of Aryeh's death.

675.    Plaintiff Eliana Ziering is a citizen of the United States and is a resident of the State

of Israel. She is the sister of Aryeh Ziering.

676. On October 7, Eliana was in her apartment in Jerusalem which she shared with her roommates. Like most people in Israel that day, Eliana learned of the attack that morning, but unlike her siblings, she had completed her army service so when military representatives knocked on her apartment door in the middle of the night (during the early hours of October 8), she assumed they had come to summon her roommate (who was still doing her military service) to report for emergency duty. Unfortunately, the knock on the door was for her and she was notified of her brother's death.

677. Plaintiff Yonatan Ziering is a citizen of the United States and is a resident of the State of Israel. He is the brother of Aryeh Ziering.

678. Like his brothers, Yonatan was called back to active duty in the Israeli military on the morning of October 7 to respond to the attack. At some point during the day, he learned from a fellow soldier that Aryeh had been shot, but he did not assume the worst because he could not imagine his older brother would fall in the battle. He was later informed by his commanding officer that Aryeh had been killed and was sent home to join his family.

679. Plaintiff Tal Ziering is a citizen of the United States and is a resident of the State of Israel. She is the sister of Aryeh Ziering.

680. Tal was also at home with her parents on October 7 but left to go back to the army that morning once she was notified that she was needed. She was later informed by her commanding officer that Aryeh had been killed and was sent home to join her family.

681. As a direct and foreseeable result of the October 7 Attack, the Plaintiff Estate of Aryeh Ziering experienced conscious pain and suffering and suffered economic loss.

682. As a direct and foreseeable result of the October 7 Attack and the death of Aryeh

Ziering, Plaintiffs Mark Ziering, Deborah Ziering, Eliana Ziering, Yonatan Ziering, and Tal Ziering have experienced severe mental anguish and extreme emotional distress, and economic loss.

**M.     The Shay Family**

683.    Yaron Oree Shay was a citizen of the United States and a resident of the State of Israel when he was killed by Hamas on October 7, 2023. He was 21 years old.

684.    Yaron was the youngest child of Plaintiffs Izhar and Hilla Shay and the younger brother of Plaintiffs Shir, Lior, and Ophir Shay.

685.    Yaron was born in New Jersey on December 13, 2001, and moved to Israel with his family when he turned four. He attended the American School in Israel for four years and was a proud dual American-Israeli citizen.

686.    For several weeks prior to October 7, Yaron was serving on active duty within a special unit of the Nahal Brigade of the Israeli military that was stationed at the Gaza border at the Kerem Shalom military base, guarding the southern end of the Gaza Strip around the Kerem Shalom border crossing between Israel and Gaza.

687.    His parents had planned to travel to Yaron's base on the Gaza border as part of a pre-planned visit with their son on October 7.

688.    Yaron messaged his parents by WhatsApp at 6:29 a.m. on October 7 to tell them that Israel had been attacked, they should not come to visit, and he would update them later in the day.

689.    He subsequently sent a message via WhatsApp to his uncle who lived in another kibbutz within the Gaza Envelope warning him of the attack. It was the only warning that kibbutz received that morning.

690.    Yaron and two other soldiers from his unit drove to the entrance of the nearby

kibbutz at Kerem Shalom and held off dozens of Hamas Nukhba terrorists for more than an hour.

691. Their heroic battle saved the lives of hundreds of civilians at the kibbutz and the adjacent military base. Sometime between 8 and 9 a.m., Yaron was severely wounded and eventually airlifted to a hospital in Jerusalem where he was pronounced dead. His two comrades were both wounded in the same firefight but survived.

692. Yaron's parents lost contact with him after his initial message to them at 6:29 a.m., and they called various military personnel during the following 24 hours trying to obtain information about him, to no avail.

693. The October 7 Attack caused confusion and chaos inside Israel, and reliable information was difficult to obtain. On Sunday morning of October 8, Plaintiffs Izhar and Hilla Shay received news that a number of Yaron's fellow soldiers had been wounded, and that one of them had been airlifted to Hadassah Ein Kerem Hospital in Jerusalem. Later that afternoon, they decided to make their way to the hospital.

694. They arrived there on Sunday afternoon and encountered masses of other families who were also looking for their loved ones.

695. Amid the chaos, Yaron's mother stopped a female military officer tasked with updating the families about the conditions and whereabouts of their relatives, asking if she had any news about their son. The officer assured her that if something had happened to Yaron, the family would have been notified by that point. Hilla pressed the officer and gave her Yaron's full name – Yaron Oree Shay.

696. The officer immediately recognized the unusual middle name and decided to inform them that Yaron had been pronounced dead at the hospital the day before rather than force them to wait for an official notification.

697.    Plaintiff Izhar Shay immediately called his three surviving children to break the news to them that their brother had died so they would hear it first from him before the media announced it. Izhar had been a minister in the Israeli government, and as a public figure, the media would have been keen to report this tragic news about his family. Indeed, moments after Izhar finished relaying the terrible news to his children, Yaron's death was made public and reported on widely.

698.    Izhar called his oldest son Lior first. Lior had been on his honeymoon in the south of Argentina and was on the second leg of his flight back to Israel after being called back to emergency duty by his unit. Izhar then called Ophir, his middle son, who was also boarding a plane back to Israel after cutting short a vacation in the Philippines. Lastly, Izhar called his daughter Shir, who was at home with her husband and their then-two-month-old child.

699.    There are special procedures for the delivery of tragic news about the death of a soldier in the Israeli armed forces which have been developed over many years and many thousands of cases. Dedicated professionals are trained for a number of years before they are allowed to deliver news of death to a victim's family members, and there is a strict protocol which has to be followed. The delivery of the tragic news about Yaron's death to his parents by non-professionals at the hospital and to his siblings by phone broke with this protocol and added significant mental anguish and extreme emotional distress to them.

700.    All five surviving relatives of Yaron (Hilla, Izhar, Shir, Lior, and Ophir) required emotional support counseling, and some continue to receive treatment.

701.    Yaron's parents, Hilla Shay and Izhar Shay, bring this action on behalf of the Plaintiff Estate of Yaron Oree Shay.

702.    Plaintiff Hilla Shay also brings this action individually. She is a citizen of the

United States and is a resident of the State of Israel. She is the mother of Yaron Oree Shay.

703.    Plaintiff Izhar Shay also brings this action individually. He is a citizen and resident of the State of Israel. He is the father of Yaron Oree Shay.

704.    Plaintiff Shir Shay is a citizen of the United States and is a resident of the State of Israel. She is the sister of Yaron Oree Shay.

705.    Plaintiff Lior Shay is a citizen of the United States and is a resident of the State of Israel. He is the brother of Yaron Oree Shay.

706.    Plaintiff Ophir Shay is a citizen of the United States and is a resident of the State of Israel. He is the brother of Yaron Oree Shay.

707.    Hilla Shay quit her job as an interior designer as a result of her son's murder. Ophir Shay was only able to resume his professional career three months after October 7, 2023, and worked part-time until June 2024.

708.    As a direct and foreseeable result of the October 7 Attack, the Plaintiff Estate of Yaron Oree Shay experienced conscious pain and suffering and suffered economic loss.

709.    As a direct and foreseeable result of the October 7 Attack and the death of Yaron Oree Shay, Plaintiffs Hilla Shay, Izhar Shay, Shir Shay, Lior Shay, and Ophir Shay have suffered severe mental anguish and extreme emotional distress, and economic loss.

### N.      The Haggai Family

710.    Judy Weinstein Haggai and Gad Haggai were U.S. citizens and residents of the State of Israel when they were murdered by Hamas on October 7, 2023.

711.    They lived in Kibbutz Nir Oz and shared four children, Iris Weinstein Haggai, Ahl Haggai, Rahm Haggai, and Zohar Haggai, and seven grandchildren. Judy is also survived by her 95-year-old mother.

712.    Judy was an English teacher who worked with children with special needs and also

used meditation and mindfulness techniques to treat children suffering from anxiety caused by years of rocket fire over the kibbutz from Gaza.

713. On Saturday, October 7, Judy and Gad took a walk around their kibbutz and its surrounding nature, as they did every Saturday morning.

714. The couple was in the field when the first sirens sounded at 6:30 am. They heard the rockets and took shelter by lying flat on the ground.

715. Their daughter texted Judy upon hearing of the attacks, and Judy responded, "We're outside. Face down in the field. We see tons of rockets."

716. Around 6:50 a.m., Hamas terrorists passed Judy and Gad, who were lying down on the ground, on motorcycles. They shot Gad in the head, and Judy once in the face and once in the arm.

717. At 7:15 a.m., an Israeli ambulance service called Judy, who described her husband's fatal injury and her own injury. Terrorists, however, had taken over the roads, and the ambulance never arrived.

718. Judy's phone was shut off by 7:26 a.m., and she was not heard from again.

719. Terrorists picked up the couple's bodies and brought them into Gaza.

720. For weeks, Judy and Gad's family did not know what had happened to their loved ones. They did not know whether the couple was dead.

721. Then, when Judy was not released during the November 2023 hostage release, their family members came to believe she was the last American woman still held hostage in Gaza.

722. On December 22, 2023, it was reported that Gad had been murdered, and his body was being held in Gaza. One week later, the news came that Hamas had also killed Judy, and her lifeless body was being held in Gaza.

723.    In response to the tragic news, President Biden first released a statement that said he was "heartbroken by the news" and praying "for the well-being and safe return" of Judy.

724.    Then, upon the announcement that Judy had also been murdered, President Biden issued another statement, which said that he and First Lady Jill Biden "are devastated to learn" of her death. He added that he "will never forget what their daughter, and the family members of other Americans held hostage in Gaza, have shared with [him]. They have been living through hell for weeks. No family should have to endure such an ordeal."

725.    Judy and Gad's children and siblings have suffered immeasurably. Initially, they believed that Judy and Gad had been badly injured but were being held alive in Gaza. Then, when they learned that Judy and Gad had been murdered, they still could not find peace, as their bodies are still being held in Gaza. Knowing that the terrorists continue to hold Judy and Gad's bodies is torture for their family members. Their grief is overbearing.

726.    Judy Weinstein Haggai and Gad Haggai's daughter, Iris Weinstein Haggai, brings this action on behalf of the Estates of Judy Weinstein Haggai and Gad Haggai.

727.    Plaintiff Iris Weinstein Haggai also brings this action individually. She is a citizen of the United States and is a resident of the State of Israel.

728.    Plaintiff Ahl Haggai is a citizen of the United States and is a resident of the State of Israel. He is the son of Judy Weinstein Haggai and Gad Haggai.

729.    Plaintiff Rahm Haggai is a citizen of the United States and is a resident of the State of Israel. He is the son of Judy Weinstein Haggai and Gad Haggai.

730.    Plaintiff Zohar Haggai is a citizen of the United States and is a resident of the State of Israel. She is the daughter of Judy Weinstein Haggai and Gad Haggai.

731.    As a direct and foreseeable result of the October 7 Attack, the Plaintiff Estates of

Judy Weinstein Haggai and Gad Haggai experienced conscious pain and suffering and suffered economic loss.

732.    As a direct and foreseeable result of the October 7 Attack and the deaths of Judy Weinstein Haggai and Gad Haggai, Plaintiffs Iris Weinstein Haggai, Ahl Haggai, Rahm Haggai, and Zohar Haggai have suffered severe mental anguish and extreme emotional distress, and economic loss.

### O.    The Neutra Family

733.    Omer Maxim Neutra was a dual citizen of the United States and the State of Israel when he was murdered by Hamas on October 7, 2023. He was 21 years old.

734.    Born in New York City and raised in Long Island, Omer had been accepted to study at SUNY Binghamton, but after spending time in Israel post-high school, he decided instead to enlist in the Israeli military.

735.    Omer became a tank platoon commander. On October 7, 2023, Omer was on duty as the commander of a post called the White House, in charge of two tanks and a platoon from the Golani Brigade. The White House post is situated between Kibbutz Nirim and Kibbutz Nir Oz.

736.    Omer was last seen in Hamas video footage taken on the morning of the October 7 Attack. In the video, he was lying on the ground outside his tank at the Gaza border, injured.

737.    Omer was taken hostage into Gaza. For almost 14 months, Omer's family believed that he was still alive. But on December 2, 2024, Israeli intelligence revealed that Omer had been killed on October 7, 2023, a few hours after he was forced into the tunnels in Gaza.

738.    Upon this announcement, New York Governor Kathy Hochul ordered flags to be flown at half-staff on the day of Omer's funeral. A section of road in the Long Island town where Omer grew up us was renamed "Captain Omer Neutra Way."

739.    Hamas still holds Omer's body hostage.

740.    Plaintiffs Ronen Neutra and Orna Esther Neutra bring this action on behalf of the Estate of Omer Maxim Neutra.

741.    Plaintiffs Ronen Neutra and Orna Esther Neutra also bring this action individually. They are dual citizens of the United States and the State of Israel and the parents of Omer Maxim Neutra.

742.    Plaintiff Daniel Yum Neutra is a dual citizen of the United States and the State of Israel. He is the younger brother of Omer Maxim Neutra.

743.    Plaintiff Or Joseph Rahbek is a Danish citizen. He is the older half-brother of Omer Maxim Neutra.

744.    Plaintiff Keren Rahbek is a Danish citizen. She is an older half-sister of Omer Maxim Neutra. Omer had recently celebrated Keren's wedding in Copenhagen in May 2023.

745.    Plaintiff Leah Rahbek is a Danish citizen. She is an older half-sister of Omer Maxim Neutra.

746.    As a direct and foreseeable result of the October 7 Attack, the Plaintiff Estate of Omer Maxim Neutra experienced conscious pain and suffering and suffered economic loss.

747.    As a direct and foreseeable result of the October 7 Attack, and the abduction and murder of Omer Maxim Neutra, Plaintiffs Ronen Neutra, Orna Esther Neutra, Daniel Yum Neutra, Or Joseph Rahbek, Keren Rahbek, and Leah Rahbek have suffered severe mental anguish and extreme emotional distress, and economic loss.

## P.    The Rousso Family

748.    Ofek Rousso was a citizen of the United States and a resident of the State of Israel when he was murdered by Hamas. He was 21 years old.

749.    Just months before, Ofek had completed the grueling training course of Shayetet

13, an elite Israeli combat unit that is often analogized to the U.S. Navy SEALs. Within his unit, he was selected to serve as a combat medic and trained to provide first aid to his fellow soldiers.

750.    On October 7, 2023, Ofek was on routine standby duty at his base. Early in the morning, when reports of the ongoing terror attacks started to surface, Ofek and several other soldiers from his unit were called to respond.

751.    They first set out for Ofakim, one of the towns that had been infiltrated by Hamas terrorists. By the time Ofek and his fellow soldiers arrived there, no terrorists remained, and Ofek provided medical treatment to several civilians.

752.    At 4:15 p.m., Ofek arrived at Kibbutz Be'eri, along with several dozen soldiers from Shayetet 13. They rushed into the kibbutz. For many hours, under the harshest of conditions, Ofek and his comrades went from house to house, fighting Hamas terrorists and rescuing civilians.

753.    Ofek provided medical attention to both civilians and soldiers, including a family with four children that his team had saved.

754.    Ofek and his fellow soldiers took their first break around 1:45 a.m. in the early hours of October 8, 2023. His unit had been fighting all day without food or water, wearing heavy combat gear, and bearing witness to horrific atrocities against the residents of Kibbutz Be'eri. But the shooting soon resumed, and Ofek immediately responded.

755.    At 2:15 a.m., Ofek heard the shout of a fellow soldier who had been hit by gunfire and needed a medic. Ofek was lying in a cover position about ten meters away. Ofek was the only medic in the group. He signaled to his commander that he was going to the wounded soldier, got approval, and immediately rushed toward him. Just as Ofek began treating his wounded comrade, he was attacked by a burst of gunfire from Hamas terrorists. One of the bullets struck Ofek's right temple, killing him.

756. Ofek died on Sunday, October 8, 2023, at 2:15 a.m. His final messages to his father, Yaniv, read "Go to sleep, everything's fine, we'll talk tomorrow. Goodnight."

757. On the afternoon of October 8, Yaniv first learned from a father of one of the soldiers in Ofek's unit that Ofek had been hurt. Yaniv began contacting anyone he could who might provide him with more information about Ofek. No one gave him any answers. Yaniv did not know if his difficulty in gathering information was a product of the chaos unfolding in southern Israel or if something had happened to Ofek and the army was withholding information.

758. Days went by without any contact from Ofek. The Rousso family experienced tremendous stress as they awaited any word about their son's fate. It was not until 3:40 a.m. on October 11, 2023, that the doorbell rang. Two Israeli military officers had arrived to deliver the worst possible news to Ofek's parents, Yaniv and Fanny, and his sister, Inbar.

759. Ofek's parents, Yaniv and Fanny Rousso, bring this action on behalf of the Estate of Ofek Rousso.

760. Plaintiff Yaniv Rousso also brings this action individually. He is a citizen and resident of the State of Israel. He is the father of Ofek Rousso.

761. Plaintiff Fanny Rousso also brings this action individually. She is a citizen of the United States and is a resident of the State of Israel. She is the mother of Ofek Rousso.

762. Plaintiff Inbar Rousso is a citizen of the United States and is a resident of the State of Israel. She is the sister of Ofek Rousso.

763. As a direct and foreseeable result of the October 7 Attack and the attack that followed on October 8, 2023, the Plaintiff Estate of Ofek Rousso experienced conscious pain and suffering and suffered economic loss.

764. As a direct and foreseeable result of the October 7 Attack and the attack that

followed on October 8, 2023, in which Ofek Rousso was killed, Plaintiffs Yaniv Rousso, Fanny Rousso, and Inbar Rousso have suffered severe mental anguish and extreme emotional distress, and economic loss.

## Q.    The Katsman Family

765.    Hayim Katsman was a dual citizen of the United States and the State of Israel when he was murdered by Hamas on October 7, 2023. He was 32 years old.

766.    Hayim was one of six children born to Hannah Wacholder Katsman, a writer and women's rights activist, and Daniel Katsman. The couple moved to Israel in 1990, and Hayim was born there a year later.

767.    Hayim was a peace activist who studied philosophy and earned a PhD in political science from the University of Washington's Henry M. Jackson School of International Studies.

768.    When Hamas struck on October 7, Hayim lived in Kibbutz Holit, where he worked as a gardener, landscaper, and deejay. Hayim also taught at various colleges and pre-army programs.

769.    On the morning of October 7, 2023, Hayim was awoken by the sounds of sirens and gunshots. He sent his mother a message letting her know he was okay at about 7:15 a.m.

770.    He ran to his safe room but could not lock it from the inside. He then left to go to his neighbor's house, where he hid with a neighbor in the closet within their safe room.

771.    For a time, Hayim stayed on the phone with his friend until he heard terrorists nearby. He hung up and continued texting.

772.    Terrorists then attacked the safe room in which he was hiding. Hayim shielded his neighbor by placing himself closest to the door of the closet. He absorbed the bullets fired into the closet, thereby saving his neighbor's life.

773.    Hayim's mother initially thought he had been taken hostage into Gaza. His body

was later identified and his family notified early the next day, Sunday, October 8.

774. Hannah Wacholder Katsman brings this action on behalf of the Plaintiff Estate of Hayim Katsman.

775. Plaintiff Hannah Wacholder Katsman also brings this action individually. She is a citizen of the United States and is a resident of the State of Israel. She is the mother of Hayim Katsman.

776. As a direct and foreseeable result of the October 7 Attack, the Plaintiff Estate of Hayim Katsman experienced conscious pain and suffering and suffered economic loss.

777. As a direct and foreseeable result of the October 7 Attack and the death of Hayim Katsman, Plaintiff Hannah Wacholder Katsman has suffered severe mental anguish and extreme emotional distress, and economic loss.

### R.     The Levy Family

778. Roy Joseph Levy was a citizen of the United States and a resident of the State of Israel when he was killed by Hamas on October 7, 2023. He was 44 years old.

779. Roy moved from Massachusetts to Israel as a child with his family and spent his career in the Israeli armed forces. He had achieved the rank of colonel at the time of his death.

780. On the morning of October 7, Roy received a call informing him of the unfolding attacks in southern Israel. He left his house by 7:45 a.m. after warning his wife, Yael Levy Oppenheimer, that it would be a long day.

781. Roy drove south and headed straight into the battle – a highly unusual move for a colonel. Around this time, Roy spoke to his brother Iddo, instructing Iddo to shelter in place and telling him that he was on a mission to save lives. These were the last words that Roy's family ever heard from him.

782. At approximately 10:30 a.m., Roy arrived in the vicinity of Re'im (near the Gaza

border), where he encountered heavy gunfire from Hamas terrorists who had infiltrated the area. Roy engaged the terrorists. Advancing from home to home, under heavy gunfire and massively outnumbered by terrorists, Roy liberated captives and saved families. Many lived to tell how Roy personally saved them from captivity, torture, and death.

783. In the course of battle, Roy was shot in his wrist. He paused to bandage the wound and kept fighting. He then took another more serious wound to his torso. Nonetheless, Roy pushed through the pain to pick up his rifle and continue fighting.

784. At about 1:30 p.m., as Roy was attempting to stop further murder and kidnapping of civilians in Re'im, a Hamas terrorist shot Roy in the heart.

785. At about 5 p.m., Roy's brother Iddo received a call from a friend, asking about Roy because of something the friend had heard about Roy having been shot, and possibly killed. Roy had not answered any calls or messages from his family, who were anxiously checking on his well-being. Nor did he return home that night.

786. At about 12:30 a.m. on October 8, two officers appeared on Yael Levy Oppenheimer's doorstep to deliver the tragic news of Roy's death.

787. The Plaintiff Estate of Roy Joseph Levy is represented here by his wife, Yael Levy Oppenheimer.

788. Plaintiff Yael Levy Oppenheimer also brings this action individually. She is a citizen and resident of the State of Israel.

789. Plaintiff Yael Levy Oppenheimer also brings this action on behalf of her three minor children, Plaintiffs I.O., Y.L., and J.L. They are citizens and residents of the State of Israel. I.O. is Roy's stepson. Y.L. and J.L. are Roy's sons.

790. Plaintiff Tzuria Levy is a citizen and resident of the State of Israel. She is Roy

Joseph Levy's daughter.

791.   Plaintiff Zohar Levy is a citizen and resident of the State of Israel. She is Roy Joseph Levy's daughter.

792.   Naomi Kahana brings this action on behalf of Plaintiff A.L., who is a citizen and resident of the State of Israel. A.L. is Roy Joseph Levy's minor daughter.

793.   Plaintiff Judith Levy is a citizen and resident of the State of Israel. She is Roy Joseph Levy's mother.

794.   Plaintiff Shlomo Levy is a citizen and resident of the State of Israel. He is Roy Joseph Levy's father.

795.   Plaintiff Eliyahu Levy is a citizen and resident of the State of Israel. He is Roy Joseph Levy's oldest brother.

796.   Plaintiff Iddo Moshe Levy is a citizen of the United States and a resident of the State of Israel. He is Roy Joseph Levy's brother.

797.   Plaintiff Nir Yehezkel Levy is a citizen and resident of the State of Israel. He is Roy Joseph Levy's youngest brother.

798.   As a direct and foreseeable result of the October 7 Attack, the Plaintiff Estate of Roy Joseph Levy experienced conscious pain and suffering and suffered economic loss.

799.   As a direct and foreseeable result of the October 7 Attack and the death of Roy Joseph Levy, Plaintiffs Yael Levy Oppenheimer, I.O., Y.L., J.L., Tzuria Levy, Zohar Levy, A.L., Judith Levy, Shlomo Levy, Eliyahu Levy, Iddo Moshe Levy, and Nir Yehezkel Levy have suffered severe mental anguish and extreme emotional distress, and economic loss.

**S.      The Rosenfeld Family**

800.   Maya Treger Rosenfeld was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas on October 7, 2023.

801.     Maya and her husband, Dvir Rosenfeld, lived in Kfar Aza with their then-11 months old son, Z.R. On the morning of October 7, Z.R. woke his parents up early. Soon after, at about 6:00 a.m., they heard loud explosions, so the family headed into their safe room, which was their baby's room.

802.     Dvir left the house briefly to bring the family's dogs inside. He returned without the dogs but left the door open for them. The Rosenfelds were later told by a neighbor that five terrorists passed by their house right after Dvir went back inside, and likely did not enter because the door was open. The terrorists assumed that the house was already under attack.

803.     The Rosenfeld family hid in their safe room for the next 24 hours, hearing terrorists roaming outside and explosions periodically throughout the ordeal. They had lost electricity and were without air conditioning, water or food throughout the extremely hot day and night. Dvir held the door closed the entire time, and Maya held the baby and kept him quiet, which sometimes meant covering his mouth with her hand.

804.     Maya and Dvir received constant WhatsApp messages about neighbors and other people they knew who had been murdered as well as people who were injured and needed help. They felt helpless; they knew if they went out to try to assist others, they would likely be killed.

805.     For example, Dvir's sister messaged Maya at about 6:55 a.m. to tell her that she and her twin babies were safe.

806.     Hours later, at about noon, Maya and Dvir received a message that the twins needed to be rescued. Dvir wanted to go, but Maya begged him not to. She continues to feel guilty for not letting him go.

807.     That night, while still barricaded in their safe room, Maya and Dvir were told that Dvir's sister and brother-in-law had been killed. They found out later that Dvir's sister was shot

through a window and then shot a second time when the terrorists entered the house. After the terrorists shot Dvir's brother-in-law, they left the twin babies in the house as bait and shot at anyone who tried to rescue them. The babies were left in the safe room with their dead father for 14 hours.

808. Maya and Dvir received messages during the ordeal that they needed to stay in their safe room and could not be rescued yet. They heard that terrorists were burning down houses, and so they kept feeling the walls of their room to see if their own house was on fire. At some point that night, their mobile phones died.

809. At about 5:30 a.m. on October 8, Maya and Dvir woke up to guns in their faces. Israeli forces had come to evacuate them, and warned them that terrorists were still outside, and they had just minutes to pack and leave.

810. The soldiers took them to another building within the kibbutz, where they joined 19 other civilians who had also been evacuated from their homes. The building had no electricity, water, or food. The group stayed there for almost five more hours while Israeli forces fought off the terrorists that continued to attack the kibbutz. Maya, Dvir, and their son were released at about 10:00 a.m., and learned more about the devastation that had taken place. Over 60 residents of their kibbutz had been murdered, among them Dvir's sister, brother-in-law, and cousin. The family's babysitter was kidnapped into Gaza along with 17 others. Two of the hostages have died in Gaza.

811. Maya, Dvir, and their son have not been back in their home since the attack.

812. Maya and Dvir attend therapy together and individually; they've lost weight from not eating and suffer from nightmares. It took each of them months to return to work; Maya currently works on a part-time schedule. She misses her sister-in-law immensely; the two had babies at the same time and were in the maternity ward together. Maya suffered a miscarriage recently, and attributes her loss to the stress and grief the attack caused her.

813.    As a direct and foreseeable result of the October 7 Attack, Plaintiff Maya Treger Rosenfeld has suffered severe physical and mental anguish and extreme emotional distress, and economic loss.

**T.      The Rothner Family**

814.    Avraham Rothner was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas. He was 22 years old at the time of the attack.

815.    On October 7, 2023, Avraham was in Kfar Aza Kibbutz. He saw the brutality of the Hamas terrorists firsthand and witnessed the murders of countless innocent Israeli civilians.

816.    During the attack, he made great efforts to help the wounded, but many of those died before Avraham's eyes.

817.    Avraham is suffering from severe PTSD and mental and emotional trauma as a result of the events of October 7, 2023.

818.    As a direct and foreseeable result of the October 7 Attack, Plaintiff Avraham Rothner has suffered severe physical and mental anguish and extreme emotional distress, and economic loss.

**U.      The Edan Family**

819.    Smadar Mor was a citizen of the United States and a resident of the State of Israel when she was murdered by Hamas. She was 38 years old.

820.    Roee Edan was a citizen and resident of the State of Israel when he was murdered by Hamas. He was 43 years old. He was Smadar's husband.

821.    A.E. was a dual U.S.-Israeli citizen when she was kidnapped by Hamas on October 7, 2023. She was three years old when she was kidnapped.

822.    M.E. was a dual U.S.-Israeli citizen when he saw his parents murdered and his sister kidnapped by Hamas on October 7, 2023. He was nine years old.

823.    Am.E. was a dual U.S.-Israeli citizen when she saw her parents murdered and her sister kidnapped by Hamas on October 7, 2023. She was six years old.

824.    On October 7, 2023, the family was at home in Kibbutz Kfar Aza, just a few miles from the Gaza border.

825.    After infiltrating the kibbutz, Hamas terrorists came into the home and shot and killed Smadar in front of A.E., M.E., and Am.E. The three children ran outside and saw their father, a newspaper photographer, running toward the house. Roee took A.E. into his arms with his other children beside him.

826.    Roee was shot from behind and fell with A.E. in his arms. M.E. and Am.E. thought both their father and youngest sister were dead. They immediately ran back into their house and hid on shelves in a closet next to where their mother's body lay.

827.    Roee collapsed on top of A.E., but his body had shielded her from the bullets. She managed to free herself and ran, covered in her father's blood, to a neighbor's house where she took shelter with Avihai and Hagar Brodetz and their children.

828.    Avihai went outside to defend the kibbutz while A.E. stayed with Hagar and her children. A.E., Hagar Brodetz, and the Brodetz children were taken hostage into Gaza.

829.    A.E. was held in Gaza for 50 days before being released as part of a 4-day ceasefire between Israel and Hamas on November 26, 2023. She celebrated her fourth birthday in captivity in Gaza.

830.    M.E. and Am.E. hid in the closet next to where their mother's body lay for nearly 14 hours. They had a phone and spoke with a social worker for a long part of this time, but it was not clear if it was safe for them to come out of hiding until Israeli forces came to rescue them.

831.    Smadar's parents, Eitan Mor and Shlomit Miriam Mor, bring this action on behalf

of the Estate of Smadar Mor Edan.

832.    Plaintiff Eitan Mor also brings this action individually. He is a citizen and resident of the State of Israel. He is the father of Smadar Mor Edan.

833.    Plaintiff Shlomit Miriam Mor also brings this action individually. She is a citizen of the United States and is a resident of the State of Israel. She is the mother of Smadar Mor Edan.

834.    Leron Mor and Zoltan Ivan Gyongyosi bring this action on behalf of minor Plaintiffs, A.E., M.E., and Am.E., as their legal guardians.

835.    Leron Mor also brings this action individually. She is a citizen and resident of the State of Israel. She is the sister of Smadar Mor Edan.

836.    As a direct and foreseeable result of the October 7 Attack, the Plaintiff Estate of Smadar Edan experienced conscious pain and suffering and suffered economic loss.

837.    As a direct and foreseeable result of the October 7 Attack, Plaintiff A.E. suffered severe physical and mental anguish and extreme emotional distress, and economic loss.

838.    As a direct and foreseeable result of the October 7 Attack, Plaintiffs M.E. and Am.E. suffered severe physical and mental anguish and extreme emotional distress, and economic loss.

839.    As a direct and foreseeable result of the October 7 Attack, the murder of Smadar Mor Edan, and A.E. being taken hostage, Plaintiffs Eitan Mor, Shlomit Miriam Mor, Leron Mor, A.E., M.E., and Am.E. have suffered severe mental anguish and extreme emotional distress, and economic loss.

840.    As a direct and foreseeable result of the October 7 Attack and the murder of their father Roee Edan, Plaintiffs A.E., M.E., and Am.E. have also suffered severe mental anguish and extreme emotional distress, and economic loss.

### V.     The Bomflek Family

841.    Sarah Bomflek is a dual citizen of the United States and the State of Israel, and a resident of the State of Israel.

842.    She is the wife of Nir Bomflek and the mother of their two young children.

843.    In the early hours of October 7, Hamas overran the Israeli military base at Nahal Oz where Nir Bomflek served as the deputy battalion commander and the base's highest-ranking officer.

844.    Nir Bomflek was shot in the head before 7:00 a.m. by Hamas terrorists. His soldiers managed to drag him away from the firefight, and for the next eight hours, kept him alive without proper medical equipment, ensuring that Nir remained conscious by talking to him and preventing him from lying down.

845.    At about 3:00 p.m., a rescue unit transported Nir to a makeshift field hospital, where he was intubated and then subsequently transported by helicopter to Sheba Medical Center about two to three hours later.

846.    It was during that helicopter ride on the late afternoon of October 7 that Plaintiff Sarah Bomflek, Nir's wife, finally received notification of her husband's whereabouts and condition; she had been trying to reach him unsuccessfully since 6:30 a.m. when the sirens first sounded. A casualty officer informed Sarah that her husband was in critical condition and was in the midst of transport. In the chaos, the officer told Sarah that Nir was being taken to Soroka Medical Center, Israel's trauma center in the South. Sarah traveled there amidst the continuing attacks and arrived to find out that Nir was not there. She started to return home in order not to miss a call regarding Nir's location, and while on the road, her support network of family and friends was able to finally reach a doctor at Sheba Medical Center, who confirmed that Nir had been brought there.

847.    Upon arrival at Sheba Medical Center, Nir was immediately taken into surgery in critical condition, unresponsive, and with life-threatening injuries. Sarah raced to his side immediately, leaving her baby daughter and toddler son with family members.

848.    Nir remained in intensive care for approximately five weeks, following which he underwent months of pulmonary rehabilitation for breathing difficulties and for traumatic brain injury.

849.    Nir's recovery has been, and continues to be, arduous. As a result of the gunshot wound, he has suffered catastrophic brain injuries, including damage to the right side of his brain, aphasia (speech impairment), immobility of his left leg and left hand, and significant cognitive impairment.

850.    Nir continues to suffer from severe communication deficits, currently able to speak only one or two words at a time and struggling to form basic three-word sentences.

851.    He continues to require ongoing daily rehabilitation treatment and intensive therapy, including speech therapy, physical therapy, and occupational therapy.

852.    Plaintiff Sarah Bomflek has been forced to simultaneously navigate her own trauma, become her husband's primary caregiver, and help their young children process complex emotions about their father's drastically altered condition. The family attends various forms of counseling.

853.    As a direct and foreseeable result of the October 7 Attack and the serious injury to her husband, Plaintiff Sarah Bomflek has experienced severe mental anguish and extreme emotional distress, and economic loss.

**W.    The Goodman Family**

854.    Donald R. Goodman was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas. He was 70 years old at the time.

855. On October 7, 2023, Donald was at home in Kibbutz Nir Yitzhak, with his wife and granddaughter. They were asleep at 6:30 a.m., when Donald and his family heard the alarm in their community instructing them to take cover within 15 seconds. They heard booming sounds and 50-60 rocket attacks.

856. Donald and his family got into their safe room with water and crackers and attempted to get information on their cell phones.

857. Hamas terrorists invaded Donald's home, smashed windows, destroyed his computer, and stole money and kitchen appliances from his home.

858. Donald and his family were also displaced from their home. When Israeli forces released the alarm, the Goodmans were told to relocate into four shelters, each housing 120 people. Donald and his family slept on the floor and had no accessible bathroom.

859. As a direct and foreseeable result of the October 7 Attack, Plaintiff Donald Goodman has suffered severe mental anguish and extreme emotional distress, and economic loss.

## X. The Cherney Family

860. Plaintiff Noa Morgan Cherney was a citizen of the United States and a resident of Israel when she was injured by Hamas.

861. Noa was a naval combatant in the Israeli military from January 2022 through January 2024.

862. On October 7, 2023, Noa was in Kibbutz Erez, when, at 6:30 a.m., rockets began to fall. Noa experienced rocket fire in the shelter she was in and buildings shaking before being called to her military base 20 minutes after the attack began. There were 40 terrorists outside of Kibbutz Erez, with just seven kibbutz members trying to fight them off. The kibbutz members were able to hold off the terrorists for three hours.

863. During the crossfire, Noa's mentor was killed, and her host family was injured.

864. Hamas cut the Wi-Fi on Kibbutz Erez, so Noa had to leave her safe room to contact her base. She was receiving alerts on her phone, which provided her with the details of the attack, the number of dead, etc. Throughout the day, Noa experienced constant booms, and she had no food. Noa volunteered to join the security team guarding the kibbutz, but there were not enough weapons for her to do so.

865. On the evening of October 7 into October 8, Noa was placed under an evacuation order, which was subsequently canceled.

866. At 10:00 a.m. on October 8, she left Kibbutz Erez in the direction of Ashkelon, in order to make it to Haifa to join her ship. On the ride to her ship, she encountered rockets, rocket alerts, UAVs, and other threats.

867. Once on her ship, Noa sailed to every border, guarding oil rigs. While at sea, she was under constant threat from Hamas via the air.

868. As a direct and foreseeable result of the October 7 Attack and her subsequent deployment to fight against Hamas, Plaintiff Noa Morgan Cherney has experienced severe physical and mental anguish and extreme emotional distress, and economic loss.

### Y.     The Daniels Family

869. Plaintiff Gil Boaz Daniels was a citizen of the United States and a resident of Israel when he was injured by Hamas.

870. Gil Boaz Daniels was at home in Kibbutz Nir Erez, which borders Gaza, on October 7 when Hamas attacked. Gil spent most of October 7 on the phone calling his family, his military unit, and his unit commander. The Army did not arrive until very late in the day. There was almost constant gunfire and explosions from the terrorists outside his home.

871. Gil was sheltered with other people from his kibbutz throughout the day, and they were crying as they learned of the deaths of family and friends.

872. Upon leaving the shelter, Gil and the others had to walk through the devastation caused by the terrorists outside the shelter.

873. As an Israeli soldier, Gil entered Gaza after the attacks and spent 45 days there. His direct commander and deputy commander were killed serving alongside him.

874. Gil's father suffered a heart attack due to the stress of the situation.

875. Gil remains displaced from his home as he is unable to move back to his kibbutz.

876. As a direct and foreseeable result of the October 7 Attack and his subsequent deployment to Gaza to fight against Hamas, Plaintiff Gil Boaz Daniels has experienced severe mental anguish and extreme emotional distress, and economic loss.

**Z.     The Davidovich Family**

877. Rivka Davidovich was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas. She was 33 years old at the time of the attack.

878. Rivka was at home in Ofakim, Israel, with her children on October 7, 2023. Her husband and oldest son were at the synagogue from 6:00 a.m. until approximately 12:00 p.m. because it was the Jewish holiday of Simchat Torah.

879. Rivka reports hearing many alarms and feeling a great deal of fear on October 7, 2023.

880. In the first week following October 7, 2023, neither Rivka, nor her family, left their home, even to buy bread and milk, due to the intense fear and trauma. Remaining shut in her home was extremely difficult because two of her children were diagnosed with ADHD and were intensely affected by the atmosphere both inside and outside of the house.

881. Once the family was able to leave their home, the entire family, including Rivka, received emotional and art therapy to process their trauma.

882. Plaintiff A.D. is a citizen of the United States and a resident of the State of Israel.

Plaintiff Rivka Davidovich, as guardian of A.D., brings this claim on behalf of A.D., a minor child.

883. Plaintiff H.M.D. is a citizen of the United States and a resident of the State of Israel. Plaintiff Rivka Davidovich, as guardian of H.M.D., brings this claim on behalf of H.M.D., a minor child.

884. Plaintiff M.D. is a citizen of the United States and a resident of the State of Israel. Plaintiff Rivka Davidovich, as guardian of M.D., brings this claim on behalf of M.D., a minor child.

885. Plaintiff Mi.D. is a citizen of the United States and a resident of the State of Israel. Plaintiff Rivka Davidovich, as guardian of Mi.D., brings this claim on behalf of Mi.D., a minor child.

886. Plaintiff S.E.D. is a citizen of the United States and a resident of the State of Israel. Plaintiff Rivka Davidovich, as guardian of S.E.D., brings this claim on behalf of S.E.D., a minor child.

887. Plaintiff Y.D. is a citizen of the United States and a resident of the State of Israel. Plaintiff Rivka Davidovich, as guardian of Y.D., brings this claim on behalf of Y.D., a minor child.

888. Plaintiff A.E.D. is a citizen of the United States and a resident of the State of Israel. Plaintiff Rivka Davidovich, as guardian of A.E.D., brings this claim on behalf of A.E.D., a minor child.

889. As a direct and foreseeable result of the October 7 Attack, Plaintiff Rivka Davidovich has suffered severe mental anguish and extreme emotional distress, and economic loss.

890. As a direct and foreseeable result of the October 7 Attack on and the injuries of Rivka Davidovich, Plaintiffs A.D., H.M.D., M.D., Mi.D., S.E.D., Y.D. and A.E.D. have experienced severe mental anguish and extreme emotional distress, and economic loss.

**AA.    The Ben Zaken Family**

891.    Chana Sarah Ben Zaken was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas. She was 31 years old at the time.

892.    Chana Sarah Ben Zaken was at home with her family in Ofakim, Israel, on October 7, 2023.

893.    When the terrorists invaded Ofakim, Chana and her children hid in the safe room in their home. Her husband, who was outside, saw the terrorists shooting in the vicinity of their home.

894.    Following the October 7 Attack, Chana and her family were displaced until December 2023 from their home in Ofakim to Hever, a villa donated to refugees from the South.

895.    Chana Sarah Ben Zaken suffers from anxiety, panic attacks, insomnia, and paranoia as a result of the October 7 Attack.

896.    Plaintiff S.L. is a citizen of the United States and a resident of the State of Israel. Plaintiff Chana Sarah Ben Zaken, as guardian of S.L., brings this claim on behalf of S.L., a minor child.

897.    Plaintiff A.L. is a citizen of the United States and a resident of the State of Israel. Plaintiff Chana Sarah Ben Zaken, as guardian of A.L., brings this claim on behalf of A.L., a minor child.

898.    Plaintiff Ay.BZ. is a citizen of the United States and a resident of the State of Israel. Plaintiff Chana Sarah Ben Zaken, as guardian of Ay.BZ., brings this claim on behalf of Ay.BZ., a minor child.

899.    Plaintiff Av.BZ. is a citizen of the United States and a resident of the State of Israel. Plaintiff Chana Sarah Ben Zaken, as guardian of Av.BZ., brings this claim on behalf of Av.BZ., a minor child.

900. As a direct and foreseeable result of the October 7 Attack, Plaintiff Chana Sarah Ben Zaken has suffered severe mental anguish and extreme emotional distress, and economic loss.

901. As a direct and foreseeable result of the October 7 Attack on and the injuries of Plaintiff Chana Sarah Ben Zaken, Plaintiffs S.L., A.L., Ay.BZ., and Av.BZ. have experienced severe mental anguish and extreme emotional distress, and economic loss.

**BB.    The Hamo Family**

902. Hadas Pnina Saffer Ben Hamo was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas. She was 31 years old at the time.

903. On October 7, 2023, Hadas was at home in Ofakim with her three young children, ranging in age from five years old to less than a year old, when the terrorists invaded. Her husband was in synagogue for the Jewish holiday of Simchat Torah, unaware of what was happening in town.

904. Hadas's next-door neighbors were shot by the terrorists, causing Hadas intense fear.

905. Hadas and her children were stuck in their home for two days.

906. Hadas suffers from psychological trauma, insomnia, and inability to readjust to normal life.

907. Plaintiff N.B.H. is a citizen of the United States and a resident of Israel. Plaintiff Hadas Pnina Saffer Ben Hamo, as guardian of N.B.H., brings this claim on behalf of N.B.H., a minor child.

908. Plaintiff R.B.H. is a citizen of the United States and a resident of Israel. Plaintiff Hadas Pnina Saffer Ben Hamo, as guardian of R.B.H., brings this claim on behalf of R.B.H., a minor child.

909. Plaintiff M.B.H. is a citizen of the United States and a resident of Israel. Plaintiff Hadas Pnina Saffer Ben Hamo, as guardian of M.B.H., brings this claim on behalf of M.B.H., a

minor child.

910.    As a direct and foreseeable result of the October 7 Attack, Plaintiff Hadas Pnina Saffer Ben Hamo has suffered severe mental anguish and extreme emotional distress, and economic loss.

911.    As a direct and foreseeable result of the October 7 Attack and the injuries of Hadas Pnina Saffer Ben Hamo, Plaintiffs N.B.H., R.B.H., and M.B.H. have experienced severe mental anguish and extreme emotional distress, and economic loss.

## CC.    The Amar Family

912.    Naama Saffer Amar was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas. She was 34 years old at the time.

913.    Naama Saffer Amar was at home in Ofakim on October 7, 2023, when Hamas terrorists invaded. Terrorists surrounded Naama's house shooting, prohibiting her and her family from leaving their building for two days. There were 50 deaths in the neighborhood, with many, if not all, of her neighbors dying, leaving her to fear for her safety.

914.    Naama was displaced from her home for two weeks.

915.    Plaintiff A.A. is a citizen of the United States and a resident of the State of Israel. Plaintiff Naama Saffer Amar, as guardian of A.A., brings this claim on behalf of A.A., a minor child.

916.    Plaintiff G.A. is a citizen of the United States and a resident of the State of Israel. Plaintiff Naama Saffer Amar, as guardian of G.A., brings this claim on behalf of G.A., a minor child.

917.    Plaintiff O.A. is a citizen of the United States and a resident of the State of Israel. Plaintiff Naama Saffer Amar, as guardian of O.A., brings this claim on behalf of O.A., a minor child.

918. Plaintiff A.M.A. is a citizen of the United States and a resident of the State of Israel. Plaintiff Naama Saffer Amar, as guardian of A.M.A., brings this claim on behalf of A.M.A., a minor child.

919. Plaintiff A.E.A. is a citizen of the United States and a resident of the State of Israel. Plaintiff Naama Saffer Amar, as guardian of A.E.A., brings this claim on behalf of A.E.A., a minor child.

920. Plaintiffs A.A., G.A., O.A., A.M.A., and A.E.A. have experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the attack on and the injuries of Naama Saffer Amar.

921. As a direct and foreseeable result of the October 7 Attack, Plaintiff Naama Saffer Amar suffered economic loss and severe physical and mental anguish and extreme emotional distress while also being forced to relocate from her home.

922. As a direct and foreseeable result of the October 7 Attack on and the injuries of Naama Saffer Amar, Plaintiffs A.A., G.A., O.A., A.M.A., and A.E.A. have experienced severe mental anguish and extreme emotional distress, and economic loss.

**DD.  The Goodman Family**

923. Yehoshua Goodman was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas. He was 43 years old at the time.

924. Plaintiff Shira Goodman was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas. She is the wife of Yehoshua Goodman.

925. On October 7, 2023, Yehoshua and Shira were in Tifrach, Israel, unable to get back to their home in Ofakim. Rockets fell two houses away from where they were staying and shattered windows in the house where they were staying, causing them to fear for their safety.

926. When Yehoshua and Shira were able to return home to Okafim, they were afraid to

leave their house.

927. Plaintiff A.G. is a citizen of the United States and a resident of the State of Israel. Plaintiff Yehoshua Goodman, as guardian of A.G., brings this claim on behalf of A.G., a minor child.

928. Plaintiff B.G. is a citizen of the United States and a resident of the State of Israel. Plaintiff Yehoshua Goodman, as guardian of B.G., brings this claim on behalf of B.G., a minor child.

929. Plaintiff Y.G. is a citizen of the United States and a resident of the State of Israel. Plaintiff Yehoshua Goodman, as guardian of Y.G., brings this claim on behalf of Y.G., a minor child.

930. Plaintiff B.G. is a citizen of the United States and a resident of the State of Israel. Plaintiff Yehoshua Goodman, as guardian of B.G., brings this claim on behalf of B.G., a minor child.

931. Plaintiff M.G. is a citizen of the United States and a resident of the State of Israel. Plaintiff Yehoshua Goodman, as guardian of M.G., brings this claim on behalf of M.G., a minor child.

932. Plaintiff N.G. is a citizen of the United States and a resident of the State of Israel. Plaintiff Yehoshua Goodman, as guardian of N.G., brings this claim on behalf of N.G., a minor child.

933. As a direct and foreseeable result of the October 7 Attack, Plaintiffs Yehoshua Goodman and Shira Goodman suffered severe mental anguish and extreme emotional distress, and economic loss.

934. As a direct and foreseeable result of the October 7 Attack on and the injuries of

Yehoshua Goodman and Shira Goodman, Plaintiffs A.G., B.G., Y.G., B.G., M.G. and N.G. have experienced severe mental anguish and extreme emotional distress, and economic loss.

### EE.   The Zer-Chen Family

935.   Leor Zer-Chen was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas. He was 25 years old at the time.

936.   On October 7, 2023, Leor was in synagogue services in Ashkelon, Israel, when the attacks began. Though Israeli security forces set up protection in the vicinity of the synagogue, Leor was compelled to reach his family. It took him thirty minutes to reach his family by foot. There were rockets landing in the streets near him, and armed people were all over. Leor feared for his safety because he did not know if the gunmen he saw were Israeli security forces or terrorists, and he worried that his family would never see him again.

937.   He was finally able to obtain a ride in an ambulance to reach his wife and son.

938.   Leor has been diagnosed with depression caused by the October 7 Attack.

939.   Plaintiff Yaakov Zer-Chen is a citizen of the United States and is a resident of the State of Israel. He is the son of Leor Zer-Chen.

940.   Plaintiff Yael Zer-Chen is a citizen of the United States and is a resident of the State of Israel. She is the spouse of Leor Zer-Chen.

941.   As a direct and foreseeable result of the October 7 Attack, Plaintiff Leor Zer-Chen has suffered severe mental anguish and extreme emotional distress, and economic loss.

942.   As a direct and foreseeable result of the October 7 Attack and the injuries of Leor Zer-Chen, Plaintiffs Yaakov Zer-Chen and Yael Zer-Chen have suffered severe mental anguish and extreme emotional distress, and economic loss.

### FF.   The Gutstein Family

943.   Avraham Gutstein was a citizen of the United States and a resident of the State of

Israel when he was injured by Hamas. He was 43 years old at the time.

944. On October 7, 2023, Avraham Gutstein was in Ashkelon when rockets began falling in the area where he had been attending synagogue. A rocket fell in a nearby parking lot, shattering windows, and causing him to fear for his safety.

945. Avraham owns two kindergarten centers in Ashkelon, and these locations were damaged by rockets, resulting in collapsed walls and damage to the buildings.

946. Avraham is also a volunteer with an organization known as "Zaka," which provides first-responder and search-and-rescue operations, among other activities, in the aftermath of mass-casualty events. In this capacity, Avraham was stationed at the hospital where he saw the casualties, including dead bodies, coming from various locations as a result of the October 7 Attack.

947. Avraham suffers from emotional trauma, sleep disturbances, endless thoughts of mortality, and PTSD.

948. Plaintiff Miriam Gutstein is a citizen of the United States and is a resident of the State of Israel. She is the spouse of Avraham Gutstein.

949. Plaintiff Z.C.G. is a citizen of the United States and is a resident of the State of Israel. Plaintiff Miriam Gutstein, as next-of-kin of Z.C.G., brings this claim for Z.C.G. as the minor child of Avraham Gutstein.

950. Plaintiff Yitshak Yisachar Gutstein is a citizen of the United States and is a resident of the State of Israel. He is the son of Avraham Gutstein.

951. Plaintiff Tamar Gutstein is a citizen of the United States and a resident of the State of Israel. She is the daughter of Avraham Gutstein.

952. Plaintiff S.G. is a citizen of the United States and is a resident of the State of Israel.

Plaintiff Miriam Gutstein, as next-of-kin of S.G., brings this claim for S.G. as the minor child of Avraham Gutstein.

953. As a direct and foreseeable result of the October 7 Attack, Plaintiff Avraham Gutstein has suffered severe mental anguish and extreme emotional distress, and economic loss.

954. As a direct and foreseeable result of the October 7 Attack and the injuries to Avraham Gutstein, Plaintiffs Miriam Gutstein, Tamar Gutstein, Z.C.G., Yitshak Yisachar Gutstein, and S.G. have suffered severe mental anguish and extreme emotional distress, and economic loss.

**GG.    The Natan Family**

955. Odeya Chen Natan, a/k/a Odeya Chen Teicher, was a citizen of the United States and a resident of the State of Israel when she was injured by Hamas. She was 30 years old at the time.

956. Odeya was at home in Sderot on October 7, 2023. She heard the events of October 7, 2023, unfolding outside her home and took her children, father-in-law, and brother-in-law to their safe room to hide. They barricaded themselves in the safe room for 48 hours until Israeli forces were able to rescue them. They heard non-stop rockets as well as the gunfire all around them from the terrorists who were lurking on the streets of Sderot.

957. While Odeya, her father-in-law, brother-in-law, and her children were hiding in the safe room in her home, Eitan had heard the rocket sirens going off in Sderot and proceeded in his vehicle to the entrance to Sderot where he was attacked by a pickup truck filled with terrorists who were infiltrating Sderot. Eitan was shot in the arm, but he continued to drive until his vehicle could no longer move after continuing to be hit with gunfire. He got into another resident's vehicle who had also been shot. Eitan plugged the other individual's gunshot wound with his finger, and the two were able to get north of Sderot where they found an ambulance to receive care.

958.    Odeya did not know what happened to her husband as she was holed up in the safe room for 48 hours. She believed him to be among the dead or captured and, aside from the emotional distress she endured because of her own personal ordeal within the safe room, she also suffered emotional distress from the belief that her husband had been killed. While Eitan survived, he has undergone multiple surgeries, physical therapy, and emotional trauma that has caused additional emotional distress for Odeya.

959.    Plaintiff Naomi Teicher is a citizen of the United States and a resident of the State of Israel. She is the mother of Odeya Chen Natan, a/k/a Odeya Chen Teicher.

960.    Plaintiff Michael Jay Teicher is a citizen of the United States and a resident of the State of Israel. He is the father of Odeya Chen Natan, a/k/a Odeya Chen Teicher.

961.    As a direct and foreseeable result of the October 7 Attack, Plaintiff Odeya Chen Natan, a/k/a Odeya Chen Teicher, has suffered severe mental anguish and extreme emotional distress, and economic loss.

962.    As a direct and foreseeable result of the October 7 Attack and the injuries of Odeya Chen Natan, a/k/a Odeya Chen Teicher, Plaintiffs Naomi Teicher and Michael Jay Teicher have suffered severe mental anguish and extreme emotional distress, and economic loss.

## HH.    The Revivo Family

963.    Shlomi Revivo is a dual citizen of the United States and Israel, and a resident of the State of Florida. At the time of the attack, he was 32 years old, newly married, and a self-employed business owner.

964.    Shlomi and his wife traveled to Israel to be married in mid-September 2023 and remained in Israel after their wedding to spend time with family.

965.    On October 7, 2023, Shlomi was staying with family at their home in Sderot when the city came under terrorist attack by Hamas.

966.    Shlomi, along with his wife, younger sister and brother, pregnant sister-in-law, nephew, and dog, were forced to hide in a safe room.

967.    As the morning of October 7th unfolded, Shlomi received devastating news via WhatsApp that terrorists had set fire to his relatives' house in nearby Kibbutz Be'eri. Shlomi's cousin pleaded with him for help, and all Shlomi could do was call the police. No assistance arrived, as emergency services were overwhelmed or had been targeted themselves. Shlomi soon learned that his cousin's husband and son had been murdered.

968.    Shlomi and his family members stayed in their safe room for approximately ten hours. All the while, they heard intense gunfire and explosions outside. Their only protection was a single kitchen knife Shlomi had grabbed on their way into the room.

969.    The family made the decision to attempt an escape at about 4:00 p.m., sure that staying in the room would mean certain death.

970.    With both family cars nearly empty of fuel, Shlomi volunteered to make the dangerous trip to find gasoline. During this journey, he witnessed stranded and abandoned vehicles, some containing dead bodies. The first gas station he went to was unmanned and inoperable, so he had to find another one. His prolonged absence caused his family to become frantic with worry; cell phone service in the area had been shut down by the Israeli military in order to prevent further terrorist coordination, leaving his family unable to contact him and fearing for his life.

971.    He eventually returned to the apartment where his family members were sheltering and began their escape from Sderot.

972.    During that escape, Shlomi and his family encountered scenes of unprecedented horror, including cars on fire, multiple shooting victims visible on the streets, destroyed buildings,

and bodies strewn along their escape route. Shlomi saw the bodies of five women murdered at a bus station, a motorcycle with a body beside it later identified as a friend, and a grocery store riddled with bullets.

973.    Shlomi's family decided to attempt to drive to Shlomi's wife's family in Eilat at the southern-most tip of the State of Israel. They also made the heartbreaking decision not to pick up Shlomi's mother in Sderot, because she insisted that they not risk their lives to reach her in her safe room. Fortunately, she survived without physical injury.

974.    Shlomi and his wife, younger sister and brother, pregnant sister-in-law and nephew reached Eilat safely and remained there for a week, unable to leave the house during their entire stay.

975.    Approximately two weeks after October 7, Shlomi secured flights back to the United States. Upon his insistence, his family whom he had driven to Eilat accompanied him to Florida, where they stayed for six months, attempting to recuperate from the shock and displacement.

976.    As a direct result of the trauma from the October 7 Attack, Shlomi's marriage deteriorated beyond repair. The couple separated six months after returning to the United States, and their divorce was finalized in August 2024.

977.    Shlomi has been officially diagnosed with PTSD and has been recognized as a terror victim by the Government of Israel. He suffers from severe and debilitating symptoms consistent with his PTSD diagnosis.

978.    Shlomi has been deemed unable to work at full capacity since October 7, 2023.

979.    As a direct and foreseeable result of the October 7 Attack, Plaintiff Shlomi Revivo has suffered severe mental anguish and extreme emotional distress, and economic loss.

**II.      The Weiser Family**

980.     Roey Weiser was a citizen of the United States and a resident of the State of Israel when he was killed by Hamas on October 7, 2023. He was 21 years old.

981.     Roey was on his base guarding the Erez Crossing into Gaza. The Erez Crossing is a border crossing between the Gaza Strip and Israel, located at the northern end of the Gaza Strip between the Israeli kibbutz of Erez and the Palestinian town of Beit Hanoun. That crossing is a place where food and goods are regularly transported into Gaza, and where thousands of Gazans come and go to work in Israel or for medical care.

982.     Early in the morning of October 7, 2023, Hamas terrorists breached the Erez Crossing.

983.     Although Roey was not on guard at the time, he leapt into action. One of two commanders at the outpost, he assigned soldiers to positions, provided updates on the situation, and ensured that as many non-combatant soldiers as possible reached the security room.

984.     Seeing that his comrades were not reaching the security room because they were pinned down by attacking Hamas terrorists, he conceived of a daring maneuver to outflank the terrorists.

985.     He led three soldiers out of cover and traveled under fire to join additional soldiers to draw fire away from their other comrades.

986.     For more than one hour, Roey and his comrades fought a fierce battle against Hamas terrorists, killing dozens of them.

987.     Running low on ammunition, Roey and his comrades decided to retreat to the safe room area, but Hamas terrorists ambushed them along the way, killing Roey.

988.     Thanks to Roey's tactical thinking and his heroism, at least 12 of his fellow soldiers were saved.

989. Roey's parents, Naomi Feifer-Weiser and Yisrael Weiser, bring this action on behalf of the Estate of Roey Weiser.

990. Plaintiff Naomi Feifer-Weiser also brings this action individually. She is a citizen of the United States and is a resident of the State of Israel. She is the mother of Roey Weiser.

991. Plaintiff Yisrael Weiser also brings this action individually. He is a citizen of the United States and is a resident of the State of Israel. He is the father of Roey Weiser.

992. Plaintiff Shani Weiser is a citizen of the United States and is a resident of the State of Israel. She is the sister of Roey Weiser.

993. Plaintiff Nadav Weiser is a citizen of the United States and is a resident of the State of Israel. He is the brother of Roey Weiser.

994. As a direct and foreseeable result of the October 7 Attack, the Plaintiff Estate of Roey Weiser experienced conscious pain and suffering and suffered economic loss.

995. As a direct and foreseeable result of the October 7 Attack and the death of Roey Weiser, Plaintiffs Naomi Feifer-Weiser, Yisrael Weiser, Shani Weiser, and Nadav Weiser have suffered severe mental anguish and extreme emotional distress, and economic loss.

**JJ. The Chen Family**

996. Itay Chen was a citizen of the United States and a resident of the State of Israel when he was killed by Hamas. He was 19 years old.

997. On October 7, 2023, Itay was serving on the Israel-Gaza border with his tank unit, the Seventh Armored Brigade's 75th Battalion. Itay was killed during an intense battle with Hamas terrorists following their breach of Israel's borders, and he was taken to Gaza.

998. Itay's family last heard from him early that morning. Two days later, the Chen family learned that the Israeli military considered Itay to be missing in action, and that he was likely being held in captivity by Hamas.

999.   For months, Itay's family believed that Itay was being held alive as a hostage in Gaza. The Chen family became, and has remained, outspoken advocates for the families of hostages being held by Hamas.

1000.   In March 2024, five months after the October 7 Attack, Itay's family received word that Itay had in fact been killed on October 7, 2023. The military was able to confirm his death based on intelligence and findings it had obtained from troops operating in Gaza.

1001.   Then-President Joe Biden released a statement on March 12, 2024, recalling when "Itay's father and brother joined me at the White House, to share the agony and uncertainty they've faced as they prayed for the safe return of their loved one. No one should have to endure even one day of what they have gone through."

1002.   Itay's parents, Ruby and Hagit Chen, bring this action on behalf of the Estate of Itay Chen.

1003.   Plaintiff Ruby Chen also brings this action individually. He is a citizen of the United States and is a resident of the State of Israel. He is the father of Itay Chen.

1004.   Plaintiff Hagit Chen also brings this action individually. She is a citizen and resident of the State of Israel. She is the mother of Itay Chen.

1005.   Plaintiff Roy Chen is a citizen of the United States and is a resident of the State of Israel. He is the brother of Itay Chen.

1006.   Ruby and Hagit Chen also bring this action on behalf of their minor child A.C. A.C. is a citizen of the United States and is a resident of the State of Israel. He is the brother of Itay Chen.

1007.   As a direct and foreseeable result of the October 7 Attack, the Plaintiff Estate of Itay Chen experienced conscious pain and suffering and suffered economic loss.

- 174 -

1008.   As a direct and foreseeable result of the October 7 Attack and the death of Itay Chen, Plaintiffs Ruby Chen, Hagit Chen, Roy Chen, and A.C. have suffered severe mental anguish and extreme emotional distress, and economic loss.

**KK.   The Glisko Family**

1009.   Itai Glisko was a citizen of the United States and a resident of the State of Israel when he was killed by Hamas on October 7, 2023. He was 20 years old.

1010.   Itai was born in New Jersey and moved with his family to Israel as a baby. On October 7, 2023, he had served in the Israeli armed forces for just twenty months.

1011.   Itai was not scheduled to be on base on October 7; he had plans to spend the Jewish holiday with his parents and brothers. A friend went on leave that day, and Itai offered to take his place.

1012.   Itai was positioned 500 meters from the Gaza border when 3,000 terrorists invaded.

1013.   He sent his family a WhatsApp message at 6:30 a.m. telling them not to worry, and that he was in a bomb shelter. His family turned on the news and continued to message him.

1014.   The severity of the attack became apparent quickly, and at 11:00 a.m., Itai messaged his family saying he was not sure if his messages would be his last. Throughout the attack on Itai's base, Itai, along with the battalion's medic, evacuated the wounded into the base's dining room to receive first aid.

1015.   At 2:30 p.m., Hamas terrorists burned the entrance to the dining room to try and suffocate the soldiers who were sheltering inside. Itai and three more troops went out to fight and try to save the others. At 5:00 p.m., the army arrived to rescue those who had survived. Twenty-four soldiers were saved.

1016.   For four days, Itai's family did not know what had happened to him. They tracked his phone, whose GPS location was 20 kilometers away from Itai's base. They checked every list

of kidnapped and missing Israelis, but his name was not on them. They held out hope that Itai was still alive until October 11, 2023, when soldiers knocked on the Gliskos' door to inform them that Itai had been killed.

1017.   The State of New Jersey honored Itai by issuing a proclamation that was delivered to the Glisko family's home. In part, it reads:

*Be It Resolved by the Senate and General Assembly of the State of New Jersey:*

That this Legislature hereby salutes the memory of Itay Ofek Glisko, pays tribute to his valiant service, and extends sincere sympathy and profound condolences to all who mourn his passing.

1018.   Itai's parents, Oren and Liat Glisko, bring this action on behalf of the Estate of Itai Glisko.

1019.   Plaintiff Oren Glisko also brings this action individually. He is a citizen and resident of the State of Israel. He is the father of Itai Glisko.

1020.   Plaintiff Liat Glisko also brings this action individually. She is a citizen and resident of the State of Israel. She is the mother of Itai Glisko.

1021.   Plaintiff Ori Glisko is a citizen and resident of the State of Israel. He is the brother of Itai Glisko.

1022.   Oren and Liat Glisko also bring this action on behalf of their minor child, Y.G. Y.G. is a citizen and resident of the State of Israel and the brother of Itai Glisko.

1023.   As a direct and foreseeable result of the October 7 Attack, the Plaintiff Estate of Itai Glisko experienced conscious pain and suffering and suffered economic loss.

1024.   As a direct and foreseeable result of the October 7 Attack and the death of Itai Glisko, Plaintiffs Oren Glisko, Liat Glisko, Ori Glisko, and Y.G. have suffered severe mental anguish and extreme emotional distress, and economic loss.

**LL.    The Libin Family**

- 176 -

1025.   Plaintiff Ethan Libin was a citizen of the United States and a resident of Israel when he was injured by Hamas.

1026.   Ethan was a member of the Israeli armed forces on October 7, 2023.

1027.   As a member of the military, Ethan had to fight his way past the terrorists into Gaza. He saw hundreds of burned cars, and bodies injured and dismembered, shot and killed by explosions.

1028.   Ethan was present at a grenade attack at Gama intersection and had to evacuate injured civilians.

1029.   Because of the attacks, Ethan did not sleep for months, experienced night terrors, flashbacks, and PTSD.

1030.   As a direct and foreseeable result of the October 7 Attack and his subsequent deployment to Gaza to fight against Hamas, Plaintiff Ethan Libin has experienced severe mental anguish and extreme emotional distress, and economic loss.

## MM.   The Werde Family

1031.   Plaintiff Shlomo Werde was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas.

1032.   Shlomo has been a soldier in the Israeli armed forces since August 2022. On October 7, 2023, he was at the training base in the vicinity of the Gaza Envelope when he heard and saw rockets overhead. Many of his friends died that day as a result of the attack.

1033.   In January 2024, Shlomo entered Gaza with his unit where he encountered RPGs, gunfire, and grenades. Later, he was sent to Lebanon. Shlomo continued to face heavy gunfire and bombings.

1034.   As a result of the Hamas terrorist attacks, Shlomo has suffered both physical and mental injuries. He has a back injury, as well as a sensitivity to noise. Psychologically, he suffers

from trauma due to the violence he has witnessed as a soldier.

1035.   As a direct and foreseeable result of the October 7 Attack and continued violence perpetrated by Hamas and Hezbollah, Plaintiff Shlomo Werde has experienced physical and mental anguish and extreme emotional distress, and economic loss.

**NN.   The Engle Family**

1036.   Plaintiff Reut Engle was a citizen of the United States and a resident of Israel when she was injured by Hamas.

1037.   Reut was a physician's assistant with the Israeli military from 2023, continuing to the present. She was at the Gaza border on October 7, 2023. She was part of the field surgery unit in Gaza in November 2023 and was responsible for evacuating the injured and performing field treatment.

1038.   As a result of this physician's assistant work, as well as being in the combat zone, Reut has experienced burst eardrums, scratched corneas, three herniated disks, trench foot/fungal infections, and psychological trauma.

1039.   As a direct and foreseeable result of the October 7 Attack and her subsequent deployment to Gaza to fight against Hamas, Plaintiff Reut Engle has experienced severe physical and mental anguish and extreme emotional distress, and economic loss.

**OO.   The Leiter Family**

1040.   Moshe Yedidyah Leiter was a citizen of the United States and a resident of the State of Israel when he was killed by Hamas on November 10, 2023. He was 39 years old.

1041.   Moshe Leiter was a father of six children. He served in the Israeli armed forces until he was 33, when he retired from active duty as a Major. He then entered medical school and completed his studies in August 2023, and was scheduled to begin hospital residency on October 8, 2023, the day after the October 7 Attack. At the time of his death, he was serving as a company

commander in the reserves.

1042. Moshe Leiter and three other armed forces reservists were killed by a Hamas booby trap in the Beit Hanoun area of Gaza while inspecting a tunnel entrance.

1043. Plaintiff Jay Michael (Yechiel) Leiter was a citizen of the United States at the time Moshe Leiter was killed. He is currently serving as Israel's ambassador to the United States and, as a result, relinquished his U.S. citizenship. He is a resident of the State of Israel. He is the father of Moshe Leiter.

1044. Plaintiff Chana Leiter is a citizen of the United States and is a resident of the State of Israel. She is the mother of Moshe Leiter.

1045. Plaintiff Neriya Dov Leiter is a citizen of the United States and is a resident of the State of Israel. He is the brother of Moshe Leiter.

1046. Plaintiff Sara Bracha (Leiter) Attias is a citizen of the United States and is a resident of the State of Israel. She is the sister of Moshe Leiter.

1047. Plaintiff David Elimelech Leiter is a citizen of the United States and is a resident of the State of Israel. He is the brother of Moshe Leiter.

1048. Plaintiff Sophia (Leiter) Redler is a citizen of the United States and is a resident of the State of Israel. She is the sister of Moshe Leiter.

1049. Plaintiff Samuel Yair Leiter is a citizen of the United States and is a resident of the State of Israel. He is the brother of Moshe Leiter.

1050. Plaintiff Noam Elisha Leiter is a citizen of the United States and is a resident of the State of Israel. He is the brother of Moshe Leiter.

1051. Plaintiff Amikam Tzion Leiter is a citizen of the United States and is a resident of the State of Israel. He is the brother of Moshe Leiter.

1052.   As a direct and foreseeable result of the November 10, 2023, attack on and the death of Moshe Leiter, Plaintiffs Jay Michael (Yechiel) Leiter, Chana Leiter, Neriya Dov Leiter, Sara Bracha (Leiter) Attias, David Elimelech Leiter, Sophia (Leiter) Redler, Samuel Yair Leiter, Noam Elisha Leiter, and Amikam Tzion Leiter have experienced severe mental anguish and extreme emotional distress, and economic loss.

**PP.   The Bours Family**

1053.   Aaron Bours was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas. He was 33 years old at the time.

1054.   Aaron was in the United States, en route to a conference in Las Vegas on October 7, 2023. When he landed in Las Vegas, he had 20 messages from his wife trying to reach him to inform him of the invasion of Israel by Hamas.

1055.   Aaron was called up to his reserve unit in the Israeli armed forces, the Givati Brigade serving under the Southern Command, almost immediately following the events of October 7, 2023.

1056.   Aaron was part of the ground invasion into Gaza. He was going house-to-house looking for Hamas terrorists and Hamas tunnels for the combat engineers to destroy.

1057.   He was in Gaza for two weeks before he was injured.

1058.   On November 14, 2023, Aaron was with his unit heading toward a home in Beit Hanoun in the Gaza Strip. His unit was the last to cross the street in open view of a school that was affiliated with the United Nations Relief and Works Agency. As is protocol, Aaron's commander stopped to ask permission to enter the house, and Aaron felt like someone was watching him. When he arrived at the house, he turned back to see if his officer was behind him, but at that same time, Aaron heard two gunshots and saw his officer and a communications person fall to the ground. Aaron saw at least two, and as many as four, Hamas terrorists with AK-47s and a sniper

shooting at them.

1059.   Aaron began to shoot back at the school. He stopped to look at his officer, who according to Aaron, "looked terrible." Aaron decided to attempt to rescue his officer to try to save his life. Aaron ran to grab his officer but was only able to travel a few feet before he was shot in the right leg, shattering his bone. He was crawling back to the safety of the house when he was shot in the left leg. He continued to crawl to the house and was rescued by the Unit 669 rescue team.

1060.   He was brought to Sheba Medical Center, where he underwent three surgeries to his right leg, including a bone graft. Aaron spent five months in recovery and underwent months of intensive rehabilitation afterward. In addition to the injuries to his legs, Aaron currently suffers from difficulty concentrating and sleeping.

1061.   As a direct and foreseeable result of the October 7 Attack and the attack that followed on November 14, 2023, Plaintiff Aaron Bours has suffered severe physical and mental anguish and extreme emotional distress, and economic loss.

## QQ.   The Airley Family

1062.   Benyamin Airley was a citizen of the United States and a resident of the State of Israel when he was killed by Hamas. He was 21 years old.

1063.   Benyamin Airley was a member of the Paratroopers Brigade's 101st Battalion in the Israeli military.

1064.   On November 18, 2023, Benyamin was fighting Hamas terrorists in the northern Gaza Strip when he was killed. Benyamin was deployed to the Gaza Strip as a direct result of the October 7 Attack.

1065.   Benyamin and fellow soldiers were staying in a beach house in Gaza. They were

eating breakfast, when at 7:30 a.m., they were called to the scene of a house that had been invaded by Hamas terrorists.

1066. Benyamin insisted on joining his fellow soldiers on this mission, believing his Negev gun would keep him safe. He and two other soldiers entered the house and began scouting rooms. They saw a terrorist on the floor and assumed he was alone, but there was another hiding behind a couch. That terrorist shot and killed all three of the soldiers.

1067. Benyamin's parents, Robert and Jennifer Airley, bring this action on behalf of the Estate of Benyamin Airley.

1068. Plaintiff Robert Airley also brings this action individually. He is a citizen of the United States and is a resident of the State of Israel. He is the father of Benyamin Airley.

1069. Plaintiff Jennifer Airley also brings this action individually. She is a citizen of the United States and is a resident of the State of Israel. She is the mother of Benyamin Airley.

1070. Plaintiff Robert Airley also brings this action as parent and natural guardian of minors A.A., C.A., and Y.A. A.A., C.A., and Y.A. are all citizens of the United States and residents of the State of Israel. They are siblings of Benyamin Airley.

1071. Plaintiff Sarah Airley is a citizen of the United States and a resident of the State of Israel. She is the sister of Benyamin Airley.

1072. Plaintiff Yehuda Airley is a citizen of the United States and a resident of the State of Israel. He is the brother of Benyamin Airley.

1073. As a direct and foreseeable result of the October 7 Attack and the attack that followed on November 18, 2023, the Plaintiff Estate of Benyamin Airley experienced conscious pain and suffering and suffered economic loss.

1074. As a direct and foreseeable result of the October 7 Attack and the attack that

followed on November 18, 2023, during which Benyamin Airley was killed, Plaintiffs Robert Airley, Jennifer Airley, Sarah Airley, Yehuda Airley, A.A., C.A., and Y.A. have suffered severe mental anguish and extreme emotional distress, and economic loss.

**RR.   The Shafer Family**

1075.   Plaintiff Shoshana Bracha Shafer was a citizen of the United States when she was injured by Hamas on November 30, 2023. She was 22 years old.

1076.   Shoshana Bracha was waiting at a bus stop on David Ben Gurion Boulevard in Jerusalem when two Hamas gunmen got out of a vehicle and opened fire on civilians at approximately 7:40 a.m. Three people were killed in the attack.

1077.   The attack was carried out by brothers Murad Namr, 38, and Ibrahim Namr, 30, both Hamas operatives who had previously been jailed for terror activities. Murad was jailed between 2010 and 2020 for planning terror attacks under directions from the Qassam Brigades in the Gaza Strip, and Ibrahim was jailed in 2014 for undisclosed terror activity.

1078.   The terrorists were armed with an M-16 assault rifle and a handgun. Police found large amounts of ammunition in their vehicle.

1079.   Two off-duty soldiers and an armed civilian in the area returned fire, killing the two terrorists.

1080.   Hamas claimed responsibility for the attack that afternoon, hailing the perpetrators as "jihad-waging martyrs."

1081.   Shoshana Bracha sustained a bullet entry wound in her back and an exit wound through her lower abdomen, leaving nine holes in her body. She has undergone three surgeries to repair severe injuries to multiple internal organs, as well as broken bones. She has yet to return to her beloved job as a teacher for middle school students and is still in outpatient rehabilitation in the hospital.

1082.   Shoshana Bracha's parents, Plaintiffs Michael Martin Shafer and Rivka Yehudis Shafer, were both in the United States at the time of the attack. It was very rare for them both to have traveled abroad at the same time, but they had been invited to celebrate a family wedding. Shoshana Bracha was on the phone with her grandmother, Rivka's mother with whom Rivka was staying in the U.S., when the shooting started. Shoshana Bracha hung up the phone quickly, and Rivka's mother commented to Rivka that she heard a lot of commotion.

1083.   Rivka called her daughter twice with no answer, and after Shoshana Bracha called back to tell her she had been in an attack and was bleeding, Rivka called her older children in Israel and instructed them to go find their sister immediately. In fact, Plaintiff Nechama Sorah Gove, Shoshana Bracha's oldest sister, met Shoshana Bracha in the hospital as she was being wheeled to a pre-surgery CT scan. She had rushed to the attack scene, and one of the emergency responders there drove her to the hospital right away.

1084.   Rivka and Michael made immediate arrangements to fly back to Israel and arrived at about 11:00 a.m. the next day. They rushed straight from the airport to the hospital, and have stayed by Shoshana Bracha's side since, remaining with her during her inpatient stays in the hospital and at rehab.

1085.   Shoshana Bracha's nine brothers and sisters have also been a tremendous source of support, while each, like their parents, has experienced the anguish of witnessing their sister's prolonged pain. The family has experienced newfound fears and anxiety since the terrorist attack.

1086.   Plaintiffs Michael Martin Shafer and Rivka Yehudis Shafer, both of whom are citizens of the United States, bring this action individually and on behalf of their minor children, Plaintiff A.S., Plaintiff E.L.S., and Plaintiff E.P.S., who are all citizens of the United States.

1087.   Plaintiff Yehuda Shafer is a citizen of the United States. He is a brother of Shoshana

Bracha Shafer.

1088. Plaintiff Yisroel Meir Shafer is a citizen of the United States. He is a brother of Shoshana Bracha Shafer.

1089. Plaintiff Yitzchok Shafer is a citizen of the United States. He is a brother of Shoshana Bracha Shafer.

1090. Plaintiff Nechama Sorah Gove, née Shafer, is a citizen of the United States. She is the sister of Shoshana Bracha Shafer.

1091. Plaintiff Chana Shira Abraham, née Shafer, is a citizen of the United States. She is the sister of Shoshana Bracha Shafer.

1092. Plaintiff Chaim Shafer is a citizen of the United States. He is a brother of Shoshana Bracha Shafer.

1093. As a direct and foreseeable result of the October 7 Attack and the attack that followed on November 30, 2023, Plaintiff Shoshana Bracha Shafer suffered severe physical and mental anguish and extreme emotional distress, and economic loss.

1094. As a direct and foreseeable result of the October 7 Attack and the attack that followed on November 30, 2023, during which Shoshana Bracha Shafer was injured, Plaintiffs Michael Martin Shafer, Rivka Yehudis Shafer, Yehuda Shafer, Yisroel Meir Shafer, Yitzchok Shafer, Nechama Sorah Gove, née Shafer, Chana Shira Abraham, née Shafer, Chaim Shafer, A.S., E.L.S., and E.P.S. have experienced severe mental anguish and extreme emotional distress, and economic loss.

### SS. The Moses Family

1095. Elitzur Moses was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas. He was 42 years old at the time.

1096. On December 2, 2023, Elitzur was serving as a member of the Israeli armed forces

in Gaza when he was wounded by an RPG that was shot at him by a terrorist, injuring his left hand.

1097.   Elitzur wrapped his injured hand and tried to continue fighting, but he was told he had to leave battle and was sent to Barzillai Hospital. He had a 90% tear to the tendon in his hand, which had to be surgically repaired at Sheba Hospital.

1098.   Plaintiff Dafna Moses is a citizen of the United States and a resident of the State of Israel. She is the wife of Elitzur Moses.

1099.   Plaintiff Elitzur Moses brings this action on behalf of Plaintiff Y.M., a minor child, as his legal guardian. Y.M. is a citizen of the United States and is a resident of the State of Israel. Y.M. is the child of Elitzur Moses.

1100.   Plaintiff Elitzur Moses brings this action on behalf of Plaintiff Ei.M., a minor child, as their legal guardian. Ei.M. is a citizen of the United States and is a resident of the State of Israel. Ei.M. is the child of Elitzur Moses.

1101.   Plaintiff Elitzur Moses brings this action on behalf of Plaintiff Ey.M., a minor child, as their legal guardian. Ey.M. is a citizen of the United States and is a resident of the State of Israel. Ey.M. is the child of Elitzur Moses.

1102.   Plaintiff Elitzur Moses brings this action on behalf of Plaintiff T.M., a minor child, as their legal guardian. T.M. is a citizen of the United States and is a resident of the State of Israel. T.M. is the child of Elitzur Moses.

1103.   Plaintiff Elitzur Moses brings this action on behalf of Plaintiff C.M., a minor child, as their legal guardian. C.M. is a citizen of the United States and is a resident of the State of Israel. C.M. is the child of Elitzur Moses.

1104.   As a direct and foreseeable result of the October 7 Attack and the attack that followed on December 2, 2023, Plaintiff Elitzur Moses has suffered severe physical and mental

anguish and extreme emotional distress, and economic loss.

1105.   As a direct and foreseeable result of the October 7 Attack and the attack that followed on December 2, 2023, and the injuries of Elitzur Moses, Plaintiffs Dafna Moses, Y.M., Ei.M., Ey.M., T.M., and C.M. have experienced severe mental anguish and extreme emotional distress, and economic loss.

### TT.   The Schenkolewski Family

1106.   Yakir Schenkolewski was the second youngest child of Plaintiff Tova Schenkolewski and her husband Ariel Schenkolewski, and the brother of Yehuda, Aviraz, Ofer, and Renana. He was 21 years old when he was killed by Hamas.

1107.   Yakir was born in Israel and lived with his parents and siblings in Kibbutz Migdal Oz. He enlisted in the Israeli military and was proud of his service with the 188th Armored Brigade's 53rd Battalion. Just before he enlisted, Yakir learned that he had a medical issue with his foot that would prevent him from becoming a combat soldier candidate. He delayed his enlistment by four months in order to complete physical therapy and thus be eligible to become a combat soldier.

1108.   Prior to October 7, 2023, Yakir was serving on active duty with his tank unit.

1109.   On the morning of October 7, Yakir's parents and eldest brother, Yehuda, with his wife and children, were at the family home. They were woken up by Ariel's phone, which was receiving calls and messages alerting the family that Israel had been attacked.

1110.   The family went to their synagogue, where they saw many people outside, including the rabbi and security forces. The family learned that war had broken out, and everyone in the kibbutz was instructed to shelter in place because the fighting could reach them.

1111.   Later in the evening of October 7, Yakir called his parents to tell them that his unit had been called up to go south and assist with efforts to repel the attack. Within twenty-four hours,

Yakir's three older brothers had been drafted into service as well: Yehuda as a tank commander, Aviraz as part of a special army ranger unit, and Ofer as security for Kibbutz Migdal Oz.

1112. For the next two months, Yakir was on the front lines of Israel's war against Hamas in the south of Israel and Gaza. He had intermittent access to his cell phone, and his family waited anxiously to hear from him during periods when he could not be in contact. During one conversation, Yakir asked his mother if she would tell him to stop serving. His mother responded that as much as she did not want him to be in danger, she knew Yakir would be angry if she tried to stop him. Yakir agreed and said "yes, I am supposed to go."

1113. On two occasions during this time, Yakir was allowed to visit his family for short periods of leave.

1114. On Wednesday, November 29, 2023, Yakir's parents and younger sister Renana came to visit him in the south. On the morning of December 1, 2023, he called to tell his family that his unit was preparing to go back into Gaza. Yakir's parents lost contact with him before he entered Gaza and waited anxiously for his next call.

1115. The following Monday, on December 4, 2023, Yakir's tank came under fire by Hamas terrorists from short range. Yakir and two other soldiers in his tank were killed in the blast. The tank driver was badly wounded but survived.

1116. That day, three officers knocked on the door of the Schenkolewski family home. Tova was home alone and opened the door. As soon as she saw the officers, she knew her son had been killed.

1117. Her husband Ariel and son Ofer returned home from synagogue a few minutes later. Tova and Ariel immediately broke the news that Yakir had been killed to their other children so that they would hear of their brother's death from their family before the media announced it.

Shortly thereafter, Yakir's death was made public.

1118.   Plaintiff Tova Schenkolewski is a citizen of the United States and is a resident of the State of Israel. She is the mother of Yakir Schenkolewski.

1119.   As a direct and foreseeable result of the October 7 Attack and the attack that followed on December 4, 2023, in which Yakir Schenkolewski was killed, Plaintiff Tova Schenkolewski has suffered severe mental anguish and extreme emotional distress, and economic loss.

### UU.   The Klughaupt Family

1120.   Amichay Klughaupt was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas. He was 19 years old at the time.

1121.   Amichay was a member of the Israeli military when he was injured by Hamas terrorists on December 8, 2023. Amichay's commander was standing outside the door of their tank when terrorists ambushed them. The commander was shot and fell into the tank, where Amichay attempted, unsuccessfully, to resuscitate him by administering CPR. The tank was bombarded with so many RPGs that it flipped over, landing upside down in a ditch on the side of the road. For the next six hours before Amichay and his team were evacuated, Amichay believed he would die.

1122.   As a result of the attack, two fingers from Amichay's hands detached and he incurred shrapnel to his thigh, back and hands.

1123.   Amichay has had two surgeries thus far, and a third will be necessary in the near future to attempt to restore feeling and function to the re-attached fingers. The likelihood of success is very low.

1124.   As a direct and foreseeable result of the October 7 Attack and the attack that followed on December 8, 2023, Plaintiff Amichay Klughaupt has suffered severe physical and mental anguish and extreme emotional distress, and economic loss.

**VV.    The Thaler Family**

1125.    Aryeh Thaler was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas. He was 23 years old at the time of the attack.

1126.    Aryeh was a graduate of the ultra-Orthodox Netzah Yehuda Battalion and an officer in the Israeli armed forces.

1127.    On December 8, 2023, Aryeh was fighting in Gaza when an IED exploded and a large piece of shrapnel entered his lower abdomen, causing severe damage to his lower internal organs and intense bleeding. He survived by being airlifted to Ashdod Hospital, while receiving blood transfusions. He was on the operating table within an hour of being attacked. He spent 2.5 weeks in the hospital and is currently still in rehab.

1128.    Plaintiff Jeffrey Thaler is a citizen of the United States and is a resident of the State of Israel. He is the father of Aryeh Thaler.

1129.    Plaintiff Karen Thaler is a citizen of the United States and is a resident of the State of Israel. She is the mother of Aryeh Thaler.

1130.    Plaintiff Zev Thaler is a citizen of the United States and is a resident of the State of Israel. He is the brother of Aryeh Thaler.

1131.    Plaintiff Eliyahu Thaler is a citizen of the United States and is a resident of the State of Israel. He is the brother of Aryeh Thaler.

1132.    Plaintiff Yosef Thaler is a citizen of the United States and is a resident of the State of Israel. He is the brother of Aryeh Thaler.

1133.    Plaintiff Pesha Thaler is a citizen of the United States and is a resident of the State of Israel. She is the sister of Aryeh Thaler.

1134.    Plaintiffs Jeffrey Thaler and Karen Thaler bring this action on behalf of Plaintiff A.T., a minor child, as his legal guardians. A.T. is a citizen of the United States and is a resident

of the State of Israel. He is the brother of Aryeh Thaler.

1135.   Plaintiffs Jeffrey Thaler and Karen Thaler bring this action on behalf of Plaintiff L.T., a minor child, as her legal guardians. L.T. is a citizen of the United States and is a resident of the State of Israel. She is the sister of Aryeh Thaler.

1136.   Plaintiffs Jeffrey Thaler and Karen Thaler bring this action on behalf of Plaintiff R.T., a minor child, as her legal guardians. R.T. is a citizen of the United States and is a resident of the State of Israel. She is the sister of Aryeh Thaler.

1137.   Plaintiffs Jeffrey Thaler and Karen Thaler bring this action on behalf of Plaintiff H.T., a minor child, as her legal guardians. H.T. is a citizen of the United States and is a resident of the State of Israel. She is the sister of Aryeh Thaler.

1138.   As a direct and foreseeable result of the October 7 Attack and the attack that followed on December 8, 2023, Plaintiff Aryeh Thaler has suffered severe physical and mental anguish and extreme emotional distress, and economic loss.

1139.   As a direct and foreseeable result of the October 7 Attack and the attack that followed on December 8, 2023, during which Aryeh Thaler was injured, Plaintiffs Jeffrey Thaler, Karen Thaler, Zev Thaler, Eliyahu Thaler, Yosef Thaler, Pesha Thaler, A.T., L.T., R.T., and H.T. have suffered severe mental anguish and extreme emotional distress, and economic loss.

**WW.   The Morell Family**

1140.   Maoz Morell was a citizen of the United States and a resident of the State of Israel when he was killed by Hamas. He was 21 years old.

1141.   In April 2022, Maoz was drafted into the Israeli military's elite Paratroopers Brigade's reconnaissance unit.

1142.   On October 7, 2023, Maoz was on holiday. As soon as he learned of Hamas's attack on Israel, he collected his army equipment and rushed to the fighting underway in Re'im—the site

of the Nova Music Festival and a kibbutz of the same name, both of which were under heavy attack from Hamas terrorists.

1143. Maoz was relocated to Gaza, where he fought for seven weeks. During that time, he was only able to call home once. The voicemail he left for his mother spanned 11 seconds, and said: "Hi Mommy, it's Maoz. Everything is sababa [Hebrew slang for great]. That's it. I've updated you."

1144. Maoz was injured on February 15, 2024, while fighting in the southern Gaza Strip. He and his unit were positioned in an evacuated house when Hamas terrorists threw a grenade inside one of the rooms, injuring many of the soldiers situated there. Maoz, who was in a different room, immediately entered the room under attack and started administering medical support to the wounded.

1145. Once Maoz provided whatever support he could, he went up to the roof to assist those engaged in active combat with the Hamas terrorists on the ground who were continuing to attack.

1146. An Israeli tank providing cover fired at one of the buildings where the Hamas terrorists were located. The blast dispersed fragmentation, a large piece of which struck Maoz in his head, critically injuring him.

1147. While Maoz was in the hospital, hundreds of his friends came to visit him. His parents were told there was no hope for his recovery, but Maoz lived until February 19, 2024, when he succumbed to his wounds.

1148. Maoz's parents, Varda and Eitan Morell, bring this action on behalf of the Estate of Maoz Morell.

1149. Plaintiff Varda Morell also brings this action individually. She is a citizen of the

United States and is a resident of the State of Israel. She is the mother of Maoz Morell.

1150. Plaintiff Eitan Morell also brings this action individually. He is a citizen of the United States and is a resident of the State of Israel. He is the father of Maoz Morell.

1151. Varda and Eitan Morell also bring this action on behalf of their minor child, E.E.M. E.E.M. is a citizen of the United States and is a resident of the State of Israel. He is the brother of Maoz Morell.

1152. Varda and Eitan Morell also bring this action on behalf of their minor child, C.M. C.M. is a citizen of the United States and is a resident of the State of Israel. She is the sister of Maoz Morell.

1153. Plaintiff Shachar Yehuda Morell is a citizen of the United States and is a resident of the State of Israel. He is the brother of Maoz Morell.

1154. Plaintiff Mordechai Eliezer Menachem Morell is a citizen of the United States and is a resident of the State of Israel. He is the brother of Maoz Morell.

1155. Plaintiff Dov Yerachmiel Morell is a citizen of the United States and is a resident of the State of Israel. He is the brother of Maoz Morell.

1156. As a direct and foreseeable result of the October 7 Attack and the attack which followed on February 15, 2024, the Plaintiff Estate of Maoz Morell experienced conscious pain and suffering and suffered economic loss.

1157. As a direct and foreseeable result of the October 7 Attack and the attack that followed on February 15, 2024, in which Maoz Morell was murdered, Plaintiffs Varda and Eitan Morell, E.E.M., C.M., Shachar Yehuda Morell, Mordechai Eliezer Menachem Morell, and Dov Yerachmiel Morell have suffered severe mental anguish and extreme emotional distress, and economic loss.

**XX.   The Spitz Family**

1158.   Aaron Moshe Spitz was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas. He was 21 years old at the time.

1159.   Aaron was a combat soldier in the Givati Brigade.

1160.   Aaron was severely injured on February 27, 2024, while serving as a soldier in the Northern Gaza Strip. Aaron lost both of his legs and his right hand due to an explosion and was thought to be dead by fellow soldiers who observed the attack. Aaron had a weak pulse and was quickly evacuated and then air-lifted to Soroka Medical Center.

1161.   He underwent a complex and prolonged surgery while there. In total, Aaron received over 30 blood transfusions to save his life and was unconscious for 41 days before waking up.

1162.   Plaintiff Leah Spitz is a citizen of the United States and is a resident of the State of Israel. She is the mother of Aaron Moshe Spitz.

1163.   Plaintiff Gavriel Binyamin Spitz is a citizen of the United States and is a resident of the State of Israel. He is the father of Aaron Moshe Spitz.

1164.   Plaintiff Avital Miriam Spitz is a citizen of the United States and is a resident of the State of Israel. She is the sister of Aaron Moshe Spitz.

1165.   Plaintiff Leah Spitz also brings this action on behalf of Plaintiffs A.H.S., a minor child, as her legal guardian. A.H.S. is a citizen of the United States and is a resident of the State of Israel. She is the sister of Aaron Moshe Spitz.

1166.   Plaintiff Leah Spitz also brings this action on behalf of Plaintiff A.S.S., a minor child, as her legal guardian. A.S.S. is a citizen of the United States and is a resident of the State of Israel. She is the sister of Aaron Moshe Spitz.

1167.   Plaintiff Leah Spitz also brings this action on behalf of Plaintiff I.J.S., a minor child,

as his legal guardian. I.J.S. is a citizen of the United States and is a resident of the State of Israel. He is the brother of Aaron Moshe Spitz.

1168.   As a direct and foreseeable result of the October 7 Attack and the attack that followed on February 27, 2024, Plaintiff Aaron Moshe Spitz has suffered severe physical and mental anguish and extreme emotional distress, and economic loss.

1169.   As a direct and foreseeable result of the October 7 Attack and the attack that followed on February 27, 2024, during which Aaron Moshe Spitz was injured, Plaintiffs Leah Spitz, Gavriel Binyamin Spitz, Avital Miriam Spitz, A.H.S., A.S.S., and I.J.S. have suffered severe mental anguish and extreme emotional distress, and economic loss.

### YY.   The Shindman Family

1170.   Nadav Benjamin Shindman was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas. He was 21 years old at the time.

1171.   Nadav was a member of the Israeli armed forces on March 31, 2024.

1172.   On March 31, 2024, Nadav and his unit were in an armored vehicle evacuating the wounded when they were injured by an RPG. Nadav was injured by shrapnel and the shockwave of the RPG.

1173.   Nadav still has three pieces of shrapnel in his throat, four in his arm, and one in his knee. Nadav lives in constant pain, making daily tasks a challenge.

1174.   As a direct and foreseeable result of the October 7 Attack and the attack that followed on March 31, 2024, Plaintiff Nadav Benjamin Shindman has suffered severe physical and mental anguish and extreme emotional distress, and economic loss.

### ZZ.   The Zimbalist Family

1175.   Eliyahu Moshe Zimbalist, nicknamed "Eli Mo," was a citizen of the United States born in Silver Spring, Maryland, who was murdered by Hamas. He was 21 years old.

1176.   He was the fourth of seven children. His family moved to Israel in 2005 when he was two years old.

1177.   A member of the Israeli military's Combat Engineering Battalion 601, Eliyahu was killed by Hamas alongside seven fellow soldiers on June 15, 2024.

1178.   They were engaged in an operation targeting Hamas terrorist infrastructure in Rafah (in the southernmost part of the Gaza Strip) when their armored personnel carrier was hit by an anti-tank missile launched from a few meters away by Hamas terrorists. The missile hit the back section of their vehicle which held ammunition and caused a massive explosion.

1179.   As a member of the Combat Engineering Corps, Eliyahu's responsibilities included locating and destroying Hamas terrorist infrastructure such as tunnels and buildings used by terrorists.

1180.   On the Saturday morning of June 15, 2024, three soldiers came to Eliyahu's home to inform his family of his death. One of Eliyahu's sisters, Plaintiff Nechama Zimbalist, was in her own home about 25 miles away. Eliyahu's parents, Plaintiffs Simeon and Sara Zimbalist, did not want to send the soldiers to their daughter's house, fearing it would cause unnecessary panic among the residents in her community. Instead, Eliyahu's parents contacted their daughter's father-in-law, asking him to break the news to her personally. They also ensured that the news did not become public until the entire family had been informed.

1181.   Plaintiffs Simeon and Sara Zimbalist, both of whom are citizens of the United States, bring this action individually as Eliyahu's parents and on behalf of the Estate of Eliyahu Moshe Zimbalist.

1182.   Plaintiffs Simeon and Sara Zimbalist also bring this action on behalf of their minor daughters, Plaintiff S.Z. and Plaintiff B.Z., who are both citizens of the United States.

1183. Plaintiffs Simeon and Sara Zimbalist also bring this action as legal guardians of their son, Plaintiff A.Z., who is a citizen of the United States.

1184. Plaintiff Nechama Zimbalist is a citizen of the United States. She is the sister of Eliyahu Moshe Zimbalist.

1185. Plaintiff Aviva Zimbalist is a citizen of the United States. She is the sister of Eliyahu Moshe Zimbalist.

1186. Plaintiff Shira Zimbalist is a citizen of the United States. She is the sister of Eliyahu Moshe Zimbalist.

1187. As a direct and foreseeable result of the October 7 Attack and the attack that followed on June 15, 2024, the Plaintiff Estate of Eliyahu Moshe Zimbalist experienced conscious pain and suffering and suffered economic loss.

1188. As a direct and foreseeable result of the October 7 Attack and the attack that followed on June 15, 2024, in which Eliyahu Moshe Zimbalist was killed, Plaintiffs Simeon Zimbalist, Sara Zimbalist, Nechama Zimbalist, Aviva Zimbalist, Shira Zimbalist, A.Z., S.Z., and B.Z. have suffered severe mental anguish and extreme emotional distress, and economic loss.

### AAA. The Susskind Family

1189. Plaintiff Nathan Susskind was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas.

1190. Nathan was a soldier in the Israeli armed forces on October 7, 2023, when he was called up to Kibbutz Reim near Gaza. Once there, he encountered dead bodies everywhere. He then had to move on to Be'eri where he sought out Hamas terrorists and their entrapments. Nathan was tasked with looking for Hamas terrorists, its booby traps, its weaponry, and explosives, as well as corpses.

1191. On or about July 9, 2024, Nathan sustained a shrapnel wound during one of his

many encounters with Hamas terrorists in Gaza.

1192.  He was redeployed to Gaza in November 2024, where he has lost five comrades, and he himself has been shot at by Hamas and had near-misses with Hamas explosives on numerous occasions.

1193.  As a direct and foreseeable result of the October 7 Attack and continued violence perpetrated by Hamas, Plaintiff Nathan Susskind has experienced severe physical and mental anguish and extreme emotional distress, and economic loss.

### BBB.  The Tawil Family

1194.  Shelomo Tawil was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas. He was 27 years old at the time.

1195.  On October 7, 2023, Shelomo Tawil was an Israeli armed forces reservist. Following Hamas's invasion into Israel, Shelomo was called up to serve in the 646th Brigade.

1196.  Shelomo served in Gaza and Lebanon for over 170 days, from October 7, 2023, through March 29, 2024. He was part of the 646th Brigade's evacuation squad, clearing out damaged homes and bodies, including the bodies of dead friends.

1197.  As a direct and foreseeable result of the October 7 Attack, Plaintiff Shelomo Tawil has suffered severe mental anguish and extreme emotional distress, and economic loss.

### CCC.  The Benzakein Family

1198.  Plaintiff Eliezer Benzakein was a citizen of the United States and a resident of Israel when he was injured by Hamas.

1199.  Eliezer enlisted in the Israeli armed forces in 2018 and continues to serve.

1200.  On October 7, 2023, Eliezer was called into (and remains in) service with the Israeli military primarily along the border between Egypt and the southern portion of the Gaza Strip. While in Gaza, he personally was involved in firefights that left his fellow soldiers dead or severely

injured.

1201.   Since the attacks, Eliezer has sought help from a mental health professional, attending therapy weekly due to his experiences of seeing dead bodies, entering blood-soaked and ransacked homes, and his experiences in combat with Hamas terrorists. He has been diagnosed with PTSD, for which he takes medication. He continuously suffers from night terrors because of his experiences.

1202.   As a direct and foreseeable result of the October 7 Attack and continued violence perpetrated by Hamas, Plaintiff Eliezer Benzakein has experienced severe mental anguish and extreme emotional distress, and economic loss.

### DDD.   The Apelbaum Family

1203.   Plaintiff David Apelbaum is a citizen of the United States and a resident of the State of Israel.

1204.   Plaintiff Nechama Apelbaum is a citizen of the United States and a resident of the State of Israel. She is the wife of David Apelbaum.

1205.   David and Nechama Apelbaum resided in Okafim, Israel; however, on the night of October 6 into the morning of October 7, 2023, they were visiting friends in nearby Moshav Tifrach when rockets began to fall in the direct vicinity of Tifrach.

1206.   With rockets falling nearby and learning of the devastation occurring elsewhere in the Gaza Envelope and in their home of Okafim, the Apelbaums were overwhelmed with fear for their safety as they feared the terrorists would move from Okafim to Tifrach while rockets would continue to fall in Tifrach.

1207.   As a direct and foreseeable result of the October 7 Attack, Plaintiffs David and Nechama Apelbaum have suffered severe mental anguish and extreme emotional distress, and economic loss.

**EEE.   The Bing Family**

1208.   Plaintiff Michal Berger Bing is a citizen of the United States and a resident of the State of Israel.

1209.   Michal Berger Bing resided in Moshav Tifrach and was at her home on October 7, 2023, when the attack began.

1210.   When the attack began, rockets began to fall in the direct vicinity of Tifrach.

1211.   With rockets falling nearby and learning of the devastation occurring elsewhere in the Gaza Envelope, Michal feared the terrorists would continue their march to Tifrach.

1212.   Since October 7, 2023, Michal has sought assistance through one-on-one counseling, art therapy, play therapy, and support groups to address her fear and emotional trauma.

1213.   As a direct and foreseeable result of the October 7 Attack, Plaintiff Michal Berger Bing has suffered severe mental anguish and extreme emotional distress, and economic loss.

**FFF.   The Biton Family**

1214.   Plaintiff Elior Biton is a citizen of the United States and a resident of the State of Israel.

1215.   Plaintiff Elior Biton brings this action individually and on behalf of Plaintiffs E.S.N. and R.N., his minor children. Both E.S.N. and R.N. are citizens of the United States and residents of the State of Israel.

1216.   On October 7, 2023, Elior Biton and his two daughters were at home in Ashkelon when sirens began to go off indicating a barrage of rocket fire from Gaza.

1217.   Since October 7, Elior Biton and his two daughters have suffered from tightness in the chest, anxiety, panic, loss of security, and difficulty sleeping. They have sought psychiatric treatment.

1218.   As a direct and foreseeable result of the October 7 Attack, Plaintiffs Elior Biton,

E.S.N. and R.N. have suffered severe mental anguish and extreme emotional distress, and economic loss.

### GGG. The Kama Family

1219. Plaintiff Shachar Hanna Kama is a citizen of the United States and a resident of the State of Israel.

1220. As part of her national service, Shachar Hanna Kama was working as a teacher in Ofakim during the Jewish holiday of Simchat Torah.

1221. As the terrorists infiltrated portions of Okafim, Shachar could hear the gunshots and screaming, but she found herself stranded and alone on the road outside of Ofakim without a phone to call for help.

1222. Knowing what was likely taking place not far from her location, and recognizing that she was a young female walking alone on the road has resulted in psychological trauma.

1223. As a direct and foreseeable result of the October 7 Attack, Plaintiff Shachar Hanna Kama has suffered severe mental health anguish and extreme emotional distress, and economic loss.

### HHH. The Kassel Family

1224. Plaintiff Chana Rachel Kassel is a citizen of the United States and a resident of the State of Israel.

1225. Plaintiff Chana Rachel Kassel brings this action individually.

1226. Plaintiff Chana Rachel Kassel also brings this action on behalf of Plaintiff M.S.K., a minor child, as his legal guardian. M.S.K. is a citizen of the United States and resident of the State of Israel. M.S.K. is the son of Chana Rachel Kassel.

1227. Plaintiff Chana Rachel Kassel also brings this action on behalf of Plaintiff Sh.K., a minor child, as his legal guardian. Sh.K. is a citizen of the United States and resident of the State

of Israel. Sh.K. is the son of Chana Rachel Kassel.

1228. Plaintiff Chana Rachel Kassel also brings this action on behalf of Plaintiff S.K., a minor child, as her legal guardian. S.K. is a citizen of the United States and resident of the State of Israel. S.K. is the daughter of Chana Rachel Kassel.

1229. Plaintiff Chana Rachel Kassel also brings this action on behalf of Plaintiff D.C.K., a minor child, as his legal guardian. D.C.K. is a citizen of the United States and resident of the State of Israel. D.C.K. is the son of Chana Rachel Kassel.

1230. Plaintiff Chana Rachel Kassel also brings this action on behalf of Plaintiff Av.K., a minor child, as his legal guardian. Av.K. is a citizen of the United States and resident of the State of Israel. Av.K. is the son of Chana Rachel Kassel.

1231. Plaintiff Chana Rachel Kassel also brings this action on behalf of Plaintiff Y.Y.K., a minor child, as his legal guardian. Y.Y.K. is a citizen of the United States and resident of the State of Israel. Y.Y.K. is the son of Chana Rachel Kassel.

1232. Plaintiff Chana Rachel Kassel also brings this action on behalf of Plaintiff AhK., a minor child, as his legal guardian. Ah.K. is a citizen of the United States and resident of the State of Israel. Ah.K. is the son of Chana Rachel Kassel.

1233. Plaintiff Chana Rachel Kassel also brings this action on behalf of Plaintiff E.K., a minor child, as his legal guardian. E.K. is a citizen of the United States and resident of the State of Israel. E.K. is the son of Chana Rachel Kassel.

1234. Plaintiff Chana Rachel Kassel also brings this action on behalf of Plaintiff B-S.K., a minor child, as her legal guardian. B-S.K. is a citizen of the United States and resident of the State of Israel. B-S.K. is the daughter of Chana Rachel Kassel.

1235. Plaintiff Chana Rachel Kassel also brings this action on behalf of Plaintiff Ye.K., a

minor child, as his legal guardian. Ye.K. is a citizen of the United States and resident of the State of Israel. Ye.K. is the son of Chana Rachel Kassel.

1236.   Chana Rachel Kassel was at home with her children in Okafim, Israel, on October 7, 2023.

1237.   As terrorists infiltrated Ofakim, Chana and her children feared for their lives as they heard rockets and gunfire in the area surrounding their home not knowing if their home would be the next one to be attacked.

1238.   Chana and her children continue to live in fear, and her children have difficulty sleeping alone at night as a result of their experiences on October 7.

1239.   As a direct and foreseeable result of the October 7 Attack, Plaintiffs Chana Rachel Kassel, M.S.K., Sh.K., S.K., D.C.K., Av.K., Y.Y.K., Ah.K., E.K., B-S.K., and Ye.K. have suffered severe mental anguish and extreme emotional distress and economic loss.

**III.   The Koskas Family**

1240.   Plaintiff Barak Koskas is a citizen of the United States and a resident of the State of Israel.

1241.   Barak Koskas resides in Ashkelon. On October 7, 2023, he feared for his life as rockets began to rain down on the areas around Ashkelon and the proximity of Ashkelon to the Gaza Envelope and the infiltrating terrorists made that fear even more palpable.

1242.   Since October 7, 2023, Barak has sought medical and psychological treatment as he has had extreme difficulty sleeping at night and has experienced nightmares about October 7 even when he is able to sleep.

1243.   As a direct and foreseeable result of the October 7 Attack, Plaintiff Barak Koskas has suffered mental anguish and extreme emotional distress and economic loss.

**JJJ.   The Russek Family**

1244. Plaintiff Naomi Russek is a citizen of the United States and a resident of the State of Israel.

1245. Plaintiff Naomi Russek brings this action individually and also on behalf of Plaintiffs R.R., S.R., T.R., A.R., Ef.R., C.P.R., M.H.R., Ep.R., and Av.R., her minor children who are all citizens of the United States and residents of the State of Israel.

1246. On October 7, 2023, Naomi Russek was at her home in Ofakim with her nine children when the attacks began.

1247. Naomi and her children collectively sheltered in place in their home as terrorists infiltrated Ofakim and she could hear shooting and screaming within her vicinity.

1248. The events of October 7 have impacted the Russek family tremendously as Naomi and her children have sought psychological treatment to try and cope with the emotional strain and trauma caused by the October 7 Attack.

1249. As a direct and foreseeable result of the October 7 Attack, Plaintiffs Naomi Russek, R.R., S.R., T.R., A.R., Ef.R., C.P.R., M.H.R., Ep.R., and Av.R. have suffered severe mental anguish and extreme emotional distress, and economic loss.

**KKK. The Knoller Family**

1250. Nadav Knoller was a citizen of the United States when he was murdered by Hamas. He was 30 years old.

1251. Nadav Knoller was in Gaza on July 1, 2024, as part of Battalion 121 of the Eighth Brigade of the Israeli armed forces when he was killed in combat.

1252. Nadav Knoller was killed by a planted explosive device in the Netzarim Corridor in Gaza.

1253. Plaintiff Eli Knoller is a citizen of the United States and a resident of the State of Israel. He is the father of Nadav Knoller.

1254.  Plaintiff Eli Knoller brings this action individually, and as the proposed Personal Representative of the Estate of Nadav Knoller.

1255.  Plaintiff Roseanne Greenwald Knoller is a citizen of the United States and a resident of the State of Israel. She is the mother of Nadav Knoller.

1256.  Plaintiff Hadar Knoller is a citizen of the United States and a resident of the State of Israel. She is the widow of Nadav Knoller.

1257.  Plaintiff Hadar Knoller brings this action individually and on behalf of Y.K., a minor child. Y.K. is a citizen of the United States and a resident of Israel. Y.K. is the son of Nadav Knoller.

1258.  Plaintiff Yuval Knoller is a citizen of the United States and a resident of the State of Israel. He is the brother of Nadav Knoller.

1259.  Plaintiff Ortal Knoller is a citizen of the United States and a resident of the State of Israel. She is the sister of Nadav Knoller.

1260.  Plaintiff Itai Knoller is a citizen of the United States and a resident of the State of Israel. He is the brother of Nadav Knoller.

1261.  Plaintiff Gilit Knoller Stzrigler is a citizen of the United States and a resident of the State of Israel. She is the sister of Nadav Knoller.

1262.  As a direct and foreseeable result of the October 7 Attack and the attack that followed on July 1, 2024, the Plaintiff Estate of Nadav Knoller experienced conscious pain and suffering and suffered economic loss.

1263.  As a direct and foreseeable result of the October 7 Attack and the attack that followed on July 1, 2024, during which Nadav Knoller was killed, Plaintiffs Eli Knoller, Roseanne Greenwald Knoller, Hadar Knoller, Y.K., Yuval Knoller, Ortal Knoller, Itai Knoller, and Gilit

Knoller Stzrigler have suffered severe mental anguish and extreme emotional distress, and economic loss.

**LLL.  The Messner Family**

1264.  Plaintiff David Messner was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas.

1265.  From 2023 to 2024, David served as a soldier in the Israeli armed forces. On May 15, 2024, David was involved in a firefight with Hamas terrorists in Gaza in which his company commander was shot in the head and killed. David was in immediate danger due to his proximity to Hamas terrorists.

1266.  During his time in Gaza, David was under constant duress from Hamas rockets, IEDs, grenades, and other munitions being fired at him and his unit.

1267.  Since his discharge from the Israeli armed forces, David has sought help from a mental health professional, attending therapy sessions weekly, but he has suffered from substance abuse as a result of his emotional trauma while in Gaza.

1268.  As a direct and foreseeable result of the October 7 Attack and his subsequent deployment to Gaza to fight against Hamas, Plaintiff David Messner has experienced severe mental anguish and extreme emotional distress, and economic loss.

**MMM.      The Holtzman Family**

1269.  Plaintiff Aharon Holtzman was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas.

1270.  On October 7, 2023, Aharon was a soldier for the Israeli military engaging with Hamas terrorists in Kissufim near the border with Gaza. During the attack, he was in immediate danger due to his close proximity to Hamas terrorists in which he experienced shootings, mortar attacks, and rocket attacks for the next three days while trying to maintain security in Kissufim.

1271.  For the next month, Aharon was engaged in operations in Gaza and the Gaza Envelope in which he was on a constant state of alert for Hamas terrorists. From the middle of November 2023 to August 2024, Aharon fought against Hamas terrorists in Gaza where he witnessed other members of his unit be killed in the fighting.

1272.  He also served in areas within Lebanon and Syria following the October 7 Attack where he continued fighting terrorists while witnessing unimaginable violence.

1273.  As a direct and foreseeable result of the October 7 Attack and continued violence perpetrated by Hamas and Hezbollah, Plaintiff Aharon Holtzman has experienced severe mental anguish and extreme emotional distress, and economic loss.

**NNN.  The Sapir Family**

1274.  Plaintiff Shilo Sapir was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas.

1275.  Shilo enlisted in the Israeli military on December 29, 2022, and continues to serve as a soldier to this day.

1276.  Shilo was an active-duty soldier on October 7, 2023, and was immediately placed in the kibbutzim that were under attack in the Gaza Envelope where he witnessed dead bodies along with burned houses. He remained in the area as part of the protection force for the kibbutzim for several weeks after the October 7 Attack. When he was subsequently deployed into Gaza, Shilo was involved in active combat against Hamas terrorists. Shilo inhaled numerous toxins such as burnt gunpowder and rubble dust, which led to lung infections. This resulted in him being in the army hospital for about two weeks.

1277.  Once released from the hospital, he was back on the frontlines in Gaza where he was almost hit with shrapnel and gunshots or explosives multiple times for several months. These events have led to trauma, sleep disorders, and sensitivity to sounds.

1278.   He later was readmitted to the hospital after breaking his ankle in Lebanon when he walked into a trap set by terrorists operating along the Lebanese border. After being treated at the hospital, he underwent three months of rehabilitation and recuperation for his broken ankle.

1279.   As a direct and foreseeable result of the October 7 Attack and continued violence perpetrated by Hamas, Plaintiff Shilo Sapir has experienced physical and mental anguish and extreme emotional distress, and economic loss.

**OOO.  The Azulai Family**

1280.   Plaintiff Tayyir Azulai is a citizen of the United States and a resident of the State of Israel.

1281.   Tayyir Azulai was at home with her family in Moshav Yevul, Israel, on October 7, 2023.

1282.   Plaintiff Tayyir Azulai brings this action individually.

1283.   Plaintiff Tayyir Azulai also brings this action on behalf of Plaintiff L.A., a minor child, as his legal guardian. L.A. is a citizen and resident of the State of Israel. L.A. is the son of Tayyir Azulai.

1284.   Plaintiff Tayyir Azulai also brings this action on behalf of Plaintiff H.A., a minor child, as her legal guardian. H.A. is a citizen and resident of the State of Israel. H.A. is the daughter of Tayyir Azalai.

1285.   Plaintiff Tayyir Azulai also brings this action on behalf of Plaintiff T.A., a minor child, as her legal guardian. T.A. is a citizen and resident of the State of Israel. T.A. is the daughter of Tayyir Azulai.

1286.   Plaintiff Tayyir Azulai also brings this action on behalf of Plaintiff Y.A., a minor child, as her legal guardian. Y.A. is a citizen and resident of the State of Israel. Y.A. is the daughter of Tayyir Azuali.

1287.   As a direct and foreseeable result of the October 7 Attack, Plaintiff Tayyir Azulai has suffered severe mental anguish and extreme emotional distress, and economic loss.

1288.   As a direct and foreseeable result of the October 7 Attack on their mother, Plaintiffs L.A., H.A., T.A., and Y.A. have suffered severe mental anguish and extreme emotional distress, and economic loss.

**PPP.   The Fayazi Family**

1289.   Plaintiff Leah Fayazi is a citizen of the United States and a resident of the State of Israel.

1290.   Plaintiff Ebrahim Fayazi is a citizen of the United States and a resident of the State of Israel. He is a son of Leah Fayazi.

1291.   Plaintiff Avigail Aharonov is a citizen of the United States and a resident of the State of Israel. She is a daughter of Leah Fayazi.

1292.   Plaintiff Malka Michael is a citizen of the United States and a resident of the State of Israel. She is a daughter of Leah Fayazi.

1293.   Plaintiff Shlomo Fayazi is a citizen of the United States and a resident of the State of Israel. He is a son of Leah Fayazi.

1294.   Plaintiff Shlomo Fayazi also brings this action on behalf of Plaintiff L.F., a minor child, as her legal guardian. L.F. is a citizen of the United States and a resident of the State of Israel. L.F. is the daughter of Shlomo Fayazi.

1295.   Plaintiff Shlomo Fayazi also brings this action on behalf of Plaintiff Yi.F., a minor child, as his legal guardian. Yi.F. is a citizen of the United States and a resident of the State of Israel. Yi.F. is the son of Shlomo Fayazi.

1296.   Plaintiff Naomi Aronof is a citizen of the United States and a resident of the State of Israel. She is a daughter of Leah Fayazi.

1297.   Plaintiff Hadassa Mizrachi is a citizen of the United States and a resident of the State of Israel. She is a daughter of Leah Fayazi.

1298.   Plaintiff Elisheva Haziza is a citizen of the United States and a resident of the State of Israel. She is a daughter of Leah Fayazi.

1299.   Plaintiff David Fayazi is a citizen of the United States and a resident of the State of Israel. He is a son of Leah Fayazi.

1300.   Plaintiff Ayala Peretz is a citizen of the United States and a resident of the State of Israel. She is a daughter of Leah Fayazi.

1301.   Plaintiff Yocheved Fayazi is a citizen of the United States and a resident of the State of Israel. She is a daughter of Leah Fayazi.

1302.   Plaintiff Leah Fayazi brings this action on behalf of Plaintiff Yo.F., a minor child, as his legal guardian. Yo.F. is a citizen of the United States and a resident of the State of Israel. He is a son of Leah Fayazi.

1303.   Prior to October 7, 2023, the Fayazi family—consisting of Leah Fayazi, 11 of her children, and two of her grandchildren—converged on the Israeli town of Sderot near the Gaza border to celebrate the Jewish holiday of Simchat Torah together.

1304.   Alarms and sirens began sounding in the early morning of October 7, 2023, and the family began to desperately search for one another in Sderot as rockets began flying overhead and landing nearby.

1305.   Soon thereafter, terrorists began to infiltrate Sderot, shooting in all directions, and the Fayazi family members sought to escape and flee from the terrorist attack.

1306.   The Fayazi family members have undergone psychological treatment to attempt to address the emotional trauma they experienced on that day.

1307.   As a direct and foreseeable result of the October 7 Attack, Plaintiffs Leah Fayazi, Ebrahim Fayazi, Avigail Aharonov, Malka Michael, Shlomo Fayazi, L.F., Yi.F., Naomi Aronof, Hadassa Mizrachi, Elisheva Haziza, David Fayazi, Ayala Peretz, Yocheved Fayazi, and Yo.F. have suffered severe mental anguish and extreme emotional distress, and economic loss.

### QQQ.  The Hordiner Family

1308.   Plaintiff Chaya Mushka Hordiner is a citizen and resident of the United States.

1309.   On October 7, 2023, Chaya Mushka Hordiner was stationed at an Israeli military base in the northern part of Israel.

1310.   In approximately September 2024, Chaya was repositioned near and in Gaza where she operated and read drone information over Gaza.

1311.   Because of her proximity to the fighting, Chaya was constantly in the line of fire for rockets being fired from Gaza and also shooting from terrorists within Gaza while also obtaining visuals of precisely what was taking place on the ground in Gaza through her piloting of drones.

1312.   Chaya has been emotionally traumatized by her experiences both within the zone of danger on the ground in Gaza and from what she witnessed as a drone pilot.

1313.   As a direct and foreseeable result of the October 7 Attack and the subsequent Israeli action in Gaza, Plaintiff Chaya Mushka Hordiner has suffered severe mental anguish and extreme emotional distress, and economic loss.

### RRR.  The (David) Tawil Family

1314.   Plaintiff David Tawil is a citizen of the United States and a resident of the State of Israel.

1315.   David Tawil served in Gaza in the Israeli armed forces reserves for several two-month periods from October 2023 through the present where he was engaged with gunfire,

grenades, and rockets, and he also encountered IEDs emplaced by terrorists within Gaza.

1316.  As a direct and foreseeable result of the October 7 Attack and the subsequent Israeli action in Gaza, Plaintiff David Tawil has suffered severe mental anguish and extreme emotional distress, and economic loss.

**SSS.   The Kassin Family**

1317.  Plaintiff Naomi Rachel Kassin is a citizen of the United States and a resident of the State of Israel.

1318.  Naomi Rachel Kassin was visiting cousins in Ofakim for the Simchat Torah holiday.

1319.  On the morning of October 7, 2023, Naomi and her cousins heard the sirens indicating rocket fire and then later heard gunfire and screaming. She saw terrorists roaming the streets in Ofakim, so she hid in the house.

1320.  As a result of the fear that she experienced on October 7, 2023, Naomi would not go outside for nearly a month and a half after the attacks.

1321.  She has sought psychological treatment to address the fear that continues to overtake her.

1322.  As a direct and foreseeable result of the October 7 Attack, Plaintiff Naomi Rachel Kassin has suffered severe mental anguish and extreme emotional distress, and economic loss.

**TTT.   The Berger Family**

1323.  Plaintiff Lisa Berger is a citizen of the United States and a resident of the State of Israel.

1324.  On the morning of October 7, 2023, Lisa Berger was at her home in Ofakim when rocket sirens began to blare.

1325.  The sirens and rockets were then accompanied by the sounds of gunfire and

screaming as terrorists infiltrated Ofakim which was the furthest east point of terrorist infiltration on October 7, 2023.

1326. As a result of the October 7 Attack, Lisa was displaced from her home in Ofakim without designated shelter, and she has undergone various different types of therapy to address the emotional wounds she experienced that day including group therapy, art therapy, and play therapy.

1327. As a direct and foreseeable result of the October 7 Attack, Plaintiff Lisa Berger has suffered severe mental anguish and extreme emotional distress, and economic loss.

### UUU. The Saffer Family

1328. Plaintiff Devorah Rachel Saffer is a citizen of the United States and a resident of the State of Israel.

1329. On October 7, 2023, Devorah Rachel Saffer was at her home in Maslool, Israel, a moshav immediately west of the town of Ofakim and approximately 15 miles from the Gaza border.

1330. Four young women who had fled from the Nova Music Festival came to Devorah's home and began to frantically tell her what had happened at the festival.

1331. Recognizing that the young women might have been followed by the terrorists, Devorah experienced a panic attack as fear washed over her.

1332. As the anticipation of the potential infiltration of Maslool overtook her, Devorah continued to experience panic attacks which continued for two weeks after October 7.

1333. As a direct and foreseeable result of the October 7 Attack, Plaintiff Devorah Rachel Saffer has suffered severe mental anguish and extreme emotional distress, and economic loss.

### VVV. Katzin Family

1334. Plaintiff Haim Katzin is a citizen of the United States and a resident of the State of Israel.

1335. On the morning of October 7, 2023, Haim Katzin was with friends in Sderot near the Gaza border.

1336. When the attack began, Haim could not remember where he was; all he could remember was shooting from the terrorists and screaming, and then he ran.

1337. With the adrenaline, his friends later told him that he fell down the stairs as they sought to escape the oncoming terrorists, and he subsequently required two months to recover from the injuries he sustained in his fall that did not come to light until nearly a week after the fact.

1338. Haim has sought psychological treatment in the aftermath of his experience in escaping from the terrorists who were infiltrating Sderot on October 7.

1339. As a direct and foreseeable result of the October 7 Attack, Plaintiff Haim Katzin has suffered severe physical and mental anguish and extreme emotional distress, and economic loss.

**WWW.    Israel Katzin**

1340. Plaintiff Israel Katzin is a citizen of the United States and a resident of the State of Israel.

1341. On October 7, 2023, Israel Katzin was with cousins and friends in Ashkelon when he heard sirens and saw rockets falling close by to where he was. He also heard gunfire in the distance and proceeded to hide at his cousin's house for a full day fearful that the terrorists would attack Ashkelon, which was the closest large Israeli city to Gaza.

1342. Israel Katzin has sought psychological treatment as a result of the October 7 Attack, and he has also been diagnosed with a sleep disorder related to his psychological trauma.

1343. As a direct and foreseeable result of the October 7 Attack, Plaintiff Israel Katzin has suffered severe mental anguish and extreme emotional distress, and economic loss.

**XXX.  The Frank Family**

1344.   Plaintiff Yonatan Frank is a citizen of the United States and a resident of the State of Israel.

1345.   Yonatan Frank was at his home in Ofakim on October 7, 2023. As set forth in a psychiatric report issued following the attack, Yonatan was exposed to the infiltration of Hamas terrorists into Ofakim, and since that time, he suffers from Adjustment Disorder with Anxiety.

1346.   As a direct and foreseeable result of the October 7 Attack, Plaintiff Yonatan Frank has suffered severe mental anguish and extreme emotional distress, and economic loss.

**YYY.   The Cohen Family**

1347.   Sandra Cohen was a citizen and resident of the State of Israel when she was injured on October 7, 2023, by Hamas.

1348.   Plaintiff Natali Rotches is a citizen and resident of the United States. She is the sister of Sandra Cohen.

1349.   Sandra Cohen and her husband Ohad Cohen and their three children lived in Kibbutz Be'eri, but on October 7, 2023, their world changed forever.

1350.   As terrorists infiltrated Be'eri, the Cohen family retreated into their safe room; however, terrorists fired multiple shots through the safe-room door severely injuring Ohad and then set the house on fire.

1351.   As the family exited their safe room, Ohad took yet another bullet for his family and was killed in front of his wife and children.

1352.   Sandra and Ohad's baby daughter M.C. was killed when a terrorist's bullet went through Sandra's arm and into M.C.'s head killing her while she was being held by her mother when they were still in the safe room.

1353.   By the time the ordeal was over and Israeli forces had overtaken the terrorists in Be'eri, Sandra had been shot four times in the lungs and multiple times to her extremities placing

her in a precarious life-or-death situation.

1354. Plaintiff Natali Rotches immediately flew to Israel to assist her sister in whatever manner possible and to try and be there for her two nephews who had lost their father and sister and almost lost their mother.

1355. As a direct and foreseeable result of the October 7 Attack and the injuries to Sandra Cohen, Plaintiff Natali Rotches has suffered severe mental anguish and extreme emotional distress, and economic loss.

### ZZZ. The Karten Family

1356. Plaintiff Jonathan Karten was a citizen of the United States and a resident of Israel when he was injured in attacks by Hamas.

1357. Jonathan Karten was a reserve soldier in the Israeli military who was activated and deployed to Gaza after October 7, 2023. He was clearing houses of terrorists and booby traps when his unit was hit with an IED, killing Jonathan's friend and spraying Jonathan with shrapnel to his lower back and glutes and causing bulging discs in his lumbar spine.

1358. Jonathan returned to Gaza a week later in the capacity of a member of the explosives ordnance disposal team in the Khan Younis, Sajaiya, and Beit Hanoun areas of the Gaza Strip where he experienced additional rocket attacks and trauma.

1359. He subsequently was stationed in the West Bank where he was involved in the arrest of Hamas activists who had stolen a car that they had loaded with Hamas paraphernalia along with explosives.

1360. As a direct and foreseeable result of the October 7 Attack and continued violence perpetrated by Hamas, Plaintiff Jonathan Karten has experienced severe physical and mental anguish and extreme emotional distress, and economic loss.

### AAAA. The Kassin Family

1361. Ezra Kassin is a citizen of the United States and a resident of the State of Israel.

1362. Plaintiff Ezra Kassin brings this action individually and also on behalf of Plaintiff E.K., his minor child. E.K. is a citizen of the United States and a resident of the State of Israel.

1363. On the morning of October 7, 2023, Ezra Kassin was in Ashkelon with E.K. when sirens began to wail indicating that rockets had been fired in the direction of Ashkelon.

1364. In the midst of the chaos that ensued, Ezra and his son heard gunfire, saw the rockets falling, and believed they saw terrorists in the street in Ashkelon. They hid in a friend's house for 12 hours before Israeli forces arrived.

1365. Since the October 7 Attack, Ezra and E.K. have received psychological treatment for the emotional trauma they endured. E.K. suffers from a massive sleep disorder and ear disturbances since the October 7 Attack.

1366. As a direct and foreseeable result of the October 7 Attack, Plaintiffs Ezra Kassin and E.K. have suffered severe mental anguish and extreme emotional distress, and economic loss.

### BBBB. The Blisko Family

1367. Plaintiff Samuel Blisko was a citizen of the United States and a resident of Israel when he was injured by Hamas.

1368. Samuel was a reservist with the Israeli military on October 7, 2023, and subsequently served in Gaza, Syria, and Lebanon following the Hamas attacks on October 7.

1369. As a direct and foreseeable result of the October 7 Attack and his subsequent deployment to Gaza, Syria, and Lebanon to fight against Hamas, Plaintiff Samuel Blisko has experienced severe mental anguish and extreme emotional distress, and economic loss.

### CCCC. The Friedman Family

1370. Plaintiff Joshua Friedman is a citizen of the United States and a resident of Israel.

1371. He was called up for reserve duty immediately on October 7, 2023, and has served

continuously since, including multiple combat deployments to Gaza. On October 7, 2023, Joshua was deployed to the Sdei Teyman military base. He drove there in his private vehicle, dodging rockets that struck along the route. His unit mobilized with little time and severely inadequate equipment, and he deployed to Sderot on October 8, 2023, where he encountered a scene of mass devastation — bodies, burnt strollers, and visibly bloodstained streets, with active Hamas terrorists still roaming the city and firing at rescue forces.

1372.   His unit had no access to bomb shelters and slept on the floor of a park while maintaining watch for active shooters in the area. Units positioned near Joshua suffered direct casualties, including two soldiers killed by a rocket strike and others killed in a Hamas ambush.

1373.   While on guard duty in Sderot, Joshua came under machine gun fire. His weapon jammed repeatedly, and while pinned down, he sent goodbye messages to his wife, children, parents, and siblings via WhatsApp.

1374.   Joshua subsequently participated in the first wave of the Israeli counter-incursion into Gaza, passing through the Erez Crossing, where he witnessed more aftermath of the October 7 massacres, including bloody fingerprints left by victims on the walls. His unit traversed Hamas-dug trenches designed to funnel soldiers into kill zones and crossed a minefield that was not identified by sappers until Joshua and his unit were already inside it. Joshua left his unit temporarily in November 2023 after experiencing severe emotional strain but eventually returned in August 2024 and continued to serve through the summer of 2025. During that period, his unit sustained 12 casualties from IEDs and snipers.

1375.   Joshua has been officially recognized by the Israeli Ministry of Defense as having PTSD because of his combat service. He receives treatment including psychiatric care, psychological therapy, and medication.

1376.   Joshua's PTSD has profoundly disrupted his family and professional life. He experiences heightened aggression and emotional dysregulation at home, requiring his wife to physically remove him from family situations. His business has collapsed because of his condition.

1377.   Plaintiff Lauren Friedman is a citizen of the United States and a resident of Israel. She is Joshua's wife. Lauren experienced the October 7 Attack and its aftermath as a spouse with very young children whose husband was rushed to Israel's southern border in the midst of an ongoing catastrophe. During Joshua's deployments, Lauren had no direct communication with him for weeks at a time, learning of events only through news reports. She received Joshua's goodbye WhatsApp messages while he was under fire in Sderot and expected him to die.

1378.   Lauren is currently experiencing PTSD symptoms including progressive loss of vision and hearing, and involuntary teeth grinding. Her neurologist, hearing specialist, and dentist have each independently attributed her physical symptoms to PTSD, and she is undergoing formal psychiatric evaluation. The Ministry of Defense has further determined that Lauren serves as Joshua's designated caregiver.

1379.   Lauren managed all childcare alone throughout Joshua's multiple extended deployments, including during a medical crisis involving their youngest child, who required emergency room visits on multiple occasions in connection with preoperative complications leading up to hernia surgery.

1380.   Plaintiffs Joshua and Lauren Friedman also bring this action on behalf of their minor children, R.Y.F., R.E.F., and E.T.H.F., who are citizens of the United States and residents of Israel. They have been deeply affected by the ongoing conflict and their father's prolonged and repeated absences. They exhibit persistent anxiety, asking their parents about sirens whenever they hear a loud noise, and repeatedly asking Joshua about the war. Each time Joshua leaves home, the

children fear he has been deployed again and will not return.

1381.   As a direct and foreseeable result of the October 7 Attack, Plaintiffs Joshua Friedman, Lauren Friedman, R.Y.F., R.E.F., and E.T.H.F. have experienced severe mental anguish, extreme emotional distress, and economic loss.

**DDDD. The Kedem Family**

1382.   Plaintiff Sela Kedem is a citizen of the United States and the State of Israel and a resident of the State of Israel.

1383.   On October 7, 2023, Sela was called up for emergency reserve military service and deployed to Kibbutz Kfar Aza located on the Israeli border with the Gaza Strip. His unit's mission was to rescue surviving families trapped in the kibbutz occupied by Hamas forces.

1384.   Sela's unit arrived at Kfar Aza at approximately 3:00 p.m. on October 7, 2023, with a force of eight soldiers in two armored vehicles. They entered through the neighborhood on the east side of the kibbutz—an area that had seen little Israeli military presence—to reach families in need of rescue on the far side of the kibbutz.

1385.   As Sela's unit traversed a central square within the kibbutz, they were ambushed. Hamas terrorists had positioned themselves on two sides of the square, anticipating that Israeli forces would have to pass through it. The lead vehicle was struck by an RPG and disabled. The soldiers in that vehicle took cover in a nearby house and attempted to engage the terrorists from inside. Sela's vehicle was caught in the open, approximately five meters behind, when terrorists opened fire from multiple directions.

1386.   The driver of Sela's vehicle exited the vehicle to engage terrorists on one side and was shot. Seeing that his fellow soldier had been wounded and was still exposed to gunfire, Sela exited his vehicle in an effort to rescue him. As Sela reached the driver and attempted to lift him

by his vest, Sela was shot in the back. A single bullet penetrated his liver and severed three ligaments in his spinal cord, causing immediate and catastrophic injury.

1387.   The driver died in Sela's arms. Unable to move, Sela lay beside his fallen comrade for over an hour, awaiting evacuation. During that time, he was shot four additional times—in the head, hand, and right leg—by Hamas terrorists who used Russian-manufactured bullets that, upon penetration, fragmented into hundreds of metal shards, causing severe internal damage throughout his body.

1388.   Sela was eventually evacuated by helicopter to Soroka Medical Center, where he fell into a coma. He did not regain consciousness until October 14, 2023.

1389.   He was subsequently transferred to Tel HaShomer Hospital, where he underwent eleven surgical operations. The bullet and shrapnel damage to his lower spinal cord—at the L2, L3, and L4 vertebral levels—left him with severe and chronic pain throughout his back and legs.

1390.   Sela spent approximately one year confined to a wheelchair before regaining the ability to walk with the assistance of a medical device. He continues to require rehabilitation. He suffers from severe chronic pain and PTSD because of the October 7 Attack.

1391.   As a direct and foreseeable result of the October 7 Attack, Plaintiff Sela Kedem has experienced severe physical injury and mental anguish, extreme emotional distress, and economic loss.

### EEEE. The Navon Family

1392.   Elkana Navon was a citizen of the United States born on October 12, 2003, in Dallas, Texas, and a resident of the State of Israel when he was killed by Hamas on August 31, 2024. He was 20 years old.

1393.   On August 31, 2024, in the mid-morning hours, Elkana was killed by Hamas

operatives in the city of Jenin during a military house clearing operation.

1394. Elkana was shot in the chest when he entered a residential home at the beginning of a firefight that lasted approximately 45 minutes.

1395. Elkana's parents, Shira Navon and Haim Refael Navon, bring this action on behalf of the Estate of Elkana Navon.

1396. Plaintiff Shira Navon also brings this action individually. She is a citizen of the United States and is a resident of the State of Israel. She is the mother of Elkana Navon.

1397. Plaintiff Haim Refael Navon also brings this action individually. He is a citizen of the United States and divides his time between Texas and the State of Israel. He is the father of Elkana Navon.

1398. Shira Navon and Haim Refael Navon also bring this action on behalf of their minor child, H.N., who is a citizen of the United States and a resident of the State of Israel. He is the brother of Elkana Navon.

1399. Shira Navon and Haim Refael Navon also bring this action on behalf of their minor child, E.N., who is a citizen of the United States and a resident of the State of Israel. He is the brother of Elkana Navon.

1400. Plaintiff Ayalah Navon is a citizen of the United States and is a resident of the State of Israel. She is the sister of Elkana Navon.

1401. Plaintiff Arye Navon is a citizen of the United States and is a resident of the State of Israel. He is the brother of Elkana Navon.

1402. As a direct and foreseeable result of the August 31, 2024, firefight in Jenin with Hamas operatives, the Estate of Elkana Navon experienced conscious pain and suffering and suffered economic loss.

1403.   As a direct and foreseeable result of the August 31, 2024, firefight in Jenin with Hamas operatives that caused the death of Elkana Navon, Plaintiffs Shira Navon, Haim Refael Navon, Ayalah Navon, Arye Navon, H.N., and E.N. have suffered severe mental anguish and extreme emotional distress, and economic loss.

**FFFF. The Ovadia Family**

1404.   Plaintiff Binyamin Ovadia is a citizen of the United States and a resident of Israel. He is originally from San Diego, California, and moved to Israel in 2013.

1405.   On October 7, 2023, Binyamin was called up for military service and was deployed to the area surrounding Kibbutz Be'eri, Kibbutz Kfar Aza, and the Erez crossing. He served with Yasar Darom, a specialized Israeli military unit established with the mission to ensure that every fallen soldier receives a proper burial with dignity and to recover the remains of casualties.

1406.   Following the initial response, Binyamin's role with Yasar Darom shifted into massive recovery and cleanup efforts. Since October 7, Yasar Darom service brought him to the burned homes of the Gaza border communities, the site of the Nova Festival massacre, bomb shelters and safe rooms where victims were slaughtered, and inside Gaza itself, recovering hundreds of bodies—soldiers and civilians alike—sometimes piece by piece, often under fire.

1407.   Binyamin's work included handling the remains of fallen soldiers and preparing them for burial, sifting through debris and wreckage, and conducting meticulous searches to recover even the smallest fragments of remains to ensure proper identification and burial according to Jewish law. This work required opening graves, searching construction sacks filled with debris, and working in areas converted by Hamas into military infrastructure, all while under constant threat.

1408.   Binyamin served with Yasar Darom for several hundred days, with a significant

part of that time spent in Gaza. His service with this unit meant continuous exposure to the devastating aftermath of the October 7 Attack.

1409.   Binyamin is now experiencing PTSD and is currently on medication to address his symptoms and he is seeing a psychologist. The trauma from his service has contributed to the dissolution of his marriage.

1410.   As a direct and foreseeable result of the October 7 Attack, Plaintiff Binyamin Ovadia has experienced severe mental anguish, extreme emotional distress, and economic loss.

**GGGG. The Simchony Family**

1411.   Plaintiff Liad Simchony is a dual citizen of the United States and the State of Israel and a resident of the State of Israel.

1412.   On October 7, 2023, Liad was at home when Hamas launched its massacre across southern Israel. The following day, he reported to his base at Tze'elim and found that his office had been destroyed by a rocket strike.

1413.   On October 10, 2023, Liad received an alert of an active terrorist infiltration at the base. He took responsibility for the female soldiers under his command, ordering them into a fortified safe room that quickly filled with dozens of soldiers. For approximately one hour, Liad remained with his charges in the cramped safe room, while explosions and alarms sounded outside.

1414.   On October 11, 2023, Liad traveled with his commanding officer and a soldier under his command to provide training to forces near Kibbutz Be'eri. Their route took them through the site of the Nova music festival massacre. Throughout the drive and at the festival site, Liad was exposed to piles of burned corpses and an overwhelming stench of burning. The road itself was red with blood. He passed burned and bullet-riddled vehicles while hearing RPG explosions during the drive. Liad experiencing intense nausea and anxiety throughout the entire

ride.

1415.   While conducting training at Be'eri, Liad's unit came under mortar fire. A soldier suffered an acute anxiety attack and froze, unable to evacuate to safety on her own. Liad dragged her to a relatively protected position, equipped her with a protective vest and helmet, and shielded her with his own body as explosions fell around them and the earth shook.

1416.   Beginning that night, Liad was unable to sleep, eat or drink. His trauma was further compounded on October 18, 2023, when he was shot in the leg in a friendly fire incident while training to enter Gaza. He was transported to Soroka Medical Center, where he received morphine and underwent two surgeries over the next week. He was conscious throughout the first of the procedures, experiencing and witnessing the surgery as it was performed.

1417.   Liad was diagnosed with severe PTSD in November 2023 and has since required continuous treatment. As part of his recovery, he has had to relearn basic life skills that his PTSD rendered him unable to perform. That recovery has been stymied during periods of renewed attacks against Israel and the attendant noise of increased aircraft activity.

1418.   As a direct and foreseeable result of the October 7 Attack, Plaintiff Liad Simchony has suffered severe physical injuries and severe mental anguish and extreme emotional distress, and economic loss.

1419.   Plaintiff Hilly Simchony is a citizen of the United States and a resident of the State of Israel. She is Liad's mother.

1420.   Plaintiff Zvi Simchony is a citizen of the United States and a resident of the State of Israel. He is Liad's father.

1421.   Plaintiff Eden Simchony is a citizen of the United States and a resident of the State of Israel. She is Liad's sister.

1422. As a direct and foreseeable result of the October 7 Attack and the injuries to Liad Simchony, Plaintiffs Hilly Simchony, Zvi Simchony, and Eden Simchony have suffered severe mental anguish and extreme emotional distress, and economic loss.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**CIVIL LIABILITY UNDER 18 U.S.C. § 2333(d) FOR AIDING AND ABETTING HAMAS, A FOREIGN TERRORIST ORGANIZATION, INCLUDING TO PERPETRATE THE OCTOBER 7 ATTACK AND KILL AND MAIM OTHERS THEREAFTER**

1423. Plaintiffs repeat and re-allege each allegation of paragraphs 1 through 1422 as if fully set forth herein.

1424. Plaintiffs were all injured by acts of international terrorism as defined by 18 U.S.C. § 2331.

1425. Plaintiffs were all injured by acts of international terrorism committed, planned, and/or authorized by FTO Hamas.

1426. Hamas had been designated an FTO as of the date of all the attacks alleged herein. (Hamas has been designated an FTO from 1997 to the present).

1427. Each Defendant aided and abetted Hamas in its commission of these acts of international terrorism that injured Plaintiffs, by knowingly providing substantial and vital assistance to Hamas from 2018 through October 7, 2023.

1428. Defendants substantially assisted Hamas by, *inter alia*, providing funding, access to property for terrorist usage (tunnels, command and control facilities, lodgings, tunnel excavation workshops, forward observation posts for surveillance, and weapons training grounds), and concealment of military infrastructure, including tunnels used to launch rockets on October 7, 2023.

1429.   Defendants also worked with Hamas to build military infrastructure under their properties, including attack tunnels.

1430.   Prior to October 7, Defendants provided electricity to Hamas and specifically to Hamas attack tunnels built under and into Defendants' properties.

1431.   Defendants provided services that legitimized Hamas and gave its operations under and within Defendants' properties greater protection from Israeli and U.S. action.

1432.   All of this assistance was beneficial to Hamas in sustaining its iron-fisted rule in Gaza and in committing acts of international terrorism.

1433.   Each Defendant understood its key role in helping fuel Hamas's illicit and violent activities and was generally aware that by providing substantial assistance to Hamas and its Qassam Brigades it was aiding and abetting Hamas's terrorist activities, but nonetheless continually assisted Hamas and its Qassam Brigades in their efforts.

1434.   The amount and extent of assistance each Defendant provided to Hamas and its Qassam Brigades—funding (in taxes, kickbacks, and fees), access to property for terrorist usage (infrastructure such as tunnels, command and control, rocket launching sites, lodging, and shelter for concealment of personnel and terrorist activities), electricity, and specifically to attack tunnels built under Defendants' properties (with their active assistance) and services that also legitimized Hamas and gave its operations at Defendants' properties greater protection from Israeli action— were all integral to Hamas's overall terrorist activities and the foreseeable acts of terrorism at issue.

1435.   Each Defendant knowingly provided this substantial assistance to Hamas for *more than a decade*.

1436.   Each Defendant knew that Hamas was an FTO and that it had consistently attacked Israel with rockets, infiltrations, kidnappings, suicide bombings, car-ramming attacks, shootings,

stabbings, and various other assorted acts of international terrorism, both before and after taking over the Gaza Strip in 2007, and that providing the funding and services described above would foreseeably aid Hamas in committing acts of international terrorism, including the October 7 Attack.

1437.   Defendants' knowing assistance to Hamas included acts undertaken in the United States, including, but not limited to, seeking and securing financing and insurance (as well as an appearance of legitimacy and diplomatic cover) from entities located in the United States, such as IFC and MIGA.

1438.   Defendants herein were important accomplices for Hamas and its Qassam Brigades, knowingly providing them with funding, electricity and assistance in developing their terrorist infrastructure – including, *inter alia*, attack tunnels, at and under their prestige properties, including those partially funded by U.S. and international aid agencies – and also engaging in joint ventures with Hamas, thereby lending it legitimacy while shielding important terror assets under (and inside) those properties.

## SECOND CLAIM FOR RELIEF

### CIVIL LIABILITY UNDER 18 U.S.C. § 2333(d) FOR DEFENDANTS' ROLE IN HAMAS'S CONSPIRACY, INCLUDING TO PERPETRATE THE OCTOBER 7 ATTACK AND KILL AND MAIM OTHERS THEREAFTER

1439.   Plaintiffs repeat and re-allege each allegation of paragraphs 1 through 1422 as if fully set forth herein.

1440.   Before and during the relevant period, Hamas formed a conspiracy whose objective was to launch a devastating mass casualty terrorist attack on Israel and retreat into Gaza with multiple Israeli hostages where its terrorist infrastructure, including hundreds of miles of attack

tunnels built under civilian infrastructure, would protect its operatives from Israeli military strikes, allow it to hide the hostages it had seized, and increase the civilian death toll in Gaza while simultaneously elevating the number of Israeli military casualties.

1441.   Defendants joined that conspiracy by knowingly agreeing to provide Hamas with civilian cover for its terrorist infrastructure, including attack tunnels under the GIE and the Blue Beach and Al Mashtal Hotels (while using the hotels themselves as command centers) as well as diplomatic and commercial cover for Qassam Brigades activity inside the GIE.

1442.   Defendants agreed to join with Hamas to participate in unlawful acts (violations of U.S. criminal laws, including 18 U.S.C. § 2339B) and to provide substantial assistance to Hamas in furtherance of the common scheme by which Defendants furthered Hamas's murderous objectives.

1443.   Defendants furthered the aims of the conspiracy by, *inter alia*, securing financing and insurance (as well as an appearance of legitimacy and diplomatic cover) from entities located in the United States, such as IFC and MIGA.

1444.   Defendants knew the objective of the conspiracy was to launch terrorist attacks against Israel and that their role was to provide material support for, and increase Hamas's capacity to, *inter alia*, commit terrorist attacks.

1445.   Defendants knew that by joining the conspiracy to provide material support to Hamas in the forms set forth herein they were contributing substantially to Hamas's capacity to commit terrorist attacks.

1446.   The terrorist attacks at issue were foreseeably committed in furtherance, and as foreseeable consequences, of the conspiracy.

1447.   Plaintiffs' injuries were a foreseeable and proximate result of the conspiracy and

overt acts made as part of the conspiracy.

**THIRD CLAIM FOR RELIEF**

**CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) FOR KNOWINGLY PROVIDING MATERIAL SUPPORT TO HAMAS IN VIOLATION OF 18 U.S.C. § 2339B(a)(1)**

1448.   Plaintiffs repeat and re-allege every allegation of paragraphs 1 through 1422 as if fully set forth herein.

1449.   Plaintiffs were injured in terrorist attacks (which were acts of international terrorism as defined by 18 U.S.C. § 2331) committed by Hamas, an FTO so-designated at the time each act of terrorism at issue occurred, and/or its agents (including other terrorist groups).

1450.   Defendants knowingly provided material support, as defined in 18 U.S.C. § 2339A(b)(1), to Hamas, an FTO designated under the Antiterrorism and Effective Death Penalty Act of 1996, in violation of 18 U.S.C. § 2339B(a)(1).

1451.   Defendants were fully aware of Hamas's terroristic nature, including its long-standing campaign of murder, suicide bombings, rocket attacks, kidnappings, and other acts of terrorism.

1452.   Defendants knew that Hamas had been designated an FTO by the Government of the United States.

1453.   Defendants' own actions on behalf of Hamas—which included knowingly providing use of properties, currency, safehouses, and services—were themselves "acts of international terrorism" under 18 U.S.C. § 2331(1).

1454.   First, they involved violent acts and acts dangerous to human life, namely assisting Hamas in attacking Israel and in providing terrorist and other infrastructure to Hamas (as well as helping to facilitate the October 7 Attack).

1455.   Second, they constituted violations of the criminal laws of the United States,

including 18 U.S.C. § 2339A(a)-(b) and 2339B(a)(1).

1456. Third, because Defendants knowingly provided property and vital services to a designated FTO responsible for *seriatim* mass terror campaigns using rockets and tunnels, Defendants' conduct objectively appeared to be intended to intimidate or coerce the civilian population of Israel, intimidate its government, or affect its conduct.

1457. Fourth, Defendants' conduct transcended national boundaries in terms of the means by which it was accomplished.

1458. Defendants provided material support to Hamas over an extended period of time, and their conduct was a substantial factor in the sequence of responsible causation of the attacks described herein. Plaintiffs' injuries were a reasonably foreseeable consequence of Defendants' conduct.

1459. By knowingly providing material support to a designated Foreign Terrorist Organization, Defendants are civilly liable for damages to Plaintiffs for their injuries pursuant to 18 U.S.C. § 2333(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a) Accept jurisdiction over this action;

(b) Enter judgment against each Defendant and in favor of Plaintiffs for compensatory damages in amounts to be determined at trial;

(c) Enter judgment against each Defendant and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333(a);

(d) Enter judgment against each Defendant and in favor of Plaintiffs for all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a); and

(e) Grant such other and further relief as justice requires.

## DEMAND FOR JURY TRIAL

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE

Dated:  June 22, 2026

**STACK FERNANDEZ & HARRIS, P.A.**

**By:**   **/s/ *Brian J. Stack***
**Brian J. Stack**
Fla. Bar No. 0476234
255 Alhambra Circle, Suite 330
Coral Gables, Florida 33134
Telephone: 305.371.0001
bstack@stackfernandez.com
Secondary email: mwolf@stackfernandez.com

*Local Counsel for All Plaintiffs*

**WILLKIE FARR & GALLAGHER LLP**
Lee Wolosky (admitted pro hac vice)
Andrew Lichtman (admitted pro hac vice)
Aaron E. Nathan (admitted pro hac vice)
787 7th Avenue
New York, NY 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
lwolosky@willkie.com
alichtman@willkie.com
anathan@willkie.com

**OSEN LLC**
Gary M. Osen (admitted pro hac vice)
Aaron Schlanger (admitted pro hac vice)
190 Moore Street, Suite 272
Hackensack, NJ 07601
Telephone: (201) 265-6400
Facsimile: (201) 265-0303
gosen@osenlaw.com
aschlanger@osenlaw.com

**STEIN MITCHELL BEATO & MISSNER LLP**
Jonathan Missner (admitted pro hac vice)
Robert B. Gilmore (admitted pro hac vice)
Kevin L. Attridge (admitted pro hac vice)
2000 K St., NW, Suite 600
Washington, D.C. 20006

Telephone: (202) 737-7777
Facsimile: (202) 296-8312
jmissner@steinmitchell.com
rgilmore@steinmitchell.com
kattridge@steinmitchell.com

*Attorneys for the Shalom, Sasi, Abramov, Goldberg-Polin, Beniashvili, Ben-Senior, Elmalem, Waldman, Ziering, Shay, Haggai, Neutra, Rousso, Katsman, Levy, Rosenfeld, Bomflek, Revivo, Weiser, Chen, Glisko, Leiter, Shafer, Schenkolewski, Morell, Zimbalist, Friedman, Kedem, Navon, Ovadia, and Simchony Plaintiffs*

**MOTLEY RICE LLC**
John M. Eubanks (admitted pro hac vice)
Michael E. Elsner (admitted pro hac vice)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9250
Facsimile: (843) 216-9450
jeubanks@motleyrice.com
melsner@motleyrice.com

*Attorneys for the Newman, Vardi, Zafrani, Rothner, Edan, Donald Goodman, Cherney, Daniels, Davidovich, Ben Zaken, Hamo, Amar, Goodman, Zer-Chen, Gutstein, Natan, Libin, Werde, Engle, Bours, Airley, Moses, Klughaupt, Thaler, Spitz, Shindman, Susskind, Shelomo Tawil, Benzakein, Apelbaum, Berger Bing, Biton, Kama, Kassel, Koskas, Russek, Knoller, Messner, Holtzman, Sapir, Azulai, Fayazi, Hordiner, David Tawil, Kassin, Berger, Saffer, Haim Katzin, Israel Katzin, Frank, Cohen, Karten, Kassin, and Blisko Plaintiffs*