**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

TOM SHALOM, *et al.*,

                    Plaintiffs,

      v.

BASHAR MASRI,
PALESTINE REAL ESTATE INVESTMENT
COMPANY,
PALESTINE DEVELOPMENT &
INVESTMENT COMPANY,
PALESTINE INDUSTRIAL ESTATE
DEVELOPMENT COMPANY, AND
MASSAR INTERNATIONAL, LTD.,

                  Defendants.

Case No. 25 Civ. 23837 (DPG)

**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**
**AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT**

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

Markenzy Lapointe
Florida Bar No. 172601
600 Brickell Avenue, Suite 2600
Miami, Florida 33131
Phone: (786) 913-4900
Fax: (786) 913-4901
markenzy.lapointe@pillsburylaw.com

Carolina A. Fornos*
Christopher C. Caffarone*
31 West 52nd Street
New York, NY 10039
Phone: (212) 858-1000
Fax: (212) 858-1500
carolina.fornos@pillsburylaw.com
christopher.caffarone@pillsburylaw.com

Melissa Lesmes*
Waleed Nassar*
1200 17th Street NW
Washington, D.C. 20036
Phone: (202) 683-8000
Fax: (202) 683-8007
melissa.lesmes@pillsburylaw.com
waleed.nassar@pillsburylaw.com

*admitted pro hac vice

*Attorneys for Defendants Bashar Masri, Palestine Real Estate Investment Company, Palestine Development & Investment Company, Palestine Industrial Estate Development Company, and Massar International, LTD.*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL ALLEGATIONS .......................................................................................... 5

I.    THE DEFENDANTS: PADICO, PRICO, PIEDCO, MASSAR, AND MR. MASRI ....... 5

    A.    PADICO Is a Publicly Traded Foreign Company with No Ties to the U.S. .......... 5

    B.    PRICO Is a Publicly Traded Foreign Company with No Ties to the U.S. ............. 6

    C.    PIEDCO Is a Foreign Company with No Ties to the United States ....................... 6

    D.    Massar Is a Foreign Holding Company with No Ties to the United States ............ 7

    E.    Bashar Masri Is a Palestinian Businessman Engaged in Commercial
Development in Palestine ..................................................................................... 7

II.   THE ALLEGATIONS: COMMERCIAL DEVELOPMENT OF GAZA
INFRASTRUCTURE BEGINNING IN 1997 ...................................................................... 8

    A.    International Institutions Publicly and Transparently Encouraged and
Supervised Economic Development of Gaza Infrastructure for Decades ............. 9

        1.    The GIE: A 1997 Civilian Commercial Development Project ................. 10

        2.    Solar Panels: A 2017 Commercial Development for GIE Tenants .......... 11

        3.    The Hotels: A 2011 Commercial Development in Hospitality ................. 12

    B.    The Gaza Tunnel Network Has Long Existed ...................................................... 14

    C.    Hamas Exercised Government Authority Throughout Gaza ............................... 15

III.  THE PLAINTIFFS' INJURIES: DIFFERENT ACTORS, TIMES, LOCATIONS, AND
CIRCUMSTANCES ................................................................................................. 15

ARGUMENT ................................................................................................................ 17

I.    THE COURT LACKS PERSONAL JURISDICTION OVER EACH DEFENDANT.... 17

    A.    *Fuld* Does Not Support Exercising Jurisdiction Over These Defendants ............. 18

    B.    Plaintiffs Fail to Allege Facts to Fairly and Reasonably Extend Personal
Jurisdiction Over Defendants Consistent with *Fuld* and *Rodriguez* ..................... 22

        1.    The Burden on Each Defendant Would Be Severe and Render the
Exercise of Jurisdiction Unreasonable and Unfair.................................. 22

            a.    Defendants Would Face Extraordinary Practical Burdens
Litigating in the United States .......................................................23

            b.    Defendants Had No Clear Statutory Notice ..................................24

            c.    Defendants Did Not Engage in Conduct Bearing a
Meaningful Relationship to the United States ..............................25

            d.    Defendants Have No Presence in the United States ......................29

2.     The United States' General Interest in ATA Enforcement Does Not Make Jurisdiction Reasonable Here...........................................................29

3.     Plaintiffs' Interest in Litigating in the United States Does Not Support Jurisdiction......................................................................................30

C.     Plaintiffs Improperly Aggregate Jurisdictional Allegations ................................31

II.     PLAINTIFFS FAIL TO PLEAD THAT EACH DEFENDANT IS LIABLE FOR AIDING AND ABETTING THE ATTACKS UNDER JASTA.....................................34

A.     Plaintiffs Fail to Plead Knowing and Substantial Assistance .............................36

1.     Plaintiffs Fail to Plead an Affirmative Act to Assist in the Attacks .........36

2.     Plaintiffs Fail to Plead Any Non-Conclusory Allegations of Knowledge 39

3.     Plaintiffs Fail to Plead That Defendants Provided Pervasive and Systemic Aid to a Terrorist Enterprise.......................................................43

B.     Plaintiffs Fail to Plead Facts Satisfying the *Halberstam* Factors for Each Defendant's Culpable Association with Hamas's October 7 Attacks ..................44

1.     No Plausible Allegations that Defendants Encouraged or Knowingly Assisted the October 7 Attacks ..................................................................44

2.     No Plausible Allegations of Knowing and Substantial Assistance...........44

3.     No Allegations that Defendants Were Present During the Attacks ..........45

4.     No Plausible Allegations of a Culpable Relationship with Hamas...........45

5.     No Plausible Allegations of a Culpable State of Mind............................45

6.     No Allegations of a Period of Knowing Assistance ................................45

C.     Plaintiffs' Conclusory Allegations of General Awareness Are Insufficient.........46

III.     PLAINTIFFS' CONCLUSORY ALLEGATIONS OF AN "AGREEMENT" TO AID HAMAS DO NOT SATISFY CONSPIRACY STANDARDS UNDER JASTA............47

A.     Plaintiffs Fail to Allege an Agreement Between Defendants and Hamas ............48

B.     Plaintiffs Fail to Allege an Agreement to Engage in an Unlawful Act ...............48

C.     Plaintiffs Allege No Overt Act in Furtherance of Any Conspiracy......................49

D.     Plaintiffs Allege No Injury Caused by Overt Acts .............................................50

IV.     PLAINTIFFS FAIL TO ALLEGE PRIMARY LIABILITY UNDER THE ATA...........50

A.     Plaintiffs Do Not Allege that Any Defendant Committed an Act of "International Terrorism"..............................................................................50

B.     Plaintiffs Fail to Plead Proximate Causation .......................................................54

V.     CERTAIN PLAINTIFFS LACK STATUTORY STANDING UNDER THE ATA .......55

VI.     THE FAC'S INFLAMMATORY ALLEGATIONS VIOLATE RULE 8'S SHORT AND PLAIN STATEMENT REQUIREMENT...........................................................57

ii

VII.    PLAINTIFFS' METHODS OF SERVICE ARE IMPROPER BECAUSE THEY
        OFFEND PALESTINIAN LAW AND CIRCUMVENT PALESTINIAN COURTS..... 58

CONCLUSION................................................................................................................................. 60

## TABLE OF AUTHORITIES

**Page(s)**

Cases

*AGS International Services S.A. v. Newmont USA Ltd.*,
346 F. Supp. 2d 64 (D.D.C. 2004) ........................................................................................28

*Albra v. Advan, Inc.*,
490 F.3d 826 (11th Cir. 2007) ...............................................................................................59

*Asahi Metal Indus. Co., Ltd. v. Super. Ct. of Cal., Solano Cnty.*,
480 U.S. 102 (1987)................................................................................................................23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................................2, 4, 38, 39, 52

*Ashley v. Deutsche Bank Aktiengesellschaft*,
144 F.4th 420 (2d Cir. 2025) ...............................................................................38, 39, 43, 44

*Averbach v. Cairo Amman Bank*,
No. 1:19-cv-00004-GHW, 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020)...............................56

*Averbach v. Cairo Amman Bank*,
No. 19-cv-0004-GHW-KHP, 2022 WL 2530797 (S.D.N.Y. Apr. 11, 2022).........................53

*Barmapov v. Amuial*,
986 F.3d 1321 (11th Cir. 2021) .............................................................................................57

*Bartlett v. Société Générale de Banque Au Liban SAL*,
No. 19-CV-00007 (CBA) (VMS), 2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) .................51

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................2, 4, 38, 39, 52

*Bernhardt v. Islamic Republic of Iran*,
47 F.4th 856 (D.C. Cir. 2022)..........................................................................................39, 48

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)...................................................................................................19, 20, 25

*Cabrera v. Black & Veatch Special Project Corp.*,
No. CV 19-3833 (LLA), 2024 WL 1435146 (D.D.C. Mar. 28, 2024) ...................................29

*Calder v. Jones*,
465 U.S. 783 (1984)................................................................................................................34

*Cherdak v. Am. Arb. Ass'n Inc.*,
443 F. Supp. 3d 134 (D.D.C. 2020) ................................................................................28

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) ........................................................................................................18

*In re Diisocyanates Antitrust Litig.*,
No. 18-1001, 2026 WL 522845 (W.D. Pa. Feb. 25, 2026) ............................................31

*Elof Hansson Paper & Board, Inc. v. Caldera*,
No. 11-20495-CIV, 2011 WL 13115561 (S.D. Fla. Sept. 6, 2011) .............................32, 33

*Eran Fin. Servs., LLC v. Eran Indus. Ltd.*,
No. 21-CIV-81386-REINHART, 2023 WL 3025347 (S.D. Fla. Feb. 24, 2023) ...............5

*Freeman v. HSBC Holdings PLC*,
413 F. Supp. 3d 67 (E.D.N.Y. 2019) ..........................................................................51, 55

*Freeman v. HSBC Holdings PLC*,
465 F. Supp. 3d 220 (E.D.N.Y. 2020) .............................................................................46

*Freeman v. HSBC Holdings PLC*,
57 F.4th 66 (2d Cir. 2023) ...............................................................................................48

*Fuld v. Palestine Liberation Organization*,
606 U.S. 1 (2025)..................................................................................................... *passim*

*Guillaume v. United States*,
No. 24-13584, 2025 WL 2610053 (11th Cir. Sep. 10, 2025) .........................................58

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) .................................................................................. *passim*

*Hammer Brand, LLC v. Voro Inc.*,
No. 8:23-CV-01272-KKM-NHA, 2024 WL 4803686 (M.D. Fla. Apr. 18, 2024) ...........22

*Herederos De Roberto Gomez Cabrera, LLC v. Teck Resources Ltd.*,
43 F.4th 1303 (11th Cir. 2022) ........................................................................................32

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010)..............................................................................................................55

*Honickman v. BLOM Bank SAL*,
6 F.4th 487 (2d Cir. 2021) ...........................................................................44, 45, 46, 47

*K3 Enters., Inc. v. Sasowski*,
No. 20-24441-CIV, 2021 WL 8363506 (S.D. Fla. Nov. 22, 2021) .................................33

*Kenemore v. Maduro Moros*,
  No. 25-cv-23652-GAYLES/TORRES, 2026 WL 2024495 (S.D. Fla. July 14, 2026)............18

*Keren Kayemeth LeIsrael – Jewish Nat'l Fund v. Educ. for a Just Peace in the Middle E.*,
  66 F.4th 1007 (D.C. Cir. 2023)..................................................................................41, 54

*Lelchook v. Islamic Republic of Iran*,
  No. 16-cv-7078 (ILG), 2020 WL 12656283 (E.D.N.Y. Nov. 23, 2020)................................57

*Linde v. Arab Bank, PLC*,
  882 F.3d 314 (2d Cir. 2018)...............................................................................................44

*Louis Vuitton Malletier, S.A. v. Mosseri*,
  736 F.3d 1339 (11th Cir. 2013) ..........................................................................................31

*Magnum Constr. Mgmt., LLC v. WSP USA Sols., Inc.*,
  522 F. Supp. 3d 1202 (S.D. Fla. 2021) ..........................................................................57, 58

*Medlink Legal Sys., LLC v. OIMA Ltd.*,
  794 F. Supp. 3d 1265 (S.D. Fla. 2025) ...............................................................................33

*Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*,
  288 F.3d 1264 (11th Cir. 2002) ..........................................................................................34

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
  339 U.S. 306 (1950)......................................................................................................59, 60

*Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*,
  526 U.S. 344 (1999)...........................................................................................................58

*Newman v. Associated Press*,
  758 F. Supp. 3d 1357 (S.D. Fla. 2024) ....................................................................... *passim*

*Ofisi v. BNP Paribas, S.A.*,
  77 F.4th 667 (D.C. Cir. 2023).............................................................................................54

*Omni Cap. Int'l v. Rudolf Wolff & Co.*,
  484 U.S. 97 (1987).............................................................................................................58

*Oueiss v. Saud*,
  No. 1:20-cv-25022-KMM, 2022 WL 1311114 (S.D. Fla. Mar. 29, 2022).............................31

*Prewitt Enters. v. Org. of Petrol. Exporting Countries*,
  353 F.3d 916 (11th Cir. 2003) .......................................................................................58, 59

*Provencher v. Bimbo Foods Bakeries Distrib. LLC*,
  175 F.4th 180 (2d Cir. 2026) ..............................................................................................24

*Raanan v. Binance Holdings Ltd.*,
  No. 24-cv-697 (JGK), 2025 WL 605594 (S.D.N.Y. Feb. 25, 2025) ............................51, 55, 56

*Rodriguez v. Imperial Brands, PLC.*,
  No. 24-11487, 2026 WL 2118957 (11th Cir. July 23, 2026)............................................ *passim*

*Rosenberg v. Lashkar-e-Taiba*,
  No. 10 CV 5381 (DLI)(CLP), 2016 WL 11756917 (E.D.N.Y. July 5, 2016), *report
  and recommendation adopted as modified*, 2017 WL 11647006 (E.D.N.Y. Mar. 31,
  2017) ....................................................................................................................................56

*Schrier v. Qatar Islamic Bank*,
  632 F. Supp. 3d 1335 (S.D. Fla. 2022) .................................................................................31

*Shalom v. Masri*,
  No. 25-cv-01024-JMC (D.D.C. filed Apr. 7, 2025) ..............................................................28

*Shnaider v. Am. Muslims for Palestine*,
  No. 8:24-cv-01067-MSS-SPF, 2026 WL 984199 (M.D. Fla. Feb. 24, 2026) ........................42

*Siam Kraft Paper Co., Ltd. v. Parsons & Whittemore Inc.*,
  400 F. Supp. 810 (D.D.C. 1975)...........................................................................................25

*Siegel v. HSBC N. Am. Holdings, Inc.*,
  933 F.3d 217 (2d Cir. 2019).................................................................................................44

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
  605 U.S. 280 (2025).......................................................................................................36, 40

*Troell v. Binance Holdings Ltd.*,
  No. 24-CV-7136 (JAV), 2026 WL 636849 (S.D.N.Y. Mar. 6, 2026) ...............................38, 40

*Twitter, Inc. v. Taamneh*,
  598 U.S. 471 (2023)................................................................................................. *passim*

*United States ex rel. TZAC, Inc. v. Christian Aid*,
  No. 21-1542, 2022 WL 2165751 (2d Cir. June 16, 2022)......................................................28

*Universal Express, Inc. v. SEC*,
  177 F. App'x 52 (11th Cir. Apr. 18, 2006)...............................................................................5

*Weinstock v. Abu Marzook*,
  No. 17-23202, 2019 WL 1470245 (S.D. Fla. Apr. 3, 2019)...................................................56

*Weinstock v. Islamic Republic of Iran*,
  No. 17-23272-CIV, 2019 WL 1993778 (S.D. Fla. May 6, 2019)...........................................57

*Weiss v. Nat'l Westminster Bank, PLC,*
  993 F.3d 144 (2d Cir. 2021)..................................................................................52

*Zapata v. HSBC Holdings PLC,*
  414 F. Supp. 3d 342 (E.D.N.Y. 2019) ...........................................................45, 52

*Zobay v. MTN Grp. Ltd.,*
  695 F. Supp. 3d 301 (E.D.N.Y. 2023) ..................................................................49

## Constitution

United States Constitution .........................................................................................18
  Fifth Amendment.................................................................17, 18, 22, 25, 30
  Fourteenth Amendment ...............................................................18, 29, 31

## Statutes and Codes

United States Code
  Title 18, Section 2331(1) ......................................................................................51
  Title 18, Section 2333(a)................................................................................ *passim*
  Title 18, Section 2333(d)(2)..........................................................1, 18, 24, 30, 48
  Title 18, Section 2334 .........................................................................................18
  Title 18, Section 2334(e)......................................................................................19
  Title 18, Section 2339B ......................................................................................55

## Rules and Regulations

Federal Rules of Civil Procedure
  Rule 4.............................................................................................................59
  Rule 4(f)...........................................................................................................58
  Rule 4(f)(3) ........................................................................................................58
  Rule 4(h)(2)........................................................................................................58
  Rule 4(k)(1)........................................................................................................19
  Rule 4(k)(1)(C) ..................................................................................................19
  Rule 4(k)(2)..................................................................................17, 18, 22, 31
  Rule 8 ..........................................................................................................57, 58
  Rule 8(a)............................................................................................................1
  Rule 8(a)(2).........................................................................................................57
  Rule 8(d)(1).........................................................................................................57
  Rule 12(b)(2)..............................................................................................1, 18, 60
  Rule 12(b)(5)..............................................................................................1, 58, 60
  Rule 12(b)(6)...............................................................................................1, 39

Local Rule
  7.1(b)...............................................................................................................60

Other Authorities

Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip, Isr.-P.L.O.,
   Sept. 28, 1995, 36 I.L.M. 551 .....................................................................................59

*Status Table: Convention of 15 Nov. 1965 on the Serv. Abroad of Jud. & Extrajudicial
   Documents in Civ. or Com. Matters, Hague Conf. on Private Int'l Law,*
   https://www.hcch.net/en/ instruments/conventions/status-table/?cid=17.................................59

Pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(5), 12(b)(6), and 8(a), Defendants Bashar Masri ("Mr. Masri"), Palestine Real Estate Investment Company ("PRICO"), Palestine Development & Investment Company ("PADICO"), Palestine Industrial Estate Development Company ("PIEDCO"), and Massar International, LTD. ("Massar," together with PRICO, PADICO, and PIEDCO, the "Corporate Defendants"), respectfully submit the following memorandum of law in support of their motion to dismiss the Amended Complaint's ("FAC") claims against Defendants under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), and, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d)(2).

## PRELIMINARY STATEMENT

This is Plaintiffs' third attempt to impose civil terrorism liability under the ATA and JASTA on four foreign companies and a Palestinian businessman for internationally known commercial development projects undertaken years before the October 7, 2023 terrorist attacks. Plaintiffs first filed suit in the District of Columbia, voluntarily withdrew that complaint, refiled in this Court, and now amend again after Defendants identified numerous pleading deficiencies in their motion to dismiss. Although the FAC adds volume, it lacks factual support, coherence, and plausibility, and still does not allege the facts necessary to establish personal jurisdiction or to state a claim under the ATA or JASTA.

Defendants unequivocally condemn Hamas's terrorist acts of October 7. But neither the ATA nor JASTA permits courts to impose liability on persons or entities because Hamas allegedly misused infrastructure lawfully developed or operated. Yet that remains Plaintiffs' theory. Through this action, stripped to its essentials, Plaintiffs seek to transform ordinary commercial activity, including the development of an industrial park, two hotels, and a solar-energy project, into actionable participation in international terrorism based on speculation that Hamas later

exploited those properties for its own criminal purpose and Defendants as owners and operators *must have known*. Aside from speculation, Plaintiffs' theory has no limits: it would convert ownership or operation of commercial property in Hamas-governed Gaza into civil terrorism liability whenever Hamas allegedly misused infrastructure in its territory.

Rather than pleading facts demonstrating that any Defendant consciously, voluntarily, and culpably participated in or encouraged Hamas's October 7 attacks, Plaintiffs rely on conclusory and implausible allegations (which are repeated numerous times to make the same seem like more), guilt by association, hindsight speculation, and labels. Ordinary commercial infrastructure becomes "terror infrastructure." Civilian development projects become a "deception campaign." Property ownership becomes "knowing assistance." And then there is the improper lumping of all Defendants. According to Plaintiffs' expansive theory, everything that any Corporate Defendant did is characterized as one act, all with Mr. Masri's knowledge, intent, and control. But labels and conclusory allegations of overlapping ownership, personnel, and control do not cure legal deficiencies. Because of these deficiencies, Plaintiffs' allegations do not satisfy any relevant pleading standard for (1) personal jurisdiction, (2) secondary liability under JASTA, or (3) primary liability under the ATA, including as stated in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

*First*, personal jurisdiction. Even after a third bite at the apple, Plaintiffs still fail to assert sufficient non-conclusory allegations for this Court to assert personal jurisdiction over Bashar Masri, a humanitarian and businessman who has dedicated his life to economic development and peace in the region, and four foreign companies with no ties to the United States. The Supreme Court's decision in *Fuld v. Palestine Liberation Organization*, 606 U.S. 1, 16 (2025) and the Eleventh Circuit's subsequent application of *Fuld* in *Rodriguez v. Imperial Brands, PLC.*, No. 24-

2

11487, 2026 WL 2118957 (11th Cir. July 23, 2026) confirm that exercising jurisdiction would be unreasonable. Unlike the uniquely situated defendants in *Fuld*, Defendants are private foreign actors who received no clear statutory notice, engaged in no alleged liability-producing conduct bearing a meaningful connection to the United States, and maintain no presence here. Significantly, the FAC's threadbare allegations of contacts with the United States which consist primarily of years-old financing from international institutions with a U.S. presence for the development of commercial projects located entirely in Gaza is insufficient to meet any due process standard. Dismissal with prejudice is thus warranted on this ground alone.

*Second*, JASTA secondary liability. The FAC asserts the precise type of expansive and attenuated aiding and abetting liability theory under JASTA that the Supreme Court rejected in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). Under *Twitter*, courts must determine: did Defendants consciously, voluntarily, and culpably participate in the particular act of international terrorism giving rise to the plaintiff's injury? Here, the answer is unequivocally no. Nothing in the FAC comes close to giving rise to any plausible inference that any Defendant knew of or planned the attacks (which surprised the world), directed the attacks (which were perpetrated both by Hamas and "other" unnamed terrorists), exercised control over Hamas (which is the *de facto* government in Gaza), or otherwise assisted in or encouraged the attacks (which involved the use of gunfire, rocket-propelled grenades, anti-tank missiles and *not* any of the Defendants). Simply put, Plaintiffs seek to impose terrorism liability for engaging in lawful development projects based on conclusory and unsupported speculation that those projects concealed tunnels, supported Hamas infrastructure, or generated energy that Hamas later siphoned for its own criminal purposes.

Plaintiffs' conspiracy theory under JASTA fares no better. The FAC does not plausibly allege an agreement between each Defendant and Hamas to commit acts of international terrorism.

3

It does not plead *who* agreed to *what*, *when*, *where*, or for *what purpose*. It instead relies on implausible inference piled upon implausible inference, asking the Court to treat commercial activity, regional presence, and post hoc speculation as proof of a meeting of the minds. But JASTA conspiracy liability cannot rest on mere conjecture. Without well-pleaded facts showing an actual agreement to commit or support the terrorist attacks at issue, the conspiracy claim fails.

*Third*, ATA primary liability. Plaintiffs' ATA theory is equally deficient. Primary liability requires that each Defendant *itself* engaged in conduct that was violent or dangerous to human life and otherwise satisfied the statutory definition of "international terrorism." Plaintiffs allege nothing of the kind. They recast developing hotels, operating industrial facilities, and installing solar panels as nefariously as possible to allege material support for Hamas. Critically for purposes of primary liability, however, those activities are not acts of terrorism. Courts have consistently held that nonviolent, ordinary business dealings are not dangerous to human life and do not confer primary liability under the ATA. Nor can Plaintiffs plausibly allege that Defendants proximately or actually caused their injuries; Plaintiffs unequivocally assert that Hamas caused the numerous types of injuries, in different locations, under different circumstances, at different times—some even months after October 7. Plaintiffs' allegations remain defective at their core.

In sum, the FAC adds length, rhetoric, and repetition, but not the factual allegations necessary to satisfy *Twombly*, *Iqbal*, *Twitter*, or the ATA and JASTA. Plaintiffs still fail to allege personal jurisdiction, still fail to plead the elements of primary liability under the ATA and secondary liability under JASTA, still fail to allege proximate causation, still lump Defendants together, still violate the rules of service, and still fail to meet the requirement of a short and plain statement of the claim. Because these defects are fundamental and cannot be cured, even after Plaintiffs' third attempt to do so, the FAC should be dismissed with prejudice.

4

**FACTUAL ALLEGATIONS**

**I.     THE DEFENDANTS: PADICO, PRICO, PIEDCO, MASSAR, AND MR. MASRI**

Plaintiffs sue five distinct Defendants. Although the FAC acknowledges their separate identities for jurisdictional purposes, it abandons those distinctions and indiscriminately collapses all Defendants into a single enterprise to manufacture contacts with the United States and to portray Mr. Masri—without any factual support—as the architect of every action allegedly taken by four separate corporate entities, including two publicly traded foreign companies. Once the 1,459 paragraphs are carefully examined, the fundamental defect is indisputable: Plaintiffs fail to allege facts sufficient to state a plausible claim against any Defendant.

**A.     PADICO Is a Publicly Traded Foreign Company with No Ties to the U.S.**

PADICO is a publicly traded company incorporated in the Republic of Liberia with its principal place of business in Rawabi, Palestine. FAC ¶ 68. Established in 1993 as a public company listed on the Palestinian Exchange ("PEX"), PADICO invests "to achieve economic advancement in Palestine through initiating and launching economically viable projects in various sectors aiming for sustainable development." 2023 Annual Report at 6-7.[1] As of the year of the attacks, PADICO had more than 6,400 shareholders, including individuals, companies, and international institutions, and is governed by a ten-member Board of Directors with independent committees overseeing audit, governance, and international relations. *See id.* at 22-23 (board of

---

[1]   The 2023 Annual Report is available at https://online.fliphtml5.com/smtsg/wxcb/#p=1 (last visited on July 31, 2026). The Court may take judicial notice of publicly available information, particularly when assessing personal jurisdiction. *See Universal Express, Inc. v. SEC*, 177 F. App'x 52, 53 (11th Cir. Apr. 18, 2006) ("A district court may take judicial notice of certain facts without converting a motion to dismiss into a motion for summary judgment," including "[p]ublic records.") (citations omitted); *Eran Fin. Servs., LLC v. Eran Indus. Ltd.*, No. 21-CIV-81386-REINHART, 2023 WL 3025347, at *1 n.4 (S.D. Fla. Feb. 24, 2023) ("In any event, the Court may consider evidence outside the complaint in assessing personal jurisdiction.") (citations omitted). In addition, Plaintiffs refer to PADICO's financial statements from 2022, which were contained in the 2023 annual report. *See* FAC ¶ 325, n.26.

directors); *id.* at 24-25 (audit committee); *id.* at 26-27 (shareholders). Its financial statements are independently audited by Ernst & Young, and it regularly discloses its board resolutions and financial reports on its website and the PEX platform. *Id.* at 25, 27. PADICO maintains no offices, property, or business operations in the United States, and Plaintiffs do not allege otherwise.

Consistent with those allegations, Plaintiffs identify no PADICO-operated business or activity in the United States. Instead, all Plaintiffs allege is that PADICO operated the Gaza Industrial Estate ("GIE")—a commercial property located in Gaza for which another entity received international funding. FAC ¶ 101.a. Tellingly, the remaining allegations under the heading of "substantial connections to the United States as a whole," concern either Mr. Masri or PRICO, not PADICO. *See* ¶¶ 101.a.-d. (discussing Mr. Masri and PRICO but not PADICO).[2]

**B.     PRICO Is a Publicly Traded Foreign Company with No Ties to the U.S.**

PRICO is a publicly traded company with its principal place of business in Palestine. FAC ¶ 69.a. Formed in 1994, and publicly traded since 1997, PRICO is described in the FAC as "the investment arm and subsidiary of PADICO [] in the real estate sector." *Id.* ¶ 69.b. PRICO maintains no offices, property, or business operations in the United States, and Plaintiffs do not allege otherwise. Notably, the only alleged "substantial connection" with the United States is PRICO's alleged receipt of financing from the World Bank's International Finance Corporation ("IFC") for the PRICO Solar Gaza project years before the attack, with the World Bank expanding support in 2017, and World Bank insurance maintained for an unspecified time period. *Id.* ¶¶102.a.-c.

**C.     PIEDCO Is a Foreign Company with No Ties to the United States**

Plaintiffs do not allege where PIEDCO is incorporated and simply assert in a conclusory fashion that PIEDCO "manages the GIE on behalf of PRICO, PADICO, and [Mr.] Masri." *Id.* ¶

---

[2]  Bizarrely, Plaintiffs also assert that PADICO and Massar use U.S. dollars in its financial reporting—which most entities throughout the world use. FAC ¶¶ 101.b.; 104.e.

70. Plaintiffs do not allege that PIEDCO maintains offices, property, or operations in the United States. With respect to PIEDCO, the conclusory heading of "substantial connections with the United States as a whole" is premised entirely on unspecified financing from the USAID for the GIE—without alleging when the funding occurred, the amount involved, or the entity that actually received it—and, once again, the allegations concerning the World Bank funding for the GIE occurred years before the October 7 attacks. *Id.* ¶¶ 103.a.,b.

### D. Massar Is a Foreign Holding Company with No Ties to the United States

Massar is a holding company incorporated in Cyprus with its principal place of business in Rawabi, Palestine. *Id.* ¶ 71.b. Plaintiffs do not allege that Massar maintains offices, property, or operations in the United States. After the pleading's introductory sections, Plaintiffs mention Massar only five times to state that Massar purchased PADICO stock in 2025 (after the October 7 attacks) and otherwise lump Massar with the other Corporate Defendants. *Id.* ¶¶ 169, 212, 234, 235, 498. And with respect to those 107 introductory paragraphs, all Plaintiffs allege as to Massar for the purported "substantial connections to the United States" are PRICO's IFC funding (*see id.* ¶ 104.a.), allegations concerning other entities (*id.* ¶¶ 104.b.-d.; *see also* ¶ 71.c., n.3 (discussing funding allegedly received by other entities between 2001-2004—nearly twenty years before the attacks at issue)), and that Massar "conducts its business in U.S. dollars" (*id.* ¶ 104.e.).

### E. Bashar Masri Is a Palestinian Businessman Engaged in Commercial Development in Palestine

Mr. Masri is a Palestinian entrepreneur who has spent decades focused on peace-building and developing commercial real estate, industrial parks, hotels, and energy infrastructure in Palestine. FAC ¶¶ 5-20. As Plaintiffs allege, those projects were financed, supported, insured, or publicly recognized by international institutions as part of broader efforts to promote economic development and regional stability, and all of which were initially completed years, or even

7

decades, before 2023. *See id.* ¶ 184 (GIE opened in 1998); ¶ 294 (Ayan Hotel built before 2011); ¶ 339 (Blue Beach Hotel built before 2016).

Like the initial Complaint, the FAC again relies on attenuated links to the United States that long predate any of the attacks at issue in this action—including college in the 1980s (*id.* ¶ 74); early work history in the mid-1980s (*id.* ¶ 75); references to his spouse and children in Washington, D.C. and obtaining U.S. citizenship (*id.* ¶¶ 64, 79-80); and a residence long since sold (*id.* ¶ 83). Grasping at straws, Plaintiffs also rely on conduct that can occur remotely from anywhere in the world, such as political donations prior to 2023 (*id.* ¶ 85); roles on boards or advisory councils at Harvard University, Middle East Investment Initiative, and the U.S. International Development Finance Corporation (*id.* ¶¶ 17, 86, 89). They also throw in irrelevant references to after-the-fact communications with U.S. politicians in 2026. *Id.* ¶ 6.

The crux of Plaintiffs' remaining allegations of "ties" to the U.S. is that Mr. Masri allegedly "relied on the U.S. Government (including Government agencies like USAID) and U.S. Government-related entities, like the World Bank, to finance the development and improvement of his properties." *Id.* ¶ 90. Having nothing else, the FAC repeats the allegations concerning the World Bank (including the IFC) and USAID funding from years before the attacks at issue no less than a dozen times. *See, e.g., id.* ¶¶ 18, 22, 32, 49.b., 55, 60, 63, 101, 104, 169.

## II.   THE ALLEGATIONS: COMMERCIAL DEVELOPMENT OF GAZA INFRASTRUCTURE BEGINNING IN 1997

Plaintiffs focus on three commercial properties in Gaza which Defendants are collectively alleged to own and operate: the Gaza Industrial Estate ("GIE"), the Blue Beach Hotel and the Ayan Hotel (f/k/a Al Mashtal Hotel) (together with the Blue Beach Hotel, the "Hotels", and all three, the "Commercial Properties"). *Id.* ¶ 174. Plaintiffs repeatedly and conclusorily characterize the Commercial Properties as "integral to enabling the terrorist attacks that injured Plaintiffs." *Id.* ¶¶

35, 63, 174. Throughout the FAC, Plaintiffs further repeatedly add the word "terror" or "terrorist" to otherwise ordinary commercial infrastructure—labeling it "terror infrastructure" or "terrorist infrastructure"—without alleging facts demonstrating that Defendants knowingly developed infrastructure to facilitate Hamas's terrorist attacks. *See e.g.*, *id.* ¶¶ 4, 7-9, 48, 52, 67, 134, 172.

Recognizing that the Commercial Properties were initially constructed *decades* before the attacks and thus, Defendants could not possibly have built anything with any link to October 7, Plaintiffs include a disclaimer in a footnote that is emblematic of their allegations: Defendants (again collectively) "knowingly assisted Hamas in *augmenting* its tunnel system in the years immediately preceding the attack, including by providing the tunnel network with enhanced electricity." *Id.* ¶ 209, n.18. Ultimately, Plaintiffs' theory of liability is that Defendants collectively, publicly, and transparently developed the Commercial Properties which: (1) provided "cover" for Hamas to reconstruct tunnels, even though the tunnels long existed and Hamas controlled all of Gaza; (2) were used by Hamas in the ordinary course, just as they were used by all other hotel patrons and GIE tenants; and (3) helped Hamas refurbish tunnels beneath the Commercial Properties for its own purposes by providing solar energy, even though Plaintiffs also allege that the tunnels were accessible from adjacent Hamas training bases and mosques which, like the rest of Gaza, benefitted from free electricity from Israel.[3]

A.    **International Institutions Publicly and Transparently Encouraged and Supervised Economic Development of Gaza Infrastructure for Decades**

Plaintiffs acknowledge that for decades, major international institutions such as the U.S.

---

[3]   While Plaintiffs allege that Defendants somehow assisted in a "deception campaign" to lull Israel into believing that Hamas was not interested in attacking Israel, they simultaneously (and contradictorily) allege that "[d]uring more than 15 years of Hamas rule in Gaza from 2007 to 2023, Hamas continually attacked Israel from its base in the Gaza Strip." *Id.* ¶ 162. They further cite and reference news articles that illustrate that tunnels were ubiquitous in Gaza and everyone knew about them. *Id.* ¶ 192 n.15 (citing a 2014 map of Gaza's tunnels published by the Wall Street Journal).

Agency for International Development ("USAID"), the Overseas Private Investment Corporation ("OPIC"), the World Bank's IFC, the Multilateral Investment Guarantee Agency ("MIGA"), the United Nations Development Program ("UNDP"), and the European Union actively promoted, financed, insured, supervised, or publicly recognized civilian economic development within Gaza, including the GIE. FAC ¶¶ 18, 22, 198. All publicly celebrated the projects as examples of economic development, renewable energy, and private-sector investment. *Id.* ¶¶ 184, 194-95.

### 1.     The GIE: A 1997 Civilian Commercial Development Project

The GIE is a large, multi-tenant commercial industrial park, not a facility operated exclusively by any Defendant. The GIE is 480,000 square meters located in Gaza near the Israeli border. *See id.* ¶¶ 21, 182. In 1996, long before Hamas assumed control of Gaza in 2007, PIEDCO signed a concession agreement with the Palestinian Authority for a 49-year period. *Id.* ¶ 180. PIEDCO began developing the GIE in 1997 with funding from the World Bank, and it opened in 1998 "as a facility designed to support the expansion of industrial production and jobs in the Gaza Strip" as part of the peace process. *Id.* ¶¶ 179, 184.

The GIE housed numerous commercial tenants operating ordinary manufacturing and industrial businesses such as pharmaceutical, cosmetics, woodworks, plastic manufacturing, food and beverages, furniture, textiles, printing, and packaging industries. *Id.* ¶ 185. "[B]usinesses like Coca-Cola and a variety of light manufacturing companies" operated in the GIE. *Id.* ¶¶ 21, 26. In fact, the Coca-Cola Company and the Palestinian National Beverage Company jointly opened a $20 million bottling plant on the premises. *Id.* ¶ 194.

Left with no facts, Plaintiffs resort to scandalous allegations about the GIE, labeling it "terror infrastructure." *See, e.g.*, *id.* at 42 (heading A) ("Defendants Partnered with Hamas to Redevelop the GIE and Construct Terror Infrastructure"); *id.* ¶ 195 (Defendants "coordinated with Hamas on its subterranean construction activities"). Not one allegation in the FAC identifies who

10

engaged in the alleged coordination, when it occurred, where within the 480,000-square-meter industrial park it supposedly took place, or what any Defendant actually did. Instead, Plaintiffs ask the Court to infer knowing participation from the mere existence of tunnels beneath the industrial park occupied by numerous commercial tenants, including at least ten factories in business sectors ranging from pharmaceuticals to packaging and even a Coca Cola bottling plant. *See, e.g.*, *id.* ¶ 208 (explaining that airstrikes damaged ten factories in the GIE in 2021).

Plaintiffs also ask the Court to infer Defendants' knowledge because Hamas had its training base *adjacent* to the GIE, and a mosque *immediately outside* the GIE which was a "command center" for Hamas. *Id.* ¶¶ 4, 23, 137. That Hamas command center *outside the GIE* was "filled with explosive devices, rocket-propelled grenades ('RPGs'), small arms ammunition, and other tools of terrorism"—the very tools that Hamas used to injure Plaintiffs. *Id.* ¶ 276. That admission negates any assertion that the GIE was integral to anything other than economic development.[4]

### 2.     Solar Panels: A 2017 Commercial Development for GIE Tenants

Understanding that the GIE and the alleged tunnel network underneath it long predated the October 7 attacks, Plaintiffs instead advance their "augmenting" theory: "Defendants knowingly assisted Hamas by providing it and its terror infrastructure with electricity." *Id.* ¶ 209, n.18; ¶ 286. But for years prior, it was Israel that supplied electricity to Gaza—and under Plaintiffs' very theory of the fungibility of power (*id.* ¶ 224, n.20)—Israel supplied Hamas with 120 megawatts of electricity. *Id.* ¶ 287, n.22. To ensure Hamas had more electricity, a diesel power plant generated 65-75 megawatts—for a total of 185-195 megawatts of electricity to power the entire region. *Id.*

In 2018, the World Bank/IFC purportedly provided funding to PRICO for a solar project

---

[4]   Plaintiffs assert that sometime *after* October 7, paraphernalia was found at and under the GIE—but that is not evidence that it existed *before* the October 7 attacks or that any Defendant has anything to do with that. *Id.* ¶ 265.

that would promote the installation of solar panels on the rooftop of several buildings at the GIE. *Id.* ¶ 227. That solar project was not implemented until years later, in March 2021. *Id.* ¶ 227, n.21. Those solar panels generated 7.3 megawatts of electricity and "successfully generated reliable electricity for the light manufacturing companies with operations in the GIE." *Id.* ¶¶ 230, 287. According to Plaintiffs, the GIE's solar energy project provided "about 18% of the solar energy [not total energy] generated in the Gaza Strip prior to October 7," *id.* ¶ 287, and thus, a much smaller fraction of all Gaza energy (including diesel and energy from Israel). *Id*. ¶ 287, n.22.

But that fraction of power was only briefly supplied. As Plaintiffs explain, Israeli forces launched airstrikes at targets inside the GIE in May 2021—just two months after the solar project was implemented—which caused severe damage to the solar energy panels on roofs of buildings. *Id.* ¶¶ 207-08, 344. It was not until 2022 that new solar panels were installed. *Id.* ¶¶ 234, 243, 346, 348. Thus, for a period between 2022 and October 2023, the GIE solar panels allegedly provided a fraction of Gaza's energy, while Israel provided the lion's share free of charge. *Id.* ¶ 287, n.22.

Nonetheless, Plaintiffs maintain that this incremental amount of electricity was so essential and so "fungible" that it aided and abetted the "terror infrastructure" under the GIE. *Id.* ¶¶ 212, 223, 224, n.20. The FAC also explains that Hamas maintained a training facility, and a mosque which housed a "command and control" center and thus presumably used electricity, immediately adjacent to the GIE. *Id.* ¶¶ 137, 260. Yet Plaintiffs claim that Hamas had to rely on Defendants to syphon its own sliver of solar energy and divert it from GIE tenants so that Hamas could refurbish the very tunnels that long existed and which were accessible from the training facility and the mosque. To impugn Defendants collectively for installing solar panels that generated a fraction of Gaza's energy, especially relative to Israel itself—defies logic and fails to state a plausible claim.

### 3. The Hotels: A 2011 Commercial Development in Hospitality

Prior to 2011, PADICO allegedly purchased a controlling stake in the Ayan Hotel. *Id.*

12

¶ 294. PADICO also allegedly owns the Blue Beach Hotel, which sits on the Gaza shoreline and across the street from the Ayan Hotel. *Id.* ¶¶ 325-26. Plaintiffs fault all five Defendants collectively for the commercial development and operation of the Hotels because the Hotels were allegedly "cover" for the Qassam Brigades, allowed Hamas to be patrons, and provided electricity from solar panels to refurbish the tunnels underneath both Hotels. FAC ¶¶ 320, 341.

In addition to claiming the Hotels are "cover" for the Qassam Brigades, Plaintiffs allege that the Corporate Defendants "contracted" with a construction company "affiliated" with the Qassam Brigades to refurbish the Ayan Hotel. *Id.* ¶ 316. Aside from that conclusory statement, which does not allege *who* contracted or *when*, Plaintiffs then proceed with a series of speculations: "the Qassam Brigades *had to coordinate* their work with Defendants" (*id.* ¶ 317 (emphasis added)) and could not "go unnoticed by hotel management" (*id.* ¶ 319); the "tunnel infrastructure beneath the [Blue Beach] hotel *was almost certainly excavated after the hotel was initially constructed*" (*id.* ¶ 333 (emphasis added)) and that process "*would have involved*" Hamas operatives (*id.* (emphasis added)). Plaintiffs offer nothing beyond the equivalents of "likely," "must have," "had to"—conclusory allegations that cannot be credited. Equally unavailing are "excavation workshops" found after the fact which Plaintiffs admit were not actually at the Hotels but rather "directly adjacent to the Blue Beach Hotel" which would explain activity extending under other adjacent properties. *Id.* ¶¶ 335-36. Similarly, Plaintiffs allege that the Hotels were used as rocket launch sites, yet they equally allege that rockets were fired from the launch site *connected* to the Ayan Hotel owned by Defendants. *Id.* ¶ 392.[5]

Plaintiffs also allege that Hamas operatives and leaders "used the hotel for private

---

[5]  Plaintiffs allege that *after* October 7, a "weapons cache" was found at the "hotel complex" (FAC ¶ 468), a post-attack discovery that does not plausibly link to any conduct of any Defendant.

13

functions" and used the "accommodations and facilities" for "international aid organizations, foreign corporations, and diplomats" and for "Hamas-sponsored events." *Id.* ¶¶ 34, 310. Those "Hamas-sponsored events" are hosting officials of the *de facto* Government such as the Minister of Tourism and Antiquities in 2013 (*id.* ¶ 299) or hosting weddings or official ceremonies of foreign leaders in 2021. *Id.* ¶ 311. But those allegations describe nothing more than ordinary operation of a commercial hotel; hotels routinely provide accommodations and meeting spaces to a wide range of guests. That Hamas officials or affiliates allegedly stayed or attended events at the Hotels does not plausibly establish that Defendants knowingly agreed to assist Hamas in their terrorist activities or the October 7 attacks.[6]

### B.      The Gaza Tunnel Network Has Long Existed

Gaza has long maintained an extensive tunnel system used for trade and smuggling. *Id.* ¶ 131. That tunnel system spanned hundreds of miles under the Gaza Strip and functioned like a "subway system" or "Metro." *Id.* ¶ 135. Hamas controlled those smuggling tunnels, so much so that Hamas established a Tunnel Affairs Commission that controlled and monitored the "tunnel smuggling trade." *Id.* ¶ 131. Those same smuggling tunnels were "heavily utilized" by Hamas special forces. *Id.* ¶ 128. After 2007, the Gaza tunnels were used for command rooms, attacks, and storing weapons. *Id.* ¶ 136. It was Hamas who "invested considerable resources into digging tunnels under the border with Israel to attack the Israeli border communities and Israeli military patrols." *Id.* ¶ 164. And Hamas already had access to that infrastructure because it controlled the training centers and mosques adjacent to the Commercial Properties. *Id.* ¶¶ 326, 332.

In conclusory fashion, Plaintiffs assert that because tunnels existed in Gaza, each

---

[6]   The FAC also describes Hamas' use of the Ayan Hotel that ended years—and in some instances a decade—before the October 7 attacks. *See, e.g., id.* ¶ 35 (alleging the Al Mashtal Hotel "hosted a significant network of attack tunnels" in 2014 but Israel struck and damaged the site); ¶ 297 (alleging that prisoners released in 2011 stayed at the hotel).

Defendant likely knew about them and assisted in their construction for the purpose of supporting terrorism. *See id.* ¶ 139. Plaintiffs use nothing more than speculation: "Defendants undertook the initial development of the hotel in coordination with Hamas, and it is *likely* that even in the initial construction project helped to conceal Hamas' excavation"; the "Qassam Brigades necessarily coordinated their work with Defendants." *Id.* ¶¶ 300, 337. The use of words "necessarily" and "likely" are telling concessions: they acknowledge that no factual predicate for coordination exists and instead invite the Court to draw improper inferences from structural proximity alone.[7]

### C.   Hamas Exercised Government Authority Throughout Gaza

As Plaintiffs acknowledge, Hamas assumed control of Gaza in 2007, becoming the *de facto* governing authority responsible for ministries, utilities, construction permitting, taxation, economic regulation, border crossings, and public works. *Id.* ¶¶ 121-34, 242. In other words, every significant commercial project necessarily required interaction with ministries and agencies controlled by Hamas because no alternative governmental authority existed. In that context, allegations that Mr. Masri interacted with government officials or other individuals whom Plaintiffs now characterize as Hamas-affiliated do not plausibly establish that he knowingly agreed to participate in Hamas's terrorist activities or shared Hamas's objectives as opposed to lawful commercial activity in Gaza.

### III.   THE PLAINTIFFS' INJURIES: DIFFERENT ACTORS, TIMES, LOCATIONS, AND CIRCUMSTANCES

Defendants do not minimize the deaths, physical injuries, hostage-taking, or trauma described in Plaintiffs' pleading. Plaintiffs' allegations, however, are unequivocal: <u>Hamas terrorists</u> killed or injured Plaintiffs with gunfire, grenades, rocket-propelled grenades ("RPGs"),

---

7   Equally unavailing is the use of guilt by association. For example, the FAC includes an undated photograph of Mr. Masri with someone that Plaintiffs describe as the "Dean" of Hamas' tunnels—but no facts other than proximity is asserted. *Id.* ¶¶ 146-47.

improvised explosive devices ("IEDs"), anti-tank missiles, booby traps, rockets, mortars, or other explosives on October 7 and in the weeks and months that followed throughout numerous locations in the region that have nothing to do with any Defendant or the Commercial Properties.

Plaintiffs' allegations establish that the asserted injuries arose from different actors, different weapons, different locations, and different events spanning months after October 7. Numerous Plaintiffs were injured as soldiers in the ensuing military campaign in late 2023, 2024, and 2025. *See, e.g.,* FAC ¶¶ 1040-42 (Hamas killed Moshe Yedidyah Leiter using a booby trap during military campaign in Gaza on November 10, 2023); *id.* ¶¶ 1106, 1114-15 (Hamas killed Yakir Schenkolewski in his tank in Gaza on December 4, 2023). Other Plaintiffs were injured far away from the Israel border, including Syria, Lebanon, West Bank, and other locations in Israel and Gaza. *See, e.g., id.* ¶¶ 1194-96 (Hamas psychologically injured Shelomo Tawil in Gaza and Lebanon from October 7, 2023, through March 29, 2024); *id.* ¶¶ 1075-81 (Hamas terrorists shot Shoshana Bracha Shafer at a Jerusalem, Israel bus stop on November 30, 2023).

Those victimized on October 7 suffered at the hands of individual Hamas terrorists using specific weapons. *See, e.g., id.* ¶¶ 502-06 (Hamas terrorists killed Ram Shalom with an RPG outside the Nova Music Festival); *id.* ¶¶ 520-28 (Hamas killed Avraham Sasi and injured Danielle Sasi and Lee Meltz Sasi with grenades and gunfire); *id.* ¶¶ 553, 557-65 (Hamas used grenades and gunfire killing Laor Abramov). Other Plaintiffs were injured not only by Hamas, but Hezbollah. *See, e.g., id*. ¶¶ 1269-73 (Hamas and Hezbollah psychologically injured Aharon Holtzman during the course of his military deployment in Gaza, Lebanon, and Syria following October 7, 2023, through at least August 2024); *id.* ¶¶ 1031-35 (Hamas and Hezbollah injured Shlomo Werde during the course of military deployment to Gaza and Lebanon beginning in January 2024 and continuing throughout the course of his time in the Israeli military).

16

Finally, many additional Plaintiffs assert derivative emotional-distress or economic-loss claims as parents, spouses, children, siblings, guardians, or estate representatives of persons allegedly killed, injured, abducted, or traumatized. *See, e.g., id.* ¶¶ 1377-81 (Lauren Friedman experiences PTSD symptoms as a result of her husband's deployments); *id.* ¶¶ 925, 933-34 (Yehoshua and Shira Goodman allege emotional distress from nearby rocket fire on October 7, 2023, and resulting fear, while their children assert claims based on their parents' alleged injuries).

Although Plaintiffs repeatedly characterize the Commercial Properties as providing "cover" for Hamas's tunnel networks, they also acknowledge that the October 7 attacks were carried out through "an above-ground assault calling for the breach of the border fence." *Id.* ¶ 357. The FAC therefore underscores the absence of any plausible factual connection between the Defendants' alleged commercial activities and the conduct that injured Plaintiffs.

## ARGUMENT

## I.      THE COURT LACKS PERSONAL JURISDICTION OVER EACH DEFENDANT

Plaintiffs invoke specific jurisdiction under Federal Rule of Civil Procedure 4(k)(2), and allege that personal jurisdiction over all five Defendants "is reasonable . . . under flexible Fifth Amendment due process principles." FAC ¶ 47. The Supreme Court's decision in *Fuld* supplies the governing constitutional framework, and the Eleventh Circuit recently applied that framework to Rule 4(k)(2) in *Rodriguez*. Both decisions confirm that exercising jurisdiction here would violate the Fifth Amendment. There are three independent defects. First, the considerations that supported jurisdiction over the uniquely situated defendants in *Fuld* are absent here. Second, applying the Fifth Amendment reasonableness analysis articulated in *Fuld* and applied by the Eleventh Circuit in *Rodriguez* confirms that requiring these foreign Defendants to litigate in the United States would be unreasonable, unfair, and would impose a severe burden on them. Third, Plaintiffs cannot cure that deficiency by aggregating the alleged contacts of five legally distinct

17

Defendants. Because personal jurisdiction must be established separately as to each Defendant, the FAC should be dismissed under Rule 12(b)(2).[8]

### A. *Fuld* Does Not Support Exercising Jurisdiction Over These Defendants

Under Rule 4(k)(2), jurisdiction is proper only if "(A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." *Rodriguez*, 2026 WL 2118957, at *4 (quoting Fed. R. Civ. P. 4(k)(2)). "[E]xercises of personal jurisdiction pursuant to . . . 4(k)(2) are subject to constitutional limitations imposed by the *Fifth* Amendment's Due Process Clause, rather than the Fourteenth's [Due Process Clause]." *Id*. (citation omitted). In *Fuld*, the Supreme Court explained that the Fifth Amendment permits a more flexible jurisdictional inquiry than the formal framework applicable under the Fourteenth Amendment, but it did not authorize "unbounded jurisdiction[]" over foreign defendants. 606 U.S. at 16, 18, 23; *see also Kenemore v. Maduro Moros*, No. 25-cv-23652-GAYLES/TORRES, 2026 WL 2024495 at *4 (S.D. Fla. July 14, 2026) (discussing "more flexible inquiry"). To the contrary, the Court emphasized that it remained "wary to reach further and bless more attenuated assertions of jurisdiction." *Fuld*, 606 U.S. at 18.

The circumstances that made jurisdiction reasonable in *Fuld* are absent here. There, petitioners asserted jurisdiction over the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO") under the Promoting Security and Justice for Victims of Terrorism Act (the

---

[8] Plaintiffs allege personal jurisdiction pursuant to Rule 4(k)(2), FAC ¶ 47, which fails for the reasons discussed herein. Defendants further expressly reserve all rights to challenge general jurisdiction and specific jurisdiction under all applicable theories. Plaintiffs do not allege that the Court has general jurisdiction and Plaintiffs cannot satisfy the "at home" test in Florida or the United States for each Defendant. *See Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (citations omitted). Plaintiffs also do not allege that this Court may exercise personal jurisdiction pursuant to Florida's long-arm statute, and no Defendant is alleged to have any contacts in Florida, precluding the applicability of this theory. While the initial complaint alleged that this Court had personal jurisdiction pursuant to 18 U.S.C. § 2334, *see* ECF No. 1 ¶ 29, that allegation has been removed; it does not apply here.

"PSJVTA"), through which Congress explicitly conferred personal jurisdiction in federal court over those two entities under Rule 4(k)(1)[9] and provided that those entities would be deemed to have consented to personal jurisdiction upon engaging in specified conduct. *See* 18 U.S.C. § 2334(e) (personal jurisdiction lies over the PA and PLO if one of two jurisdictional predicates is satisfied: the defendant (i) made payment to individuals who committed acts of terrorism that injured U.S. nationals or (ii) conducts activities or maintains offices in the United States). The statute thus supplied both a narrowly tailored jurisdictional mechanism and clear notice of the conduct that would expose those particular defendants to suit in federal court.

The Supreme Court also emphasized the distinctive character of the PA and PLO. They are "sui generis foreign entities," "exercise governmental functions in a geopolitically sensitive region," and have maintained "decades of 'meaningful contacts, ties, [and] relations' with the United States." *Fuld*, 606 U.S. at 22 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)) (alteration in original) (internal quotation marks omitted). Congress therefore did not create a generally applicable jurisdictional rule for all foreign defendants accused of conduct related to terrorism. It enacted a targeted provision addressing two uniquely situated entities as one component of a broader foreign-policy relationship. *Id.* at 22-25.

Defendants bear none of those characteristics. They are four foreign commercial companies and a Palestinian businessman, not governmental entities exercising sovereign or quasi-sovereign functions. No statute identifies them by name, specifies conduct that would subject them to federal jurisdiction, or otherwise provides the clear notice that the Supreme Court considered

---

[9]  Rule 4(k)(1) provides that "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant . . . when authorized by a federal statute." Fed. R. Civ. P. 4(k)(1)(C). Because no such authorization is provided here, Rule 4(k)(1) is inapplicable, but Defendants reserve the right to challenge any related argument that Plaintiffs make.

significant in *Fuld*. Nor does the FAC allege that any Defendant maintains an office, headquarters, facility, or business operation in the United States comparable to the longstanding U.S. relationships of the PA and PLO.

Lacking facts that would demonstrate that Defendants are similarly situated to the PA and the PLO for purposes of personal jurisdiction, Plaintiffs instead resort to generalized allegations that all Defendants, collectively, obtained funding for economic development projects in Gaza through financing institutions with a connection to the United States. Significantly, after Defendants pointed out in their first motion to dismiss that Plaintiffs had "lumped" jurisdictional allegations together as to all Defendants, primarily on the basis of international funding, ECF No. 52 at 17, Plaintiffs revised their FAC to contain what is drafted to *look* like a long list of "substantial ties with the United States as a whole" for each of the Corporate Defendants. FAC ¶ 49; *see also id.* ¶ 101-04. But a careful review of that "list" reflects an aggregation of a number of insufficient allegations, mostly regurgitating the same financing which does not allege any conduct that comes close to the PLO's and PA's "decades of 'meaningful contacts, ties, [and] relations' with the United States." *Fuld*, 606 U.S. at 22 (quoting *Burger King Corp.*, 471 U.S. at 472) (alteration in original) (internal quotation marks omitted).

**PADICO.** PADICO is a publicly traded company incorporated in Liberia with its principal place of business in Palestine. FAC ¶ 68. Plaintiffs do not allege that PADICO maintains offices, property, employees, or business operations in the United States. Instead, Plaintiffs rely principally on allegations that PADICO participated in commercial development projects in Gaza financed in part through international institutions with a U.S. presence and that it reports financial information in U.S. dollars. FAC ¶ 101. Those allegations do not resemble the governmental status, statutory notice, or longstanding relationship with the United States found significant in *Fuld*.

**PRICO.** PRICO likewise is a publicly traded Palestinian company with its principal place of business in Palestine. FAC ¶ 69. Plaintiffs identify no office, facility, employees, or operations in the United States. Instead, Plaintiffs rely primarily on allegations that PRICO obtained financing and insurance for the Gaza solar project from the IFC and MIGA years before October 7. *Id.* ¶ 102. Those allegations likewise do not resemble the governmental, statutory, and longstanding U.S. relationships that supported jurisdiction in *Fuld*.

**PIEDCO.** Plaintiffs do not even allege where PIEDCO is incorporated. *Id.* ¶ 70. Nor do they allege that PIEDCO maintains any office, property, or operations in the United States. Their allegations instead concern unspecified USAID funding and management of a commercial development project in Gaza. *Id.* ¶ 103. Again, those allegations fall far short of the circumstances the Supreme Court relied upon in *Fuld*.

**Massar.** Massar is a Cyprus holding company with its principal place of business in Palestine. *Id.* ¶ 71. Plaintiffs do not allege that Massar conducts business in the United States. Instead, they attempt to attribute alleged U.S. relationships of other entities to Massar and point to its use of U.S. dollars in financial reporting. *Id.* ¶ 104. Those allegations do not remotely resemble the direct and longstanding U.S. relationship the Supreme Court considered in *Fuld*.

**Mr. Masri.** Finally, Plaintiffs' allegations concerning Mr. Masri consist primarily of historical and attenuated connections with the United States, including former residences, service on advisory boards, consulting relationships, and efforts to obtain financing for commercial projects in Palestine. *Id.* ¶¶ 73-92. Whatever significance Plaintiffs attempt to assign those allegations, they do not transform Mr. Masri into a governmental actor comparable to the PA or PLO, nor do they approach the type of longstanding institutional relationship with the United

21

States that the Supreme Court considered important in *Fuld*. [10] Accordingly, *Fuld* does not support

exercising jurisdiction over these Defendants. The Supreme Court upheld jurisdiction over two

uniquely situated governmental entities identified by Congress and expressly declined to endorse

more attenuated assertions of jurisdiction. Plaintiffs seek exactly the expansion that *Fuld* rejected.

B. **Plaintiffs Fail to Allege Facts to Fairly and Reasonably Extend Personal Jurisdiction Over Defendants Consistent with *Fuld* and *Rodriguez***

The Eleventh Circuit recently applied *Fuld's* Fifth Amendment framework to Rule 4(k)(2)

in *Rodriguez*. There, the Court held that the Fifth Amendment "doesn't impose a formal minimum-

contacts requirement" under Rule 4(k)(2) but instead requires a context-specific inquiry into

whether exercising personal jurisdiction would be fair and reasonable. 2026 WL 2118957, at *9.

The Court considered the three factors identified in *Fuld*: "[1] the burden on the defendant, [2] the

interests of the forum State, and [3] the plaintiff's interest in obtaining relief." *Id* at *9 (alteration

in original) (quoting *Fuld*, 606 U.S. at 24). Applying those factors, the Eleventh Circuit affirmed

dismissal for lack of personal jurisdiction over foreign commercial defendants because exercising

jurisdiction would be unreasonable under the Fifth Amendment. The same result follows here.

1. **The Burden on Each Defendant Would Be Severe and Render the Exercise of Jurisdiction Unreasonable and Unfair**

The first *Rodriguez* factor strongly favors dismissal. The Fifth Amendment's

reasonableness inquiry is animated by concerns of fundamental fairness to the defendant, and the

Eleventh Circuit recognized that the burden imposed on a foreign defendant is often the most

significant consideration. *Id.* at *9-13. The Eleventh Circuit provided several bases for its

---

[10] Mr. Masri's alleged post-complaint outreach to a U.S. official adds nothing to the jurisdictional analysis. *See* FAC ¶¶ 91-92. That contact has no relation to the October 7 attack and post-dates the filing of this litigation. *Hammer Brand, LLC v. Voro Inc.*, No. 8:23-CV-01272-KKM-NHA, 2024 WL 4803686, at *6 (M.D. Fla. Apr. 18, 2024) ("To comport with due process, a defendant must have had contacts with a jurisdiction before a lawsuit was filed, such that the defendant had fair warning that a lawsuit could be brought there.") (collecting cases).

determination that the exercise of jurisdiction would place an unfair burden on the defendants. All compel the same finding here. Defendants are foreign commercial entities and a Palestinian businessman with no presence in the United States. They had no clear statutory notice that their alleged conduct could subject them to suit in a United States court, engaged in no alleged conduct bearing a meaningful relationship to the United States, and would face extraordinary practical burdens defending this action in this forum. The FAC's allegations concerning each Defendant only reinforce that conclusion.

### a. Defendants Would Face Extraordinary Practical Burdens Litigating in the United States

The Eleventh Circuit held that the burden on the defendants was unreasonable in part because, "most obviously, recognizing personal jurisdiction over [the defendants] could well require a U.K.-based company to dispatch officers and employees across an ocean to the Southern District of Florida to defend this suit in a foreign nation's judicial system." *Id.* at \*10. The burdens are even greater here. Defendants are based in Palestine, which is further away from the Southern District of Florida than the U.K. and presents administrative concerns that a U.K.-based defendant does not need to address. For example, British corporations conduct business in the English language, and their offices are not near a war zone. Requiring the foreign Defendants in this case to litigate complex terrorism claims in a U.S. court would impose significant burdens on them, including the inability to compel foreign witnesses, the need to marshal and translate materials located abroad, and the significant practical and security challenges inherent in obtaining evidence and testimony from individuals located in Gaza. "Certainly the burden on the defendant[s] in this case is severe." *Asahi Metal Indus. Co., Ltd. v. Super. Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 114 (1987) (finding that forcing Japanese defendant to litigate in California would be a "unique burden" of "significant weight").

23

### b.          Defendants Had No Clear Statutory Notice

The Eleventh Circuit also found it significant that the defendants in *Rodriguez*, unlike the PA and PLO in *Fuld*, lacked clear statutory notice that their conduct could subject them to suit in the United States. *Rodriguez*, 2026 WL 2118957, at *11. The same is true here. The PSJVTA specifically named and conferred jurisdiction over the two defendants in that case. *See Fuld*, 606 U.S. at 21-22. As in *Rodriguez*, Defendants here are not subject to "the sort of by-name targeting exhibited in the PSJVTA," and "[t]he fact that an entity engages in covered conduct doesn't necessarily mean that it has a meaningful relationship with the United States." *Rodriguez*, 2026 WL 2118957 at *11.

Critically, the PSJVTA was an amendment to the ATA itself and Congress made a reasoned, deliberate decision to confer jurisdiction on two unique entities and declined to extend that jurisdiction to any other party; that decision would have no import if it were determined that any foreign ATA or JASTA defendant were subject to this court's jurisdiction without statutory notice. *See Fuld*, 606 U.S. at 22 ("Rather than subject to jurisdiction in its courts a broader range of potential defendants—each of which presumably would implicate distinct foreign affairs concerns—the Federal Government took a narrower tack. We decline to second guess why Congress did not use a blunter remedial tool to achieve its desired foreign policy ends. And moreover, the statute's targeted applicability put the PLO and PA on full notice that they could be subject to personal jurisdiction in ATA suits in U.S. courts.") (internal quotation marks and citation omitted).

The absence of that clear notice weighs heavily against the reasonableness of exercising jurisdiction here. *See Provencher v. Bimbo Foods Bakeries Distrib. LLC*, 175 F.4th 180, 187 (2d Cir. 2026) (finding *Fuld* inapplicable to the Fair Labor Standards Act because it does not contain a jurisdictional provision). Plaintiffs' theory of jurisdiction "does the very thing the *Fuld* Court

24

seemed to condemn: It asserts liability over run-of-the-mill private defendants that may not have meaningful contacts, ties, and relations with the United States." *Rodriguez*, 2026 WL 2118957 at *11 (cleaned up) (quoting *Fuld*, 606 U.S. at 22); *see also Burger King,* 471 U.S. at 472. Defendants could not reasonably have anticipated that the conduct alleged in the FAC would expose them to suit in a United States court, and thus, exercising jurisdiction here violates the Fifth Amendment.

> **c.** **Defendants Did Not Engage in Conduct Bearing a Meaningful Relationship to the United States**

The Eleventh Circuit also considered whether the defendants themselves engaged in conduct bearing a meaningful relationship to the United States. *Rodriguez*, 2026 WL 2118957, at *11. Plaintiffs fail to allege any such conduct here. Instead, they rely almost entirely on foreign commercial projects that allegedly obtained financing and insurance years before the attacks from international institutions maintaining a U.S. presence. Those allegations do not establish the type of meaningful relationship to the United States contemplated by *Fuld* and *Rodriguez*.

**PADICO.** *First*, Plaintiffs allege that PADICO generally received funding from "USAID and the World Bank" which "included funding in connection with the solar energy installation at the GIE." FAC ¶ 101.a.[11] Receipt of funding for overseas projects from an entity operating worldwide with a presence in Washington D.C., however, does not constitute a "meaningful relationship" with the United States. *Rodriguez*, 2026 WL 2118957, at *11; *see also Siam Kraft Paper Co., Ltd. v. Parsons & Whittemore Inc.*, 400 F. Supp. 810, 812 (D.D.C. 1975) ("[W]e do not think that the entry into any jurisdiction for the purpose of securing a [government] loan or an insurance guaranty, with accompanying negotiations among the parties, would or should confer jurisdiction on the local courts under . . . [a] 'long arm' statute."). *Second*, Plaintiffs allege that

---

[11] Elsewhere, Plaintiffs allege that the portion of funding from the World Bank "represented about 12% of total project costs" for the GIE, "focused on off-site infrastructure, capacity building, and project management." *Id*. ¶ 179, n.14.

"PADICO conducts its financial reporting in U.S. dollars." FAC ¶ 101.b. But use of the U.S. dollar—the world's reserve currency—is not a significant tie with the United States. *Third*, Plaintiffs allege that "Masri has used PADICO to sponsor visits by Harvard students to the Palestinian Territories, in part to familiarize them with PADICO's role in developing business there." FAC ¶ 101.c. If anything, that is an allegation of the relationship Harvard students have with Palestine, not of PADICO's with the United States; the alleged fact is irrelevant to Plaintiffs' claims. *See Rodriguez*, 2026 WL 2118957, at *12 n.5 (discounting allegations related to the United States that do not relate to the conduct at issue). Finally, Plaintiffs attempt to attribute PRICO's alleged contacts to PADICO based solely on PADICO's ownership interest. FAC ¶ 101.d; *see Rodriguez*, 2026 WL 2118957, at *12 (rejecting attempt to attribute jurisdictional conduct of one corporate entity to a related one). None of these allegations, individually or collectively, establishes meaningful contacts, ties, and relations with the United States by PADICO.

**PRICO.** Plaintiffs' jurisdictional allegations concerning PRICO are similarly deficient. Three of the four alleged ties to the United States concern financing or insurance provided by the World Bank, IFC, or MIGA which, as discussed above, do not constitute a meaningful relationship to the United States. FAC ¶ 102.a.-c. Moreover, Plaintiffs allege that the World Bank and IFC merely "expanded" that financing in 2017—more than six years before the October 7 attacks. *Id.* ¶ 102.b. Plaintiffs' remaining allegation—that "PRICO is also closely associated with Masri's ownership and management of the Blue Beach hotel"—does not concern the United States at all. *Id.* ¶ 102.d. Accordingly, Plaintiffs fail to allege any meaningful relations with the United States.

**PIEDCO.** Plaintiffs' allegations concerning PIEDCO fare no better. Plaintiffs alleged unspecified USAID funding at an unknown time, in an unknown amount, and without identifying the entity that received it. *Id.* ¶ 103.a. Plaintiffs also allege that PIEDCO managed "the installation

26

of the U.S.-funded PRICO Solar Gaza project." *Id.* ¶ 103.b. But managing a commercial project located entirely in Gaza does not constitute a meaningful relationship with the United States simply because financing allegedly originated from an institution with a U.S. presence. *See Rodriguez*, 2026 WL 2118957, at *12 (concluding that even a New York headquarters was not enough). Plaintiffs have not pled any meaningful contacts between PIEDCO and the United States.

**Massar**. Plaintiffs likewise plead nothing as to Massar. The "list" which appears to enumerate five "ties" to the United States for Massar underscores why there is no personal jurisdiction here. FAC ¶ 104.a-e. The first allegation attempts to attribute PRICO's conduct to Massar based on the conclusory allegation that "Massar used PRICO to obtain" funding for the Solar Gaza project. *Id.* ¶ 104.a. The second asserts that Massar partners with "U.S. entities," and "was awarded over $44 million by USAID to expand markets for Palestinian products, build resilience, and mitigate shocks to the Palestinian economy." *Id.* ¶ 105.b. (internal quotation marks omitted). But there is no further link to the present case, and even with a link, funding for overseas projects is not meaningful as a matter of law. The third item relates to a subsidiary of Massar (not a Defendant) which allegedly received U.S. funding as recently as 2019, four years before the October 7 attacks. *Id.* ¶ 105.c. The fourth item relates to another subsidiary of Massar (also not a Defendant) which has provided Masri's consulting services to "U.S.-based institutions" including U.S. government entities. *Id.* ¶ 105.d. Finally, Plaintiffs note that Massar conducts its business in U.S. dollars, which is irrelevant. *Id.* ¶ 105.e.[12] In sum, Plaintiffs identify no conduct by Massar itself bearing a meaningful relationship to the United States.

**Mr. Masri.** Plaintiffs assert scattershot claims concerning Mr. Masri's supposed

---

[12] After these introductory paragraphs of purported ties to the United States, Plaintiffs mention Massar only five more times—four merely lump Massar with other Defendants and one concerns post-attack purchase of PADICO stock in 2025. *See* FAC ¶¶ 169, 212, 234-35, 498.

connections to the United States, including that he has U.S. citizenship, lived in the U.S. twenty-five years ago, served on the advisory board of the DFC from 2020-2023 and sat on the Dean's Council at Harvard University's Kennedy School of Government, and engages in philanthropic and political activities in Virginia, Massachusetts, and Maryland. *See* FAC ¶¶ 16-18, 54, 60, 79-92. Plaintiffs further allege that he leveraged these relationships and his U.S. citizenship to help the Corporate Defendants obtain financing, and that his consulting company's decades-old contracts with USAID somehow provided "legitimacy and diplomatic cover for Hamas operations." *Id.* ¶¶ 60, 62. Those allegations concern historical personal associations and commercial activities abroad, not conduct bearing a meaningful relationship to the United States.

Pre-*Fuld*, courts consistently rejected the proposition that obtaining financing or insurance from institutions located in or connected to the United States for projects located entirely overseas creates a sufficient relationship with the United States. In *AGS International Services S.A. v. Newmont USA Ltd.,* the court held that a foreign entity's receipt of IFC financing did not permit the exercise of personal jurisdiction because the entity could not "reasonably foresee being haled into this jurisdiction's courts as a result of such activity." 346 F. Supp. 2d 64, 82 (D.D.C. 2004), *abrogated on other grounds as recognized in Cherdak v. Am. Arb. Ass'n Inc.*, 443 F. Supp. 3d 134 (D.D.C. 2020). "To conclude otherwise would inundate the courts in [the U.S.] with the filing of countless lawsuits that concern events about which the [U.S.] has no interest." *Id.* Likewise, the Second Circuit expressly rejected the theory that "applying for and contracting with the United States government to obtain USAID funding" was sufficient to justify the exercise of personal jurisdiction. *United States ex rel. TZAC, Inc. v. Christian Aid*, No. 21-1542, 2022 WL 2165751, at *2 (2d Cir. June 16, 2022) (summary order).[13] Those decisions reinforce the conclusion that

---

[13] A court in the District of Columbia, where Plaintiffs initially filed this action, *see Shalom v.*

28

Plaintiffs' allegations concerning IFC, MIGA, World Bank, and USAID financing do not establish conduct bearing a meaningful relationship to the United States.

### d.     Defendants Have No Presence in the United States

Finally, the Eleventh Circuit in *Rodriguez* also considered whether the defendants maintained a meaningful presence in the United States. 2026 WL 2118957, at *12. Even though one of the *Rodriguez* defendants maintained "dual headquarters in London and New York," the court nevertheless concluded that exercising personal jurisdiction would be unreasonable because the complaint did not allege conduct occurring through the New York office that bore a meaningful relationship to the claims at issue. *Id*. The allegations here are substantially weaker. As discussed above, Plaintiffs do not allege that any Defendant maintains any office, headquarters, facility, employees, property, or business operations in the United States. Nor do they allege that any Defendant engaged in conduct in the United States related to the claims asserted in this action. If the allegations in *Rodriguez* were insufficient to render the exercise of jurisdiction reasonable, Plaintiffs' far more attenuated allegations here necessarily fail as well.

### 2.     The United States' General Interest in ATA Enforcement Does Not Make Jurisdiction Reasonable Here

The United States unquestionably has a substantial interest in providing a forum for American victims of international terrorism. *Fuld*, 606 U.S. at 24. But *Rodriguez* confirms that the

---

*Masri*, No. 25-cv-01024-JMC (D.D.C. filed Apr. 7, 2025), addressed materially similar allegations and reached the same conclusion with respect to IFC funding. Although the Report and Recommendation in *Cabrera v. Black & Veatch Special Projects Corps.* was not adopted and was vacated on other grounds and applies the Fourteenth Amendment test, it is instructive. *See* No. 19-cv-3833-EGS-ZMF, 2021 WL 3508091, at *13 (D.D.C. July 30, 2021), *report and recommendation vacated sub nom. Cabrera v. Black & Veatch Special Project Corp.*, No. CV 19-3833 (LLA), 2024 WL 1435146 (D.D.C. Mar. 28, 2024). The court there explained that "[e]ntry into a forum for the sole purpose of 'securing a loan or an insurance guaranty' does not constitute purposeful availment of the forum, especially where the funding is for non-forum projects." *Id.* (quoting *Siam Kraft.*, 400 F. Supp. at 812 (citation omitted)).

existence of a federal cause of action and U.S. plaintiffs does not by itself make jurisdiction reasonable over foreign private defendants whose alleged conduct lacks a meaningful connection to this country. The *Rodriguez* court emphasized that "the PSJVTA represents but one targeted aspect of a multifaceted foreign policy toward these two *sui generis* foreign entities, both of which exercise governmental functions in a geopolitically sensitive region and have decades of meaningful contacts, ties, and relations with the United States." 2026 WL 2118957, at *10 (quoting *Fuld* 606 U.S. at 22). That larger foreign policy interest is not present here, where Plaintiffs seek to impose ATA liability on ordinary foreign commercial entities and a private businessman. As *Rodriguez* recognized, Defendants are "run-of-the-mill private defendants," not the uniquely situated governmental entities at issue in *Fuld*. *Id*. Congress demonstrated through the PSJVTA that it knows how to enact targeted jurisdictional provisions when it determines that particular foreign defendants should be subject to suit in United States courts. It enacted such a provision for the PA and PLO, but not for Defendants like these. That distinction reinforces *Rodriguez*'s conclusion that the United States' general interest in ATA enforcement, standing alone, does not make the exercise of personal jurisdiction reasonable under the Fifth Amendment.

### 3. Plaintiffs' Interest in Litigating in the United States Does Not Support Jurisdiction

In *Rodriguez*, the Eleventh Circuit held that plaintiffs had a strong interest in litigating in the United States because "this country's courts are the only tribunals in which" they are able to "vindicate[e] their rights under the Helms-Burton Act" due to that law's unique considerations. 2026 WL 2118957 at *10. This case presents no comparable circumstance. Unlike the Helms-Burton Act, the ATA does not create a cause of action that can be vindicated only in United States courts, and Plaintiffs allege no reason why the United States is the exclusive forum for adjudicating their claims. Moreover, many Plaintiffs are foreign nationals, unlike the plaintiffs in *Rodriguez*,

30

further diminishing whatever interest they may have in litigating in the United States. *See infra* Section V (explaining that plaintiffs who are not U.S. citizens lack standing under the ATA). Accordingly, this factor also favors Defendants.[14]

### C. Plaintiffs Improperly Aggregate Jurisdictional Allegations

Lacking individual contacts as to each Defendant, Plaintiffs attempt to aggregate one Defendant's alleged contacts with those of another. *Rodriguez*, however, squarely rejected that approach, explaining that "*Fuld* didn't purport to jettison or alter" the settled principle that "the actions of a foreign parent company's subsidiary can't be imputed to the parent for personal-jurisdiction purposes absent a showing that the sub is nothing more than an alter ego of the parent such that veil-piercing is proper." 2026 WL 2118957, at *11 (citations omitted). Likewise, "[t]he Court must assess its personal jurisdiction over each defendant separately." *Oueiss v. Saud*, No. 1:20-cv-25022-KMM, 2022 WL 1311114, at *9 (S.D. Fla. Mar. 29, 2022) (citation omitted). Plaintiffs were on notice of this defect through Defendants' initial motion to dismiss. Rather than cure it, they now pepper the FAC with generic allegations of "interlocking ownership structures"

---

[14] Plaintiffs frame their jurisdictional allegations as Defendants' "contacts" and "ties" with the United States. *E.g.,* FAC ¶¶ 54, 57, 58, 84; *see also In re Diisocyanates Antitrust Litig.*, No. 18-1001, 2026 WL 522845, at *6 (W.D. Pa. Feb. 25, 2026) (holding that absent congressional grant of jurisdiction, jurisdiction under Rule 4(k)(2) still requires demonstration of minimum contacts with the United States after *Fuld*). To the extent the traditional Fourteenth Amendment analysis is applied, Plaintiffs also fail to meet that standard. For minimum contacts, courts assess: "(1) whether the plaintiff's claims arise out of or relate to at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant purposefully availed himself of the privilege of conducting activities with the forum state, thus invoking the benefit of the forum state's law; and (3) whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice." *Schrier v. Qatar Islamic Bank*, 632 F. Supp. 3d 1335, 1358 (S.D. Fla. 2022) (quoting *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013)). As noted herein, decades-old financing and insurance from entities with links to the United States have no causal nexus to the attacks and claims alleged; such funding does not constitute purposeful availment as a matter of law; and nothing about exercising personal jurisdiction over each Defendant comports with fairness and justice because no Defendant is alleged to be incorporated in, reside in, or maintain offices, employees, or business operations in the United States and all projects at issue are located abroad.

31

and "share[d] directors and employees," typical of many complex corporate structures, FAC ¶ 56, apparently relying on an alter ego theory to attribute one Defendant's alleged contacts to another. As discussed above, however, Plaintiffs have failed to allege sufficient jurisdictional contacts as to any Defendant individually. Nor have they alleged facts sufficient to disregard the Corporate Defendants' separate legal identities.

This case resembles *Herederos De Roberto Gomez Cabrera, LLC v. Teck Resources Ltd.*, in which plaintiffs pled that "some of [the parent's] corporate officers or leadership [were] also officers of [its] U.S.-based subsidiaries" and that the parent "consolidate[d] its financial statements with those of its US-subsidiaries." 43 F.4th 1303, 1312 (11th Cir. 2022), *abrogated on other grounds by Fuld*, 606 U.S. 1. The Eleventh Circuit held those allegations insufficient, however, because the entities remained legally distinct and observed ordinary corporate formalities, such as each having "its own board of directors, officers, books of account, and separate taxes." *Id*. Similarly, in *Rodriguez,* allegations that a parent company "centrally coordinated [its subsidiaries'] financial matters, reporting, control, treasury, tax, mergers, acquisitions, investor relations, legal affairs and internal audit from its headquarters" were insufficient to disregard corporate separateness. 2026 WL 2118957, at *12 (alteration in original).

Here, the FAC alleges nothing more. It does not support the inference that any Defendant conducts business on behalf of the other, or that the Corporate Defendants lack separate corporate identities. Instead, Plaintiffs repeatedly allege that Mr. Masri "controls" the Corporate Defendants, *see, e.g.*, FAC ¶¶ 7, 8, 19, 21, 22, 27, 54, 66, 67, 70, 93, 97, but mere use of the word "controls" is not enough. "Conclusory allegations will not suffice to state a claim based upon an alter-ego theory of liability." *Elof Hansson Paper & Board, Inc. v. Caldera*, No. 11-20495-CIV, 2011 WL 13115561, at *4 (S.D. Fla. Sept. 6, 2011). "Rather, the plaintiff must set forth facts demonstrating

32

that the corporate form should be ignored." *Id.*

Nor do Plaintiffs' factual allegations bridge that gap. As to Massar, Plaintiffs only allege that Massar owns a minority share of PADICO "indirectly," FAC ¶ 95, that Mr. Masri is its chairman, and that PADICO's CEO is a "Senior Partner" and "Trustee of Masri's children's shares." *Id*. ¶ 97. As to PRICO, Plaintiffs allege only that it owns "more than 80% of PIEDCO," that a member of PADICO's board of directors was its "Chief" five years ago (not even simultaneously), and that it shares the same logo as PRICO and PADICO. *Id*. ¶¶ 97-98. More broadly, Plaintiffs only allege seven individuals, including Mr. Masri, were overlapping officers, and they do not allege any Defendant wholly owns another. *See id.* ¶¶ 93-97. These allegations describe nothing more than ordinary parent-subsidiary relationships and commonplace overlap in ownership and management. Accepted as true, Plaintiffs' theory would effectively eliminate corporate separateness in virtually every parent-subsidiary corporate structure. That is not the law.

Even if Plaintiffs had adequately alleged an alter ego relationship—which they have not—their theory would still fail because none of the Defendants is alleged to reside or maintain a meaningful presence in the United States. Courts in this District have recognized that alter ego jurisdiction ordinarily permits a plaintiff to impute the contacts of a *resident entity* to a *nonresident affiliate*, not the contacts of one nonresident defendant to another. *K3 Enters., Inc. v. Sasowski*, No. 20-24441-CIV, 2021 WL 8363506, at *5 (S.D. Fla. Nov. 22, 2021); *see also Medlink Legal Sys., LLC v. OIMA Ltd.*, 794 F. Supp. 3d 1265, 1274 (S.D. Fla. 2025) ("Medlink's alter ego theory of personal jurisdiction fails because there is no resident entity."). Here, Plaintiffs seek to do precisely the latter. Every Defendant is foreign. Accordingly, even if Plaintiffs had plausibly alleged alter ego, that theory would not supply a basis for exercising personal jurisdiction.[15]

---

[15] While this caselaw relates to Florida's long-arm statute, it is still applicable to the FAC. "Each

## II. PLAINTIFFS FAIL TO PLEAD THAT EACH DEFENDANT IS LIABLE FOR AIDING AND ABETTING THE ATTACKS UNDER JASTA

Even if the Court could exercise jurisdiction over any Defendant, Plaintiffs still fail to state a claim because their allegations do not satisfy the statutory elements for secondary liability under JASTA (or primary liability under the ATA, as discussed below, *infra* Section IV). Originally, Plaintiffs hinged their case on the concept that simply operating the Commercial Properties in the ordinary course was sufficient for aiding-and-betting liability under JASTA because the Commercial Properties were in a conflict zone. Faced with the deficiencies in the initial complaint, Plaintiffs now attempt to bolster the FAC with allegations that the Commercial Properties provided "cover" to Hamas, that Hamas used the properties, and that Defendants knowingly allowed Hamas to refurbish and augment the tunnels beneath them. Despite these new allegations, the FAC still fails to identify any non-conclusory facts showing that any Defendant consciously, voluntarily, and culpably participated in or encouraged Hamas's terrorist activities. Instead, Plaintiffs continue to rely on speculation, hindsight, and conclusory assertions of "coordination" and "assistance."

The ATA, as amended by JASTA, "attaches a civil cause of action for U.S. nationals 'injured . . . by reason of an act of international terrorism.'" *Newman v. Associated Press*, 758 F. Supp. 3d 1357, 1367 (S.D. Fla. 2024) (quoting 18 U.S.C. § 2333(a) (alteration in original)). To state a claim for aiding-and-abetting liability under JASTA, Plaintiffs must allege "three elements: (1) 'the party whom the defendant aids must perform a wrongful act that causes an injury;' (2) 'the

---

defendant's contacts with the forum State must be assessed individually." *Calder v. Jones*, 465 U.S. 783, 790 (1984). It is consistent with due process to pierce the corporate veil if a non-resident defendant fully controls resident defendants as "mere instrumentalities" such that resident defendants are agents acting within the court's jurisdiction "solely" on the non-resident's behalf. *See Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1272-73 (11th Cir. 2002). It does not follow, however, that the corporate form as to five foreign defendants can be disregarded together, allowing some jurisdictional contacts of one defendant to be mixed with those of another. That is not the law.

34

defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance;' and (3) 'the defendant must knowingly and substantially assist the principal violation.'" *Id*. (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)). Absent plausible factual support for each element, dismissal is required.

JASTA's meaning was set out in *Twitter*, 598 U.S. 471 (2023). The "fundamental question of aiding-and-abetting liability" is, "[d]id defendants consciously, voluntarily, and culpably participate in or support the relevant wrongdoing?" 598 U.S. at 505. As in *Twitter*, "the answer in this case is no." *Id*. The Supreme Court emphasized that "[o]ur legal system generally does not impose liability for mere omissions, inactions, or nonfeasance." *Id*. at 489. Measured against that standard, the FAC alleges, at most, lawful commercial development, ownership and operation of commercial properties, and a failure to prevent Hamas's alleged misuse of those properties. Those allegations do not plausibly establish the knowing and substantial assistance that JASTA requires.

Instead, the FAC continues to rest on the premise that engaging in routine economic development in Gaza or Hamas's alleged later misuse of the Commercial Properties constitutes aiding and abetting Hamas's terrorist activities. *Twitter* forecloses that theory. The Supreme Court warned that extending aiding-and-abetting liability too far would mean that "anyone who passively watched a robbery could be said to commit aiding and abetting by failing to call the police." *Id.* at 488-89. Plaintiffs' theory suffers from the same defect. The FAC never plausibly alleges that any Defendant took action with the intent to assist Hamas's terrorist activities or otherwise consciously, voluntarily, and culpably participated in or encouraged the October 7 attacks or the wrongful conduct giving rise to Plaintiffs' injuries.[16]

---

[16] While Plaintiffs allege that Hamas caused injury to Plaintiffs, they also allege that "other terrorist[s]" caused injury to Plaintiffs. FAC ¶¶ 138, 447, 1449. Thus, some injuries may not even be attributable to a foreign terrorist organization ("FTO") or to anyone Defendants are

### A.      Plaintiffs Fail to Plead Knowing and Substantial Assistance

Plaintiffs fail to allege that each Defendant provided knowing and substantial assistance to Hamas or other terrorists because they fail to show that Defendants "consciously and culpably participated in a tortious act in such a way as to help make it succeed." *Twitter*, 598 U.S. at 497 (internal quotation mark and citation omitted). Based on the FAC, no Defendant can be said to have taken "some affirmative act with the intent of facilitating the offense's commission" because Plaintiffs do not identify an affirmative act, nor do they adequately allege intent to facilitate the October 7 attacks. *Id*. at 490 (internal quotation mark and citation omitted); *see also id.* at 491-92 (describing "substantial assistance" and "scienter" as "twin requirements").

### 1.      Plaintiffs Fail to Plead an Affirmative Act to Assist in the Attacks

At best, the FAC alleges lawful, non-violent conduct, and at worst, it alleges omissions and inaction. That is not enough. The Supreme Court's recent decision in *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280 (2025), clarified that allegations "of 'indifference,' rather than assistance" are insufficient, and that "omissions" or "inactions" are "rarely the stuff of aiding-and-abetting liability." *Id*. at 297 (citations omitted). *Smith & Wesson* reaffirmed that viable aiding and abetting claims must "pinpoint" a "specific criminal transaction[] that the defendants (allegedly) assisted." *Id*. at 294. Plaintiffs point to no such transaction here.

Plaintiffs allege that "Defendants undertook the initial development of [a] hotel *in coordination with Hamas*, and *it is likely* that even the initial construction project helped to conceal Hamas's excavation and construction of a network of attack tunnels immediately below the hotel and accessible from the hotel's lower levels." FAC ¶ 300 (emphasis added). But the FAC pleads no facts identifying who allegedly coordinated with Hamas, when any coordination occurred, what was

---

accused of aiding. Regardless, Plaintiffs have not pled any facts to support a claim that any Defendant aided Hamas or "other terrorists" in the attacks of October 7.

said or agreed to, or what any Defendant actually did to facilitate Hamas's terrorist activities. "[I]t is not enough, as plaintiffs contend, that a defendant have given substantial assistance to a transcendent 'enterprise,'" like Hamas, "separate from and floating above all the actionable wrongs that constitute it." *Twitter*, 598 U.S. at 495. Rather, "a defendant must have aided and abetted . . . another person *in the commission of the actionable wrong* . . . ." *Id*. (emphasis added).

Plaintiffs further rely on acts that are neither tortious nor anything more than ordinary commercial activity, such as contracting "to help redevelop and refurbish the Al Mashtal Hotel." FAC ¶ 316. To transform that lawful commercial activity into an affirmative act, Plaintiffs allege only that the construction company was affiliated with Hamas. *Id.* Plaintiffs also allege that Hamas (not Defendants) used the Blue Beach Hotel "with Defendants' assistance." *Id*. ¶ 329. That is not enough. Plaintiffs attempt to do exactly what the Supreme Court warned against in *Twitter*, extending secondary liability "too far" by imposing liability on commercial actors based on Hamas's misuse of their goods, services, or property. *See Twitter*, 598 U.S. at 489 (explaining that "if aiding-and-abetting liability were taken too far, then ordinary merchants could become liable for any misuse of their goods and services"). That is guilt by association, not knowing and substantial assistance.

Plaintiffs' augmentation theory fares no better because Plaintiffs conclusorily allege that all Defendants "*knowingly assisted* Hamas by providing it and its terror infrastructure with electricity." FAC ¶ 286 (emphasis added). Beyond that, there are no further allegations as to *who*, *when*, or *how* this electricity was provided. Nor is there any explanation as to *why* or *how* Hamas specifically relied on the slight "fungible" solar energy, *see id.* ¶ 224, n.20, that briefly existed at the Commercial Properties versus the free electricity provided for decades by Israel to refurbish tunnel infrastructure that long existed. And from a plausibility analysis, if Hamas was the *de facto* government in Gaza,

why did they need access from the Commercial Properties when Hamas could access the tunnels from any part of the region it controlled, including training grounds and mosques? Under *Iqbal* and *Twombly*, more is required. *Iqbal*, 556 U.S. at 678-80; *Twombly*, 550 U.S. at 556-57; *see also Troell v. Binance Holdings Ltd.,* No. 24-CV-7136 (JAV), 2026 WL 636849, at *23 (S.D.N.Y. Mar. 6, 2026) (dismissing JASTA and ATA claims against Binance for October 7 attacks and finding alternative explanation for Binance's conduct could "more plausibly be inferred").

The FAC alleges that Gaza's tunnel network long predated the October 7 attacks and extended throughout Gaza, where it served multiple purposes, including trade, smuggling, and military operations. FAC ¶¶ 131, 136. It further alleges that the GIE solar project generated only 7.3 megawatts of electricity—a small fraction of Gaza's overall power supply—for a limited period before October 7. *Id.* ¶ 287. Even accepting Plaintiff's theory that electricity is "fungible," *see id.* ¶ 224 n.20, those allegations do not plausibly support an inference that Defendants knowingly and substantially assisted Hamas's terrorist activities by installing solar panels for commercial tenants. *See Twitter*, 598 U.S. at 491 (explaining "passive actors . . . carrying out routine transactions" are not liable for aiding-and-abetting liability). Nor can Plaintiffs evade the principle that "the defendant is not liable for the principal's wrongs without understanding, to some extent, the foreseeable consequences of the defendant's actions." *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 444 (2d Cir. 2025) (citation omitted) (dismissing JASTA claim and holding that a "fungibility theory" is not actionable under JASTA). Plaintiffs make no case that that installing solar panels to generate a small percentage of Gaza's electricity made Hamas's terrorist activities reasonably foreseeable.

To get around these defects, Plaintiffs focus on *Hamas's* conduct, not Defendants. For example, the FAC relies on conclusory buzzwords with respect to Mr. Masri, claiming he "was

38

actively involved in helping" Hamas, "facilitat[ed]" Hamas's construction, and "work[ed] with Hamas." FAC ¶ 501. But Plaintiffs identify no facts explaining what Mr. Masri allegedly did that constituted knowing and substantial assistance. Plaintiffs also allege that Mr. Masri is responsible for "allowing" Hamas to use the GIE "as a staging area." *Id.* But "allowing" is insufficient under *Twitter*. Plaintiffs insist that "Defendants did more than just passively allow their properties and money to be appropriated by terrorists." *Id.* ¶ 171. But they do not allege what that "more" is.

### 2. Plaintiffs Fail to Plead Any Non-Conclusory Allegations of Knowledge

The FAC is replete with conclusory phrases of "knowledge" and "knowing assistance." Phrases like "Defendants knew," "worked directly," or acted "with the full knowledge and support" of Hamas's activities do not meet pleading standards under *Iqbal* and *Twombly* and the requirements of *Twitter*. *See, e.g.*, FAC ¶¶ 25, 204, 231, 351, 452, 1437. Repetition of conclusory allegations does not make them any less conclusory. To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citation omitted). Inferences "unsupported by facts or legal conclusions disguised as factual allegations" do not suffice. *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 866 (D.C. Cir. 2022) (cleaned up).

Nowhere in the FAC do Plaintiffs allege that any Defendant had advance notice of the attacks, was aware of their planning, or knowingly provided assistance for the purpose of engaging in terrorist acts. And even if there was knowledge, that is still not enough. "[K]nowledge, acquiescence, carelessness, indifference," or "lack of concern" are not enough. *Ashley*, 144 F.4th at 443 (citation omitted). Instead, Plaintiffs must plead "interested cooperation, stimulation, instigation," or "something more to indicate a willingness to aid [Hamas's] terrorist activities." *Id*. Plaintiffs fail to do so here.

39

For example, Plaintiffs allege that rockets were fired from one of the Hotels. FAC ¶ 307. But they do not allege when this rocket fire occurred, that any Defendant knew rockets were being launched from the Hotels, or that any Defendant intended to facilitate such activity. *See Troell*, 2026 WL 636849, at *19 (processing transactions for wallets hosted by an entity allegedly controlled by the IRGC did not plausibly suggest defendants intended to assist terrorist attacks). Instead, Plaintiffs ask the Court to infer knowledge because "owners and operators of properties situated above Hamas attack tunnels," not just Defendants, allegedly "understood that the tunnels were used to attack Israel, as they often drew airstrikes to suppress the rocket fire." FAC ¶ 170. That inference is insufficient. That Israel targeted property in Gaza does not plausibly establish that the owners of those properties knew why strikes occurred, much less that they knowingly participated in Hamas's terrorist activities.

Similarly, Plaintiffs' characterization of what they allege to be "attack tunnels" near Defendants' development sites are not only conclusory, but also a retroactive self-serving characterization to fit their narrative. *See, e.g.*, FAC ¶ 4. The FAC itself acknowledges that there is nothing unusual about tunnels in Gaza; they are ubiquitous. *Id.* ¶¶ 135-61. Indeed, Hamas's tunnel networks are described as "vast" and "constitut[ing] an unprecedented form of urban planning." *Id.* ¶ 143. These tunnels are, and have long been, used "[l]ike a subway system or 'Metro,'" and for other purposes like "smuggling." *See id.* ¶¶ 135-36. Such overbroad claims of liability cannot survive *Twitter* and *Smith & Wesson*. To hold otherwise would extend liability to the thousands of "owners and operators of properties situated above" the hundreds of miles of tunnels which Hamas allegedly decided to use in the October 7 attacks. *See id.* ¶ 170.

Accordingly, the development of Commercial Properties, or passive acquiescence to the laws of the *de facto* government in Gaza, or Hamas's conduct is insufficient. Defendants are not

40

liable simply for being near Hamas, or even knowledgeable of Hamas as a wrongdoer—everyone in Gaza would be similarly situated. As Plaintiffs allege, Hamas has been the "de facto ruler in Gaza, assuming control of its borders, creating its own police force, and taking control of all governmental functions." *Id*. ¶ 121. Merely residing in Gaza or engaging in lawful business operations under the *de facto* Government's rule does not make Defendants complicit in Hamas's crimes. *See Keren Kayemeth LeIsrael – Jewish Nat'l Fund v. Educ. for a Just Peace in the Middle E.*, 66 F.4th 1007, 1015 (D.C. Cir. 2023) ("*JNF*") (Courts "cannot reasonably infer that Hamas controls every act…merely because it administers the Gaza Strip."). Extending aiding and abetting liability to such activity would effectively convert ordinary commerce into strict liability for international terrorism and would make the millions of people living in Gaza liable to claims under JASTA—which is inconsistent with core principles of "our legal system." *See Twitter*, 598 U.S. at 489. Congress enacted JASTA to reach those who knowingly and intentionally assist terrorism, not those engaged in lawful commerce in areas under terrorist control.

Nor can Plaintiffs infer intent or knowledge from the FAC's collection of public statements, business relationships, commercial activities, and historical anecdotes. *See, e.g.*, FAC ¶¶ 73-78, 97, 99, 234, 242-43, 288-89, 311-12. PADICO's press releases about reconstruction projects and photographs of Mr. Masri at public signing ceremonies describe economic development initiatives carried out openly with international participation, not clandestine efforts to aid Hamas in the October 7 attacks. The appointment of a local executive such as Farid Al-Qeeq, whose prior academic work at the Islamic University of Gaza is alleged to show Hamas ties, does not establish that Defendants shared Hamas's objectives or knowingly advanced its terrorist activities. Likewise, allegations that Hamas members or affiliates stayed at the Hotels merely show that Defendants operated public accommodations in Gaza, not that they knowingly provided

41

assistance to Hamas; to the extent those Hamas members or affiliates misused the Hotels for their own purposes, that misuse cannot establish any Defendant's scienter. Finally, Mr. Masri's decades-old comments about his youth—reflecting on events from the 1970s, well before Hamas's formation—cannot reasonably support an inference of a present intent to support Hamas and its October 7 attacks decades later. Individually and collectively, these allegations amount to nothing more than guilt by association and hindsight inference, not plausible allegations of the knowing and substantial assistance JASTA requires.

The same holds true for post-October 7 statements by Mr. Masri and PADICO board members. *See* FAC ¶¶ 479-99. These include PADICO's financial statement referencing "aggression on the Gaza Strip," Mr. Masri's personal Facebook posts criticizing Israel's military response, and political commentary by two PADICO directors regarding the ensuing conflict. *See, e.g.*, *id.* ¶¶ 348, 479-80, 482, 491. Even accepting those allegations as true, these statements do not plausibly support the inference that Defendants knowingly assisted or intended to further the October 7 attacks. They do not celebrate the October 7 attacks, endorse Hamas's terrorist acts, admit prior coordination with Hamas, or express approval of the violence inflicted on civilians. Instead, they reflect political and humanitarian commentary concerning the ensuing war and its consequences for civilians in Gaza—subjects that have generated substantial international debate and public disagreement. *See Shnaider v. Am. Muslims for Palestine*, No. 8:24-cv-01067-MSS-SPF, 2026 WL 984199, at *4 (M.D. Fla. Feb. 24, 2026) ("Any alleged encouraging statements…that discussed October 7 were made after the attacks and thus could not have aided or abetted the commission of the specific offense."). Read in context, these statements are entirely consistent with political and humanitarian commentary concerning an ongoing armed conflict and do not plausibly support the inference that Defendants knowingly and substantially assisted

42

Hamas's terrorist activities.

In sum, Plaintiffs' allegations amount to nothing more than guilt by association, hindsight speculation, and lawful commercial activity in a region governed by Hamas. They do not plausibly establish that any Defendant consciously, voluntarily, and culpably participated in or encouraged Hamas's terrorist activities or provided the knowing and substantial assistance JASTA requires.

### 3.    Plaintiffs Fail to Plead That Defendants Provided Pervasive and Systemic Aid to a Terrorist Enterprise

As explained above, Plaintiffs fail to allege either that Defendants affirmatively assisted in the commission of the October 7 attacks, or that Defendants had any intent that they occur. Given the lack of a connection between any act that a Defendant actually committed and Plaintiffs' injuries, Plaintiffs cannot allege any "direct nexus between the defendant's acts and the tort" at issue. *Twitter*, 598 U.S. at 506. Without such a nexus between Defendants and the October 7 attacks themselves, Plaintiffs must show "pervasive and systemic aid" that "would hold a defendant liable for all the torts of an enterprise[.]" *Id.* Plaintiffs fail to do so.

In the first federal appellate decision applying *Twitter,* the Second Circuit held that allegations of "pervasive and systematic" assistance still did "not meet th[e] high bar" established in *Twitter*, because the complaint did not support the inference that the defendants' conduct was "designed or performed with the intent to aid the [FTO]." *Ashley*, 144 F.4th at 445. The same is true here. Plaintiffs fail to allege that Defendants' infrastructure development or commercial activities were designed or undertaken with the intent to aid Hamas or any terrorist activity. To date, no court has held that a JASTA complaint has met this high bar, and the FAC is not the first. Its allegations of assistance relate to one attack, without any allegation that "defendants and [Hamas] formed a near-common enterprise of the kind that could establish such broad liability." *Twitter*, 598 U.S. at 501-02.

43

B.      **Plaintiffs Fail to Plead Facts Satisfying the *Halberstam* Factors for Each Defendant's Culpable Association with Hamas's October 7 Attacks**

Under JASTA, to assess whether a defendant "culpably associated themselves with [Hamas's] actions," *Twitter*, 598 U.S. at 504, courts focus on the *Halberstam* factors: "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (citing *Halberstam*, 705 F.2d at 483-84); *see also Ashley*, 144 F.4th at 437 ("[I]t is best to revisit JASTA's sweep under the *Halberstam* framework with the benefit of *Twitter*."); *Newman*, 758 F. Supp. 3d at 1367. Considered together, the *Halberstam* factors do not support such the inference that any Defendant consciously, voluntarily, and culpably participated in or encouraged Hamas's terrorist activities or knowingly provided substantial assistance.

1.      **No Plausible Allegations that Defendants Encouraged or Knowingly Assisted the October 7 Attacks**

Plaintiffs do not allege that Defendants knew about the October 7 attacks or any subsequent hostilities, let alone that they encouraged Hamas. *See Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 225 (2d Cir. 2019) ("The plaintiffs here have not plausibly alleged that [Defendant] encouraged the heinous November 9 Attacks or provided any funds to [the FTO]."). Critically, "the alleged aid"—the tunnel infrastructure and other infrastructure within Gaza—was not "important to the nature of the injury-causing act." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 500 (2d Cir. 2021). As noted above, tunnels are ubiquitous throughout Gaza and served multiple purposes by many actors, while the Commercial Properties were commercial developments.

2.      **No Plausible Allegations of Knowing and Substantial Assistance**

As discussed above, *see supra* Section II.A.1, Plaintiffs only allege conclusory assistance, lawful commercial activity, and passive inaction.

44

### 3. No Allegations that Defendants Were Present During the Attacks

Plaintiffs do not allege that any Defendant was present at the location of any of the alleged attacks on or after October 7. This absence further underscores the physical and temporal distance between Defendants' commercial activities and the terrorist acts—precisely the sort of attenuation *Halberstam* recognized as incompatible with aiding and abetting liability. *See Zapata v. HSBC Holdings PLC*, 414 F. Supp. 3d 342, 356 (E.D.N.Y. 2019).

### 4. No Plausible Allegations of a Culpable Relationship with Hamas

Plaintiffs allege no supervisory authority, operational control, revenue-sharing arrangement, or coordinated relationship between Defendants and Hamas that would support JASTA liability. Instead, Plaintiffs allege that "Hamas and the companies it controlled monopolized lucrative sectors of the Gaza economy," including "significant real estate and commercial developments[.]" FAC ¶ 133. From that premise, they infer that Defendants' projects "could not have been commenced or completed without" Hamas's approval or coordination. *Id.* ¶ 134. Those allegations amount to nothing more than speculation that, because Hamas governed Gaza, Defendants necessarily shared Hamas's objectives or knowingly participated in its terrorist activities. That inference is too "attenuated" to establish knowing and substantial assistance under JASTA. *See Honickman*, 6 F.4th at 501. Plaintiffs' theory amounts to guilt by geography, not a plausible allegation of any culpable relationship with Hamas.

### 5. No Plausible Allegations of a Culpable State of Mind

Plaintiffs must allege that Defendants acted "consciously and culpably" "with respect to their actions and the tortious conduct (even if not always the particular terrorist act)." *Twitter*, 598 U.S. at 503-04. As discussed above, *see supra* Section II.A.2, Plaintiffs fail to make that showing.

### 6. No Allegations of a Period of Knowing Assistance

Finally, the FAC identifies no period during which Defendants knowingly provided

ongoing assistance to Hamas's terrorist activities. The alleged conduct—developing the Hotels, the GIE, and a solar project—consisted of discrete, lawful commercial projects completed years before the October 7 attacks. Nothing in the FAC suggests an ongoing relationship, continuing assistance, or any temporal overlap with the attacks. This absence of contemporaneous support forecloses liability under *Halberstam* and *Twitter*, both of which require sustained, knowing participation in the tort itself. *Twitter*, 598 U.S. at 495; *Halberstam*, 705 F.2d at 488. Further, even if there were allegations of a "lengthy" period of assistance, which there are not, "there are no allegations that Defendants provided any services to" Hamas directly. *Freeman v. HSBC Holdings PLC*, 465 F. Supp. 3d 220, 234 (E.D.N.Y. 2020) (citation omitted). In short, every *Halberstam* factor weighs decisively in favor of dismissal of Plaintiffs' claims.

## C.      Plaintiffs' Conclusory Allegations of General Awareness Are Insufficient

Just as Plaintiffs fail to satisfy the substantial assistance requirement, their JASTA claim lacks allegations of general awareness. These are separate and independent requirements; failure to plead either is fatal to the claim. *See Twitter*, 598 U.S. at 486, 503-04. To satisfy the general awareness requirement, the FAC "must plausibly allege" that Defendants were "generally aware of [their] role in unlawful activities from which the attacks were foreseeable while it was providing" its services. *Honickman*, 6 F.4th at 501 (citation omitted). General awareness requires more than allegations that Defendants knew Hamas governed Gaza, maintained tunnel networks, or exercised governmental authority throughout the region. Rather, Plaintiffs must plausibly allege that Defendants understood that their conduct would assist Hamas in committing the October 7 attacks. *See id.*; *see also Twitter*, 598 U.S. at 497-505 (holding mere association with wrongdoers or awareness of wrongdoing is insufficient to establish aiding and abetting liability). They do not.

Plaintiffs allege that Hamas exercised pervasive governmental authority throughout Gaza, regulated economic activity, and maintained extensive tunnel networks. *See* FAC ¶¶ 121-61. Those

46

allegations may support the conclusion that Defendants knew Hamas existed and governed Gaza. They do not plausibly support the distinct inference that Defendants understood their lawful commercial development projects were assisting Hamas's terrorist activities. As *Twitter* makes clear, general awareness requires more than knowledge of a wrongdoer's existence or operations; it requires plausible allegations that Defendants understood they were playing a role in the wrongful conduct itself. *See* 598 U.S. at 497-505.

Plaintiffs acknowledge that Hamas "foster[ed] a belief by Israeli intelligence" that it "was deterred from attacking Israel and was instead prioritizing economic development." FAC ¶ 363. Plaintiffs claim that Defendants were somehow "integral" to that deception campaign, *id.* ¶ 4, but plead no facts showing that any Defendant participated in any deceptive scheme or terror plan beyond engaging in lawful, public economic development.[17] Without well-pleaded facts showing that each Defendant knew, or was at least aware, that its own conduct played a role in advancing Hamas's violent aims of October 7, the general awareness element fails as a matter of law.

## III.   PLAINTIFFS' CONCLUSORY ALLEGATIONS OF AN "AGREEMENT" TO AID HAMAS DO NOT SATISFY CONSPIRACY STANDARDS UNDER JASTA

To plead a JASTA conspiracy, Plaintiffs must allege "(1) an agreement between two or more persons; (2) to participate in an unlawful act; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Newman*, 758 F. Supp. 3d at 1373-74 (quoting *Halberstam*, 705 F.2d at 477). Plaintiffs do not come close to satisfying any of these elements.

---

[17] The FAC adds the new allegation that Mr. Masri allegedly stated in May 2025 that Hamas controlled everything in Gaza. FAC ¶ 499. But awareness that Hamas exercised control over Gaza—something Plaintiffs repeatedly allege throughout the FAC—is not enough. Plaintiffs must plausibly allege that Mr. Masri "was generally aware that it was playing a role in unlawful activities from which terrorist attacks were foreseeable." *Honickman*, 6 F.4th at 498 (cleaned up). They do not.

A.      **Plaintiffs Fail to Allege an Agreement Between Defendants and Hamas**

"An 'agreement' in the context of an ATA conspiracy requires that the defendant 'conspire with the person who committed' the terrorist act." *Bernhardt*, 47 F.4th at 873 (quoting 18 U.S.C. § 2333(d)(2)). "For there to be an agreement, Plaintiffs here must allege that the [Defendants were] 'pursuing the same object' as Hamas." *Newman*, 758 F. Supp. 3d at 1374 (quoting *Bernhardt*, 47 F.4th at 873). They do not. The FAC asserts the legal conclusion that "Defendants joined [Hamas's] conspiracy" to launch the October 7 attacks "by knowingly agreeing to provide Hamas with civilian cover for its terrorist infrastructure…as well as diplomatic and commercial cover[.]" FAC ¶ 1441. Plaintiffs fail to allege *when* such an agreement was formed, *who* entered into it, *what* its terms were, or *how* any Defendant manifested assent to an unlawful objective. The FAC alleges no meeting, negotiation, or communication among any Defendant, or any meeting of the minds. with Hamas.

Alleging that Defendants operated projects in Gaza at the same time Hamas operated there does not plausibly establish a meeting of the minds. Conspiracy cannot be inferred from parallel conduct, geographic proximity, or participation in the same economic environment. Plaintiffs' theory amounts to guilt by geography, not a plausible allegation of agreement.[18]

B.      **Plaintiffs Fail to Allege an Agreement to Engage in an Unlawful Act**

Even if Plaintiffs had plausibly alleged an agreement—and they have not—the supposed agreement concerned lawful commercial projects, not an unlawful act. *Newman* is instructive. There, Plaintiffs claimed that the Associated Press ("AP") conspired with Hamas to commit the October 7 attacks based on allegations that the AP had a "tacit understanding . . . to publish

---

[18] Plaintiffs also cannot rely on the "signing ceremony" attended by Mr. Masri and an alleged Hamas official because the alleged agreement was "to rebuild parts of the GIE." FAC ¶¶ 241-45. An alleged agreement to rebuild commercial property is not an agreement to accomplish "an unlawful objective." *See Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 79 (2d Cir. 2023).

activities and further Hamas's propaganda designed to win support for their ongoing murderous cause." *Newman*, 758 F. Supp. 3d at 1374 (internal quotation marks and citation omitted). However, the court rejected that theory, finding that "the only factual support" for such allegations was the AP's publication of photographs and alleged payments for them—lawful journalistic activity that did not plausibly suggest an agreement to commit terrorism. *Id.* The court concluded that "the conclusory allegation of an agreement at some unidentified point in time is not plausible to infer that the terrorist attacks that injured Plaintiffs"—the same attacks at issue here—"were in furtherance of a conspiracy to which the AP allegedly agreed." *Id*. at 1374-75.

Plaintiffs' allegations that Defendants engaged in economic development in Gaza reflect lawful, transparent commercial activity, not an agreement to participate in terrorism or the October 7 attacks. As *Zobay v. MTN Grp. Ltd.*, explains, "conclusory allegations that Defendants each shared a common specific intent" are inadequate; the alleged agreement must be "a common scheme to commit an act of international terrorism." 695 F. Supp. 3d 301, 355 (E.D.N.Y. 2023) (internal quotation marks citations omitted). In *Newman*, the plaintiffs alleged a concrete agreement: the AP obtained photographs in exchange for compensation. 758 F. Supp. 3d at 1374-75. But even that agreement did not constitute a "common scheme" to commit terrorism. *Id.* Plaintiffs attempt to transform lawful commercial arrangements into an undefined, unexplained agreement to commit terrorism simply because Hamas later exploited the surrounding infrastructure. That inferential leap is precisely what *Newman* rejected.

C.      **Plaintiffs Allege No Overt Act in Furtherance of Any Conspiracy**

The FAC also fails to identify any unlawful overt act performed "pursuant to and in furtherance of the common scheme." *See Halberstam*, 705 F.2d at 477 (citation omitted). The only acts alleged—developing the Commercial Properties—were lawful commercial projects conducted with the knowledge and support of international institutions and even Israel. Plaintiffs'

49

theory of civilian "cover" for Hamas activities is purely speculative. "[C]onclusory allegation[s] of an agreement at some unidentified point in time" are insufficient to infer that the acts at issue "were in furtherance of a conspiracy to which [Defendants] allegedly agreed." *Newman,* 758 F. Supp. 3d at 1374-75.

### D.      Plaintiffs Allege No Injury Caused by Overt Acts

Finally, even if Plaintiffs could identify an agreement—which they cannot—they plead no facts showing that any alleged overt act furthered the October 7 attacks or proximately caused Plaintiffs' injuries. Indeed, the FAC does not identify a single overt act by Defendants that proximately caused the October 7 attacks or any other terrorist activity. Instead, as in *Newman* and *Zobay*, the allegations here rest on impermissible speculation and hindsight—asserting that because Hamas carried out an attack, anyone doing business in Gaza must have "agreed" to aid it. But JASTA does not impose liability based on geography or association. Without factual allegations linking each Defendant's supposed agreement or conduct to Plaintiffs' injuries, their conspiracy claim collapses, just like all other claims.

## IV.      PLAINTIFFS FAIL TO ALLEGE PRIMARY LIABILITY UNDER THE ATA

Plaintiffs' direct liability claim "has three elements: (1) unlawful action, i.e. an 'act of international terrorism;' (2) the requisite mental state, and (3) causation." *Newman*, 758 F. Supp. 3d at 1375 (citation omitted). Here, Plaintiffs allege no violent conduct by any Defendant.

### A.      Plaintiffs Do Not Allege that Any Defendant Committed an Act of "International Terrorism"

Unlike JASTA, which imposes secondary liability for knowingly assisting another's act of international terrorism, the ATA imposes primary liability only where the defendant itself commits an act of "international terrorism." Even accepting every factual allegation in the FAC as true, Plaintiffs do not allege that any Defendant engaged in conduct that was violent or dangerous to

human life or that objectively appeared intended to intimidate or coerce a civilian population.

An act of "international terrorism" must "(A) involve violent acts or acts dangerous to human life . . . ; (B) appear to be intended . . . to intimidate or coerce a civilian population . . . [or] to influence the policy of a government by intimidation or coercion[,] or . . . mass destruction . . . ; and (C) occur primarily outside the [United States'] territorial jurisdiction [or transcend national boundaries]." *Id.* at 1375-76 (quoting 18 U.S.C. § 2331(1)).

*First*, nowhere in the more than 233-page FAC do Plaintiffs identify any act by any Defendant that is violent or dangerous to human life or otherwise meets the definition of "international terrorism." *See Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 82 (E.D.N.Y. 2019) ("Plaintiffs must plausibly allege that Defendants' actions were, themselves, acts of international terrorism in order to give rise to primary liability under § 2333(a)"); *Newman*, 758 F. Supp. 3d at 1376 ("Accordingly, to successfully assert a claim for primary liability, the Court agrees with the AP that Plaintiffs must separately allege that the AP committed an act of international terrorism."). Only routine commercial activity such as "constructing new buildings," "development of [a] hotel," and "install[ing] solar panels" is alleged as to Defendants. FAC ¶¶ 252, 300, 339. Such activities are lawful, nonviolent, and apolitical. That Hamas committed acts of violence does not render Defendants' alleged conduct acts of violence. *See Bartlett v. Société Générale de Banque Au Liban SAL*, No. 19-CV-00007 (CBA) (VMS), 2020 WL 7089448, at *7-8 (E.D.N.Y. Nov. 25, 2020) (dismissing ATA claim because providing "financial services" to customers, including those "affiliated with a foreign terrorist organization . . . is not an act which is 'violent or dangerous to human life' as contemplated by the ATA"); *Raanan v. Binance Holdings Ltd.*, No. 24-cv-697 (JGK), 2025 WL 605594, at *16 (S.D.N.Y. Feb. 25, 2025).

Plaintiffs' attempt to recast that commercial work as "terrorist infrastructure" or part of a

51

"campaign of deception" does not cure the deficiency. Even accepting those labels, the FAC alleges no facts suggesting that any Defendant built, financed, or maintained any structure for the purpose of facilitating terrorist violence, knew of violent plans, or intended such use. Construction and maintenance of infrastructure (*e.g.*, the Hotels and GIE) that others may later misuse does not convert lawful development into an act of violence. Likewise, any alleged "deception" or public-relations activity is nonviolent, expressive conduct that is not "dangerous to human life."

*Second*, Plaintiffs do not plausibly allege that Defendants acted with the apparent intent to intimidate or coerce civilians or to influence a government. This inquiry is objective: the question is how Defendants' conduct would appear to a reasonable observer, not their subjective motives. *Weiss v. Nat'l Westminster Bank, PLC*, 993 F.3d 144, 161 (2d Cir. 2021). Nothing in the FAC supports the conclusion that Defendants' conduct appeared intended to intimidate or coerce anyone. The rehabilitation of hotels, development of an industrial park, and installation of solar panels are inherently economic acts aimed at promoting investment and stability. Indeed, the FAC itself cites the IFC's stated goal of demonstrating "the commercial viability of renewable energy investment in Gaza" and boosting "investor confidence and comfort." FAC ¶ 226. Those aims are plainly economic and developmental, not coercive or violent. Plaintiffs acknowledge that international institutions and even Israeli authorities supported or encouraged aspects of these development efforts. *Id.* ¶¶ 365-66. Against that backdrop, Plaintiffs' conclusory assertion that these same projects objectively appeared intended to intimidate or coerce civilians is simply not plausible.[19] *See Zapata*, 414 F. Supp. 3d at 358-59 (dismissing direct liability claims where "to an

---

[19] Plaintiffs assert that Defendants participated in a deception campaign that somehow lulled the sophisticated Israeli intelligence apparatus into believing Hamas no longer intended to attack Israel. *See e.g.*, FAC ¶ 4 ("Defendants were an integral part of [a] grand deception…"). Allegations of this kind, untethered to any factual basis that ties Defendants to the deception campaign, do not warrant credit under *Twombly* and *Iqbal*. Plaintiffs' own pleadings also

objective observer," defendant's "conduct appeared to be motivated by economics, not by a desire to intimidate or coerce") (internal quotation marks and citations omitted).

Ultimately, Plaintiffs' allegations never move beyond the assertion that Hamas later exploited or benefitted from ordinary commercial infrastructure. But the ATA imposes primary liability only for the defendant's own act of international terrorism, not for otherwise lawful conduct that a third party later misuses for violent ends. *See Averbach v. Cairo Amman Bank*, No. 19-cv-0004-GHW-KHP, 2022 WL 2530797, at *17-19 (S.D.N.Y. Apr. 11, 2022) (recommending dismissal of ATA direct liability claim because, even assuming defendant's awareness of its clients' ties to terrorism, conducting normal business is neither violent nor endangering human life). Plaintiffs anticipate this deficiency by asserting, in conclusory fashion, that "Defendants did more than just passively allow their properties and money to be appropriated by terrorists." FAC ¶ 171. But even accepting those allegations as true, the alleged "develop[ment of] *new* projects," FAC ¶ 172, does not constitute an act of terrorism.[20]

Plaintiffs' theory of primary liability would expand the ATA beyond its statutory limits and chill virtually all economic activity throughout the developing world, as companies like the Corporate Defendants could be found liable in a U.S. court for simply engaging in the economic development in poor, faraway countries, regardless of their lack of knowledge or intent.

---

undermine the allegation. The initial complaint stated that, on August 25, 2023, a Hamas official openly described *on television* preparations for an "all-out war" with Israel and declared that such a war was imminent. ECF No. 1 ¶ 439. The FAC uses the same phrase—"all-out war"— for the exact opposite assertion: that Israel had "been lulled into a false sense of security that Hamas was no longer interested in all-out war with Israel." FAC ¶ 382.

[20] None of the projects was new. As the FAC acknowledges, the GIE opened nearly thirty years ago. *Id*. ¶ 184. The Blue Beach Hotel and the Ayan Hotel were renovated, not built, because both properties' existence predated Defendants' involvement. *Id*. ¶ 36. Plaintiffs frame these long-existing developments as new projects to create the illusion of active culpability where the allegations, at most, describe passive conduct or routine commercial conduct.

Allegations of passive inactivity or incidental use of Defendants' property by others fall far short of terrorist conduct. For that reason, Plaintiffs' ATA direct liability claim fails as a matter of law.

### B.        Plaintiffs Fail to Plead Proximate Causation

Even if Plaintiffs had plausibly alleged that Defendants committed an act of international terrorism—which they have not—the ATA claim independently fails because they do not show that Defendants' conduct proximately caused their injuries. Proximate cause under the ATA requires a showing that Defendants "substantially contributed to Plaintiffs' injuries[.]" *Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667, 678 (D.C. Cir. 2023). Plaintiffs cannot do so here. Whether Plaintiffs were injured on October 7, 2023, or in the following weeks or months, nothing in the FAC plausibly connects Defendants' conduct to the events of October 7.

Plaintiffs allege that that Defendants' Commercial Properties "were crucial elements in Hamas's strike plan for October 7." FAC ¶ 4. Yet not one factual allegation supports that assertion. Plaintiffs do not allege that any Defendant knew of Hamas's plans, participated in the construction or use of tunnels for violent purposes, or acted with any intent to facilitate the attacks. The FAC concedes that Hamas's tunnel network was built long before the October 7 attacks. *See id.* ¶ 135. By Plaintiffs' own telling, the tunnels were a pervasive feature of Gaza's economic life, not specialized terrorist infrastructure known to Defendants. That context makes it implausible that Defendants could have foreseen Hamas's later use of tunnels for violence or that their lawful development projects were "a substantial factor in, and had the reasonably foreseeable effect of, causing" Plaintiffs' injuries. *JNF*, 66 F.4th at 1015.

Setting aside the tunnel allegations—and Plaintiffs' self-serving characterization of them as "attack tunnels"—the FAC still fails to connect Defendants to any of the attacks or injuries described. Plaintiffs allege in conclusory terms that Hamas used tunnels located beneath or near the Commercial Properties during the October 7 attacks. *See, e.g.*, FAC ¶¶ 255-56. But the

54

Complaint pleads no facts showing that Defendants built, financed, controlled, or knowingly facilitated the use of those tunnels, or that they had any knowledge of Hamas's plans to use the tunnels for violence. Instead, the injuries depicted in the FAC stem from random acts of violence by unidentified individuals, in different circumstances, at different locations, at different times. *See supra* Factual Allegations, Section I.A.3.

"Given the lack of any connection between Hamas's actions [after] the October 7 Attack and [Defendants'] alleged conduct . . . Plaintiffs fail to plead proximate cause." *Newman*, 758 F. Supp. 3d at 1381. The ATA does not permit recovery where the link between a defendant's conduct and a plaintiff's injury is "remote, purely contingent, or overly indirect." *Freeman*, 413 F. Supp. 3d at 84; *see also Raanan*, 2025 WL 605594, at *17 ("As alleged, the causal link between [Defendant's] provision of financial services and the plaintiffs' injuries is too attenuated to support a plausible finding of proximate cause."). Nor can Plaintiffs satisfy the statute's foreseeability requirement. Nothing in the FAC suggests that any Defendant could have anticipated Hamas's attack plans or that their lawful development projects made such violence more likely. The properties at issue were longstanding, openly operated commercial sites financed and monitored by international institutions and, at times, supported by Israeli authorities. These facts sever any conceivable chain of proximate causation and no ATA claim exists.[21]

## V. CERTAIN PLAINTIFFS LACK STATUTORY STANDING UNDER THE ATA

Many Plaintiffs (*e.g.*, the Waldman plaintiffs) independently lack standing because they are not U.S. nationals. *See, e.g.*, FAC ¶¶ 635-40 (Eyal, Ella, Guy, and Sharon Waldman are citizens

---

[21] Plaintiffs fail to allege scienter. "[U]nder § 2339B, Plaintiffs must establish that [Defendants] 'knowingly provided material support or resources to a foreign terrorist organization.'" *Newman*, 758 F. Supp. 3d at 1379 (quoting 18 U.S.C. § 2339B). However, Section 2339B "does not penalize mere association," but rather "prohibits . . . the act of giving material support." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 39 (2010) (citation omitted). The FAC lacks allegations of knowingly providing material support; it instead hinges on guilt by association.

of the State of Israel and not of the United States and assert claims in their individual capacities because of their personal injuries).[22] The ATA provides a private right of action only to "[a]ny national of the United States injured in *his or her* person, property, or business by reason of an act of international terrorism, or *his or her* estate, survivors, or heirs." 18 U.S.C. § 2333(a) (emphasis added). While a foreign national may bring a claim on behalf of a U.S. national, only personal injuries suffered by U.S. nationals are actionable. *Raanan*, 2025 WL 605594, at *14 ("[A] foreign national plaintiff cannot sue under the ATA based on that plaintiff's *own* personal injuries."); *Averbach v. Cairo Amman Bank*, No. 1:19-cv-00004-GHW, 2020 WL 1130733, at *2 (S.D.N.Y. Mar. 9, 2020) ("[A]ny United States national, or his estate, survivors, or heirs, may sue for any injuries that the national receives to his person, property, or business by reason of an act of international terrorism. Nowhere in the statute does Congress provide remedies for non-nationals claiming damages for personal injuries.") (citation omitted); *Rosenberg v. Lashkar-e-Taiba*, No. 10 CV 5381 (DLI)(CLP), 2016 WL 11756917, at *19 (E.D.N.Y. July 5, 2016), *report and recommendation adopted as modified*, 2017 WL 11647006 (E.D.N.Y. Mar. 31, 2017) (The ATA "is clear that only claims brought on behalf of individuals who are United States nationals may proceed.").[23] Accordingly, the non-U.S. national claims must be dismissed.

---

[22] Other non-U.S. nationals bringing personal injury claims include: Plaintiff Aviram Abraham Bejerano, FAC ¶¶ 615, 618; Plaintiffs Inbal Chen, David Zafrani, and Osnat Tal Zafrani, *id.* ¶¶ 660-61, 663, 666; Plaintiff Izhar Shay, *id.* ¶¶ 703, 709; Plaintiff Yaniv Rousso, *id.* ¶¶ 760, 764; Plaintiffs Yael Levy Oppenheimer, I.O., Y.L., J.L., Tzuria Levy, Zohar Levy, A.L., Judith Levy, Shlomo Levy, Eliyahu Levy, Nir Yehezkel Levy, *id.* ¶¶ 788-95, 797, 799; Plaintiffs Eitan Mor and Leron Mor, *id.* ¶¶ 832, 835, 839; Plaintiff Hagit Chen, *id.* ¶¶ 1004, 1008; Plaintiffs Oren Glisko, Liat Glisko, Ori Glisko, and Y.G., *id.* ¶¶ 1019-22, 1024; and Plaintiffs L.A., H.A., T.A., and Y.A., *id.* ¶¶ 1283-86, 1288. The citizenship of A.Z. (minor child of Itay Zafrani and Inbal Chen) is not alleged. *Id.* ¶¶ 660, 666.

[23] There is a split of authority on this question. The cases in this District to have determined whether foreign nationals could bring a claim under the ATA held that the ATA "contains no requirement that the survivors or heirs of a United States national killed by an act of international terrorism must themselves be citizens of the United States." *Weinstock v. Abu Marzook*, No. 17-23202,

## VI.   THE FAC'S INFLAMMATORY ALLEGATIONS VIOLATE RULE 8'S SHORT AND PLAIN STATEMENT REQUIREMENT

Plaintiffs have violated Rule 8's core purpose of fair notice. *Magnum Constr. Mgmt., LLC v. WSP USA Sols., Inc.*, 522 F. Supp. 3d 1202, 1206 (S.D. Fla. 2021). It requires "a *short* and *plain* statement of the claim" with each allegation "*simple*, *concise*, and *direct*," not a chronicle or a political broadside. Fed. R. Civ. P. 8(a)(2), (d)(1) (emphasis added). In response to Defendants' motion to dismiss the prior 220-page, 1,418-paragraph Complaint, *see* ECF No. 52 at 47-49, Plaintiffs responded with a *longer* FAC that is a geopolitical commentary, covering the Intifadas, Hamas's rise, Gaza tunnel logistics, Hamas's military development, and a plethora of non-parties, without tying that material to the claims against Defendants. *See, e.g.*, FAC ¶¶ 76-78, 109-42, 176-96. This is precisely the shotgun pleading the Eleventh Circuit condemns—"a complaint that is 'replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action.'" *Barmapov v. Amuial,* 986 F.3d 1321, 1325 (11th Cir. 2021) (citation omitted).

Plaintiffs further continue to lump all Defendants: "Each Defendant aided and abetted Hamas"; "Defendants substantially assisted Hamas"; "Defendants agreed to join with Hamas"; and "Defendants knowingly provided material support." FAC ¶¶ 1427-28, 1442, 1450. Nowhere do Plaintiffs allege what each Defendant did, with whom, when, for what. And Plaintiffs' conclusory allegation of a "single corporate organism," *id.* ¶ 98, is simply not pled—and contradicted by the allegations of corporations incorporated in different places, at different times, with different functions. *See supra* Section I.C. Similar blurring of "Defendants" was rejected in

---

2019 WL 1470245, at *4 (S.D. Fla. Apr. 3, 2019) (citations omitted); *Weinstock v. Islamic Republic of Iran*, No. 17-23272-CIV, 2019 WL 1993778, at *4 (S.D. Fla. May 6, 2019). No Appellate Court has decided the issue, and the weight of authority is consistent with Defendants' position. *See Lelchook v. Islamic Republic of Iran*, No. 16-cv-7078 (ILG), 2020 WL 12656283, at *4 (E.D.N.Y. Nov. 23, 2020) ("The ATA does not include language authorizing foreign nationals to bring ATA claims in a U.S. court for their own injuries[.]") (footnote omitted).

57

this District. *See, e.g., Guillaume v. United States*, No. 24-13584, 2025 WL 2610053, at \*4 (11th Cir. Sep. 10, 2025) (affirming dismissal with prejudice of a complaint that blurred "Defendant" and "Defendants," after plaintiff failed to cure despite prior notice). Collective allegations against related but legally distinct entities "impermissibly lump[s] them together and render[s] the Complaint a shotgun pleading." *Magnum,* 522 F. Supp. 3d at 1207 (citation omitted). Tellingly, Plaintiffs do not even make any allegations against Massar. *See* Factual Allegations, Section I.D. Warned of the Rule 8 defect, Plaintiffs failed to cure, ignored the deficiencies, and doubled down. Dismissal with prejudice is proper. *Guillaume*, 2025 WL 2610053, at \*4.

## VII. PLAINTIFFS' METHODS OF SERVICE ARE IMPROPER BECAUSE THEY OFFEND PALESTINIAN LAW AND CIRCUMVENT PALESTINIAN COURTS

Plaintiffs sought to serve the Corporate Defendants by FedEx and Mr. Masri by publication in an *Israeli* newspaper, email, and social media. *See* ECF Nos. 22, 25, 28. These methods bypass Palestinian courts, disregard Palestinian law on service, and are not reasonably calculated to provide notice to satisfy the requirements of Federal Rule of Civil Procedure 4(f). *See* Fed. R. Civ. P. 4(f), 4(h)(2) (extending Rule 4(f) requirements to foreign corporations). Without proper service, this action should be dismissed under Fed. R. Civ. P. 12(b)(5).[24]

First, the attempted service offends Palestine law. *See Prewitt,* 353 F.3d at 927 (11th Cir. 2003) (affirming dismissal, noting "*an earnest effort* should be made to devise a method of communication that is *consistent with due process* and *minimizes offense to foreign law*") (quoting Fed. R. Civ. P. 4(f)(3) advisory committee's notes to 1993 amendments). The Oslo Accords

---

[24] *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999) (holding that "a court ordinarily may not exercise power over a party the complaint names as defendant" without "service of process") (citation omitted); *Prewitt Enters. v. Org. of Petrol. Exporting Countries*, 353 F.3d 916, 924-25 (11th Cir. 2003) (noting that due process requires "'*more than* notice to the defendant . . . [t]here also must be a *basis* for the defendant's amenability to service of summons. … [T]his means there must be *authorization* for service of summons on the defendant.'") (citing *Omni Cap. Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987).

established a separate judicial authority between Israel and Palestine. *See* Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip, Isr.-P.L.O., Sept. 28, 1995, 36 I.L.M. 551.[25] As Plaintiffs concede, Palestine is not a signatory to the Hague Convention. *See,* ECF No. 22 at 10. Nor has Israel extended the Convention to Palestine under Article 29.[26] Plaintiffs' methods of service involving Israel are thus not consistent with Rule 4.

Second, Plaintiffs' methods conflict with Palestinian law on service. Plaintiffs themselves quoted the relevant provisions, which authorize electronic notification only through "approved electronic means" and authorize publication, if electronic notification is impossible, in "two local daily newspapers" as determined by the Supreme Judicial Council. ECF No. 22 at 14 (quoting the Palestinian Civil and Commercial Procedures Law No. 2 of 2001 and its amendments). Plaintiffs did not use the approved Palestinian electronic-notification system, nor did they publish in two local Palestinian daily newspapers. Instead, Plaintiffs chose methods most convenient for them.

Third, while this Circuit recognizes that "actual notice is not sufficient to cure defectively executed service," the chosen methods of service were not reasonably calculated to provide notice. *See Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007) (citation omitted). Plaintiffs sought to serve Mr. Masri by email, social media, and publication *in Yediot Ahronot,* an *Israeli* newspaper. *See* ECF No. 22 at 15-16.[27] Publication satisfies due process only where it is "reasonably

---

[25] *Id.* at Annex IV(Art. III)(1) ("The Palestinian courts and judicial authorities have jurisdiction in all civil matters[.]")

[26] *See Status Table: Convention of 15 Nov. 1965 on the Serv. Abroad of Jud. & Extrajudicial Documents in Civ. or Com. Matters, Hague Conf. on Private Int'l Law*, https://www.hcch.net/en/instruments/conventions/status-table/?cid=17 (last visited July 31, 2026).

[27] Plaintiffs infer that Mr. Masri likely reads *Yediot Ahronot* because he once provided a statement to it. *See* ECF No. 22 at 15. But giving an interview does not establish that he subscribes, reads, or is likely to see notices in that newspaper. *See Mullane*, 339 U.S. at 315 ("Chance alone brings to the attention of even a local resident an advertisement in small type inserted in the back pages of a newspaper, and if he makes his home outside the area of the newspaper's normal circulation the odds that the information will never reach him are large indeed.").

59

calculated, under all the circumstances," to apprise the defendant of the action. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Plaintiffs did not allege *Yediot Ahronot* circulates where Mr. Masri lives, that he reads the newspaper, or that he otherwise would likely see the notice. Nor does Plaintiffs' email-tracking filing establish that Mr. Masri personally opened or reviewed the summons and complaint; Plaintiffs' declarant states only that the opening pattern was "consistent with" forwarding and review. *See* ECF No. 39 ¶ 11. In sum, Plaintiffs' attempted service was defective and requires dismissal under Rule 12(b)(5).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the FAC pursuant to Rules 12(b)(2), 12(b)(5), 12(b)(6), and 8(a) of the Federal Rules of Civil Procedure.

## REQUEST FOR A HEARING

Pursuant to Local Rule 7.1(b), Defendants respectfully request oral argument on their Motion. The Motion raises multiple significant and complicated legal issues, including several that implicate recent Supreme Court precedent, and Defendants respectfully submit that oral argument, for approximately 45 minutes per side, may be helpful to the Court if the Court has questions.

Respectfully submitted,                                      Dated: July 31, 2026

By: */s/ Markenzy Lapointe*
   **PILLSBURY WINTHROP SHAW PITTMAN LLP**

Markenzy Lapointe
Florida Bar No. 172601
600 Brickell Avenue, Suite 2600
Miami, Florida 33131
Phone: (786) 913-4900/Fax: (786) 913-4901
markenzy.lapointe@pillsburylaw.com

Carolina A. Fornos*
Christopher C. Caffarone*
31 West 52nd Street
New York, NY 10039
Phone: (212) 858-1000/Fax: (212) 858-1500
carolina.fornos@pillsburylaw.com
christopher.caffarone@pillsburylaw.com

Melissa Lesmes*
Waleed Nassar*
1200 17th Street NW
Washington, D.C. 20036
Phone: (202) 683-8000/Fax: (202) 683-8007
melissa.lesmes@pillsburylaw.com
waleed.nassar@pillsburylaw.com

*admitted pro hac vice*
*Attorneys for Defendants Bashar Masri,*
*Palestine Real Estate Investment Company,*
*Palestine Development & Investment Company,*
*Palestine Industrial Estate Development*
*Company, and Massar International, LTD.*

60